1                  IN THE UNITED STATES DISTRICT COURT

2                  IN AND FOR THE DISTRICT OF DELAWARE

3                              -  -  -

4
     IN RE BRIMONIDINE            )       C.A. 07-md-1866-GMS
5    PATENT LITIGATION            )

6                              -  -  -

7                        Wilmington, Delaware
                         Monday, March 9, 2009
8                            9:00 a.m.
                           Day 1 Trial
9
                               -  -  -

10

11   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

12

     APPEARANCES:
13
             WILLIAM J. MARSDEN, JR., ESQ.
14           Fish & Richardson, P.C.
                   -and-
15           JUANITA BROOKS, ESQ.
             Fish & Richardson, P.C.
16           (San Diego, CA)
                   -and-
17           JONATHAN E. SINGER, ESQ.
             Fish & Richardson, P.C.
18           (Minneapolis, MN)
                   -and-
19           W. CHAD SHEAR, ESQ.
             Fish & Richardson, P.C.
20           (Dallas, TX)

21                              Counsel for Plaintiff
                                Allergan, Inc.
22

23

24

25

1    APPEARANCES (Cont'd.):

2
             FREDERICK L. COTTRELL, III, ESQ., and
3            KELLY E. FARNAN, ESQ.
             Richards, Layton & Finger, P.A.
4                     -and-
             B. JEFFERSON BOGGS, JR., ESQ.
5            SHARON E. CRANE, Ph.D., ESQ., and
             ERIN M. DUNSTON, ESQ.
6            Bingham McCutcheon
             (Washington, D.C.)
7
                                Counsel for Exela, Paddock
8

9    APPEARANCES (Continued):

10           RICHARD L. HORWITZ, ESQ., and
             DAVID E. MOORE, ESQ.
11           Potter Anderson & Corroon LLP
                     -and-
12           ROBERT B. BREISBLATT, ESQ.,
             STEPHEN P. BENSON, ESQ., and
13           BRIAN J. SODIKOFF, ESQ.
             Katten Muchin Rosenman LLP
14           (Chicago, IL)

15                              Counsel for Apotex Inc.
                                and Apotex Corp.
16

17                        -   -   -

18                        -   -   -

19

20

21

22

23

24

25

```
 1                    THE COURT:  Good morning, counsel.  Please be
 2    seated.
 3                    (Counsel respond "Good morning.")
 4                    THE COURT:  I see we have a cast of thousands.
 5    Please, take your seats.
 6                    Mr. Marsden, would you like to do the honors?
 7                    MR. MARSDEN:  Thank you, Your Honor.  Good
 8    morning.  William Marsden from Fish & Richardson.  To my
 9    immediate left is Jon Singer, also from Fish & Richardson.
10    To [his see left is Juanita Brooks, also from Fish &
11    Richardson.
12                    If I could introduce two representatives of our
13    client in, the back, Bill Sharp, who is the chief litigation
14    counsel at Allergan, and Martin Borit (phonetic), who is the
15    chief intellectual property counsel.
16                    THE COURT:  Good morning.
17                    Mr. Cottrell.
18                    MR. COTTRELL:  Good morning, Your Honor.  Fred
19    Cottrell for Exela.  With me at counsel table, Jeff Boggs,
20    and Sharon Crane, Erin Dunston in the back.
21                    I think Mr. Boggs would like to introduce our
22    client who is here today.
23                    THE COURT:  That is fine.
24                    MR. BOGGS:  Yes, Your Honor.  With me today, I
25    have the founder and the president and CEO of Exela
```

```
 1    Bio-Cide, Dr. Koneru.

 2              THE COURT:  Welcome to Delaware, sir.

 3              MR. MOORE:  Good morning, Your Honor.  David

 4    Moore from Potter Anderson.  With me today from Katten

 5    Muchin are Robert Breisblatt, Steven Benson, and Brian

 6    Sodikoff.

 7              THE COURT:  Good morning.  Welcome back, all of

 8    you.

 9              Counsel, a few items we should discuss.  We have

10    eight days.  What I am thinking is, the typical day will go

11    roughly from 9:00 to 5:00.  And this is going to be a timed

12    proceeding.  We will take probably a morning break at some

13    point, and an afternoon break.  We will take an hour for

14    lunch, roughly around 12:30 usually.

15              That works out, by my estimate, to roughly six

16    and a half hours a day.  That is the multiplier, it will be

17    six and a half times eight divided equally, unless there is

18    some discussion we need about that.

19              MR. BREISBLATT:  Your Honor, when you say

20    "equally," do you mean equally among each of the three

21    parties?

22              THE COURT:  Mr. Marsden.

23              MR. MARSDEN:  We have had an exchange on this.

24    Defendants have proposed 60/40, with defendants getting 60

25    percent of the time.  We would argue the other way around
```

1    would make more sense, because we have 11 witnesses, they

2    have, collectively, five.  We offered 50-50, 50 for

3    Allergan, 50 for the defendants.  They have raised six of

4    the same defenses.  One would hope that they are not going

5    to repeat the evidence on those defendants, so there should

6    be no overlap.  We need to prove our invention story, prove

7    our infringement against Exela, and respond to this kitchen

8    sink they have collectively raised.

9              We think 50-50 is a fair allocation.

10             MR. BREISBLATT:  Your Honor, the reason we said

11   60-40 is, frankly, we have five patents that we have the

12   burden on.  We have the higher burden.  We have more patents

13   to go on, Apotex.  We are going on invalidity of, like I

14   say, all patents at issue.  We think the 60/40, with us and

15   Exela probably splitting 30/30 makes the most sense.  They

16   still get 40.  They still get more than the two of us

17   individually.

18             Remember, this started off as an individual

19   case.

20             THE COURT:  Both positions are very reasonable,

21   counsel.  Mine is more.  So it will be 50-50.

22             Again, multiplier is six-and-a-half times eight.

23   You will keep time on one another, we will back you up.

24             Anything else?

25             Let's go.  Ms. Brooks, are you ready?

1                    MS. BROOKS:  I am ready, Your Honor.

2                    Good morning, Your Honor.  Counsel, may it

3      please the Court.

4                    Your Honor, this is a case about a medication

5      that Allergan produced called Alphagan P.  As a result of

6      the inventions that occurred during the formulation of

7      Alphagan P, the United States Patent and Trademark Office

8      issued four patents that covered those inventions.

9                    In addition, there was a preservative used in

10     Alphagan P called Purite.  That preservative had already

11     been awarded a U.S. patent several years before, before the

12     combination of the Purite with the Alphagan.

13                    THE COURT:  You might want to use the mike so

14     everybody can hear you, Ms. Brooks.

15                    MS. BROOKS:  Thank you, Your Honor.

16                    What is this case about?  What does Alphagan P

17     do?

18                    Alphagan P is used for the treatment of

19     glaucoma.

20                    THE COURT:  Is there anything you would like me

21     to have?

22                    MS. BROOKS:  My apologies, Your Honor.  We

23     should have had those ready to go.

24                    What is glaucoma?  Glaucoma is a disease of the

25     eye that, if left untreated, can eventually cause blindness.

1          This is, as Your Honor can see, there is an

2   arrow right here to show the very early stages of glaucoma,

3   what happens.  You begin to get blurring on the outside of

4   your vision.

5          If glaucoma is left untreated in the

6   intermediate stages, as you see here, there is substantial

7   blurring that occurs.  There is only clarity in the center.

8   Again, if it is left untreated, it goes to the advanced

9   stages, you end up hardly seeing anything, and, in fact, it

10   could cause, eventually, blindness.

11          This I gathered from the American Health

12   Assistance Foundation, off of the Internet.  If you look up

13   glaucoma, this is how it is described to individuals.  This

14   is the eyeball.

15          Right here we have, it is hard to read, zero

16   ciliary body and muscle, iris, the lens, the cornea.

17          What happens in glaucoma, and they are not sure

18   exactly why, there is a buildup of aqueous humor fluid here

19   in the front of the eye.  What that causes is the eye then

20   to be compressed and pressure to build up inside the eye.

21          Your Honor is going to hear this term throughout

22   this case, intraocular pressure, which is also known as IOP.

23   What happens in glaucoma is that an individual suffering

24   from glaucoma will have elevated intraocular pressure, or

25   elevated IOP.

1              If it is left untreated, that pressure will

2    damage the optic nerve that is back here.  And the optic

3    nerve is essentially the cable that runs to the brain,

4    enabling one to be able to see and translate the sights that

5    are coming in through the eye.

6              If that optic nerve is damaged to such an

7    extent, one could actually become blind.

8              So it is very important, if possible, to get

9    that intraocular pressure lowered, thereby preventing the

10   damage to the optic nerve.

11             How is that done?  This is a very busy chart.

12   It is just to show Your Honor the industry that is out there

13   for the treatment of glaucoma.  There are all sorts of

14   medications that are presently being marketed.  And they

15   have different mechanisms of action.  Up here, the first

16   ones we have are what are called beta-adrenergic receptor

17   antagonists, also known as beta-blockers.  There is a

18   medication called Timoptic that is out there, in that

19   category, Betimol, Betoptic-S, they are manufactured by

20   different companies.

21             That is a different mechanism of action than

22   Alphagan P.  Alphagan P is located down here in the third

23   category.  It is an alpha-2-adrenergic receptor agonist and

24   it has a different mechanism of action than, for example,

25   the beta-blockers do or the next category, which are the

1    prostamides, or this category down here called the

2    prostaglandins.

3            Each of these categories have their own risks

4    and benefits.  Beta-blockers can be very successful in

5    lowering IOP in the eye.  The problem is if it is absorbed

6    systemically, a lot of the elderly glaucoma patients are

7    already on beta-blockers for heart problems they may be

8    having, then you have a combination of beta-blockers in your

9    eye with beta-blockers in your body and it could turn out to

10   have very bad side effects.  Each of these have their ups

11   and downs.

12           The alpha-2-adrenergic receptors in this case,

13   the alpha-2-adrenergic agonists, with brimonidine tartrate,

14   that is the active ingredient that is in Alphagan P ,Dr.

15   Whitcup, who will be our first witness, will explain the

16   mechanism of action of brimonidine tartrate and how it works

17   to lower intraocular pressure in the eye.

18           Alphagan P was not the first medication to have

19   brimonidine tartrate as the active ingredient.  The first

20   medication to have brimonidine tartrate as the active

21   ingredient was Alphagan.

22           Alphagan, as disclosed in the prosecution

23   history of the patents in suit, had two characteristics of

24   it that turned out to make it not as beneficial a drug as it

25   could be.

1              Alphagan, the original Alphagan, first of all,

2    had .2 percent brimonidine.  That was the amount of active

3    ingredient.  In addition to that, it was formulated at a pH

4    of about 6.3 to 6.5.  And that will become very important

5    later as we get into the details of the patents.

6              But it was a successful drug.  It lowered

7    intraocular pressure.  It had some side effects, but they

8    weren't so substantial that it made it a completely

9    ineffective drug or unsafe drug.  But it wasn't, certainly,

10   as effective and as safe as it could be.

11             Now, why was it not?  This, Your Honor, this

12   next PowerPoint is the pH scale, and the pH scale runs

13   essentially from 0 to ten.  As we go down the pH scale, a

14   lower pH gets more acidic.  As we go up the pH scale for a

15   substance, it's more alkaline, or it's called base.

16             I don't know if Your Honor remembers the basic

17   science classes where you put the litmus paper in and it

18   turned red or it turned blue, letting you know if you had an

19   acid or base.  The pH of the eye is almost at neutral.

20   Seven is neutral.  The pH of the eye is 7.4.  So in

21   formulating an ophthalmic, it certainly would be a good idea

22   if possible to try to keep that ophthalmic as close to the

23   pH of the eye as possible.  That certainly makes common

24   sense.  If you get too low, you are going to have an acidic,

25   it is going to burn, sting.  Even if you get too high, way

1   up on this scale, you are going to have an alkaline that,

2   indeed, could also have a great deal of stinging and

3   burning.  It would be good if we could have an ophthalmic

4   that is manufactured somewhere in the general pH of the eye

5   itself.

6          Why wasn't the original Alphagan then at a pH of

7   around 7.4?  As Your Honor may recall, it was at a pH of 6.3

8   to 6.5.  Why was that?  The inventors in this case explained

9   to the Patent Office why that was.  It turns out that there

10  was a characteristic of the brimonidine tartrate, which is

11  the active ingredient in Alphagan.  This is the problem with

12  it.  This comes from Column 4, Lines 15 through 19 of the

13  '210 patent.

14         The solubility data for brimonidine tartrate in

15  the formulation vehicles are presented in Table 2.

16         I will show that in a moment.

17         The results show that the solubility of

18  brimonidine tartrate is highly pH-dependent and spans more

19  than two orders of magnitude over the pH range of 5 to 8.

20  The solubility decreases sharply as the pH increases.

21         There is a table in the patent, Table 2, that

22  shows this solubility decreasing.  If you see here, a pH of

23  about 5.55, this is the solubility, and then as we go up,

24  this is the solubility of brimonidine, the higher we go up

25  the pH scale, the less soluble is the brimonidine.

1           So the formulators are facing that problem.

2    What the formulators of Alphagan did is gave up on the

3    problem, sort of, and said, All right, we won't then

4    formulate at a pH that is higher than 7.0, that is closer to

5    the pH of the eye.  We will go down the pH scale more toward

6    the acidic, and that way we will be assured that the

7    brimonidine tartrate will stay in solution.  And that was

8    what the formulators of the original Alphagan did.

9           But the formulators for Alphagan P, Drs.

10   Olejnik and Kerslake, who will be testifying later in this

11   case, were given a task.  They were given a task by

12   Allergan:  We want you to make a better drug.  The problem

13   with Alphagan is that the brimonidine, while successfully

14   lowering intraocular pressure, has its own side effects.

15   One of them is allergic conjunctivitis.  That is a localized

16   side effect, they call it.

17          It deals specifically with the eye and it causes

18   the eye to become very red, very inflamed.  And,

19   essentially, once an individual develops an allergic

20   reaction to the brimonidine, they can't take it anymore.

21          So it is not as if they go off the drug, the

22   allergic reaction corrects itself, they can go back on the

23   brimonidine.  Once they develop that allergic reaction, then

24   brimonidine is no longer a treatment option for that

25   individual.

Now, why is that important?  Because in fighting glaucoma, physicians need all the treatment options they can get.  There are some individuals for various reasons that can't take beta-blockers.  There are other individuals that are on the prostaglandins and they stop working.

There are other individuals on which the prostamides work to a certain extent, but they need a boost. And that's why the brimonidine is an important tool in the physician's war chest of fighting glaucoma, and to prevent the physician from being able to use that because there has been an allergic reaction of the brimonidine takes away one of their important tools.

So the formulators of Alphagan P were tasked with trying to figure out a way to increase either the efficacy and/or the safety profile from the original Alphagan.  And that's what eventually led to the inventions in question.

So how did they go about it?

They went about it over the course of almost two years of research and development at Allergan.  This, Your Honor, which will be introduced as PTX-289, is a document dated December of 1996.  This shows some of the early formulations that the inventors tried in order to see if they could improve upon Alphagan, make it more effective and/or make it safer.

They went through -- this particular chart shows

11 different inventions -- excuse me, formulations.  They

tried carbopol, they tried it in a norm ophth bottle, a

bottle in bottle, an ointment tube.  They tried an emulsion.

They tried a standard gel/carbopol combination, an Alginate

gel, a certain gel, a SynerGel suspension, NanoSystems Gel,

GelMed, et cetera.  Why were they trying all these gels?

The defendants will argue to Your Honor that

there is no invention here, that all Allergan did was take

their brimonidine that they were already using in Alphagan

and stick it in an artificial tear called Refresh Tears,

and, boo, they called it an invention.

As you can see, they didn't do that at all.

These first 11 formulations have nothing to do with Refresh

Tears.  And, in fact, they are all gels.  Why were they

working with gels?

They had a hypothesis.  If you had the

substance, the brimonidine, in a substance that was more

viscous, it might stick to the eye longer.  And if it stuck

to the eye longer, then less of it would drain into what

they call the nasal lacrimal duct, thereby, less of it

getting into your circulatory system and systemically having

systemic side effects and hopefully more of it would end up

getting absorbed by the eye and getting absorbed into the

cornea, which is really where you need the active ingredient

1    to go to lower the IOP in the eye.

2              They tried the gels.  They tried 11 of them,

3    back in December of '96.  This one, JTX-094, is yet another

4    iteration.  We are now dealing with, the date on this is

5    mid-'97 but the testing was actually done in early '97.  We

6    have 11 formulations they tried in late 1996.  We now move

7    on to yet an additional five more formulations that the

8    formulators are trying.

9              They are testing them all against the original

10   Alphagan.  Remember, their task is, their project is, try to

11   make it safer, try to make it more effective.  What did they

12   do?

13             They tried brimonidine tartrate in a different

14   Carbopol combination with HPMC.  And for the purpose of the

15   story, we won't do all the acronyms, unless they have some

16   importance.

17             They tried it with two different, Carbopol HPMC

18   combinations, they tried it with an Aquasite gel.  They

19   tried it in suspension.

20             So they said to themselves, All right.  We know

21   brimonidine at higher pH's has trouble staying in solution.

22   So maybe we will give up on a solution and maybe we will try

23   a suspension where the brimonidine is actually just

24   suspended in the vehicle.

25             Let's try that.  They did it with something

1      called perfluorodecalin.

2                  If you notice, at least in the gels, the pH's

3      are all at 6.4.  They have already accepted and understand

4      that if they try to go higher, they are not going to get a

5      solution.  So they stick with -- I mean a solution, not a

6      solution to the problem, but a solution, as in the

7      brimonidine is going to fall out of solution.

8                  If it falls out when it is supposed to be in a

9      solution, you are going to end up with the equivalent of

10     shards of glass in that medication, which we all know would

11     not be a good thing for the eye.

12                 Their way of dealing with the solubility problem

13     in these early formulations -- we are now moving on -- these

14     are five more formulations on top of the original 11.  16

15     formulations they have gone through.  They have yet to try

16     Fresh Tears.

17                 They try all of these, and what happens?

18                 What happens is this:  This is the

19     pharmacokinetics data report.  What the pharmacokinetics

20     report says is this:  While the reformulations that offered

21     an ocular pharmacokinetic advantage, however, they were

22     cursed with a significant systemic disadvantage.  Plasma

23     concentrations were consistently higher after Aquasite and

24     both carbopol formulations than after Alphagan.

25                 What does that mean?

1              Plasma concentrations are how much brimonidine

2    has been measured in the body where it is not supposed to

3    be.  It is supposed to be in the eye.

4              So something is going on.  This whole theory

5    about, wow, if we use gels, it will stay on the eye longer

6    and it won't end up getting passed through the nasal

7    lacrimal duct into the body, it turns out that didn't work.

8    And, in fact, this observation, that this gel idea didn't

9    work, and, in fact, caused even more of the active

10   ingredient to end up in the body rather than less, was,

11   according to David Small, both unexpected and unwanted.

12             And why was it unexpected and unwanted?  First

13   of all, it was unexpected because it went contrary to the

14   idea that if you keep the gel on the eye longer, then it is

15   going to give the eye more chance to absorb the brimonidine

16   and it won't get into the body.  So it was completely

17   unexpected that the exact opposite happened.  Why was it

18   unwanted?  Because such a phenomenon of the increase of the

19   brimonidine in the blood, such a phenomenon in humans is

20   going to lower the systemic safety margin.  In other words,

21   you are going to have more systemic side effects because of

22   this phenomenon.

23             Now, what is a systemic side effect?  I

24   described to Your Honor what a localized side effect was,

25   which was this allergic conjunctivitis, this red irritated

1     eye.  A systemic side effect would be sleepiness, for

2     example, that the brimonidine gets into the system, and

3     while your glaucoma is treated, you turn out to be

4     incredibly sleepy, tired, and, in fact, end up, how some of

5     the pills say don't operate machinery, well, you are

6     supposed to be able to operate machinery with your glaucoma

7     medication, you are supposed to be able to drive a car, you

8     would end up not being able to do so.  So it is pretty

9     counterproductive.

10          So all 16 of those formulations have to get

11    jettisoned, it's back to the drawing board.  There was

12    nothing, unlike what the defendants say, that this was a, I

13    believe their description is expected, easy, obvious

14    formulation, it was just the opposite.

15          We now move to four more formulations.

16          The date on this report is March of 1998.  But

17    the actual tests on these four additional formulations, so

18    that is four in addition to the 16 already tried, is

19    actually done in about mid-'97.  So we have worked all the

20    way through '96, half the year through '97, trying all of

21    these different formulations.  They are not working.

22          Now we come to some new formulations.  This is

23    where we see the Fresh Tears.  This is Alphagan, which

24    everything is going to be tested against.  Here is

25    brimonidine tartrate in Refresh Purite.

1          Now we have the higher pH of 7.4.  Why?  Well,

2    Refresh Purite has a pH of 7.7.

3          Let me stop and explain what Refresh Purite is.

4    Refresh Purite is an artificial tear.  It is manufactured by

5    Alphagan and used in the treatment of dry eye.  A lot of

6    individuals suffer from dry eye.  There is no active

7    ingredient in it.  It is essentially just a substitute for

8    your own tears.  That's why it's called an artificial tear.

9    It has to have a preservative in it.  The reason being you

10   would use it over time, and if there is no preservative,

11   once you use it once, once you open up the bottle of your

12   dry eye medication, if there is no preservative, then,

13   obviously, all kinds of bugs are going to grow in there and

14   it's not a good thing.

15         So there was a preservative in Fresh Tears

16   called Purite.  And I will tell Your Honor a little more

17   about the Purite story later when we get to that patent.

18         But Fresh Tears itself is this product.  It is a

19   dry eye medication.  It is manufactured at about a pH of

20   7.7.  So they took the brimonidine tartrate.  They put it

21   into the Fresh Tears product, and it ended up with a pH of

22   about 7.4.

23         The formulators at this point were so convinced,

24   there was no way that formulation was going to work because

25   of the brimonidine tartrate solubility problems.  They are

1    up at 7.4.   It's not going to be soluble.   All the tests

2    show that.   What did they do?

3              They add something called cyclodextrin in this

4    formulation.   Cyclodextrin is known to have solubility

5    enhancing properties.   Dr. Olejnik, one of the inventors,

6    will explain to Your Honor why.   It essentially is somewhat

7    of a tubular structure that is hydrophobic on the inside and

8    hydrophilic on the outside, or vice versa.   I always get

9    them backwards.   And it will take the active ingredient sort

10   of inside the tube, thereby aiding the solubility of the

11   active.

12             The problem, of course, with that is that it

13   would then possibly hang on to the active ingredient,

14   preventing it from being absorbed into the eye, and then,

15   once again, we have got the problem of instead of getting

16   absorbed in the eye, it is going to go into the body and you

17   are going to have these systemic side effects.   But they put

18   the cyclodextrin in this formulation to see if they could at

19   least compensate for the solubility problem of brimonidine.

20   But they were so sure that this formulation would not work,

21   this Refresh Purite at 7.4, that they still stuck with a gel

22   formulation, only now they were going to try it at a higher

23   pH of 7.3, and even a castor oil emulsion.   They were

24   determined that somehow, some way, they were going to

25   improve the safety profile of Alphagan.   But it was by no

1    means an easy and an expected and an obvious way to go.

2            So now we are up to 20 different formulations

3    that the formulators have tried in their attempts to improve

4    the safety and efficacy profile of Alphagan.

5            There was another problem, why they were so kind

6    of adverse to and thinking that using Fresh Tears in

7    combination with the brimonidine would actually work.  In

8    addition to the pH solubility issue, there was another

9    problem, which is the Purite.  The Purite, which is the

10   preservative that is in Refresh Tears, was known, or at

11   least they believed, to have the potential to oxidize the

12   brimonidine.  What does that mean?

13           That means you take the brimonidine.  You put it

14   in the Fresh Tears, you have got your preservative called

15   Purite.  And the Purite ends up oxidizing the brimonidine,

16   so that by the time the patient gets around to using the

17   drug, the brimonidine has been essentially chewed up by the

18   Purite.  It doesn't work anymore.  Therefore, you are not

19   going to have an effective composition.

20           So they had all these problems that they were

21   dealing with.  Were they going to be able to keep the

22   brimonidine in solution at the higher pH?  Was the Purite,

23   or was it, in fact, going to fall out as they expected it

24   to?  Was the Purite going to chew up the brimonidine,

25   oxidize the brimonidine, thereby making it no longer an

1    active ingredient?

2              These are all documents made contemporaneously

3    with the formulation.  These aren't after-the-fact things we

4    came up with to cover our invention story.  These are what

5    the inventors are saying to themselves back in 1998.

6              So now, it's, oh, mid-'98.  They have been

7    working on this for about a year.  Here are our two lead

8    inventors, Dr. Kerslake and Dr. Olejnik.  And in June 1998,

9    they write a memo to Hans Peter-Pfleger, who is in

10   marketing, and they say to him, here is what we have done so

11   far.  More than a dozen formulations have been developed by

12   Product Development and they have been tested both by

13   pharmokinetic evaluation in rabbits and ultimately in

14   humans.

15             And here is where we are now, mid-'98.  "Based

16   on all this different data, alternative formulations are

17   unlikely to offer any appreciable benefits to the efficacy

18   and safety profile of Alphagan."

19             In other words, our own inventors at that point

20   are expressing skepticism that this can ever be done.

21             They say, you know what?  This opinion is

22   consistent with the assessment and prediction submitted by

23   an external advisory panel of experts.  So not only are

24   inventors expressing skepticism, but Allergan had brought in

25   an advisory panel of outside experts to say, look at what we

1    are trying to do here.  What do you guys think?

2              They said, you aren't going to be able to do it.

3    They decided that the only avenue for actually improving the

4    brimonidine tartrate efficacy over Alphagan would be the

5    development of a controlled ocular delivery insert, meaning

6    to take the brimonidine and actually insert it in an insert

7    fashion into the eye.

8              This is where they are in mid-'98.

9              But our inventors weren't willing to give up.

10   Over all these obstacles, unwanted results, unexpected

11   results, skepticism internally and externally, they were

12   determined that they were going to find a way to improve the

13   efficacy and/or safety of Alphagan.

14             And so they did, and that is what resulted in

15   the patents at issue in this case, Your Honor.

16             This is out of the prosecution history.  During

17   the course of the formulation efforts in this case, here is

18   what they found:

19             That it was particularly surprising that such a

20   therapeutically effective dosage of brimonidine could be

21   formulated in an aqueous solution at a pH greater than about

22   7.0.  Figure 1 of the present specification -- and I will

23   show that to you in a moment, Your Honor, it is in the

24   patent -- shows the brimonidine solubility decreases

25   precipitously at pH values above 7.0.

1              Actually, that is the table I already showed

2    Your Honor, it is Table 2.  The fact that a therapeutically

3    effective dosage could be provided by a composition

4    containing about .15 percent or less of brimonidine at such

5    pH values is truly unexpected.

6              What does it say?  Alphagan P ended up being

7    brimonidine at .15 percent.  Remember, Alphagan was at 2

8    percent.  Alphagan P was at .15 percent.  And it ended up

9    being at a pH of approximately 7.2.  Alphagan was at a pH of

10   6.3 to 6.4.

11             How could they have done this?  How could you,

12   first of all, get the same therapeutic effect with 25

13   percent less of the brimonidine?  And the answer is

14   something called the pH partition theory, that if you make a

15   drug closer to the pH of the membrane that you are dealing

16   with, you are going to get more of what they call the

17   unionized version of it.

18             The bottom line is, it is going to allow more of

19   the active ingredient to penetrate the membrane, thereby

20   getting more of the active ingredient into the eye and less

21   of it into the circulatory system.

22             Dr. Olejnik, who is certainly much more

23   qualified than I to speak to this, will explain to Your

24   Honor exactly how this unionized versed ionized works and

25   how it fits in with pH and the level of pH.

But the second completely unexpected result was that it was staying in solution.  Not only were they able to lower the brimonidine by 25 percent, they were able to keep it in solution at this higher pH.  And as Your Honor saw, nobody believed that could be done.

This is the chart showing how they were able to keep it in solution.  This is Figure 1 of the patent.  It turns out that by combining it with Refresh Tears, what the inventors had also done was introduce a drug called carboxy -- not a drug -- a compound called carboxymethylcellulose.  That is another one Your Honor is going to hear over and over again, CMC, carboxymethylcellulose.  Unlike cyclodextrin, which was known to enhance solubility, carboxymethylcellulose, certainly in conjunction with something like brimonidine, which is an alpha-2-adrenergic agonist, had not been demonstrated to enhance the solubility of an alpha-2 agonist.  It didn't have that tubular shape like cyclodextrin did.  There was nothing about it that led the inventors to believe that it would enhance the solubility of brimonidine.  In fact, it was only in there as a viscosity agent in the Refresh Tears.  It wasn't in there as a solubility enhancer.  But they tested.  And Dr. Kerslake will talk about this testing.  They tested over weeks, in fact, months, to figure out the phenomena that was going on

1   that enabled the brimonidine to stay in solution at these

2   higher pH's.  And they discovered this, that the CMC was

3   enhancing the solubility of brimonidine.  And that was part

4   of the inventive features that the Patent Office granted a

5   patent for.

6          And that, Your Honor, resulted in Alphagan P.

7   Alphagan P, as Your Honor can see, is at .15 percent

8   brimonidine.  It is at a pH of approximately 7.2.  And it

9   only got there after years of work by the inventors in this

10  case at Allergan, and overcoming hurdle after hurdle,

11  obstacles after obstacles, skepticism upon skepticism.

12          This is the bottle that it comes in.

13          This, Your Honor, is allergic conjunctivitis

14  that I told you about.  The clinical trials of Alphagan P

15  showed that there was a 40-percent reduction in this as a

16  result of reducing the amount of brimonidine from .2 percent

17  to .15, a 40-percent reduction in allergic conjunctivitis,

18  resulting in all of these people getting to continue to use

19  brimonidine as a treatment rather than having it taken away

20  as a treatment option for the physicians.

21          This is only one of the increased safety

22  profiles of Alphagan P over Alphagan.

23          Now, as a result of this increased safety

24  profile, Allergan decided to withdraw Alphagan from the

25  market.  They now had Alphagan P.  It was shown to be safer,

1    significantly safer than Alphagan.  There was no need to

2    have Alphagan on the market anymore.

3           And just to show you the continued skepticism in

4    the industry, Allergan wants to withdraw Alphagan, which

5    they have an absolute right to do.  It is their drug.  They

6    can take it off the market.  But they petitioned the FDA, in

7    addition to that, they petitioned the FDA in a citizens'

8    petition.  And they say, FDA, we are pulling Alphagan and we

9    are pulling it for safety and efficacy reasons because

10   Alphagan P is so much safer than Alphagan.  So we would like

11   you to agree with us that we are pulling Alphagan for safety

12   and efficacy reasons.

13          The FDA -- now, this is in May of 2003, so this

14   is important, because this is when Alphagan P is just first

15   out there -- the FDA is skeptical still that it could be

16   done.  The FDA says, well, you know, we have looked at the

17   data, and we disagree with your assertion that Alphagan .15

18   percent is safer and/or more effective than Alphagan .2

19   percent and we reject your contention that Alphagan .2

20   percent was withdrawn for safety or effectiveness reasons.

21          They go on in that citizens' petition in May of

22   2003 to say this.  Allergan had argued to them, well, wait a

23   minute.  If we weren't withdrawing it for safety and

24   efficacy reasons, why would we withdraw it and thereby

25   deprive ourselves of an additional income stream?  And if

1    Alphagan P isn't significantly safer and effective than

2    Alphagan, why are physicians choosing it over Alphagan?  Why

3    aren't they just sticking with the drug that is already out

4    there?

5              The FDA answered Allergan this way, in 2003.

6    "We find this reasoning unpersuasive.  The fact that

7    physicians have begun prescribing Alphagan P .15 now that

8    Alphagan .2 percent has been withdrawn from the market does

9    not support a conclusion that Alphagan P.15 percent is more

10   effective than its predecessor.  It probably reflects only

11   the lack of available alternatives."

12             It makes sense.  Right?  It makes perfect sense.

13   They are saying, come on, Allergan, you pulled Alphagan off

14   the market and now you are saying, they are all prescribing

15   Alphagan P.  Of course, they are.  There is no alternative.

16   And that made sense in May of 2003.

17             However, in June of 2003, the generics came on

18   the market, the generics of Alphagan, the original Alphagan.

19   So now they are generic versions in June of 2003.  So when

20   the FDA is saying this in May of 2003, it makes sense.  But

21   in June of 2003, on come the generics.  And there is the

22   generic version of Alphagan .2 percent at a pH of 6.3 to

23   6.4.  And now the physicians have a choice.  If they don't

24   believe that Alphagan P is significantly safer or more

25   effective, then go and prescribe generic Alphagan.

1           And in June of 2003, when it hits the market,

2    obviously, there is no prescriptions yet, so let's wait and

3    see what happens.  One of the companies that came on with

4    the generic was Bausch & Lomb, one of the world's largest

5    ophthalmology companies.  They did a huge ad campaign,

6    telling the physicians, we have got generic Alphagan.

7    Alphagan P is just marketing hype by Allergan.  Buy our

8    generic.  Get it cheaper for your patients.  You will get

9    the same benefit.

10           Here is what we saw.  This is June of 2003.  The

11   data we have goes all the way out to April of 2006.  This

12   has the physicians, three years with an opportunity to start

13   prescribing Alphagan, generic Alphagan, instead of Alphagan

14   P.  They never did it.  It flattened out at ten percent, and

15   it never changed.

16           The physicians have spoken.  The physicians have

17   said, oh, no, FDA, there is a significant safety advantage

18   to Alphagan P.  There is something here that is new.  There

19   is something here that is novel.  There is something here

20   that brings a benefit to our patients.  And we are going to

21   use it.

22           Managed care has spoken, because they could

23   easily just take Alphagan P off the formulary and require

24   only the prescription -- that they will pay only for generic

25   brimonidine.

1               But they haven't done it, either.

2               And what's interesting is that is not normally

3      what happens.  If, truly, there is no difference between a

4      drug that is out there, like Alphagan P, and a generic

5      brimonidine, then what normally happens after the generic

6      comes on the market is you see this (indicating), only it's

7      literally the opposite.  Recently, a glaucoma medication

8      called Cosopt went generic, and you will hear the testimony

9      of Joseph Schultz from Allergan, in three weeks time 90

10     percent of the market was prescribing generic Cosopt, three

11     weeks they converted back.

12               Here we have three years and nobody is doing it.

13               The United States Patent and Trademark Office

14     recognized how Alphagan P was new and novel and inventive.

15     They were told all about Alphagan.  It was right there.  I

16     showed it to Your Honor at the beginning of my opening.

17     They were told all about Alphagan, and yet they issued four

18     United States patents based on the various inventions that

19     took place during the formulation of Alphagan P.

20               The first one was the '210 patent.  This deals

21     with compositions containing alpha-2-adrenergic agonist

22     components.  And I have put up just a representative claim.

23     Our expert, of course, will walk Your Honor through these

24     claims.  Essentially, what the '210 patent talks about is

25     not just alpha-2-adrenergics, but specifically brimonidine,

1    and the use of a polyanionic solubility enhancing component

2    with that brimonidine, something that had not been done

3    before.

4            And this is the '210 patent, Your Honor.

5            They also issued the '873 patent.  The '873

6    patent deals with the broader category of alpha-2-adrenergic

7    agonists, rather than being limited just to brimonidine, it

8    is the broader category of the alpha-2-adrenergic agonists,

9    in addition to a solubility enhancing component, and note,

10   excluded is other than cyclodextrin, because cyclodextrin

11   was known to have the solubility enhancing, so it is

12   specifically excluded in this claim, and, an oxychloro

13   component in an effective amount to at least aid in

14   preserving the composition.  So this is the Purite is an

15   oxychloro component.  And, of course, up until the

16   formulation efforts of the inventors here, it was believed

17   that you couldn't combine Purite with brimonidine.  It would

18   chew it up.

19           So, indeed, once again, there was an additional

20   discovery that is covered by the '873 patent.  And we are

21   asserting, Your Honor, Claim 12, the dependent claim, to

22   limit it even further.  So it's not just an alpha-2 with an

23   SEC with an oxychloro component, but the solubility

24   enhancing component has to be carboxymethylcellulose.

25           So that is the '873 patent, Your Honor.

1            They also issued the '834 patent.  The '834

2    patent is the Alphagan P formulation.  It is very specific,

3    very narrow.  And it is the only patent that we are

4    asserting, Your Honor, against Exela.

5            Now, Apotex will argue that all four patents are

6    exactly the same.  If that were the case, we would be

7    asserting all four patents against Exela.  But we are not.

8    We are only asserting the '834 patent against Exela, because

9    Exela has a different formulation than Apotex, and Exela's

10   formulation, we are asserting, does, indeed, infringe the

11   '834 patent.  But we are not asserting that it infringes the

12   other three patents.

13           So what is the '834 patent?

14           The '834 patent is specifically a

15   therapeutically effective aqueous ophthalmic composition

16   comprising up to about .15 percent of brimonidine, having a

17   pH of about 7.0 or greater, and the brimonidine being

18   soluble in the composition at room temperature.

19           So that is the formulation.  That is the

20   formulation that Exela, indeed, is going to be using, if

21   ever allowed to by the FDA.  And that is what Exela is, in

22   fact, infringing.

23           We have one more patent, Your Honor, that was

24   issued as part of the overall inventive process that went on

25   here, the '337 patent.

1           The '337 patent is essentially like the '210

2   patent but it's broader, it is the genus versus the species.

3   The '210 patent is limited to brimonidine.  The '337 patent

4   is limited to alpha-2 adrenergic agonists, not limited just

5   to brimonidine, which is a subpart, a species of the overall

6   genius of alpha-2-adrenergic agonists.  It is in addition a

7   solubility enhancing component, again, other than

8   cyclodextrin, and we are asserting, along with Claim 1,

9   dependent Claim 5, which limits the polymer to being an

10   anionic polymer.

11           The '210 patent was limited to polyanionic

12   polymers.  Again, we are talking about the '337 is the

13   genius.  The '210 is the species.  It is even more narrow.

14   But we are asserting it in this case.

15           So the U.S. Patent and Trademark Office found

16   four different inventive aspects of the formulation work

17   that went on at Allergan.  And in addition to that, there is

18   someone else that thinks that what we did is new and novel,

19   even though in this courtroom they will argue otherwise.

20   That's Apotex.

21           Apotex has stipulated that they infringe all the

22   asserted claims in this case.  And this is their

23   stipulation, and it's in the pretrial order, Your Honor, I

24   won't read it.  But they have stipulated that all of the

25   claims that are being asserted against Apotex, indeed, they

1    infringe with their formulation.

2              Now, they tried not to.  I will give them credit

3    for this.  They tried not to.  They looked at our patents.

4    They looked at our formulation.  They said, how can we make

5    a generic Alphagan P without using all the inventions that

6    are in the patents?

7              So the first thing they did was say, how about

8    this:  Let's now use carboxymethylcellulose.  Let's use PVA,

9    polyvinyl alcohol.  See if we can do that.

10             They couldn't.  It says formulation is not

11   possible with polyvinyl alcohol.  As noted salting out

12   occurred.  The very thing I mentioned to Your Honor, the

13   falling out of solution.

14             They tried to get rid of one of our inventions,

15   they tried to not use carboxymethylcellulose, tried to

16   substitute it with PVA, didn't work.

17             They tried something else.  They tried something

18   called HEC.  And the problem was they had to use so much HEC

19   to get anything going here that it took them over the FDA

20   limits.  They had to get rid of that one.  There was another

21   problem they had.  It says, Please see the attachment, the

22   pH has changed significantly.  So this is another problem I

23   have not explained to Your Honor yet.  It is not just you

24   have to get the brimonidine into the solution and keep it in

25   the solution, but you have got to do it in all kinds of

varying conditions, because this is an eye medication.  It's

not going to be under controlled settings at Allergan all of

the time.  It is going to be used by somebody in Alaska.  It

is going to be flown to somebody in Europe.  It is going to

be used by somebody in Southern California.  There are going

to be temperature variations.  And as a result of that, you

may have shifts in pH.

Now, if you don't have a way to make sure that

that brimonidine stays soluble within the solution at

various temperatures and under various conditions, you are

going to get that salting out.  You are going to get the

brimonidine bombing out, and therefore, it will no longer be

effective and it will no longer be safe.

And Apotex saw in their attempts to design

around patents that they were getting shifts in pH.  They

did a pH, an assay monitoring for the above product in the

past three weeks, and the study shows pH 6.3 -- they tried

to formulate at a lower pH.  Okay.  Let's get around one of

their inventions, the 7.0 pH or higher.  Let's try to

formulate at a lower pH.  Guess what happened?  They weren't

stable.  The pH and preservative assay have dropped

significantly after three weeks.  They had to get rid of it.

So this is what they did.  They simply copied,

which a generic has a right to do, they just don't have a

right to infringe a patent.  So they copied our formulation

to a T, because it was tried and true and they knew it would work.

And so, this is where they say, right here, RLD stands for reference listed drug, that's us, Alphagan P. Formulation completed based on patent, and de -- so they looked at the patents -- and deformulation results of the -- in other words, they took ours, they deformulated it, and they copied it.

In fact, they say, brimonidine .15 percent, the strategy, develop identical to the listed drug, Alphagan P. And they did, and that's why they have stipulated that they infringe.

Who else has recognized that what we have done is new, novel and inventive. The FDA. Remember their skepticism back in 2003?

Now we are up to 2007. Alphagan P has been on the market. Physicians have voted with their feet on this one. They are going with Alphagan P for all the reasons I have told Your Honor. Exela decides, all right, we don't want to infringe. We are going to design around. And the way we are going to design around is we are going to make Alphagan again, except that won't do us any good because if we simply make Alphagan all over again, then we are already behind five, six other generics that are out there on the market. Alcon is already out there with a generic Alphagan.

1    Bausch & Lomb is out there with a generic Alphagan.  As we

2    can see, combined, they are only getting ten percent of the

3    market.  So Exela says, what we will do is make the original

4    Alphagan but we will make it look like Alphagan P by

5    reducing the amount of active ingredient to .15 percent.

6    That was going to be their formulation.  They said to the

7    FDA, here is what -- here is our generic version of Alphagan

8    P.  Look.  All we have to show you is biological

9    equivalence, and the brimonidine in Alphagan P is at .15

10   percent, and our brimonidine is at .15 percent, and that's

11   good enough.  Right?  Even though our pH is significantly

12   lower, even though our preservative, this BAK, which was in

13   the original Alphagan, not Purite, even though essentially

14   everything about this is the original Alphagan, because we

15   have lowered the brimonidine to .15 percent, that is going

16   to be a generic Alphagan P.

17           Now the FDA, four years later, is saying, no

18   way.  That's absolutely not.  Why not?  Because, this is the

19   FDA, in June of 2007, to Exela:  Exela, there is evidence

20   that pH and/or Purite preservative plays a role in the

21   ocular bioavailability of brimonidine.  They may not have

22   gotten it in 2003, but even the FDA can reconsider, and now

23   we have seen it, there is evidence that there is a lot more

24   going on here than we thought.

25           Exela, the current reference listed drug --

that's us, Alphagan P product -- Alphagan P .15 percent

solution with Purite as a preservative has the pH range of

6.6 to 7.4, whereas the test product, yours, Exela, with

BAK, benzene alconium chloride as a preservative, has a pH

range of 5.5 to 6.7.

You, Exela, have not shown conclusively that the

difference in pH range between the test and reference listed

drug products has no significant impact on the

bioavailability or efficacy of the drug.

Exela, no.  And they told them, you got to go

back to the drawing board, you got to correct it.  As Your

Honor will see, they didn't, and the FDA has now closed

their ANDA.

So we are not exactly sure what case we are

trying here against Exela.  But we are here, and Exela is

here.  So you move ahead.  And we need to show that Exela's

product that they may eventually get FDA approval on, if

they go back to the drawing board and change their ANDA,

will, indeed, have to be infringing.  And why?

Well, first of all, let me say this.  Exela has

stipulated, or is not arguing, that they don't meet all of

the elements of the '834 patent except for one thing, and

the one thing they are arguing about is their pH.  They are

saying, we are below 7.0.  We are not about 7.0 or higher,

we are below 7.  That's why we don't infringe the '834

1    patent.

2              The problem is that Exela's own internal data

3    shows that in order to hit even their target pH, at some

4    point they are going to have to make an infringing product.

5              And, of course, the patent laws say, it isn't

6    just the using and the selling, it's the making.  And it is

7    our contention, Your Honor, and our expert will so testify,

8    from Exela's own internal documents, that in order to hit

9    even their target pH, because of this drift that I told you

10   about, the pH drift, they are going to have to start with a

11   formulation that is about 7.0 or higher.  How do we know

12   that?

13             Their target pH is, well, they keep changing it,

14   but we think it's around 6.5, between 6.3 to 6.5 -- 6.5 to

15   6.7, I am sorry.  Exela's own internal data shows that when

16   they start with a pH of about 6.7, in about three months

17   time, at this size bottle, it has dropped all the way down

18   to 6.2.  When they start out with a pH of 6.7 with this size

19   bottle, it's dropped all the way to 6.4.  And at three

20   months with this size, it's dropped to 6.5.  In other words,

21   all of their pH's, all of these formulations have

22   significant pH drift.

23             What does that mean?

24             They did accelerate a study, where they said,

25   let's accelerate the formulation and see whether or not what

1    happens when you accelerate and the pH drift rather than

2    over three months time, they did this from zero to three

3    months, rather than the previous one that went out to six

4    months.  And what does it show?

5              Once again, it shows a drop all the way, being

6    accelerated from 6.7 all the way down 6.2.  What does that

7    mean?  What it means is this.  This is again an Exela

8    internal document.  They did studies in India, Your Honor,

9    on the pH, also.  And what they did was they saw that if

10   they are going to end up in their target pH of 6.5 to 6.7,

11   which we admit is not about 7.0, if they are going to end up

12   there, look where they have to start, Your Honor.  They have

13   to start right here, 7.1.

14             So in order for them to hit their target range,

15   they have he infringe.  They have no choice.  They will

16   begin with a pH of about 7.0 or higher, even to get down to

17   their lower pH.

18             And that is the infringement case against Exela.

19             So I have now gone through four of the five

20   patents.  There is one left to go.  That is the Purite

21   patent.

22             What happened, Your Honor, is that long before

23   the formulators came up with the invention that would become

24   Alphagan P, there was a company called Bio-Cide.  And

25   Bio-Cide had a product which they called all sorts of

1   things.  It was an interesting company.  They called their

2   product Purogene.

3              Sometimes.  They called it Oxine sometimes.

4   They had terrific salesmen.  The salesmen would go around

5   and say, you can use our product to fog your hog barns,

6   literally.  I never heard of it before.  It's hog fogging.

7   It is a way to disinfect a hog barn, you fog it, you take

8   this Purogene and put the fog in and, poof, it disintegrates

9   the hog barn.  You can clean bed pans with it.  Clean, I

10  think, mortuaries with it.  They had all sorts of uses.

11  Short of suggesting you wear it as a hat, they were telling

12  any company that would listen, you should try this, as a

13  disinfectant, or even as a preservative.

14             THE COURT:  Sounds like Listerine or something.

15             MS. BROOKS:  Interestingly, it is almost because

16  this is a label off of this Purogene, one of their Purogene

17  products called Oxine.  This is right off their product:

18  "Caution, keep out of reach of children.  Harmful if

19  swallowed.  May cause irritation.  Avoid contact with eyes.

20             "Active ingredient:  Chlorine dioxide."

21             They came to Allergan and said, why don't you

22  put this in your ophthalmic products?

23             Now, you can imagine the reaction that these

24  salesmen got from Allergan when he suggested that.  However,

25  to our inventors' credit, and these are different inventors

1    now, you will hear from Mr. Dziabo, they thought, all right,

2    we don't think we can do what you are suggesting.  But maybe

3    there is something here that we can work with, and if we

4    work hard enough, maybe we can come up with something that

5    will be new and novel and different than simply taking what

6    you are suggesting and putting it in an ophthalmic

7    medication.

8              And so what they discovered was that -- what

9    Bio-Cide was selling was this idea that if you took

10   something called sodium chloride and you were able to

11   release from it chlorine dioxide, and that was the Oxine

12   label we saw right here, this chlorine dioxide, that that,

13   the chlorine dioxide, is what you could use as your

14   disinfectant or your preservative.

15             Now, there were lots of problems with that.  One

16   of the problems is the chlorine dioxide is extremely --

17   first of all, you are not supposed to put it in your eye.

18   Secondly, it is extremely difficult to work with.  It can

19   turn into a very volatile gas and actually explode.

20             So there were certainly problems with that.  But

21   Allergan had been working with other gaseous antimicrobial

22   agents.  So they thought, well, there is something

23   interesting here.  We are not going to do what you are

24   suggesting, no, but there is something interesting here and

25   maybe if we work with it a little bit more we can figure it

1    out.

2              And here is what they figured out.  They figured

3    out that if you take the sodium chloride, don't turn it into

4    the chlorine dioxide, but simply keep it as the sodium

5    chloride, and if you use it in exceedingly small amounts, in

6    a certain way, guess what?  You can use it as a

7    preservative.  And that, in fact, was awarded a patent by

8    the United States Patent and Trademark Office, the '078

9    patent.  Aqueous Ophthalmic Formulations and Methods for

10   Preserving Same.

11             Your Honor, the '078 patent was based on the

12   fact that until Allergan figured this out through their own

13   internal testing, it had never been done.  There were

14   preservatives out there.  And, in fact, the most common one

15   was benzene alconium chloride, or BAK, I will call it, used

16   in many, many ophthalmics, still used in many ophthalmics to

17   this day.

18             Purite, however, brought the benefit that once

19   it is put into the eye, actually turns into a completely

20   natural product of the eye.  So it is a gentler

21   preservative.  It is much more easily -- who would have

22   thought that from fogging your hog barn through the work of

23   Allergan you would get this gentle preservative?

24             But they did.  And as a result, they got the

25   '078 patent.  And it was only after they did testing

1   internally at Allergan, tried these different ways of

2   getting there, that finally they saw that their formulation

3   results met the U.S. PET criteria for preservatives.

4           I don't want to leave out that second part,

5   because I don't want to look like I am trying to be

6   misleading.

7           Allergan had even more stringent internal

8   criteria, particularly for Europe, they had certain

9   requirements for Europe dealing with this particular kind of

10  microbial preservative.  And it didn't meet that particular

11  criteria.  But it did meet the U.S. PET criteria for

12  preservatives, and therefore it was approved as a

13  preservative in ophthalmics.

14          So just so we are clear, Your Honor, because

15  there is going to be a lot of misnomers, what the defendants

16  will call stabilized chlorine dioxide -- and actually the

17  industry calls it stabilized chlorine dioxide -- isn't

18  chloride dioxide at all.  What you are putting in your eye

19  isn't that chlorine dioxide off the label that has the big

20  "Don't put this in your eye."

21          What Allergan developed, invented, and

22  discovered is actually chloride.  And the chloride is both

23  safe, it's stable, and it kills the microbes and the

24  microbials very slowly.  That's why it acts as a

25  preservative rather than a disinfectant that goes in there

1    and goes, kaboom, your hog barn is now disinfected.  The

2    chlorine dioxide on the other hand is explosive.  It also

3    evaporates so it is not going to work very well as a

4    preservative because a preservative has to stay in solution

5    and act as a preservative throughout time.  Of course, it

6    also kills very rapidly, which is not, again, something that

7    is particular good for the eye.

8                    And that, Your Honor, is the story of Alphagan

9    P.

10                   It took me quite a while to go through because

11   it took the inventors quite a while to accomplish.  But as a

12   result, we have these five patents before Your Honor, and we

13   have generics switching to copy our formulation and Allergan

14   wishing to protect its patent rights.  Thank you.

15                   THE COURT:  Thank you, Ms. Brooks.

16                   Do the defendants want to preserve or do you

17   want to open now?

18                   MR. BOGGS:  I would like to open now.

19                   MR. BREISBLATT:  Your Honor, we will open as

20   well after Mr. Boggs.

21                   THE COURT:  Let's see where we are.

22                   MR. BOGGS:  Thank you, Your Honor.

23                   Your Honor, Exela is here today to clear a

24   hurdle necessary to proceed with its .15 brimonidine

25   tartrate formulation.  I want to make it clear through our

words and the evidence that we present at this trial that
Exela wants to market its own generic but noninfringing
formulation.  That's Exela's point.  That's its theme.
That's what Exela is all about, its own formulation.

The evidence we will present will show that
Exela is a pharmaceutical formulation development company.
I underscore the words "formulation and development."  Exela
does different formulations.  The evidence will show, and I
think Allergan has already alluded to the fact, Exela is not
seeking to market a copy of Alphagan P, the brand name drug.
And Exela has gone to great lengths to formulate its product
to avoid the legal scope of every patent that Allergan says
covers the product.

The testimony will be that approach is Exela's
business model.  It is a reformulation company.

Exela believes that it can safely reformulate
drugs by changing things like preservatives, like buffers,
like viscosity enhancers, like the specifications, and avoid
patent infringement claims.

They can have their drug.  But we can have ours,
too.

It's that approach that is why we have not been
sued on five patents.

And it's that approach that is why we haven't
even been sued on all the claims of the '834 patent.

1              The idea underlying Exela is that they can

2    reformulate, avoid infringement, avoid these types of

3    lawsuits, and avoid the 30-month stay that is associated

4    with Paragraph 4 litigation.  And, then, they can get lower

5    cost generics to those that need them even faster than the

6    ordinary course.

7              The whole idea is not to get sued.  They can

8    have their patents, they can have their products.  Exela

9    wants to compete with them fair and square in the

10   marketplace, with a different but bioequivalent and

11   noninfringing formulation.

12             The evidence will show that Exela's formulation

13   will contain .15 percent brimonidine tartrate.  But the

14   similarities with Alphagan P pretty much end there.  The

15   Exela formulation does not include carboxymethylcellulose

16   slows as a thickening agent.  More importantly, a solubility

17   enhancing component.

18             We have no solubility enhancing component.  It

19   will not contain Purite as a preservative.  It will not have

20   a borate buffer.  And it will not have a pH of 7.2.

21             The testimony will be that it's not just the

22   .15 percent brimonidine that makes Alphagan P the product

23   that it is.  It's the combination of all its excipients

24   together, which make up that product which people on the

25   market know.

1          This, we will see, is an important conclusion to

2   reach in this case when we decide whether the '834 patent

3   claims are truly a fair characterization of Alphagan.

4          Why is that important?  Because Allergan will

5   attempt to attribute the product's success and unexpected

6   results associated with Alphagan P over the entire scope of

7   the patent claims of the '834 patent.

8          Next slide.

9          This is a demonstrative here, but it says it

10  best.  This is like attributing the characteristics of one

11  solar system or the terrain and the atmosphere of one planet

12  to every planet in every solar system in the entire Milky

13  Way.  I heard that the claims of the '834 patent are very

14  narrow.  If they were very narrow, we wouldn't be here,

15  where we are today in this courtroom.

16          They are not narrow.  They are not even close to

17  being narrow.

18          The testimony will show that the Exela product

19  will have a formulation much more like that of Allergan's

20  original Alphagan product, the original Alphagan product was

21  not patent protected.  And long ago, original Alphagan was

22  pulled from the market and abandoned by Allergan.

23          The testimony will be that like original

24  Alphagan, the Exela product will contain polyvinyl alcohol

25  as a viscosity enhancer.  The testimony will be that like

1    original Alphagan, the Exela product will contain benzyl

2    alconium chloride, or BAK, as the preservative.  And the

3    testimony will be that like original Alphagan, the Exela

4    product will contain a citrate buffer.

5         The evidence will also show that the labeling pH

6    of the Exela product will be 5.5  to 6.7, which embraces

7    completely and entirely the labeling of 5.6 to 6.6 of

8    Alphagan.

9         Obviously, with such vast differences between

10   these two products, the question arises:  How can Exela's

11   product possibly infringe a patent on Alphagan P?

12        Well, it doesn't.  And Allergan is overreaching.

13   The testimony will be that there is no infringement of the

14   '834 patent.

15        Allergan is looking at experimental products,

16   exploratory experiments, and speculative, hypothetical FDA

17   approval for which is not being sought to prove their case.

18        All of those experiments, exploratory

19   experiments, would be unlawful if marketed.  They are

20   entirely irrelevant to this case.

21        All of the claims of the '834 patent require a

22   pH of about 7.0 or greater.  They also require that the

23   brimonidine be soluble in the composition at about 21

24   degrees C.  The evidence will show that the specification

25   for the Exela product for which it seeks approval will

1    require, in all cases, a pH of 6.7 or less.

2            And that is true whether or not it's the

3    manufacturing pH, 6.5 to 6.7.  That is true whether or not

4    it is the release pH, 6.2 to 6.7.  And whether or not it's

5    the shelf-life pH, or the stability pH, which is 5.5 to 6.7.

6            I expect that we will hear Allergan's own

7    expert, Dr. Stella, testify that a pH of 6.7 is not a pH of

8    about 7.0 or greater.  And there is a well-settled

9    scientific reason for this.  It is not a question of

10   semantics.  The testimony will be that a brimonidine

11   formulation with a pH of 6.7 will be much different than one

12   with a pH of 7.0.

13           The evidence will be that pH affects

14   dramatically both the solubility and the amount of unionized

15   brimonidine that is available to treat the disease of

16   glaucoma.

17           THE COURT:  I am sorry to interrupt.  Isn't

18   that -- there is no dispute over that, is there?  I thought

19   I heard that point you have just made is agreed to.

20           MR. BOGGS:  They have never stipulated that our

21   formulation --

22           THE COURT:  That is that 6.7 is not 7.0.

23           MR. BOGGS:  That's correct.

24           THE COURT:  Is that something over which there

25   is a contest?

1             MS. BROOKS:  No, Your Honor.

2             THE COURT:  I just wanted to make sure.  Perhaps

3     we don't need to spend time, testimonial time, jousting

4     about that.

5             MR. BOGGS:  Okay.

6             So it affects both the concentration of the

7     unionized brimonidine as well as the solubility profile of

8     the two products.  They are different.  I will move on to

9     another section.

10            As I mentioned before, Your Honor, it's not

11    Exela's objective to get sued.  The way it's supposed to

12    work is that Exela notifies the brand name company of what

13    it's doing and then the brand name company considers that

14    information and agrees that it doesn't infringe, and then

15    once Exela gets product approval from the FDA, they can get

16    that medicine to the people that need it much quicker.  They

17    don't have the 30-month stay.  They don't have this.  They

18    can go right there.

19            However, should Exela get sued, like it has

20    here, it will raise the defenses that are available to it.

21    And it has done so here.

22            The evidence will be that the Alphagan P was a

23    straight reformulation of original Alphagan.  Alphagan P

24    resulted from the application of known design options,

25    predictable solutions, and anticipated success.  All driven

1    by the design need for market pressure to reformulate

2    original Alphagan.

3            Alphagan P was not a product of innovation.  It

4    was a product of ordinary skill and common sense.

5            It was obvious, and it was unpatentable.

6            One of the things that is at play here is the

7    Henderson-Hasselbach equation, which is pretty standard

8    science.  What the Henderson-Hasselbalch equation is, and

9    Ms. Brooks indicated it before, the closer you get to the

10   pKa of these salts, like brimonidine tartrate, the more --

11   the more unionized species that you have will be available.

12           The testimony will show that when it decided to

13   reformulate original Alphagan, Allergan used a very similar

14   approach to Dr. Koneru, the one that he used in order to

15   reformulate the product, which came to be known as Alphagan

16   P.

17           The testimony will be that Allergan substituted

18   known preservatives and known buffers and known viscosity

19   enhancers to get exactly the result one of ordinary skill in

20   the art would expect, starting with the commercial product,

21   Alphagan, it substituted a known preservative, which was the

22   Purite.  It substituted a known viscosity enhancer for that

23   used in Alphagan, and the testimony will show that Allergan

24   then made the expected and routine adjustments in

25   concentration and pH that one of ordinary skill in the art

1    would do to accommodate those changes.  There were no

2    unexpected results.  There were no unexpected advantages.

3    And there was no surprise.

4            It was a routine reformulation, one that was

5    well within the ordinary skill in the art.

6            Alphagan P is a nice product, it's a good

7    product.  But in terms of scientific advancement, it is no

8    penicillin and it is no polio vaccine.

9            So let's look at it a little bit more closely.

10           The evidence will show that in 1996, Alphagan,

11   the original Alphagan, was a soluble therapeutically

12   effective and commercially successful ophthalmic

13   formulation.  It had a pH of 5.6 to 6.6.  Original Alphagan

14   contained .2 percent brimonidine, BAK, benzene alconium

15   chloride, as a preservative, polyvinyl alcohol as the

16   viscosity enhancing agent, and a citrate buffer.

17           Allergan's testimony will be that Allergan

18   wanted to reformulate Alphagan to reduce its adverse

19   effects.  We can debate that, but we don't need to.

20           We can accept that, and that would be the design

21   need or market pressure.  In particular, the testimony will

22   be that Alphagan irritated the eyes.  They have different

23   names for this.  It comes in all different forms.  They call

24   it red eye, allergy, allergic conjunctivitis, we saw that,

25   discomfort or just plain old-fashioned irritation.

1          And another problem with Alphagan was its

2    sedative effect, sedation, it caused drowsiness.  That is in

3    the file history.  That is in the literature.  We heard

4    about it before I was here.

5          Now, we will see that benzene alconium chloride,

6    or BAK, which is the preservative used in almost all

7    eyedrops worldwide, is notorious, notorious, for irritating

8    patients' eyes.  Now this would be the known cause of the

9    problem, the known cause of the problem.  And we will see

10   that Allergan chose to substitute the gentler Purite, also a

11   known preservative for eye drops, and it's known to be

12   gentler.  That would be the application of a known design

13   option to solve the problem.

14         In fact, the evidence will show that Allergan,

15   itself, as I said, had an eyedrop on the market using Purite

16   as a preservative, that was the Refresh Tears we heard

17   about.  And I have heard it described as Allergan's

18   flagship, flagship eyedrop product.  They knew all about it.

19         This would be the predictable solution and the

20   anticipated success associated with dealing with the

21   irritation caused by BAK.

22         The evidence will show that the decision to

23   change the preservative, that decision, change the

24   preservative, then led to some additional but routine and

25   expected formulation adjustments.  In other words, ordinary

1    skill and common sense.

2              Whenever you change anything, you have to tweak

3    it a little bit.  The evidence will show that it was known

4    that Purite requires a pH of neutral or higher if you are

5    going to use it in a formulation.  It degrades at pH's lower

6    than that.  So the pH of the formulation was increased.

7    That's a predictable solution, anticipated success.

8              The evidence will show that it was known that at

9    the chosen pH of 7.2, citrate buffers aren't useful at that

10   pH.  But borate buffers are.  There is no magic here.

11   Predictable solution, anticipated success.

12             What about reducing the concentration of

13   brimonidine?  What about that?  It is important, or so it

14   seems.  But that is the biggest fiction of them all.  The

15   evidence will show that the increase in pH required a

16   reduction in the concentration of brimonidine.  It required

17   it.

18             That was no unexpected advantage, as I

19   frequently hear.  It was required.  What do I mean by that?

20             Remember the sedative effect of brimonidine, the

21   sedation?  That was an adverse effect.  When you raise the

22   pH, you increase the amount of brimonidine that's going into

23   the eye, that is transporting across that eye membrane.  If

24   you are going to raise that pH, you don't want to put more

25   of that stuff in there.  You are going to aggravate that

1    sedative effect.  And that was a serious side effect.

2              So how do you deal with that?  You just lower

3    the concentration.  You just lower it.  That was required.

4    That wasn't an advantage.

5              I expect the Court will hear from Allergan's own

6    expert that everyone knew, everyone knew, that raising the

7    pH of amine drugs, including alpha-2-adrenergic agonists,

8    such as brimonidine, increases the amount of unionized form

9    and thus their bioavailability.

10             You want to raise the pH to get better

11   bioavailability.  That's taught by every paper of amine

12   drugs.  So if you know you are going to be dumping more

13   brimonidine into the body and you know that it causes a

14   sedative effect, you need to reduce the amount.

15             Much will be said about the advantages of

16   Alphagan, but that's only meaningful in a legal sense if the

17   advantages or results would have been unexpected, unexpected

18   to one of ordinary skill in the art.  And nothing like that,

19   nothing like that exists here.  The evidence will show that

20   it was not unexpected that changing the amount of

21   brimonidine from .2 percent to .15 percent would provide a

22   therapeutically effective drug.

23             As I said before, on this slide, everyone knew

24   that it was known that raising the pH increases the

25   bioavailability.  That is the Henderson-Hasselbalch

equation.  The Henderson-Hasselbalch equation is basic,
standard chemistry.  It's a hundred years old.

If you have an amine drug, you want to raise the
pH to get better bioavailability.  That is taught by every
paper of amine drugs.

Now, the evidence will show that the means
existed to predict the result.  The means existed.  It was
in the literature.  You will hear about the Walters' paper.
The Walters' paper reports on results from clinical trials
associated with the original Alphagan product.  And this
graph here comes right out of -- it is Figure 3 in the
Walters' paper.  And it shows the therapeutic effectiveness
of a .08 percent solution, a .2 percent solution, and a .5
percent solution.

Completely surrounds, completely surrounds .15.

Now, I think you could predict, and that's what
that red line is, you can predict therapeutic effectiveness
with .15.  It's right there.  It's within the error bars
between .08 and .2.  There was no surprise that .15 was
therapeutically effective.

Now, this is a blockbuster.  Contrary to what
was said during prosecution of the '834 patent, and contrary
to what we have heard, the evidence will show that it was
not unexpected that one could raise the pH to 7.0 or greater
to a soluble .15 percent formulation of brimonidine

1    tartrate.

2            The problem here with this '834 patent and what

3    we are looking at is this lower limit of 7.0.  What they say

4    about solubility and the difficulties with solubility may be

5    true at 7.5, where you need these magic solubility enhancing

6    components.  But not at 7.0.  Exela does not use a

7    solubility enhancing component.  That's what their invention

8    is all about.  And it's all about at 7.5.

9            But what does this chart show, and where did it

10   come from?

11           Well, Allergan, itself, disclosed the solubility

12   profile for brimonidine tartrate when it filed its NDA in

13   1996 on the .5 percent formulation of Alphagan.  This is a

14   publicly available document at the FDA.  And what this

15   shows, and we have highlighted it, pH 7.0, you can be

16   soluble all the way up to .194 percent.  That is more than

17   .15.  Less brimonidine, anything less than that, than .194,

18   will be soluble at a 7.0.

19           It was no surprise that at 7.0, a .15 percent

20   solution could be made.  But that's the cornerstone, that's

21   the cornerstone of their nonobviousness case.  And, you

22   know, that may be true if that claim started at 7.5.  Up

23   here on this chart, 7.5-80, .15 would not be soluble at 7.5.

24   But all this information was available, you can get it

25   through a FOIA request, we did that.

Now, I heard a story this morning, and there is

a lot of evidence to look at.  And the evidence will show

that we can endlessly debate what Allergan's true motives

for immediately setting out to reformulate the commercially

successful Alphagan was.  And we can endlessly debate what

the problems that they were trying to solve were.  But we

don't have to do that here.  We can use Allergan's own spin

in this case, and at the end of the day, the legally

relevant motivations existed to do what the Allergan

scientists did, regardless of their motives for doing so.

It was a routine reformulation of original Alphagan.

Of course, when Dr. Koneru set out to formulate

his product, he had one issue to address that Allergan

didn't.  And that's these five patents that we are talking

about in this lawsuit.  Now, Dr. Koneru had to formulate his

product with an eye towards the claims of all five of those

patents.  Now, today, there is no dispute with respect to

four of them, and it seems that there is no dispute on

infringement with respect to the fifth.

But the evidence will show that when he was

designing his formulation and looking at the '834 patent,

that Dr. Koneru observed that it's not clear what the

boundaries of the '834 patent claims are, or even when it

was filed, if the '834 patent was intended to cover what

they finally claimed.

1              Now, these are series flaws.  These are series

2    flaws.  Lack of written description, lack of enablement, and

3    indefiniteness, they all come to mind.

4              Those are just some technical problems that

5    people kind of dismiss.  Is it really a problem that the

6    boundaries are unclear in these claims?  Well, yes, it is.

7              The claims serve a necessary and important

8    notice function to competitors and the public, like

9    Dr. Koneru, and the requirements for claims are statutorily

10   defined in 112.  The public is entitled to know where the

11   boundaries of claims are.  That is a fundamental principle

12   of the patent system.  Allowing others to freely operate,

13   just outside the bounds, like Dr. Koneru, that encourages

14   innovation.  Dr. Koneru's work in its way is innovation.  He

15   is working outside the bounds.

16             Now, with the claims that we will see -- and we

17   will look at them much more closely through the course of

18   this trial -- with these claims with uncertain boundaries,

19   that stifles innovation.  People are afraid of it.  But it

20   is the patentee's responsibility to make sure, when they

21   draft their claims, that the public will be able to

22   understand what they mean.  That's the bargain they strike

23   with the government when they seek their monopoly.

24             I want to look at two ranges that we see in the

25   claims of the '834 patent.  The first one is "up to about

1    0.15 percent."

2              The other range is a "pH of about 7.0 or

3    greater."

4              There is that 7.0.  7.0, that doesn't mean an

5    SEC.

6              I talked about that earlier.  But let's look at

7    up to about 0.15 percent.  What does that mean?  Where did

8    it come from?  What's the lower limit of that?

9              We know the upper limit is about .15.  Well, the

10   evidence will show that that range came out of the blue,

11   just completely out of the blue.  There is no disclosure of

12   the lower limit of that range.  That range was not in the

13   specification as filed.

14             Now, with regard to the lower limit, it is

15   impossible, impossible to determine what it is, because its

16   meaning depends on another phrase that's in the claims, and

17   that is therapeutically effective.  You have to know what

18   that means before you can determine of what the lower limit

19   of "up to about .15 percent" is.

20             Now, people will say, will, therapeutically

21   effective, that is effective for glaucoma.  That's effective

22   for reducing intraocular pressure.  Well, I don't know the

23   degree to which you are going to do that, but there is not a

24   single mention, not a single one, of glaucoma or intraocular

25   pressure in the '834 patent.  And I suspect that's true with

1    the other three patents as well.  Not a single mention.  I

2    saw pictures of glaucoma.  I was talking about how it works.

3    And there is no doubt in my mind that Alphagan was used to

4    treat glaucoma and so on and so forth.  That is not

5    mentioned in these patents, in the specification.

6              That's why I asked the question, it's not clear

7    what the patent applications were intended to cover when

8    they were filed, but after they were pending for a while,

9    all of a sudden, up to about .15 percent comes in,

10   brimonidine tartrate comes in.  And now it's covering a

11   treatment for glaucoma and it's Alphagan P.

12             But we will look, at this trial, at the

13   progression of the prosecution and we will see how this

14   evolved.

15             Now, with respect to the lower limit of this

16   claim, I expect Allergan's expert to testify as he did

17   during his deposition, that, at some point, as you move down

18   the range of .15 percent, you reduce the concentration, you

19   are no longer going to have a concentration of drug that is

20   effective.

21             That is common sense.  However, I learned, it's

22   not predictable where that point is.  It requires a value

23   judgment.  It is often based on animal studies.  And then

24   you take that data, I learned, you take that animal study

25   data, and you hope that it will translate into humans.  We

saw an internal document today from Allergan where they said

it was a failure, that because their data did not translate

from the animal studies to the human studies, that is

exactly what we are talking about here.  And then, once you

have gone far enough to do that, going to humans is limited,

doing human clinical trials is limited, because of costs and

because of the things you can do to humans at clinical

trials.

It was described to me as a dilemma.

So where do you draw the line?  What is the

lower limit of up to about 0.15 percent?  You have to do

clinical trials to figure it out.  Is that a problem?

Yes.  It's a very big problem.  The claims as

written are broader than their neighbor link disclosure.

The specification must teach those skilled in the art how to

make the full scope of the claim, not Alphagan P at .15.

And you have to make that teaching, it has to be the full

scope of the claim without undue experimentation.

Animal studies, hoping that they translate into

human studies, human clinical trials, I think that's undue

experimentation.

Now, I said before, up to about 0.15 percent

just appeared in an amendment.  It appeared.  There is a

lack of written description for this range.  It is a range.

There is a whole body of law on ranges.  You have to

1   disclose the invention when you file your patent

2   application.  Not at some point later.  That's what happened

3   here.  The test, of course, is whether the specification

4   indicates that the inventors were in possession of the

5   invention as later claimed.  This is new matter.

6          The specification didn't mention this range.

7   They will point to little data points and charts and try to

8   cobble together this range.  This range, they were not in

9   possession of this, or they concealed it when they filed

10  their patent application.

11         And, as I said before, that patent application

12  makes no mention of glaucoma and IOP, intraocular pressure.

13  You couple all that with the fact that there is tons of

14  unpredictable experimentation that would be required to know

15  what the lower limit of this claim is, the inventors were

16  not in possession of this range when they filed their patent

17  application.

18         To this day, no one is in full possession of

19  this range.  No one knows what the lower limit of that is.

20         Now, the other range I want to talk about is pH

21  of about 7.0 or greater.  All the same problems exist with

22  this one as well.  The testimony will be that this range was

23  not in the original specification or claims, neither one, it

24  wasn't in the original specification, it wasn't in the

25  original claims.

1            You may remember from the Markman hearing what

2    is in the specification is 7, but not 7.0.  And we discussed

3    that at great length in terms of construing the claim.

4            But what is the upper limit of this?  The pH

5    range goes to 14.  I saw a chart this morning that went to

6    10.  Dr. Stella, Allergan's expert, told me the upper limit

7    is 8.5.

8            Now, we also heard this morning that, depending

9    on where you are in that scale, a solubility enhancing

10   component is required.  I think it's around 7.4 or 7.5.  The

11   claims in the '834 patent do not require a solubility

12   enhancing component.  They have a pH that can go up to,

13   depending on who you talk to, 8.5, or 10, or 14, which is

14   the end of the pH scale.

15           How do you make a soluble brimonidine tartrate

16   formulation without a solubility enhancing component at a pH

17   of 11 or 12 or 13?  These claims encompass such things, but

18   they are broader than the enabling disclosure.  They

19   encompass inoperable embodiments.

20           The specification does not teach those skilled

21   in the art how to make and use the full scope of the claims

22   without undue experimentation.

23           Now, we have come full circle, and you have

24   heard me ask the question at the Markman hearing, Where do

25   you draw the line?  I have asked it several times today:

1     Where do you draw the line?

2             The bottom line, although it seems to be solved,

3     they have drawn the line.  They have said 6.7 does not

4     infringe.  So we are okay.

5             But the real answer is, none of us should be in

6     this position where we are guessing what about 7.0 or

7     greater is.  And almost by definition, that impinges on

8     another part of the statute, which is the second paragraph

9     of 112.  The claims are vague and indefinite.  We don't know

10    the metes and bounds.  That's a problem.

11            Now, to wrap it up, at that point in time when

12    all the evidence is in, at that point in time, and the smoke

13    begins to clear from all of these validity challenges and

14    the witnesses and the testimony, there will be the one fact

15    that remains about Exela, and it will remain unchanged.

16    Exela will still be seeking FDA approval for one and only

17    one formulation.  That formulation is the one set forth in

18    the Exela ANDA.  By FDA specification, that formulation has

19    a pH that never exceeds 6.7.  And that's all that's

20    important.  That's all that matters here.  And that's the

21    one piece of information that you need to decide the one

22    issue, which is the cornerstone of the Exela business model,

23    which is noninfringement.

24            This case is not about all the distracting flack

25    to Exela.  Prior experimental formulations, they are not

1     relevant.  Prior exploratory experiments in India, they are

2     not important.  And speculative, hypothetical formulation

3     changes about moving pH to avoid stability problems, those

4     are meaningless.  The ANDA is what the ANDA is.  Exela seeks

5     FDA approval for one and only one product.  And everyone

6     seems to agree that it does not infringe.

7               Thank you.

8               THE COURT:  Thank you, Mr. Boggs.

9               MR. BREISBLATT:  Your Honor, do you exclude

10    witnesses from the courtroom?  Do you invoke the rule?

11              THE COURT:  It's up to what counsel agree upon.

12    I am comfortable with either.  If you don't agree, I will

13    invoke the rule.

14              (Recess taken.)

15              THE COURT:  Counsel, please take your seats.  We

16    will hear from Apotex.

17              MR. BREISBLATT:  Good morning, Your Honor.

18              THE COURT:  Good morning, counsel.

19              MR. BREISBLATT:  First of all, let me say that

20    Apotex, the documents they showed you, yes, appear looked at

21    other formulations.  But once it realized that these

22    patents, the five in issue were invalid, under the

23    Hatch-Waxman statute, it did what it's allowed to do.  It

24    copied the formulation and it said, in its Paragraph 4

25    filing, which is the active infringement, that the patents

1    are invalid.  So all that prior stuff just isn't relevant.

2    But it's the kind of red herring that I think we will see a

3    lot of in this case.

4              First of all, what does this case not involve?

5    Well, it doesn't involve a new molecule.  We have all heard

6    how brimonidine tartrate was, in fact, in use at .20.  It

7    was being used to cure exactly what it cures.  And there are

8    no claims being made that somehow it is being put to a new

9    use.  The patents in issue basically cover a known

10   formulation doing exactly what it was supposed to do, that

11   is, relieve pressure on the inside of the eye and help treat

12   glaucoma.

13             What it does involve is taking an artificial

14   tears product, and why don't we go to DTX-10 at 59380.  And

15   this is an Allergan document.

16             THE COURT:  Did you have anything you wanted me

17   to have?

18             MR. BREISBLATT:  No, because these are documents

19   the Court will see later.  What I want to hand up are two

20   charts that are not in evidence.  They are just

21   demonstrative.

22             THE COURT:  Okay.

23             MR. BREISBLATT:  And to set the stage, if we

24   look at this section here, and I will ask that it be pulled

25   out, "Refresh Tears, which also contains Purite, is an

1   ophthalmic over-the-counter product for the symptomatic

2   treatment of dry-eye disease."

3          That is important because one of the symptoms of

4   glaucoma is dry eye.  So people who are suffering from

5   glaucoma, and they might have been taking Alphagan at this

6   time, would have been using Refresh Tears.  The other

7   benefit of Refresh Tears is the FDA allows it to be sold

8   over the counter.  You don't need a prescription for it.

9          So all of the ingredients in the Refresh Tears

10  are FDA approved, they are gentle on the eye, to one skilled

11  in the art, it would have been a perfect vehicle.

12          Let me take a step back.

13          We heard a lot about what Allergan scientists

14  did and what they tried and all that.  Again, you read KSR,

15  that is all irrelevant.  What is relevant is what would one

16  skilled in the art do before the filing date of the Allergan

17  patents?  So what we are looking at is in 1999, in July, one

18  skilled in the art who would know these things, what would

19  they do?  And all that stuff about Allergan trying 20

20  inventions in 1995, 1996, we are just wasting the Court's

21  time.  It's just not relevant.

22          So what happens in July of 1999?  Well, we know

23  that Refresh Tears had been on the market since 1997, being

24  sold and marketed in the U.S. and Canada.  And what does it

25  tell us about it?  It has a large margin of safety for its

1    components, including Purite, including CMC, which we will

2    talk about, and in clinical trials with Refresh Tears, there

3    was no clinically significant findings in either safety or

4    patient acceptability.  It was perfect.  It was a great

5    product.

6                Let's go to Page 59381.  Now, this is the

7    background, the rationale for developing brimonidine Purite

8    0.15.  Let's just look at why we would want to replace it.

9    This is something that would be known to one skilled in the

10   art.  If we go down to -- down here, I will have that pulled

11   out, "Brimonidine-Purite ophthalmic solution is a new

12   formulation of brimonidine tartrate.  The formulation

13   differs from Alphagan in that it is preserved with a novel

14   preservative, Purite, rather than benzylalconium chloride,

15   BAK."

16               Now, you notice that is what Refresh Tears

17   had -- it had Purite and CMC.  Then it goes on to say, The

18   replacement of BAK with Purite was initiated in an effort to

19   improve the efficacy and/or tolerability of the Alphagan

20   formulation.

21               Now, you will hear a lot of discussions about

22   allergies and these percentages.  But this tells us what the

23   real intent was and it would have been obvious to anyone

24   skilled in the art back in 1999, July of 1999, there was an

25   understanding that BAK causes issues.  And if we go down to

1    the next sentence, "Although BAK has been safely used in

2    numerous ophthalmic preparations, it is known to induce

3    corneal epithelial toxicity and cause allergic reactions in

4    some patients."

5              There you have the motivation.  One skilled in

6    the art would have wanted to get rid of BAK with a former of

7    brimonidine tartrate.

8              And, as we have already seen from a number of

9    charts, one would have a goal to try and get a pH level of 7

10   or above because that's closer to the natural pH of the eye,

11   again, something one skilled in the art would know.

12             Now, as far as Apotex is concerned, we

13   challenged five patents.  Our goal is to show that they are

14   all invalid.  We know we have a burden by clear and

15   convincing evidence.

16             But the Supreme Court has made our job easier

17   because of KSR, because it's done away with the teaching,

18   motivation and suggestion.  It's offered some other things.

19   We can all debate it.  Right?

20             But one of the things it does tell us is common

21   sense is something that the Court can utilize.  One skilled

22   in the art can use common sense.  As we have just shown, and

23   why don't we put up DM-1, this is the chart I have to the

24   right, that is all that went on here.  They took a known

25   glaucoma drug, which was brimonidine tartrate, they added it

1    to Refresh Tears, and it worked.  It worked.  No question

2    about it.

3           Now, there has to be the minor adjustments for

4    percentage.  And percentage becomes kind of important.  You

5    will see in three of these patents, Allergan never tells us

6    what the percentage of brimonidine tartrate is.  It always

7    just refers to it as therapeutically.  A therapeutic amount.

8    Well, we know everything above .08, .08 and above could be

9    therapeutic.  So to reduce the amount from .2, which was in

10   their present product, to .15, one skilled in the art would

11   try and do that.  Why?  It's logical.  The less medication

12   you give someone, the better it is.  We are always trying to

13   go to the lowest most effective dose.  I think that was one

14   of the charts put up by Exela's counsel.

15          At this point in time, meaning in July of 1999,

16   that less effective dose was somewhere between .08 and .2.

17   So .15 would have been a logical selection.  As .1 is.

18          Now, for Apotex, we have been charged with

19   infringing five patents.  We are going to look at what I

20   call the combination patents together.  Those are the '873,

21   the '210, the '337, and the '834.  And they charge us with

22   infringing 52 claims.  We are turning out one product, one

23   product, 52 claims.

24          How do you get 52 claims that cover a single

25   product?  As we will look, imaginative patent lawyering.

1    They had a good patent lawyer who used every word

2    combination they could to describe the same thing.

3           If this Court finds that, in fact, it would have

4    been obvious to combine brimonidine tartrate and Refresh

5    Tears at a pH above 7.0, all those claims are invalid.  All

6    of them.

7           That is why we stipulated to infringement.

8           Now, there is something else that is interesting

9    about these patents.  Let me show you the front page of

10   them.  We will start with the '873

11          I am going to highlight what it says.  You shall

12   find this on the front of each of the four patents in issue.

13   Allergan's counsel didn't mention it.  And I can understand

14   why not.  The Patent Office made Allergan take a terminal

15   disclosure on each and every one of these patents.  And they

16   did it because the inventions were not patentably distinct.

17   So they gave up any term of any of these patents that would

18   be longer than the others, because they are all the same

19   thing.

20          Now, what we have done to make it a little

21   easier is we have prepared our chart No. 2.  What this does

22   is it takes the active ingredient, and the ingredient that

23   they make all the claims about in these cases.  And that's

24   brimonidine tartrate, carboxymethylcellulose, which I will

25   call CMC because I can't pronounce it right, and Purite.

1    And Purite is stabilized chlorine dioxide.

2             What they did, throughout the claims, is they

3    gave them different names for the same thing.  So instead of

4    calling it brimonidine tartrate in every one of those

5    claims, what they do is they refer to it as the

6    therapeutically active component in some claims, the

7    adrenergic antagonist in some claims, the alpha-2 agonist

8    component in some claims, the quinoxaline component in some

9    claims.

10            And I am not going to even try and explain the

11   scientific terminology that comes after.  But you know

12   something?  It's all brimonidine tartrate.  In some cases,

13   it might be broader and cover other drugs.  But it all is

14   brimonidine tartrate.

15            So, for example, why don't we pull up the claims

16   of the '873 patent, just as an example.  What I have done is

17   I have taken by color coding system, and I just have now

18   shown where brimonidine tartrate is, where the CMC is, and

19   where the Purite is by color coding them.  And what the

20   Court sees is in all of these claims that Apotex has been

21   charged with, it's just those three components.  It's always

22   the red, yellow and blue, brimonidine tartrate, it's Purite,

23   and it's CMC.

24            Now, they could have saved us all time and just

25   charged us with one claim in every one of these patents.

1    But I guess they thought if they charge us with a lot of

2    them, it would look like we were really in there infringing

3    to a high extent.

4              Bottom line:  That's it.  Brimonidine tartrate,

5    Purite, CMC.  And every so often, they throw in a pH greater

6    than 7.  And that's it.

7              Now, that's just the '873.  Why don't we go to

8    the claims of the '210.

9              Again, this patent adds a terminal disclaimer,

10   and what do we see when we look at it?  Red, blue, and

11   yellow.  And the reason why some only have yellow, you will

12   see they are dependent claims.  If you look at 23, it says,

13   The composition of Claim 1.  You look at Claim 1, there is a

14   red and blue, red, blue and yellow.

15             Just because it's a dependent claim, you got to

16   look back and say, What's it dependent to?  And it will

17   always be dependent to the red and the blue.

18             Why did the Patent Office allow it?  Imaginative

19   patent writing.  You call it a different thing, it sounds

20   different, even though it is all brimonidine tartrate.  It's

21   all different words.  That is why I prepared the "also known

22   as" chart.  And that's how they got all those claims.

23             Let's move on.  Let's look at the '337 patent.

24             Again, the red, yellow, and blue.  Brimonidine,

25   CMC, and Purite.  And, remember, CMC was part of Refresh

Tears.  It was there from the beginning.  Anyone who added

brimonidine tartrate to Refresh Tears would have gotten

whatever effect there was from the CMC and the Purite and it

would have been obvious to make that combination.  You have

the perfect vehicle.  And it was all FDA approved.

Why don't we move to the '834 patent.

This one is interesting, because this is the one

that Exela has been talking a lot about, so I am not going

to dwell on it a lot.  Here, they say, they don't claim, at

least, a CMC.  They don't even claim a solubility enhancing

agent.  But they do claim .15 percent, because at .15

percent, you don't need a solubility hang agent.

Brimonidine tartrate is going to be soluble at pH's greater

than 7.  They don't claim it.

Of course, again, if you had simply mixed

brimonidine tartrate and Refresh Tears, you would have had

it.  And one skilled in the art would have done that in July

of 1999.

Now, just because Allergan didn't turn to it

originally, we shouldn't reward them.  Here is something

that is very interesting.  If you looked at the file history

of each of the four patents we have just discussed, and they

have admitted they took the Refresh Tears former and just

put brimonidine tartrate in it, don't you think you should

have told the Patent Office about Refresh Tears?  They never

1    mentioned to the Patent Office, you look through every one

2    of those specifications, you look through every one of those

3    file histories, and they never told the Patent Office about

4    Refresh Tears.

5              Not only that, and now we will get to the last

6    patent issue, remember, they talked about the '078 patent

7    and what a great invention it was because they took

8    stabilized chlorine dioxide and they put it into an

9    ophthalmic formulation?  Don't you think they should have

10   told the Patent Office about the '078 patent in the four

11   patents we just looked at where they are claiming this

12   preservative?

13             They don't mention it.  You look at the face of

14   those four patents, you won't see the '078 patent.

15             Now, the '078 patent claimed the use of the

16   stabilized chlorine dioxide, which is the Purite, and, of

17   course, it was invented by another company, and they make

18   light of it.  But why don't we put up the letter that was

19   being sent out, PTX-216.  And why don't we highlight -- yes.

20   Now, this is a letter being sent out by Bio-Cide Chemical

21   Company.  It wasn't confidential.  They just sent it out.

22   They sent it out in 1983, which is years before, years

23   before the patent was filed for in this case.

24             Bio-Cide is introducing themselves.  They tell

25   us that Purogen, which is the Purite, is a replacement for

1    your disinfectant Quadarine (phonetic), the paragraph above,

2    and your preservative Dermasol.  And those were

3    preservatives in ophthalmic products.

4            So what Bio-Cide is telling Allergan and the

5    public in 1983 is you can use our product.  You can use our

6    product as a preservative.

7            Now, there is another patent, and that's the

8    '208 patent, JTX-071.  Why don't we throw that up.

9            This patent is prior art.  It is the Stokel

10   patent.  It was in front of the Patent Office.  No question

11   about it.  But remember, again, this is prior to KSR, and

12   the Patent Office rules have even changed since then.  Why

13   don't we go to the next page.

14           In this patent -- and we will go through it --

15   they talk about its use in ophthalmic preparation -- next

16   page -- if I may have a moment, Your Honor.

17           If you go over to the summary of the invention,

18   right after the first page, the second page, there we go,

19   all right.  Why don't we go to the '078 patent.  I will come

20   back to this, because it actually tells us what Stokel

21   includes.  If we go to the second page, this is the patent

22   in issue, Your Honor.

23           They even can see, you see what it says about

24   Stokel, it says, Stokel, et al., U.S. Patent No. 4,654,208

25   discloses an antimicrobial composition for contact lenses

1    including an aqueous solution of a germicidal polymeric

2    nitrogen compound and an oxidizing agent, and it refers

3    specifically to stabilized chlorine dioxide.  And we will

4    talk more about the Stokel patent as we go through.  I

5    apologize for that, Your Honor.

6         The use of stabilized chlorine dioxide in

7    ophthalmic solution was known, that is the important thing.

8    As the letter from Bio-Cide says it can be used as a

9    preservative.  So the earlier patent is invalid as well.

10        We believe, at the conclusion of the case, the

11   Court will find that all that happened here was that prior

12   art elements that were known were combined to yield

13   predictable results.  And that is the brimonidine tartrate

14   and the Refresh Tears, as well as using the stabilized

15   chlorine dioxide.  The simple substitution of one known

16   element for another to obtain predictable results -- again,

17   they substituted a known ophthalmic vehicle without BAK to

18   cure the BAK problem.  The use of known techniques to

19   improve similar devices, they used a higher pH to get better

20   bioavailability, a well-known effect.

21        If we look at each of the factors that should be

22   considered, we will find that all five of the patents in

23   this case are obvious.

24        Thank you, Your Honor.

25        THE COURT:  Thank you, counsel.

1                       All right.  Let's have our first witness.  Have

2          counsel agreed, or do I need to order sequestration?

3                       MR. BREISBLATT:  There has been no agreement

4          between the parties.

5                       THE COURT:  Let's sequester the witnesses.  To

6          the extent there are experts in the room that need to

7          remain, that's fine.

8                       MR. BOGGS:  Your Honor, Dr. Kuneru will be one

9          of our witnesses.  We have agreed that he can stay.

10                      THE COURT:  That is fine with the Court if the

11         parties can agree.

12                      MS. BROOKS:  Your Honor, he can stay as Exela's

13         corporate representative and he has signed under the

14         protective order.

15                      THE COURT:  And I assume Apotex has no

16         difficultly with that?

17                      MR. BREISBLATT:  We have no objection.

18                      MS. BROOKS:  Your Honor, our first witness will

19         be Dr. Scott Witcup and Mr. Singer will be doing his direct

20         examination.  And he just needs a moment to set up.

21                      THE COURT:  Keep in mind, counsel, we will break

22         at 12:30.

23                      MR. SINGER:  We will try to get through the

24         whole examination before 12:30.

25                      THE COURT:  That would be great.  That is not

1    what I was saying.

2                    SCOTT WHITCUP, having been duly

3          sworn as a witness, was examined and testified as

4          follows.

5                         DIRECT EXAMINATION

6    BY MR. SINGER:

7    Q.    Good morning, Dr. Witcup.  Thank you for coming today.

8                Where are you currently employed?

9    A.    I am currently employed at Allergan, Inc. in Irvine,

10   California.

11   Q.    What is your position there?

12   A.    Currently, I am executive vice president and head of

13   research and development.

14   Q.    What does that mean your responsibilities are?

15   A.    So all of the laboratory research and the clinical

16   testing of our new treatments in patients is under my

17   responsibility.

18   Q.    How long have you been employed with Allergan?

19   A.    I joined the company in January of 2000.

20   Q.    Could you briefly describe for the Court your

21   educational background?

22   A.    Sure.  I did my undergraduate work at Cornell

23   University.  I got a Bachelor's in biology in 1980.  I then

24   went to medical school at Cornell as well, as I was in

25   New York City, completed that in 1984.

1    I then did two residencies -- after medical

2    school, I went to do an internal medical residency at UCLA,

3    and following that, did three years of ophthalmology

4    training and ophthalmology residency training at Harvard

5    Massachusetts Eye & Ear infirmary.

6    Following that, I went to the National Institute

7    of Health and completed fellowship training in ocular

8    immunology and uveitis, which is inflammation in the eyes,

9    completed that in 1992.

10   Q.   Have you published in the field of ophthalmology?

11   A.   Yes.   I have a, over 150 published articles and the

12   vast majority of those are in ophthalmology.

13   Q.   Also, Dr. Whitcup, do you have any textbooks in the

14   field as well?

15   A.   I do.   I co-author a textbook on inflammation in the

16   eye on uveitis.

17   Q.   Where were you employed before coming to Allergan?

18   A.   Right before I came to Allergan -- after I finished my

19   fellowship training at the NIH, I stayed on and I was

20   clinical director for the National Alliance.   So I ran all

21   the intramural clinical programs for the government in

22   ophthalmology.

23   Q.   When you came to Allergan, what was your position at

24   that time?

25   A.   When I first came to Allergan, I was head of the

Whitcup - direct

```
 1    ophthalmology therapeutic area.  That meant in charge of

 2    clinical testing.  So once treatments went into the clinic,

 3    human testing, clinical trials, those were under my

 4    responsibility.

 5    Q.    Are you a formulation scientist or a clinician?

 6    A.    I am a clinician.

 7    Q.    What were your responsibilities in 2000 when you

 8    joined Allergan?

 9    A.    So we had a number of clinical programs.  My

10    responsibility was to make sure we were doing the right

11    studies, ensure patient safety, help analyze those results,

12    make sure that the studies were put together in new drug

13    applications and interacted with the FDA to get treatments

14    approved.

15    Q.    About how frequently did you interact with the FDA?

16    A.    It depended upon where in the cycle we were with

17    various products.  It could be daily.  It could be once a

18    week.  There probably wasn't two or three where I didn't

19    interact with FDA in some fashion.

20    Q.    Did those responsibilities you had in 2000 include the

21    development of new drugs?

22    A.    Yes, it did.

23    Q.    Also new glaucoma drugs?

24    A.    Yes.

25    Q.    And about how many products were you working on when
```

 1    you joined the company in 2000?

 2    A.    There were probably about ten or so major clinical

 3    programs going on when I came to Allergan.

 4    Q.    And about how many of them were glaucoma drugs that

 5    you took over?

 6    A.    There were probably about three that were glaucoma

 7    related.

 8    Q.    And have you, yourself, treated glaucoma patients?

 9    A.    Yes, I have.

10    Q.    Do you still treat patients today?

11    A.    I do.

12    Q.    Okay.  We have heard a lot about glaucoma.  I want to

13    give the Court a very brief background on what the disease

14    is, a little beyond what Ms. Brooks said.

15          What is glaucoma?

16    A.    As you heard, glaucoma is a disease where the optic

17    nerve, the nerve in the back of the eye that takes vision

18    from the retina to the brain, is impacted and actually dies.

19    And as that nerve dies, patients lose vision, unfortunately.

20    Q.    About how many people are affected by glaucoma in the

21    United States?

22    A.    We think over 3 million people in the U.S. have

23    glaucoma.

24    Q.    Is that a number that is going up or going down?

25    A.    Unfortunately, it's going up, mostly because it's

1    associated with aging, so as the population ages, the amount

2    of glaucoma is increasing.

3    Q.    I would like to put up a demonstrative.  Did you bring

4    one with you to help explain what happens when you get

5    glaucoma?

6    A.    Yes.

7    Q.    If we could have ADX-2, the effects of glaucoma.

8          Dr. Whitcup, Ms. Brooks explained a little of

9    what we see here.  I would like you to explain for the Court

10   what is going on in each of the boxes we have here on the

11   demonstrative?

12   A.    As you heard a little bit earlier this morning,

13   patients with glaucoma first may notice changes in the

14   periphery of their vision.  So you can see, really, here,

15   you see some blurring at the far periphery.  One of the

16   problems with glaucoma is actually some patients don't

17   actually recognize that early change.  We find that by the

18   time patients are diagnosed, they have lost about 50 percent

19   of that optic nerve.

20   Q.    Just to be clear, the first is a patient with glaucoma

21   or a patient about to get glaucoma?

22   A.    That is already glaucoma.  They have already had

23   enough damage in that optic nerve that they have lost

24   vision.

25   Q.    Going to the intermediate box, what does that show?

1    A.    Here you can see progression now, the loss of vision

2    is moving more centrally.  And the degree of the blurring

3    peripherally is more severe.

4    Q.    And then what is the layout box?

5    A.    The layout box, actually, I have seen patients worse

6    than this.  Now the patient only has the central vision

7    left.  And with more progression of the disease, you can

8    actually lose half of this.  Unfortunately, some patients

9    will lose all light perception, be able to see nothing at

10   all.

11   Q.    Thank you.

12         Is there considered to be a primary cause of

13   glaucoma?

14   A.    You know, the main pathological cause is pressure

15   backup in the eye.  We think that's the major risk factor

16   for the disease.  We think that that is due to the drainage

17   system of the eye not functioning as well over time.

18   Q.    Is there a normal pressure in the eye?

19   A.    Studies show that the normal pressure in the eye is

20   somewhere between 10 and 20.

21   Q.    And the elevated intraocular pressure, what is that?

22   Is it anything above 20?

23   A.    It really depends on the patient.  But typically,

24   pressures of 22 millimeters of mercury, 24 millimeters of

25   mercury or higher are then associated with high risk or

1    higher risk of losing vision from glaucoma.

2    Q.    Did you bring a demonstrative to explain this effect

3    as well?

4    A.    Yes, I did.

5    Q.    If we could have demonstrative Exhibit 3 on the

6    screen.

7          We saw this in opening, this graphic from the

8    American Health Assistance Foundation.  You talked about

9    pressure.  If you could describe for me, where is the

10   pressure in the eye felt and what are we looking at?

11   A.    Again, a little bit hard to read on the chart, but the

12   ciliary body, which is the structure where the arrow is

13   pointing, is where the fluid in the eye is produced.

14   Q.    What is that fluid?

15   A.    That fluid is called the aqueous humor.  The aqueous

16   humor does a couple things.  One, it keeps the eye's shape.

17   The second important thing it does is it nourishes the

18   cornea, the front part of the eye.  It nourishes the lens.

19   So it is a very important fluid in the eye.

20         The problem is with glaucoma, as you can see in

21   this bottom part, the fluid does not drain out of the eye as

22   well as it should.  So as the eye continues to increase

23   fluid production, the pressure in the eye goes up, and as

24   this diagram shows, that pressure from the front of the eye

25   presses on the jelly in the back of the eye and then onto

1    the optic nerve.  That pressure on the optic nerve causes

2    the cells in that nerve to die.

3    Q.    Dr. Whitcup, why doesn't this fluid just drain out

4    with our tears?

5    A.    There is really no connection between tears and the

6    fluid in the eye.  The fluid in the eye actually drains out

7    of the eye through the blood system, through the venous; it

8    goes through a couple of pathways in the eye.  But has

9    nothing to do with tears.

10   Q.    Thank you.

11         Now, I want to go back to your time at Allergan

12   and move forward.  You talked about having about ten

13   programs underway.  Did you have a typical ratio of success

14   when you have a program that goes into the clinic that you

15   follow at your job?

16   A.    If you look across the industry, the statistics show

17   that if you are lucky enough to get a treatment that the FDA

18   allows you to go into humans with, you have got a one in

19   eight chance of that making it all the way through clinical

20   testing, filed with the FDA, and then approved.

21   Q.    What is it that is filed with the FDA to gain

22   approval?

23   A.    So the documents that go into a New Drug Application,

24   a whole host of information, from formulation work to animal

25   testing to ensure safety, and then the vast array of the

1    clinical studies that the FDA made require usually the Phase

2    1-2-3 studies you hear about.

3    Q.    There is a little jargon there.  What is a New Drug

4    Application?

5    A.    A New Drug Application is the formal documents that

6    the FDA requires to assess approval of a new treatment.

7    Q.    Then you said Phase 1, Phase 2 and Phase 3.  What is

8    Phase 1?

9    A.    Phase 1 is a clinical trial, it is the initial test in

10   humans.  It is usually done in normal volunteers.  You

11   usually start at a low dose of the drug and go up.  It's

12   usually about 40 to 60 patients on average.  It's focused on

13   safety.  Really, is this drug safe at the doses you are

14   testing?

15   Q.    What is Phase 2?

16   A.    Phase 2 expands on that safety testing, is a little

17   larger in terms of the number of patients.  Often, as

18   opposed to the normal volunteers that you might do in a

19   Phase 1, the Phase 2s actually now start testing patients

20   with the disease.  So you get your first hints of, Is the

21   drug effective?  So you said increased safety and some

22   initial information on efficacy and the right dose that you

23   want to pick.  And these studies tend to be about 100

24   patients.  So bigger than the Phase 1 trials.

25   Q.    Then what is a phase three trial?

Whitcup - direct

1    A.      The Phase 3 trials tend to be the pivotal studies

2    which the FDA bases approval on.  They tend to be randomized

3    trials, so patients either get the new treatment or control

4    treatment or a placebo where they are randomly assigned to

5    each of those treatment paradigms.  They tend to be longer,

6    up to about a year, and have many more patients.  So

7    typically a Phase 3 trial will be 600, 700 patients.

8    Q.      All together, about how much time does all this take

9    to put together?

10   A.      We do some benchmarking.  A typical -- the work that

11   goes in to get to filing a new drug from start to finish is

12   maybe somewhere between a hundred person-years, often 200

13   person-years.

14   Q.      Did you bring -- is there an NDA example in the

15   courtroom today?

16   A.      Yes.  I think we have the NDA for the Alphagan P .15

17   percent in the court.

18           It was roughly 209 volumes, about 300 pages

19   apiece.  A lot of work goes into putting those together.

20   Q.      Is that a fairly typical size for the document?

21   A.      It is typical, yes.

22           MR. SINGER:  Your Honor, we have identified that

23   as Joint Exhibit 1.  I would just move it into evidence, if

24   you like.

25           THE COURT:  It is admitted.  It's already part

1    of the record.

2              MR. SINGER:  Thank you, Your Honor.

3    BY MR. SINGER:

4    Q.   A couple more background questions for our discussion.

5              Through your job, have you become familiar with

6    the general FDA requirements for approval of an ophthalmic

7    drug?

8    A.   Yes.

9    Q.   Recognizing it is a complex process, are there a

10   couple touchstones that we can guide the Court with for FDA

11   approval?

12   A.   At the end of the evaluation, it always comes down to

13   risk and benefit.  Are the benefits of the drug treating the

14   disease that you are addressing, do they outweigh the risks

15   of the treatment that usually comes down to assessing both

16   safety and efficacy?

17   Q.   In your experience, what does "safety" mean?

18   A.   So safety, especially when you are talking about eye

19   medications, has two parts to it.  One, how well tolerated

20   is the medication for the eye, we have heard about some of

21   the issues with the drug today brimonidine.  But the drugs,

22   once you put an eyedrop in the eye, will drain down your

23   tearduct and get absorbed into the bloodstream.  So there

24   are systemic side effects with drugs as well.

25              When I look at ophthalmic medications, I assess

1    very carefully not only how well the eye tolerates the drug

2    but what are the systemic side effects of that medication as

3    well.

4    Q.    You used another term, "efficacy."  What does efficacy

5    mean in your experience?

6    A.    Efficacy is how well the drug works, treating the

7    disease that you are setting out to treat.  In the case of

8    glaucoma, the medications are indicated to lower intraocular

9    pressure.  So the FDA, after years of working on glaucoma

10   medications, has very set ways when you measure the

11   pressure, when you see the patient.  So it is very

12   standardized to establish what the effectiveness of that

13   drug is.

14   Q.    Have you also heard the term "line extension" in your

15   work?

16   A.    Yes, I have.

17   Q.    What is your understanding of that?

18   A.    Line extension is using the same active medication, so

19   in the case of Alphagan, it was brimonidine, but using

20   either a different concentration formulation, potentially a

21   different indication.  So something new for that active

22   ingredient.

23   Q.    And in your experience at Allergan, do line extensions

24   result in improvements?

25   A.    Absolutely.  And that's always the goal as to

1    improving.  In fact, the group that worked on this is called

2    product enhancement, product improvement.  We really do want

3    to make the product either more effective or safe.

4    Q.    Does the FDA apply the same standards to line

5    extensions as it does to an original drug?

6    A.    Yes.  They, as well, want to make sure that the drug

7    is effective and safe as labeled.

8    Q.    In your job, how do you judge whether there has been

9    an improvement made?

10    A.    I look at the efficacy that comes out of the clinical

11    trials.  I look at the wealth of safety data that we have.

12    It's my responsibility as the head of R&D to make sure our

13    treatments are safe for patients.  It is really my primary

14    concern.  I look at the data that goes into the New Drug

15    Application.  Then it really doesn't stop there.  You want

16    to make sure that once the product is approved, and patients

17    are using it, is it safe out in the marketplace?  The

18    feedback that I get from my fellow ophthalmologists, saying

19    that, yes, this is a better product and do we see that in

20    terms of reported safety issues from our patients?

21    Q.    I take it, from your testimony, Alphagan P is a line

22    extension of Alphagan.  Is that right?

23    A.    That's correct.

24    Q.    Do you believe it to be an improvement over Alphagan?

25    A.    Absolutely.

1                MR. BREISBLATT:  Objection, Your Honor.

2      Relevancy.

3                MR. SINGER:  I would just add, if I could lay a

4      little foundation, he is going to be discussing the clinical

5      trials.

6                THE COURT:  Okay.

7      BY MR. SINGER:

8      Q.    Dr. Whitcup, were you in charge of the clinical trials

9      for the Alphagan P product?

10     A.    Yes.  When I came to Allergan, the Phase 3 studies

11     were ongoing.  But it then became my responsibility to make

12     sure those trials got completed, helped with the analysis of

13     the data, supervised putting together the New Drug

14     Application.

15     Q.    Was it your judgment that the clinical trials were

16     suitable for submission to show an improvement over Alphagan

17     at the FDA?

18     A.    Yes.

19     Q.    Based on that, do you believe that Alphagan P is an

20     improvement over Alphagan?

21     A.    Absolutely.

22               MR. BREISBLATT:  Objection, relevancy, and calls

23     for an opinion outside -- he is not listed as an expert

24     witness, Your Honor.

25               THE COURT:  I wouldn't sustain it on the first

Whitcup - direct

1    basis.  But the second.

2            MR. SINGER:  I can move on, Your Honor.  That is

3    perfectly fine.

4            THE COURT:  Then I will sustain the objection.

5    BY MR. SINGER:

6    Q.    Let's talk a little bit about the active ingredient

7    and then go to the clinical trials that will be the subject

8    of this case.

9            I think we heard that brimonidine is the active

10   ingredient in both Alphagan and Alphagan P.  Is that

11   correct?

12   A.    That's correct.

13   Q.    How does brimonidine operate to treat glaucoma?

14   A.    So brimonidine treats glaucoma by lowering the

15   pressure in the eye and actually has two mechanisms of

16   action to do so.

17   Q.    About how much does brimonidine lower the intraocular

18   pressure?

19   A.    In the clinical trials that we have done, it lowers

20   pressure by approximately five or six millimeters of

21   mercury.  As we said, the normal range is approximately 10

22   to 20.

23            THE COURT:  What was the figure again?

24            THE WITNESS:  About five to six.

25   BY MR. SINGER:

Whitcup - direct

1   Q.    You said normal range is about 10 to 20?

2   A.    Correct.

3   Q.    Did you bring a demonstrative to explain the dual

4   mechanism you have actually described?

5   A.    Yes, we do have one.

6   Q.    If I could pull up ADX-14, please, on the screen.

7           This has a lot of arrows and some colors.  What

8   are we looking at, Dr. Whitcup?

9   A.    This is a cross-section of the eye.  Just to orient

10   the Court, this would be, for example, a patient lying on

11   the back looking upwards.  So the cornea, the front part of

12   the eye would be toward the top, and that optic nerve that I

13   talked about would be more toward the floor of the

14   courtroom.

15           This is the iris, the chloride part of the eye;

16   here, this would be the pupil, just to orient you.  This is

17   the lens of the eye.

18   Q.    And there are a bunch of arrows, unfortunately, they

19   are all the same color.  What are the arrows showing?

20   A.    This explains the normal flow and production of

21   aqueous humor and then drainage out of the eye.  Here is the

22   ciliary body that we talked about before.  That's the part

23   of the eye that produces this aqueous humor or fluid in the

24   eye.  The normal flow of the fluid is to go into the front

25   part of the eye through the pupil, and then normally drains

Whitcup - direct

1    out through two structures, not that the exact name matters,

2    is called the trabecular meshwork and the other main pathway

3    is the called the uveoscleral outflow pathway.

4            What this does is two things.  One, it decreases

5    the production of fluid, so it inhibits fluid production,

6    and also increases the amount of fluid leaving the eye, and

7    thereby lowering the pressure.

8    Q.    I think you mentioned earlier that there was cloggage

9    in the drainage system in glaucoma patients.  Where does

10   that occur?

11   A.    Typically, the cloggage, we think, occurs in the

12   trabecular meshwork.

13   Q.    Thank you, Dr. Whitcup.

14           You talked about the clinical trials for

15   Alphagan P that you were responsible for.  I want to move to

16   that.

17           When you joined Allergan in 2000 and took over

18   the clinical trials for Alphagan P, what did you understand

19   to be the goal of those clinical trials?

20   A.    The goal, we knew with brimonidine that there were

21   several side effects that inhibited its use in patients.  I

22   had seen some of the side effects.

23           One was the allergic conjunctivitis, the low

24   tolerability what also concerned me was the systemic safety.

25   So it was somnolence, which was an overall weakness, oral

Whitcup - direct

1    dryness was another one that we watched for, because that

2    was an indication, sort of a sentinel side effect that you

3    were getting systemic absorption of the drug.

4            The systemic side effects were of concern

5    because we knew, actually, if you give brimonidine, for

6    example, to infants, we saw some infants stop breathing.

7    This is not a subtle side effect.  In older patients, we

8    have done work to show that the amount of somnolence could

9    be associated with severe car accidents.

10            Given that safety is a key concern, not only

11    making the drug more tolerable to the eye, but decreasing

12    the systemic side effects, were really critical components

13    of the program.

14    Q.   If I could just talk a minute about the local side

15    effects you talked about, which I think you mentioned was

16    the allergy.  We saw the picture that was in opening

17    statements.  Is that the allergy that you are speaking

18    about?

19    A.   Yes.  That's, you know, a case of allergic

20    conjunctivitis that you can see.

21    Q.   Can we have that demonstrative up, please?

22            What are we looking at here in terms of the

23    effect of the drug on this person here, ADX-7?

24    A.   Conjunctivitis basically means inflammation of the

25    conjunctiva.  The conjunctiva is sort of the white part of

1    the eye.  That white part of the eye actually extends on the

2    underneath part of the eyelid itself.

3            You can see on this patient, the eyes are very

4    red, swollen, and the eyelids as well are involved with this

5    inflammation.  As noted before, just getting rid of bacteria

6    would get rid of this problem.  We didn't think that would

7    at all make sense, because there are a number of

8    medications.  The leading glaucoma product, which is

9    actually sold by another company, it Pfizer, called Salatin,

10   has lots of BAK in it.  And you almost never, maybe one in

11   1,000, would see this.  And we were seeing this in 15

12   percent of our patients.  We knew it wasn't a BAK problem.

13   Maybe a gentler preservative may help.  But this was due to

14   brimonidine.  And we knew that.

15   Q.    Is this a serious condition in your experience?

16   A.    You can see, this patient is not a happy patient.

17   They are calling up their ophthalmologist.  So the

18   ophthalmologist isn't happy.  We talked a little bit in the

19   opening statement as well, if you develop a sensitization

20   like this to brimonidine, then you can't use it anymore.

21   And although there are a number of other medications,

22   brimonidine is used by a number of patients, and even with

23   all the medications, there are still patients who don't get

24   pressure lowered enough and you need then to go to the

25   operating room.

Whitcup - direct

So it is an important motivation to try to decrease this type of sensitization so that people can stay on the medication.

Q.   Is the prognosis for a patient who has the allergy such that they can never receive the drug again?

A.   Most ophthalmologists feel if you get an allergic conjunctivitis like this, you would not want to take a chance and re-challenge the patient to risk this a second time.  So the vast majority of patients, once they develop this, they stay off the medication forever.

Q.   You talked about systemic side effects as well.  Just beg me some indulgence.  You said A-S-T-H-E-N-I-A.  What is asthenia?

A.   Asthenia is a weakness, a feeling of over generalized weakness.  That, in combination with somnolence, is the side effects that we knew occurred with brimonidine.  We had seen it in a number of studies that we did so one we really wanted to try to reduce.

Q.   What is somnolence again?

A.   Somnolence is sleepiness.  Again, we have done studies to show that the amount of somnolence you get with brimonidine with the .2 percent is severe enough to be associated with car accidents.

Q.   Then, I think you mentioned one other, which was an oral dryness.  What is the significance of oral dryness?

1    A.     So oral dryness, as well as being a bothersome side

2    effect that sometimes patients discontinue the medicine for,

3    was important for us because you get it with systemic

4    absorption of the drug.

5              THE COURT:  We are going to have to take a short

6    break, counsel.

7              (Recess taken.)

8              THE COURT:  Be seated.  Sorry about that.

9    Mr. Singer.

10             MR. SINGER:  Thank you, Your Honor.

11   BY MR. SINGER:

12   Q.     I want to turn now from the side effects that you

13   described to the clinical trials that you described you had

14   responsibility for.

15             How many clinical trials were done for the

16   Alphagan P .15 percent project?

17   A.     I believe there were five total trials done,

18   culminating in the two pivotal Phase 3 trials.

19   Q.     What are the two pivotal Phase 3 studies again?

20   A.     Those were randomized studies where we looked at the

21   original Alphagan compared to two concentrations, .15

22   percent and .2 percent, in the Purite formulation with the

23   changed pH.

24   Q.     You should have a notebook up there.  If you could

25   turn in there to what's marked as PTX-367.  Do you have

Whitcup - direct

1    that, sir?

2    A.    Yes, I do.

3    Q.    Is that your signature on the face page of that

4    document?

5    A.    Yes, it is.

6    Q.    Can you identify that document for the Court, please?

7    A.    That is the final 12-month clinical study report for

8    the first of the two Phase 3 trials.

9    Q.    Was that submitted to the FDA in connection with the

10   NDA for Alphagan P .15?

11   A.    Yes, it was.

12   Q.    If you would turn to the next document in your book,

13   it should be PTX-417.  Is that there, sir?

14   A.    Yes, it is.

15   Q.    Is that your signature on the face page of that

16   document?

17   A.    Yes.

18   Q.    Can you identify that document for the Court?

19   A.    This is the complete 12-month study report for the

20   second Phase 3 clinical trial, Study 008.

21   Q.    Was that also submitted to the FDA in connection with

22   the study of Alphagan P 0.15 percent?

23   A.    Yes.

24              MR. SINGER:  I would move PTX-617 and 417 into

25   evidence.

Whitcup - direct

1              THE COURT:  Fine.  These were pre-identified.

2              MR. SINGER:  Yes, on plaintiff's list.  They are

3    a subpart of the NDA.

4              THE COURT:  If these were all identified in the

5    pretrial order submission, they are in the record.

6              MR. SINGER:  Thank you.  I won't take up the

7    Court's time looking at documents then.

8    BY MR. SINGER:

9    Q.    Dr. Whitcup, as the person who signed off on these

10   trials, what were the major results of these trials?

11   A.    First one was efficacy, because we knew in talking to

12   the FDA that there were very strict criteria to show that

13   the pressure lowering of the new formulations was equivalent

14   or comparable to the base Alphagan.  We needed to have in

15   statistical terms the upper limits of the 95 percent

16   confidence intervals, which is a variability piece, within a

17   millimeter at the majority of time points and within a

18   millimeter and a half at every single time point.  We

19   measured I think at about 16 or 20 time points over the

20   study.

21              That was the key efficacy piece.  And we showed

22   that they were, in fact, comparable and did meet the FDA's

23   strict criteria in each of the Phase 2 studies.

24   Q.    Was there a safety finding as well?

25   A.    Yes.  Importantly, we saw significantly less of this

Whitcup - direct

1    allergic conjunctivitis that we were hoping to see.  And

2    also we saw decreased systemic side effects, like the oral

3    dryness, the somnolence and asthenia.

4    Q.    Is there a summary from which this data is put

5    together?

6    A.    The pooled data from those two Phase 3 trials was

7    published in the Journal of Glaucoma subsequent to

8    completing those studies.

9    Q.    What is the Journal of Glaucoma?

10   A.    The Journal of Glaucoma is one of the major

11   peer-reviewed journals where articles focused on glaucoma

12   are published.

13   Q.    Who was that article authored by?

14   A.    Dr. Jay Katz.

15   Q.    Who is Dr. Katz?

16   A.    Dr. Katz is a glaucoma specialist, who was also one of

17   the investigators in the trial.

18   Q.    Hopefully, you have that paper in front of you.  It's

19   EDTX-099.  I know it's also in the pretrial order at DTX-17.

20   Do you have that in front of you?

21   A.    Yes, I do.

22   Q.    If we could put that up on the screen.

23         You describe, Dr. Whitcup, the general protocol

24   of the study.  Is there somewhere we can find that protocol?

25   A.    If you look, on the second page, under Study Design.

Whitcup - direct

1   Q.   If we go to the second page, please.  Where do we see

2   the protocol?

3   A.   This basically describes the study design, that it was

4   12-month, it was double-masked.  That means neither the

5   patient or the evaluating physician knows.  Actually, you

6   may hear the term double-blind.  In ophthalmology we don't

7   use double-blind.  Patients don't want to go into a study

8   where they hear anything about blind.  So we call them

9   double-masked.  But it's basically the same thing.

10           The second paragraph talks about how the

11   patients were randomly assigned to receive those three

12   formulations of brimonidine, either the Purite formulation

13   of .15 percent, the Purite formulation of .2, or the

14   original brimonidine at .2 percent.

15   Q.   The original brimonidine .2 percent that we have

16   highlighted, is that Alphagan?

17   A.   That's correct.

18   Q.   And is one of the other. 2 Alphagan P?

19   A.   Yes, the .15 percent brimonidine Purite is Alphagan P.

20   Q.   What was the purpose of studying both the .15

21   brimonidine Purite and the .2 brimonidine Purite?

22   A.   To be honest, we were not sure that we would be able

23   to maintain equivalent efficacy at the FDA's strict criteria

24   with a .15 percent.  We knew that systemically we would hope

25   to see decreased systemic side effects by decreasing the

Whitcup - direct

1    concentration.  But given the strict criteria, we weren't

2    sure that .15 percent would meet the definition and may, in

3    fact, not be equivalent.  So we had the .2 percent in the

4    Purite formulation study as well.

5    Q.    Does the paper report those equivalent results?

6    A.    For the .15 percent, it does.

7    Q.    And where is that?

8    A.    That can be seen on the graph, I believe it's on Page

9    122, the manuscript.

10   Q.    And which graph are you referring to?

11   A.    It's on the bottom of the page.

12   Q.    If we could blow that up?

13         What are we seeing there on that graph?

14   A.    This summarizes the IOP data at just one of the time

15   points.

16         Again, we measured the intraocular pressure at

17   multiple time points during the day.  But for the article,

18   just one of the time points was picked.  You can see, the

19   lines really do need to be right on top of each other to

20   meet the FDA definition.  This needed to be replicated at

21   multiple time points in the day, at multiple study visits,

22   in each of the two studies independently.

23   Q.    If there were a gap between the lines, what would that

24   mean?

25   A.    A gap, if you saw a gap on this, it would mean that

Whitcup - direct

1    you wouldn't meet the FDA's definition.

2    Q.    And you talked about the safety profile.  Is that

3    found in here somewhere as well?

4    A.    There is a summary of some of the safety data, which

5    is on the following page.

6    Q.    Where are you referring to, sir?

7    A.    If you go to the next page.

8              The table at the top of the page.  This

9    summarizes some of the major findings of side effects, the

10   top line is the allergic conjunctivitis.  So you can see, it

11   was 9.2 percent in the Alphagan P formulation.  If you go to

12   the far right, it was 15.7 percent in the Alphagan, and

13   approximately the same, 14.6, in the .2 percent Purite

14   formulation.

15             In fact, the .15 percent Purite was

16   significantly less than either of the two other

17   formulations.  You can also then see oral dryness was

18   significantly less than the original Alphagan.  Redness of

19   the conjunctival hyperemia was significantly less as was eye

20   discharge.

21   Q.    In terms of patients, we have had a lot of numbers

22   thrown around right now, what is the difference between the

23   15.7 percent allergic conjunctivitis and the 9.2 percent

24   conjunctivitis?

25   A.    That is approximately six percent difference.  When

Whitcup - direct

1    you figure that there are probably half a million Americans

2    on this medication, half a million people in the U.S., the

3    six-percent decrease would be 30,000 less patients with

4    allergic conjunctivitis.  That means less people who can't

5    take the medication, less phone calls to physicians, less

6    unhappy patients.  This is felt to be a very meaningful

7    difference.

8    Q.    Are there additional a results that are not recorded

9    in the table that you reviewed?

10   A.    Yes, again I was concerned about somnolence and

11   asthenia.  Although not a focus of this paper, those were

12   also significantly less with the Alphagan P than with

13   Alphagan.

14   Q.    Were you surprised at the results?

15             MR. BREISBLATT:  Objection.  Again, he is not

16   listed as an expert witness.

17             MR. SINGER:  May I ask was he surprised at the

18   time just as a factual question?

19             THE COURT:  I will permit that.

20   BY MR. SINGER:

21   Q.    Were you surprised at the time by the results?

22   A.    I was very surprised by the results.  When I first

23   came to Allergan and I learned about the project, I was not

24   sure that the formulation would increase the bioavailability

25   to get more in the eye to get the exact pressure lowering

1    compatibility that the FDA requires and to be able to

2    demonstrate the striking side effect benefit.

3    Q.      Thank you, Your Honor.

4            Dr. Whitcup, did there come a time when the FDA

5    approved Alphagan P?

6    A.      Yes.  It was approved in, I believe it was the fall of

7    2001.

8    Q.      Did there come a time when Allergan withdrew the

9    Alphagan product?

10   A.      Yes, they did.

11   Q.      Did you support that withdrawal at the time?

12   A.      I did.

13   Q.      And why was that?

14   A.      We had data to show that Alphagan P had exactly

15   comparable pressure lowering, which is what the patients

16   wanted to see from an efficacy standpoint.  And looking at

17   the totality of the data there was a clear safety benefit.

18   Q.      Did you have discussions with the FDA about that

19   withdrawal before it occurred?

20   A.      Yes.  Actually, on initial approval they had asked

21   whether there were plans to potentially withdraw.

22   Q.      What did you tell them?

23   A.      We were considering withdrawing it.

24   Q.      Once it was withdrawn, were there proceedings at the

25   FDA over the withdrawal?

Whitcup - direct

1    A.      Allergan did file a citizens' petition, as was

2    discussed by Ms. Brooks this morning, discussing the

3    withdrawal of the base Alphagan product.

4    Q.      And you have in your -- you should have in your book

5    what is marked as DTX-335.  Do you have that there?

6    A.      Yes.

7    Q.      Is that the FDA's response to the citizens' petition?

8    A.      Yes.

9    Q.      Can we have that up on the screen.

10            I am going to read the conclusion that Ms.

11   Brooks highlighted in her opening, which was on the last

12   page:  "Therefore, we disagree with your assertion," your

13   being Allergan, "that Alphagan P .15 percent" -- if we could

14   put the last page up to help the Court follow along --

15   "Therefore, we disagree with your assertion that Alphagan P

16   0.15 percent is safer and more effective than Alphagan .2

17   percent and reject your contention that Alphagan .2 percent

18   was withdrawn for safety or effectiveness reasons."

19            Did I read that correctly?

20   A.      Yes.

21   Q.      Did you agree with that at the time of citizens'

22   petition decision?

23            MR. BREISBLATT:  Objection, relevancy as to

24   whether he agrees with it or not.  That is the FDA's

25   decision.

Whitcup - direct

1          THE COURT:  Overruled.

2          THE WITNESS:  No, I did not agree.

3    BY MR. SINGER:

4    Q.    Why not?

5    A.    We had clear-cut data on allergy and somnolence and

6    asthenia that showed that it was safer, that was borne out

7    by the treating physicians as well who started using the

8    product.

9          MR. SINGER:  Your Honor, I am at a convenient

10   breaking point if you want to break.  I can finish up in

11   about six or seven minutes.

12         THE COURT:  Let's do that.

13         MR. SINGER:  Thank you.

14   BY MR. SINGER:

15   Q.    Dr. Whitcup, since Allergan brought Alphagan P .15

16   percent to the market, has Allergan done anything further to

17   try to improve the product?

18   A.    Yes.  You know, though we had a substantial decrease

19   in the side effects that we see with brimonidine, that

20   didn't go to zero, we still got some patient complaints of

21   somnolence and some of the other side effects.  We talked to

22   the formulators and said, could we decrease the

23   concentration further, and could you, with the formulation,

24   improve the bioavailability, so we got more in the eye so we

25   could -- because we knew we needed to keep the same IOP

Whitcup - direct

1   lowering.  The FDA wouldn't allow us to get a comparable

2   product unless the IOP were the same.  So the formulators

3   said yes, and we did undertake a program to look at .1

4   percent brimonidine as well.

5   Q.    What was the result of that project?

6   A.    The result was that again we showed comparable

7   equivalent IOP lowering, met the FDA definition,

8   the 95-percent confidence intervals being within the margins

9   they set.  When you look at the totality of safety data,

10  again, it showed some safety benefit for patients.

11  Q.    Is that the Alphagan P 1-percent product?

12  A.    That is.

13  Q.    That is on the market today as well?

14  A.    That is.

15  Q.    In your book, let me ask one more question, was there

16  a clinical study, a report done for the FDA like the ones

17  for Alphagan P .15 percent?

18  A.    Yes, there is a 12-month complete study report that

19  summarizes both efficacy and safety over a one-year period.

20  Q.    Hopefully you have in your book Pages 188435 to 40 of

21  JTX-102.  Is that there, sir?

22  A.    Yes.

23  Q.    Can you identify this document for the Court, please?

24  A.    Yes.  That's the 12-month complete study report for

25  the pivotal Phase 3 trial for the Alphagan P 0.1 percent

Whitcup - direct

1    product.

2    Q.    And is this part of the NDA for the Alphagan P .1

3    percent product?

4    A.    Yes.

5    Q.    Is there a methodology you can point to as we did in

6    the Katz paper for the study?

7    A.    If you go to the synopsis on Page 3, under

8    Methodology, you can see that it describes the method of the

9    Phase 3 trial.

10   Q.    What was being studied there?

11   A.    So here we were comparing the new formulation, the

12   brimonidine Purite 0.1 percent to the base Alphagan.  It was

13   again a randomized trial, so patients were randomly assigned

14   to one of those two treatments.  And it talks about the

15   visit schedule, again, the FDA had very strict times at

16   which you measured all the intraocular pressures.

17   Q.    Why wasn't it compared to the Alphagan P .15 percent?

18   A.    Again, you know, the FDA -- one of their primary

19   concerns is efficacy, and where possible they always make

20   you measure back to the original product just in case there

21   were 12 iterations of a product, each almost imperceptibly

22   less effective than the first one, you could get a stepping

23   effect.  So they always have you compare back to the

24   original, in the FDA's mind it is almost the best and

25   fairest comparison.  We are trying to say you are comparable

Whitcup - direct

1    or equivalent to the original Alphagan.  So they made you

2    say compare the original Alphagan.

3    Q.    Are the efficacy results reported in here?

4    A.    Yes, they are.

5    Q.    Where can we find those?

6          THE COURT:  Doctor, would you explain what

7    stepping effect is?

8          THE WITNESS:  Sure.  The FDA had requirements to

9    be comparable.  If you were slightly less but not -- you

10   know, not inferior enough that you triggered their

11   definition of being not as effective, then you did another

12   one, and you were again imperceptibly or slightly less

13   effective than your drug 2, and you kept doing those, at the

14   end of the day, you might be far away from the original

15   Alphagan.  So they make you compare to the original so that,

16   even with the strict definition, there is no chance that you

17   sort of are a little bit less effective each time.  But

18   after five or six of these, you add them all up, you are now

19   three or four millimeters worse when each time you might

20   have been .3 millimeters worse.  They always have you go

21   back to the original one.

22         MR. SINGER:  Thank you, Your Honor.

23   BY MR. SINGER:

24   Q.    I asked before His Honor asked the question where the

25   efficacy results are in the documents.

Whitcup - direct

1   A.      If you look, there is a summary of the pressure

2   measurements on Page 5, if you look at the bottom half, this

3   just gives you an be idea of the criteria that the FDA used.

4   So you needed to measure this at multiple hours, at multiple

5   visits.

6           Again, one of the reasons I was surprised we

7   could do this and even more surprised at the .1 percent was

8   just the strict definition, and just the rigor of needing to

9   measure the pressure so thoroughly and at so many time

10  points.

11  Q.      And were the results also on adverse events that were

12  significant as well?

13  A.      Yes.  If you go to the safety section, which can be

14  seen on Page 7, it summarizes some of the main safety

15  benefits.  If you look at the first couple of paragraphs, I

16  will focus on a couple of things.  One, if you look at a the

17  first sentence in the second paragraph, where it says

18  Treatment related adverse events, so those were

19  significantly different, again, at .014.  We also noted that

20  discontinuations were less.

21          If you look at adverse events that forced the

22  patient to stop, it's in the last paragraph, that was also

23  significantly lower for patients using the Alphagan P .1

24  than the base Alphagan.

25          Again, I always looked at safety and looked back

Whitcup - direct

1    to asthenia and oral dryness.  If you go to the top

2    paragraph, the last sentence, you can see that again a

3    sentinel symptom of oral dryness was lower as was asthenia.

4            Again, we are seeing the same benefits that we

5    had hoped for.  Less side effects for the patient but

6    equivalent IOP.

7            MR. SINGER:  Thank you, Dr. Whitcup.  I have no

8    further questions at this time.

9            THE COURT:  Thank you, Doctor.  We will have

10    cross-examination after lunch.  Let's come back at 1:30.

11            (Luncheon recess taken.)

12            THE COURT:  Counsel, please stay seated.

13            Counsel, a housekeeping matter for tomorrow.  I

14    have a rather important issue that I am dealing with.  It's

15    going to affect the schedule for tomorrow.  You are going to

16    need to be flexible.  My present plan is to begin at the

17    9:00 hour and to work until 10:15, and then resume between 2

18    and 2:15, depending upon my late morning and early

19    afternoon.

20            Okay.  Cross.

21            THE COURT:  And we will go until 6:00 tomorrow.

22                  CROSS-EXAMINATION

23    BY MR. BREISBLATT:

24    Q.    Do you still have your book there that you were handed

25    with your exhibits?

Whitcup - direct

1    A.    No, I don't.

2    Q.    May I please have it?

3          MR. BREISBLATT:  Your Honor, does the Court

4    still have its copy of the book?

5          THE COURT:  I do.

6    BY MR. BREISBLATT:

7    Q.    Dr. Whitcup, I would like you to look at DTX-335.  I

8    believe you referred to it in your direct examination.  That

9    is the FDA letter.  Do you recall that?

10   A.    Yes.

11   Q.    I would like to take you to Page AGN 0224688, and you

12   were employed by Allergan at the time that this letter was

13   written.  Correct?

14   A.    The response -- yes.

15   Q.    Now, I would like to look at the first sentence, go

16   down to the last paragraph on that Page 10, I am going to

17   focus on the sentence that begins with, "When Allergan

18   withdrew Alphagan 0.2 percent."  Do you see that?

19   A.    Yes.

20   Q.    Now, the FDA suggested that you did not, Allergan did

21   not cause itself significant harm because it waited until it

22   was able to supply adequate amounts of Alphagan P 0.15 to

23   cover Alphagan 0.2 prescriptions before implementing the

24   withdrawal.  Do you see that?

25   A.    Yes, I do.

1    Q.    In fact, that's what happened, isn't it?

2    A.    I wasn't involved in that.

3    Q.    That's not my question, sir.  That's what happened.

4    In other words, Allergan kept Alphagan .2 percent on the

5    market until it had enough Alphagan .15 to cover the

6    prescriptions.  Isn't that correct, sir?

7    A.    That's what it says.

8    Q.    And, in fact, Allergan still sells Alphagan 2 percent

9    in Europe, doesn't it?

10   A.    Yes, it does.  But the --

11   Q.    Does it sell .2 percent in Europe, sir?

12   A.    I answered yes.

13   Q.    Thank you.

14           MR. SINGER:  If the witness could be permitted

15   to finish his answer, I would appreciate it.

16           THE COURT:  That is fair.  I understand this is

17   cross-examination, counsel.  But let the witness finish his

18   answer.

19           THE WITNESS:  We don't sell it because the

20   European requirements for preservatives are different, so we

21   could not get the .15 percent approved.

22   BY MR. BREISBLATT:

23   Q.    You could have taken .2 percent off the market if you

24   thought it was a safety and health problem, couldn't you?

25   A.    We could.

Whitcup - direct

1    Q.    Now, the FDA's said, if anything, Allergan's decision

2    economically benefited the company by removing from the

3    market a drug that was subject to imminent generic

4    competition on the Alphagan 2 percent.  And that's what was

5    about to happen.  Right?  Allergan knew that generic

6    versions of .2 percent were going to be hitting the

7    marketplace.  Am I correct?

8    A.    Correct.

9    Q.    And shifting the vast majority of prescriptions for

10   the remaining drug Alphagan .15, which was not facing

11   imminent generic competition, and that's what you did.  Am I

12   correct?

13   A.    There was a shift to what we thought was a safer

14   product.

15   Q.    But you took the .2 percent off and you shifted the

16   doctors to .15 before the generic competition could begin.

17   Correct?

18   A.    It was before the generic competition, but after

19   approval.

20   Q.    And then Allergan is no doubt aware that even if an

21   ANDA referring to Alphagan 0.2 percent is approved, it

22   cannot be rated therapeutically equivalent, and, therefore,

23   substitutable to Alphagan P 0.15, the product remaining on

24   the market.  Isn't that correct?

25   A.    That's correct.

Whitcup - direct

1   Q.    And the FDA found that Allergan had gained economic

2   advantage through the withdrawal of the Alphagan 2 percent.

3   Isn't that correct?

4   A.    It hypothesized that.

5   Q.    Now, are you familiar as to the date when the NDA was

6   filed for Alphagan P .15?

7   A.    No, I don't recall the exact date.

8   Q.    Would it refresh your recollection if I showed you the

9   cover page and it showed a date of June 29, '00?

10  A.    I am sure if that's the correct date --

11  Q.    Let me show you a copy of GTX-101 A and let me ask if

12  this refreshes your recollection?

13          THE COURT:  Counsel, you would like to approach

14  the witness?

15          MR. BREISBLATT:  I am sorry, Your Honor.  May I

16  approach the witness?

17          THE COURT:  Yes, you may.  And you have leave to

18  approach freely.

19  BY MR. BREISBLATT:

20  Q.    If you look at the second page, does that refresh your

21  recollection as to the filing date of the NDA for Alphagan P

22  .15?

23  A.    Yes, it appears to be 2/29/2000.

24  Q.    Is it fair to say by June 29th, 2000, Alphagan

25  believed that the .15 was the best mode for making a

Whitcup - direct

1    brimonidine tartrate glaucoma medication?

2    A.    We felt by then that if approved and available for

3    patients, it was the safer medication, absolutely.

4    Q.    Now, when you file an NDA and it is accepted, in this

5    case, for the P .15, Alphagan received from the FDA three

6    years of exclusivity, did it not?

7    A.    I believe so, yes.

8    Q.    And during that period of time, no generic could come

9    on the marketplace even if you didn't have any patent

10   protection.  Isn't that correct?

11   A.    Correct.

12   Q.    Now, in the Allergan business model, that three years

13   of exclusivity is not enough, is it?

14   A.    I am not sure what the question is.  Not enough for

15   what?

16            THE COURT:  If you are not sure, just say you

17   are not sure.

18            THE WITNESS:  I am not sure.

19   BY MR. BREISBLATT:

20   Q.    That what Allergan really shoots for is to get patent

21   protection for its products.  Correct?

22   A.    I think that's always one of the considerations.  The

23   key consideration, you know, as well as to have a better

24   product for patients.

25   Q.    But it is a key consideration, patent protection.  Am

Whitcup - direct

1    I correct?

2    A.    That is one consideration, yes.

3    Q.    Because that will extend out the period of time of

4    exclusivity.  Am I correct?

5    A.    If you have patent protection, that would do that,

6    yes.

7    Q.    Now, the Alphagan family of products, is that a major

8    product for Allergan?

9    A.    It's one of our major products.

10   Q.    Very profitable line?

11   A.    It is not the most profitable but it is an important

12   medication that we sell.

13   Q.    And a profitable one.  Correct?

14   A.    Yes.

15   Q.    In the case of the Alphagan P, even though you were

16   not there, you learned that the way that they came up with

17   this product is combining the Alphagan Refresh Tears product

18   with brimonidine tartrate.  Correct?

19   A.    My understanding, although I am not a formulator, is

20   it wasn't as simple as taking two known products and

21   combining them.

22   Q.    That wasn't my question.  They took the Refresh Tears

23   formulation and combined it with brimonidine tartrate.

24   Isn't that correct?

25   A.    Again, I am not a formulation expert, so I don't know

Whitcup - direct

1   what was exactly in the Refresh Tears formulation and if

2   it's really an exact combination.

3   Q.    And the Refresh Tears product was a patented product,

4   wasn't it?

5   A.    I believe that the Purite preservative was patent

6   protected.

7   Q.    Let me show you what has been marked as DTX-021.  Do

8   you recognize this as being Brimo X being the formulation

9   for Alphagan P?

10   A.    Again --

11   Q.    I know you are not a formulator, but do you recognize

12   that as being the ingredients within it?

13   A.    Parts of it, yes.  Parts of it, to be honest, no.

14   Q.    If you look over to the Refresh Tears, you see where

15   it contains, other than the brimonidine tartrate, the same

16   ingredients.  Do you see that?

17   A.    Yes, I see it.

18          MR. BREISBLATT:  If I may have a moment, Your

19   Honor?

20          THE COURT:  Yes.

21          (Pause.)

22   BY MR. BREISBLATT:

23   Q.    Now, you would agree with me, would you not, at least

24   in 1999, which is before the Katz study -- the Katz study

25   you have in front of you.  Do you still have that in your

Whitcup - direct

1   book?  I believe it is --

2   A.   I have it.

3   Q.   EDTX-099?

4        What is the date of that?

5   A.   I am looking myself.

6   Q.   I believe if you look down at the bottom on that first

7   page, you see where it says, Received May 9, 2001; Accepted

8   August 7, 2001?

9   A.   Right.  So it was published sometime after that.

10  Q.   Sometime after 2001?

11  A.   Well, sometime after August.

12  Q.   August 2001.  And you would agree with me, though, in

13  the summer of 1999, there really hadn't been any

14  authoritative studies done on whether there was allergies

15  caused by brimonidine tartrate.  Correct?  Or you have not

16  seen one, at least?

17  A.   I wasn't at Allergan then, but I am fairly sure that

18  there was a number of reports of severe allergy with

19  brimonidine prior to that.

20  Q.   Allergies, but no substantial report like the Katz

21  report comparing .15 to .20.  Am I correct?

22  A.   That is correct.

23  Q.   And it was known that BAK caused irritation, you have

24  testified about that.  Correct?

25  A.   Not nearly in the same vein.  The irritation you get

Whitcup - direct

1    with BAK is really not like what was shown today.

2    Q.    Let me show you what has been marked as DTX-10.

3              THE COURT:  I have given you free leave to

4    approach this witness.  Just with each witness, ask for

5    liberty to approach that witness.

6              MR. BREISBLATT:  Thank you.

7    BY MR. BREISBLATT:

8    Q.    Do you have DTX-10 in front of you?

9    A.    Yes.

10   Q.    It is a pretty thick document, so I will direct you to

11   AGN 00059381.  And you know what numbers I am talking about?

12   The little Bates numbers at the bottom?

13   A.    Yes.

14   Q.    And you understood this to be an Allergan internal

15   document dated January 24, 2000.  Am I correct?

16   A.    Yes.

17   Q.    If you look at AGN 59381, do you see at least in

18   January 24, 2000 at Allergan, the replacement of BAK with

19   Purite was initiated in an effort to improve the efficacy

20   and/or tolerability of Alphagan formulation.  Do you see

21   that?

22   A.    Yes.

23   Q.    "Although BAK has been safely used in numerous

24   ophthalmic preparations, it is known to induce corneal

25   epithelial toxicity and cause allergic reactions in some

1    patients."  And it cites to some literature.  Is that

2    correct?

3    A.      That's correct.

4    Q.      The literature it cites to all predates July of 1999.

5    Am I correct?

6    A.      That's correct.

7    Q.      Finally, Doctor, a general proposition.  If one wants

8    to eliminate or limit side effects, one of the things they

9    can do is limit the dose of the active ingredient.  Am I

10   correct?

11   A.      To limit side effects, you can -- the issue is can you

12   maintain efficacy at the same time?

13   Q.      One way to deal with side effects is to lower the drug

14   dose.  Am I correct?

15   A.      That's correct.

16            MR. BREISBLATT:  No further questions.

17            THE COURT:  Any redirect?

18            I am sorry.  I apologize.  Mr. Boggs.

19            MR. BOGGS:  That's okay.

20   BY MR. BOGGS:

21   Q.      Hello, Mr. Whitcup.

22            When you first started your direct testimony,

23   you were describing Phase 1, Phase 2, and Phase 3 clinical

24   trials.  What is done in a Phase 1 trial?

25   A.      Phase 1 trials assess predominantly safety of the

1    medication.

2    Q.    Safety issues.  Is that right?

3    A.    Correct.

4    Q.    What's done in Phase 2 trials?

5    A.    Phase 2 expands upon the safety and looks at efficacy

6    of the medication.

7    Q.    Now, you mentioned before Alphagan P .15 percent

8    brimonidine.  Was that the first product you worked with at

9    Allergan?

10   A.    One of the first ones when I came to the company was

11   that .15 percent.

12   Q.    What were the results of the Phase 2 trials for

13   Alphagan .15 percent P?

14   A.    Both studies were done prior to my arriving at

15   Allergan.  But I have seen publications of the results that

16   showed that there was a dose response to brimonidine for

17   lowering intraocular pressure.

18   Q.    For a .15 percent formulation?

19   A.    I believe the study looked at .08, that was shown this

20   morning as well, .2, .5.

21   Q.    There were no Phase 2 trials done with .15 percent

22   brimonidine.  Isn't that correct?

23   A.    That's correct.  .15 was based on pharmacokinetic data

24   that we had with the new formulation.

25   Q.    So no safety Phase 1 trials were done and no safety

1    and efficacy Phase 2 trials were done.  Is that right?

2    A.    Well, it is not exactly true.  We did pharmacokinetic

3    studies.  But what the FDA wanted to see was what was the

4    patient actually exposed to.  What we showed them, both in

5    patients and in our animal models, was that by changing the

6    formulation, we could lower to .15, get the same amount in

7    the eye, but have less in the blood.  That allowed the FDA

8    to accept our .15 percent.

9    Q.    Mr. Whitcup, Allergan went straight to Phase 3 trials

10   with the .15 P formulation.  Isn't that right?

11   A.    No, that's not correct.  Again, we did pharmacokinetic

12   studies.  Initially, we did dose ranging in Phase 2 and then

13   presented data to the FDA after those studies to justify the

14   doses we picked for Phase 3.  That is always an important

15   part before you go into Phase 3 is to have conversations

16   with the agency.  And those were all done.

17   Q.    Were there Phase 2 trials done with .15 P?

18   A.    Yes.  Again, not with that specific dose.  But trials

19   that justified the use of that dose.

20   Q.    So you predicted the .15 would do just fine in Phase 3

21   .  Is that right?

22   A.    Well, actually, we didn't.  We picked that as one of

23   the dosages, but we also put a .2 in there, because, given

24   guidance from the FDA, they said we have a very strict

25   hurdle rate to be comparable, and there were people at

Whitcup - direct

1    Allergan who didn't think that the change in formulation

2    would improve the bioavailability enough at that point, .15,

3    that it would meet the FDA hurdle and that's why we actually

4    put two doses in Phase 3.  If we were sure .15 would work,

5    we would have never put the .2 in.

6    Q.    What is involved in a Phase 3 trial?

7    A.    Phase 3 trials, the FDA gives you pretty standard ways

8    to measure pressure.  At least for glaucoma, you know

9    exactly what you want to do.  They tell you when and how to

10   measure the pressure, you put the patients with glaucoma

11   into the study, dose them, and measures the pressures as the

12   FDA says.

13   Q.    They are very costly, aren't they?

14   A.    You know, again, the nice thing about glaucoma studies

15   is you know how to do them.  So in the scheme of the

16   products we develop, you know, they are not inexpensive, but

17   they are among the less expensive trials that we do, just

18   because they are standard approaches to those patients.

19   Q.    You have talked about those boxes over there earlier.

20   Is that one NDA or two NDAs?

21   A.    I believe that's just the Alphagan P NDA.  So single

22   NDA.

23   Q.    Alphagan P .15?

24   A.    Correct.

25   Q.    There is nine boxes?

Whitcup - direct

1    A.    Correct.

2    Q.    And you say that's a standard size for an NDA?

3    A.    Correct.

4    Q.    Now, are there, in an NDA, manufacturing instructions?

5    A.    I believe there is a manufacturing section that is

6    included, yes.

7    Q.    And that manufacturing section explains how the

8    product is made.  Is that right?

9    A.    Part of those sections talk about manufacturing.

10   Q.    And what happens if you deviate from those

11   manufacturing instructions?

12   A.    I am not, you know, I am not the manufacturing expert.

13   But there are FDA guidelines that you -- that get reviewed.

14   And if you fail to meet certain FDA regulations, then the

15   New Drug Application won't be approved.

16   Q.    What if it's approved and you deviate from those

17   manufacturing instructions, can you sell that product?

18   A.    If the FDA becomes aware, there are certain -- it

19   depends what the deviation is.  Some you can explain to the

20   agency, and as long as they are corrective measures, or you

21   explain why there is no impact to the patients, you may be

22   able to change the specification.  If it's a deviation that

23   puts patients at risk, clearly, you shouldn't and we

24   wouldn't sell that medication.

25   Q.    I would like to look at the picture of allergic

Whitcup - direct

1  conjunctivitis, ADX-7?

2         Dr. Whitcup, is this your patient?

3  A.    This is not my patient.

4  Q.    Where did this picture come from?

5  A.    I am not exactly sure where this photograph came from.

6  I believe it was from an academy publication.  But I am not

7  sure.

8  Q.    There is something wrong with that patient's nose.  Do

9  you know what's wrong with that?

10  A.    I am not sure.

11  Q.    So you can't even testify with certainty that this

12  person was taking Alphagan.  Is that right?

13  A.    Since I didn't see this specific patient, I can't

14  testify.  I can tell you that I have seen many patients with

15  allergic conjunctivitis from Alphagan that look very much

16  the same as this patient.

17  Q.    Did you bring any pictures of them with you?

18  A.    No, I did not.

19         MR. BOGGS:  No further questions.  Thank you.

20         THE COURT:  Redirect, Mr. Singer.

21         MR. SINGER:  May I have redirect for two

22  minutes.

23         THE COURT:  Yes.  That's what I was offering.

24  If you want to take longer than two minutes, you may.

25              REDIRECT EXAMINATION

1    ^  BY MR. SINGER:

2    Q.    I just wanted to give you a chance, Dr. Whitcup, to

3    follow up on something that counsel asked.  If I can refer

4    you, I believe it was DTX-10, the portion about the BAK, it

5    was on that big thick document, AGN 0059381.

6          Do you have that in front of you?

7    A.    Yes.

8    Q.    Counsel referred to the sentence that although BAK has

9    been safely used in numerous ophthalmic preparations, it is

10   known to cause corneal epithelial toxicity and cause

11   allergic reactions in certain patients.  And I believe you

12   commented that it was very different than the patient

13   Mr. Boggs put up.  What did you mean, "it was different"?

14   A.    Two points.  One, the epithelial toxicity in some

15   patients causes mild discomfort.  There are rare cases of

16   allergy, but in the range of maybe one percent or less.  We

17   have BAK in many, many of our products and don't see

18   anything at all that looks like the rate and the type of

19   allergy we have seen with Alphagan.

20         So although BAK is known to cause some ocular

21   side effects, they tend to be much more mild than we saw

22   with Alphagan and the allergy much rarer.  In fact, as I

23   said before, the leading glaucoma product, Zalton, has a lot

24   of BAK.  You just don't see any similar side effects in

25   scope or in frequency to what we saw with Alphagan.

Whitcup - direct

1          When I looked at it, if you can have a better

2     preservative, that is a plus, but I didn't think changing

3     the BAK would at all address the allergy problem that we had

4     with Alphagan.

5     Q.     What did you attribute the allergy improvement to in

6     the Alphagan P product?

7     A.     Less drug.

8               MR. SINGER:  Thank you, I have nothing further.

9               THE COURT:  Thank you, Doctor.

10              THE WITNESS:  Thank you.

11              (Witness excused.)

12              MR. SINGER:  Your Honor, we don't plan to recall

13    Dr. Whitcup.  May he stay in the courtroom.

14              MR. BREISBLATT:  We have no objection, Your

15    Honor.

16              MR. BOGGS:  No objection.

17              MR. SINGER:  Thank you, counsel.

18              THE COURT:  Certainly.

19              MR. SINGER:  Thank you, Your Honor.

20              MS. BROOKS:  Your Honor, Allergan would call as

21    its next witness Dr. Olejnik.

22              OREST OLEJNIK, having been duly

23    sworn as a witness, was examined and testified as follows:

24              MS. BROOKS:  Your Honor, might I approach the

25    witness to give him an exhibit binder?

Whitcup - direct

1              THE COURT:  You have leave to approach the

2      witness, Ms. Brooks.

3              MS. BROOKS:  Thank you, Your Honor.

4              Your Honor, before I forget, Dr. Olejnik has a

5      medical condition that might require him to take very sudden

6      breaks.  Hopefully not.  But with the Court's permission, if

7      he does, we may just ask the Court for a break and be

8      excused.

9              THE COURT:  Just let me know, Doctor.  We will

10     both take a break.

11             MS. BROOKS:  Thank you, Your Honor.

12                        DIRECT EXAMINATION

13     ^  BY MS. BROOKS:

14     Q.    Good afternoon, Dr. Olejnik.

15     A.    Good afternoon.

16     Q.    I can hardly see you with that monitor there.

17     A.    Good afternoon.  Does this chair --

18             THE COURT:  It doesn't move.  It's the

19     government's way of maintaining control?  I don't know.

20             MS. BROOKS:  It is a bad combination of a big

21     monitor and a short lawyer.

22             With the Court's permission, may I conduct the

23     examination from here.

24             THE COURT:  Absolutely.

25             MS. BROOKS:  Thank you.

Whitcup - direct

1   BY MS. BROOKS:

2   Q.    Dr. Olejnik, have you ever testified in a courtroom

3   before?

4   A.    No, I have not.

5   Q.    Is it a bit intimidating?

6   A.    I am trying to think.  It will be a new experience,

7   put it this way.

8   Q.    Well, if at any point I or opposing counsel ask a

9   question you don't understand or if we go too fast, will you

10  please just let us know?

11  A.    I will.

12  Q.    Thank you.  Can you tell the Court, please, where you

13  work?

14  A.    I work at Allergan, in Irvine, California.

15  Q.    How long have you worked there?

16  A.    Over 17 years.  It will be almost 18 years in July.

17  Q.    What is your current position at Allergan?

18  A.    I am a senior vice president of global pharmaceutical

19  sciences.

20  Q.    What does that mean?

21  A.    It means, it covers many discipline functions within

22  that pharmaceutical sciences area.  And, essentially, it's

23  the pre-formulation, understanding the physical and chemical

24  characteristics of API, the drug substance, the active

25  pharmaceutical ingredient, developing the formulations to be

1    safe, effective, fit for use for the patient.

2            It involves manufacturing of formulations,

3    understanding how to scale them up for manufacturer, large

4    scale, it includes manufacturer for clinical supplies, for

5    safety studies, flexibility studies, we do get involved in a

6    lot of the method analytical developments to understand

7    again the key aspects of the formulation.  Finally,

8    providing all of the data that we generate in that field,

9    the chemical, manufacturing, and control section that goes

10   into a dossier to the agency, whether it be the FDA or other

11   agencies worldwide.

12   Q.   That sounds like a lot of stuff that you oversee?

13   A.   It does.  I have good people that do that as well.

14   Q.   How many people do you have that report to you either

15   directly or indirectly in your position?

16   A.   Approximately 300 people.

17   Q.   Now, I would like to back up a little bit then and

18   talk a little about your background that would enable you to

19   have the sort of position that you have at Allergan.

20            Do you have a Ph.D.?

21   A.   Yes, I do.

22   Q.   Could you tell the Court what your Ph.D. is in?

23   A.   It is a Ph.D. in ion association, species and drug

24   transport.  It is in pharmaceutics, essentially.

25   Q.   Did you just say that you got your Ph.D. in ion

1    association, and could you repeat the rest of it, please?

2    A.    Species and drug transport.

3    Q.    Ion association species and drug transport.  That was

4    the title of your thesis?

5    A.    I think it was the title.  Whether "species" is in

6    there, I don't know.  But it was ion association drug

7    transport.

8    Q.    What year did you get your Ph.D.?

9    A.    That was in 1981.  Convocation was in December of

10   1981.

11   Q.    Convocation?

12   A.    Yes.

13   Q.    Can you explain, I think that may be a British term,

14   so can you explain to us what convocation is as far as a

15   Ph.D.?

16   A.    After going through your viability, defending the

17   thesis, which it feels like I am doing here now, there is a

18   natural official ceremony where the Ph.D. is bestowed on the

19   student.  And that occurred, I think it was on the 12th of

20   December.

21   Q.    What university was that?

22   A.    That was the University of Nottingham.

23   Q.    So I detect a British accent?

24   A.    It is a British accent.  The name may not suggest it.

25   But I was born and raised in the U.K., yes.

Whitcup - direct

1    Q.      When did you come to the United States?

2    A.      That was in April of 1984.

3    Q.      After coming to the United States, did you work in the

4    area of drug formulations at all?

5    A.      Yes, I did.

6    Q.      Could you tell the Court a little bit about that

7    background?

8    A.      Here in the U.S.?

9    Q.      Sure.  Or even starting in Great Britain, if it is

10   pertinent.

11   A.      I started with Sterling Winthrop prior to -- my first

12   degree, undergraduate degree is in pharmacy.  And after

13   finishing the pharmacy degree, I went to work for Sterling

14   Winthrop.  As part of that was to also register with the

15   Pharmaceutical Society of Great Britain, which required you

16   to get experience with an industry, within the hospital,

17   within the retail pharmacy side.  The majority of my work

18   was done at Sterling Winthrop.  And I was involved in solid

19   dosage forms, gels for dermatological products,

20   suppositories.  The full gamut of dosage forms.

21   Q.      And after that, what happened?

22   A.      After that, I went to Nottingham University to do my

23   Ph.D.  After I finished that, I went to Fisons

24   Pharmaceuticals, which is now part of AstraZeneca.  And I

25   was focused in the pre-formulation area, providing all the

1   physical-chemical characterization of compounds, excipients,

2   that were, again, for a wide range of products, and some of

3   the work with ophthalmic wholesalers, solid dosage forms,

4   and so on.

5   Q.    Let me stop you there because you put a lot in that

6   answer, some terms we may not be familiar with, including

7   me.  You said it's in the pre-formulation area.  What is

8   pre-formulation?

9   A.    Pre-formulation is one where you are studying the

10  aspects of the drug compound.  You need to understand how it

11  would behave one as its own substance.  You need to know, is

12  it stable enough just as a drug in a container.  The

13  pharmaceutical companies, they have their compounds, drug

14  substances, synthesized.

15        You need to fully understand, is that drug

16  stable under conditions of light, in air, what other, heat,

17  will heat cause the drug to degrade.  You need to fully

18  understand, again, the stability aspects of that compound.

19  And then begin to understand its physical chemical behavior,

20  the pKa, the solubility aspects of the drug.

21        If you are developing it as a solid dosage form,

22  you want to understand its crystal behavior, does it change

23  form?  Does it become a polymorphic form, which, in of

24  itself, could, in fact, be in a form that is completely

25  insoluble in an aqueous system, indeed, when taken into the

1    body?

2           So there are many facets with regards to

3    understanding just the preliminary aspects.  Then again the

4    behavior of excipients.  You need to understand the behavior

5    of the excipients in relation to the drug itself.

6    Q.    You mentioned the word "drug," and separate from that,

7    you used the term "excipient."  Are they different things?

8    A.    Yes, they are.

9    Q.    What is the difference between what you would refer to

10   as a drug and what you would refer to as an excipient?

11   A.    An excipient is an inactive ingredient that is brought

12   together as a formulation with the drug, which is the active

13   ingredient, to create a system that is amenable for

14   administration to the patient, ultimately.

15   Q.    And I heard you mention in your earlier answer

16   something about having to know about the pKa of the drug.

17   What is pKa?

18   A.    The pKa basically defines what pH, in a very

19   simplistic term, what pH will the drug be -- in a 50 percent

20   - 50 percent ionized/non-ionized state.

21   Q.    Now, moving ahead, you did all this pre-formulation

22   work.  What is the next company you worked for after that?

23   A.    I then left Fisons to work for, I was going to go to

24   Merck but I decided to go to this smaller company, it was

25   out in Mountain, UCA, I didn't know what "CA" meant at the

1  time, it ended up being California.  I ended up working for

2  a small company up in Northern California called Cooper

3  Vision.

4  Q.    I take it Cooper Vision, based on the last part of

5  that title, dealt with ophthalmic?

6  A.    It was ophthalmic.  A lot of contact lens care, as

7  well as ophthalmic drug products.

8  Q.    What time period are we talking about now?

9  A.    That was in April of 1984.  I remember it well.  When

10  I arrived, there was an earthquake in Morgan Hill, which was

11  quite an interesting experience.

12  Q.    I take it you had not been in an earthquake before?

13  A.    No, I had not.

14  Q.    My apologies from the State of California?

15  A.    And the wrath of my mother at times.

16  Q.    But you are still in California now?

17  A.    Yes, I am.

18  Q.    So based on what you have told us, so we can kind of

19  fast-forward to your really extensive work history, at some

20  point, did you work for Johnson & Johnson?

21  A.    Yes, I did.  At one point in time, Cooper Vision, the

22  pharmaceutical side of the business which I was a part of,

23  Johnson & Johnson acquired that business.

24  Q.    So would it be fair to say that you have worked in the

25  area of pre-formulations and formulations of ophthalmic for

Whitcup - direct

1   over three decades?

2   A.     Yes.   Sounds rather long.   But, yes.

3   Q.     That is the first time you counted it up.

4          So, Dr. Olejnik, during the course of all of

5   that time, did you obtain, were you listed as an inventor on

6   any United States patents?

7   A.     Yes, I was.

8   Q.     And, specifically, if you could turn in your binder to

9   what has been marked as JTX-002, JTX-003, JTX-004, and

10  JTX-005, and please tell the Court -- they are already in

11  evidence -- what these four patents are?

12  A.     Well, JTX-003 is the composition containing

13  therapeutically active components having enhanced

14  solubility.

15  Q.     You are going to have to slow down, I am afraid, so

16  the court reporter can get that down.

17         Could you say again what that is?

18  A.     Compositions containing therapeutically active

19  components having enhanced solubility.

20  Q.     And what number was that?

21  A.     That was JTX-002, I might have said 003.   It's

22  JTX-002.

23  Q.     Is that the '873 patent?

24  A.     That is the '873 patent, correct.

25  Q.     Are you a listed inventor along with Dr. Kerslake?

Whitcup - direct

1    A.    Yes, I am.

2    Q.    And now, JTX-003, is that the '210 patent?

3    A.    JTX-003 is the '210 patent.

4    Q.    Are you also a listed inventor on that patent?

5    A.    Yes, I am.

6    Q.    JTX-004, is that the '834 patent?

7    A.    JTX-004, that is the '834 patent.

8    Q.    And, again, are you a listed inventor along with

9    Dr. Kerslake on that patent?

10   A.    Yes, I am.

11   Q.    JTX-005, is that the '337 patent?

12   A.    JTX-005, that is the '337 patent.

13   Q.    Are you a listed inventor on that patent along with

14   Dr. Kerslake?

15   A.    Yes, I am.

16   Q.    We are going to come back in a little bit to talk

17   about the patents themselves.  But what I would like to do

18   now is back up to how you came to create the inventions that

19   are the subject of the four patents that we just talked

20   about.

21            Okay?

22   A.    Yes.

23   Q.    So when you came to Allergan in 1991, was anyone at

24   Allergan working on a formulation involving brimonidine?

25   A.    Yes, they were.

Whitcup - direct

1    Q.    And what were they working on?

2    A.    They were working on what became the Alphagan .2

3    percent product.

4    Q.    Now, we have heard about the Alphagan .2 percent

5    product.  When you refer to .2 percent, does that mean the

6    brimonidine is at a .2 percent amount?

7    A.    That was the brimonidine tartrate .2 percent.

8    Q.    If you could look, please, in your binder, at JTX-101,

9    it is a joint exhibit, and, specifically, if we could have

10   Bates No. 8769 put up.  If we could have blown up, it is

11   really not very good print, but it's the best copy we have,

12   the very first sentence says, Alphagan, under Description,

13   so we have Alphagan brimonidine tartrate ophthalmic solution

14   .2 percent.

15         Is that the formulation that they were working

16   on at Allergan when you arrived in 1991?

17   A.    That is correct, yes.

18   Q.    And then if we could go down below the molecular

19   structure, there is a sentence that says, The pH of 6.3 to

20   6.5.  It is right above where it says, Clinical

21   pharmacology.  There we go.  Do you see that?

22   A.    Yes, I do.

23   Q.    Now, did you work on this actual formulation?  If we

24   could leave that up there, thank you.  Did you work on this

25   actual formulation?

Whitcup - direct

1    A.    No.   Only indirectly in terms of filing the proving

2    reports and involved in filing the NDA.

3    Q.    You saw, obviously, at some point, what this

4    formulation was going to be, the amount of brimonidine and

5    what the pH was going to be?

6    A.    Yes, I did.

7    Q.    And when you saw that the pH of Alphagan was going to

8    be approximately 6.3 to 6.5, did you have any questions

9    regarding that?

10   A.    Well, I had concerns that it was in an acidic region

11   from all the work that I have done in the past and knowledge

12   about the complexities of the eye and so on.   It's

13   preferable, as part of a formulation focus, to achieve

14   physiological pH.

15          This was not physiological pH.   This was in the

16   acidic region.

17   Q.    In fact, could we put up ADX-5, please.   Just so we

18   know what we are talking about and can orient ourselves,

19   when you say "acidic region," we have put up here a big "I"

20   and it says pH 7.4.   Is that the pH of the eye?

21   A.    It is the pH of the eye.

22   Q.    When I say the eye, is it actually the tears of the

23   eye?

24   A.    It's the tears.   Generally, it is higher than 7.

25   There are varieties of pHs.   But, for the most part, people

Whitcup - direct

1    recognize 7.4 as the pH of the tear.

2    Q.    And on this pH scale, where is neutral?

3    A.    Neutral is 7.

4    Q.    So if you are lower than 7 with your pH, is that

5    considered an acidic pH?

6    A.    You are in the acidic region, yes.  You are beginning

7    to go into the acid side, yes.

8    Q.    If you are higher than 7, is that then considered an

9    alkaline or base pH?

10   A.    It is more alkaline, more base, yes.

11   Q.    So if I heard you correctly, you had questions why

12   Alphagan P was -- excuse me -- Alphagan was being formulated

13   down here, all the way down at approximately 6.3 to 6.5.  Is

14   that right?

15   A.    That is correct.

16   Q.    So what if anything did you do with those questions?

17   A.    Well, the principal formulator at the time, Dr. Shulin

18   Ding, I actually questioned as to why would you be

19   developing a product under acidic conditions.  And

20   particularly when this product is going to be used

21   chronically in the treatment of glaucoma.

22   Q.    When you say "chronically," what do you mean?

23   A.    It means it's going to be repeatedly used each and

24   every day throughout the life of the patient, assuming that

25   they have glaucoma, for that period of time.

1  Q.    Did you receive a response to your questions?

2  A.    Yes, I did.

3  Q.    What was the response?

4              MR. BREISBLATT:  Objection.  Hearsay.

5              MS. BROOKS:  Your Honor, we are not offering it

6  for the truth of the matter asserted but for Dr. Olejnik's

7  state of mind and why he did what he did.  In fact, the

8  response turned out not to be accurate.

9              THE COURT:  Do you want to withdraw the

10  objection, with that explanation?

11             MR. BREISBLATT:  No.  I think I will copy it.

12  It's still hearsay.

13             THE COURT:  I will overrule it.

14  BY MS. BROOKS:

15  Q.    Dr. Olejnik, did you receive a response to your

16  questions?

17  A.    Yes, I did.

18  Q.    Could you please tell the Court what that response

19  was?

20  A.    It couldn't be formulated in physiological pH because

21  the brimonidine would precipitate out.  It wasn't soluble

22  enough to achieve that pH.

23  Q.    That's what Dr. Shulin Ding told you?

24  A.    That is correct.

25  Q.    And what if anything did you do with that information?

1   A.     Well, based on the solubility profile she had and

2   recognizing the work that she had been involved in, I fully

3   understand that that was an issue.  And I left it at that.

4   Q.     Now, you say that it's based on the work that she had

5   done and the solubility profile.  Did any of the solubility

6   work that had already been done at that point make its way

7   into the patents that we have just discussed?

8   A.     Yes, they did.

9   Q.     Could you specifically go back to the '210 patent,

10  which is JTX-003, and could we put Table 2 up there, please?

11         It's on the screen, also, Dr. Olejnik, if it

12  saves you time.  What are we looking at here when we look at

13  Table 2, which is in the '210 patent at Column 14, starting

14  at Line 25?

15  A.     It's a solubility study that was conducted by one of

16  the professionals in Shulin's group.  It's looking at the

17  effect of pH on solubility.

18  Q.     The effect of pH on the solubility of what?

19  A.     Of brimonidine tartrate.

20  Q.     Had you seen this data before?

21  A.     Yes, I had.

22  Q.     Was it done -- were these studies done in

23  approximately 1994?

24  A.     I would need to go back and check the actual report as

25  to which date.  But it would have been around that time

1    period, yes.

2    Q.    What does this data show us?

3    A.    Well, the data is showing you that as the pH

4    increases, the solubility of brimonidine tartrate decreases.

5    Q.    Now, when this table, by the way, was taken out from

6    the lab notebook and made its way into the patent, was there

7    a mistake made on this particular chart?

8    A.    Yes, there was.

9    Q.    Where is the mistake?

10   A.    I think that's at the bottom of, I think it's line 49,

11   where it says, I think that's an "E," is it not?  I can't

12   read it from here.  It says, "percent weight per volume."

13   That is incorrect.  It should read, milligrams per ml.

14   Q.    If we could blow up where it says "percent weight per

15   volume."  Right there.  The very last one.  Right there.

16   There we go.

17          So you are saying instead of saying percent

18   weight per volume, it should say what?

19   A.    Milligrams per ml.

20   Q.    Does that mistake change at all, though, what this

21   table is showing as far as the solubility of brimonidine

22   vis-a-vis pH?

23   A.    No.  It still holds true that as pH increases,

24   solubility decreases.

25   Q.    Let's fast-forward if we could.  Did there come a time

Whitcup - direct

1    when you and a group of others at Allergan were tasked with

2    improving upon, if possible, the Alphagan formulation, the

3    .2 percent brimonidine at a pH of 6.3 to 6.5?

4    A.    Yes, we were.

5    Q.    And, specifically, did that project have a name?

6    A.    It had a name, brimonidine X.  We shortened it to

7    Brimo X.

8    Q.    Why was it called Brimo X?  Why the X?

9    A.    Because we didn't know what formulation we were going

10   to develop at that point in time.  We were aware of the

11   challenges.  But we needed to do a significant amount of

12   formulation work to understand again what the final

13   formulation would be.

14   Q.    Well, Dr. Olejnik, we have heard from Apotex counsel

15   that all you did was take brimonidine and stick it in a

16   product called Refresh Tears and you had a new formulation?

17            MR. BREISBLATT:  Objection to the form of the

18   question.

19            THE COURT:  Please repeat the question.

20   BY MS. BROOKS:

21   Q.    Dr. Olejnik, we have heard that all that you actually

22   did was take brimonidine and put it in Refresh Tears in

23   order to create a new formulation.  Is that what happened?

24            THE COURT:  Do you still object?

25            MR. BREISBLATT:  Different question.  I will

Whitcup - direct

1    withdraw it.

2    BY MS. BROOKS:

3    Q.    Is that what happened?

4    A.    No.  I wish life were that simple, but it's not.

5    Q.    Let's see what actually happened.  If you could turn

6    in your binder, please, to JTX- -- I am sorry, it is

7    PTX-289.  What are we looking at here, Dr. Olejnik?

8    A.    It's showing a matrix of a variety of systems that

9    were evaluated.

10   Q.    And if we could go to the bottom right-hand corner

11   next to PTX-289, can you tell me the date of this document?

12   A.    That was December 1996.

13   Q.    Thank you.  Now if we could go back and blow up the

14   left-hand column, what are we looking at -- first of all, it

15   says "delivery system" at the top of that column.  Do you

16   see that?

17   A.    Yes, I do.

18   Q.    What is meant by "delivery system"?

19   A.    It's developing a system that would deliver the

20   compound in an appropriate manner to have a therapeutic

21   effect.

22   Q.    When you refer to the compound, are we talking in this

23   case about brimonidine?

24   A.    Yes, we are.

25   Q.    What are you looking at here, when it has listed

Whitcup - direct

1    Carbopol, Norm Ophth Bottle, Bottle in Bottle, Ointment

2    Tube, Emulsion, Standard Gel, can you take us through,

3    please, in under an hour, if you can, a brief kind of

4    snapshot what each of these formulations or potential

5    formulations are?

6    A.    Certainly.  So the first section on the Carbopol 1382

7    cellulosic synergel, we are looking at a variety of gels

8    that we knew with these types of excipients, they had

9    certain behaviors, and evaluating them.  It's known that,

10   again, as part of the, in the ocular field, you are having

11   to deal with significant effects of mother nature, the eye

12   is well designed because of the blinking reflex, the

13   tearing, the elimination is such at a fast rate that we are

14   looking at systems at that point in time to see whether we

15   could retain the drug on the eye for a longer period of

16   time.

17        With it, also, is also you are developing a

18   system that is highly viscous, it is a gel, and looking at

19   how can we present this to the patient to ensure good,

20   effective compliance and precise delivery of the product to

21   the eye in a repeated, reproducible manner.

22        So we were also evaluating various container

23   closure systems.  That also involved looking at different

24   tip sizes.  One of the things with conventional dropper

25   bottles is that the tip of the container closure system, it

Whitcup - direct

1    will deliver on the order of 35 microliters.  The human eye

2    tolerates around seven, eight microliters, maybe up to 10

3    microliters.

4              So you are putting in an excessive amount that

5    can overspill down to the lid margins.  Indeed, that has

6    been seen with various products in the past.

7              So we were looking, can we design a system that

8    would also allow us to reduce the drop volume to a volume

9    that was more compatible with the eye.  Why would we do

10   that?  Because when you put in a very large amount of

11   volume, it can stimulate the eye to start tearing.

12             That's not something you want to have happen

13   because it's going to accelerate the drainage of the product

14   away from the cornea, the eye itself, down the nasal

15   lacrimal duct, and obviously eliminate it, and you could

16   have a propensity, where there is a drug in there, to

17   potentiate side effects because of systemic effects.

18   Q.    You just gave us a whole bunch of information there.

19   Let's see if we can break it down a little bit.

20             Let's go back to the fact that you are trying

21   out gels.

22             First of all, in this time period, did Allergan

23   already make artificial tear products?

24   A.    Yes.  They were well-known for artificial tear

25   products, yes, Liquid Film.

Whitcup - direct

1    Q.    You mentioned Liquid Film.  In fact, Alphagan, the

2    original Alphagan, was that actually in an artificial tear

3    product?

4    A.    It was in an artificial tear base, liquid film base,

5    yes.

6    Q.    But it was at a low pH?

7    A.    A low pH, correct.

8    Q.    Aren't most artificial tears, I believe, in fact, we

9    heard from opposing counsel that artificial tear products

10   are made to be at a neutral or alkaline pH because of the pH

11   of the eye?

12             MR. BREISBLATT:  Objection to the form of the

13   question.

14             THE COURT:  Rephrase it.

15   BY MS. BROOKS:

16   Q.    Dr. Olejnik, is it your experience, with decades of

17   ophthalmic, that normally artificial tear products are

18   formulated so that they are close to the pH of the eye?

19   A.    That's correct.

20   Q.    So if the brimonidine in the original Alphagan product

21   was in this liquid film tears, which is an artificial tear

22   product, how did the formulators lower the pH in order to

23   get it to be in the acid range?

24   A.    Well, they would have to use hydrochloric acid to

25   reduce the pH, which was, again, necessary to ensure that

1    the drug remained in solution.

2    Q.    So this is in late '96.  You know that Allergan has an

3    artificial tear product.  Why didn't you just take the

4    brimonidine and stick it in an artificial tear product and

5    be done with it?

6    A.    Because we knew that brimonidine would be precipitated

7    because of the solubility issues.  There is nothing unique

8    about an artificial tear in terms of knowing what the

9    excipients were and the behavior of the excipients at that

10   time.  You wouldn't be gaining anything.  You basically are

11   developing another Alphagan .2 percent product or whatever

12   concentration you would have.  But you would still have to

13   formulate it under acidic conditions to main a solution

14   state, a liquid state.

15   Q.    So you would have just ended up exactly back where you

16   started?

17   A.    Essentially, yes.

18   Q.    So, instead, you are experimenting with gels, 11

19   different kinds here, or at least 11 different delivery

20   systems.  You mentioned that you wanted to use gels to see

21   whether it would cause the brimonidine to stay on the eye

22   longer.  Why did you want to try to do that?

23   A.    Well, we wanted to improve the bioavailability of the

24   drug.  We were also looking at tests, Can we reduce the drug

25   concentration?  If we do that, it's not going to be

1    effective.  Now you are getting below the potential for it

2    to have a therapeutic effect, meaning certain clinical end

3    points that would be expected of you when you would do the

4    clinical studies.

5              So you needed to evaluate systems that would

6    actually help you design a formulation to achieve certain

7    criteria of performance for the product.

8    Q.    Let's move ahead, then, to JTX-098.  This is a joint

9    exhibit.  Specifically, if we could go to Page 3, and under

10   "Manufacture of Formulations," blow that up, please.

11             Before we were looking at these 11 different gel

12   formulations that you were experimenting with in late '96.

13   Now we have moved to the February-March time period of 1997.

14   Did I get that right?

15   A.    Correct.

16   Q.    And are we now looking at yet more formulations in

17   addition to the 11 that we just looked at?

18   A.    Yes, we are.  These are in addition to those that we

19   had assessed.

20   Q.    What are we looking at here, what formulations are

21   these?

22   A.    Well, we are looking and comparing it to the Alphagan,

23   the "BT" represents the brimonidine tartrate.  There is a

24   carbopol and the hydroxy propyl methylcellulose at a .2

25   percent, .15, the concentrations are listed there.  High

Whitcup - direct

1    velocities.  Another carbopol, HPMC formulation.  We

2    investigated an Aquasite gel system, which was a company

3    called Insite Vision.  They were based up in Northern

4    California.  Looking at outside technologies.

5    Q.    Let me stop you before we move onto the bottom two,

6    which are suspensions.  The three formulations that come

7    before the bottom two, which are suspensions, they are all

8    at a pH of 6.4.

9          Why are you still trying to formulate at this

10   acidic pH?

11   A.    Well, as much as we try, we still wanted to make sure

12   that the drug, the brimonidine tartrate, remained in

13   solution.  It was important -- for drugs to have an effect,

14   they have to be in solution first and foremost.

15          We were not able to actually develop a

16   formulation, a composition, that would achieve physiological

17   pH.  We were still having many challenges in that area.  So

18   we were evaluating these systems under acidic conditions.

19   Q.    I don't see, unless I am missing it here, anything

20   about Refresh Tears yet?

21   A.    No.

22   Q.    Is that right?

23   A.    That's correct.

24   Q.    What's perfluorodecalin?

25   A.    Perfluorodecalin is a unique liquid.  It looks like

1    water, but it's twice the density.  In other words, it is

2    twice as heavy as water.  But it has some very unique

3    properties.  And one of them is, because of its specific

4    gravity, when squeezed out of a dropper bottle, you get

5    little minute drops of around seven to eight microliters,

6    which was ideal from, if you recall what I mentioned

7    earlier, it was ideal in terms of dropping it into the eye

8    and not stimulating a tearing effect.

9         It also had a lot of other properties with

10   regards to the fact that it would not support microbial

11   growth, and, therefore, one would not need a preservative in

12   there.

13        There were benefits in terms of stabilization of

14   the drug.  It was a very clean system, because you are

15   reducing the number of excipients you would need to utilize.

16   The big problem here is that it wouldn't dissolve in

17   perfluorodecalin.

18   Q.   What wouldn't dissolve in perfluorodecalin?

19   A.   The brimonidine tartrate.  So it was a suspension.

20   Q.   So let me stop you right there.  What is the

21   difference between a suspension and a solution?

22   A.   Well, a suspension has solid particles floating around

23   in the vehicle, in the carrier system, versus the drug, in

24   this case, brimonidine tartrate, being homogeneous, a part

25   of the aqueous system.

1    Q.      So you are trying, still, some gels, three different

2    gels.   Those are going to be in solution, the brimonidine is

3    going to be in solution in the gels.   Is that right?

4    A.      That's correct.

5    Q.      That is why you are still formulating an acidic pH of

6    6.4?

7    A.      That is correct.

8    Q.      Then you are thinking about, well, let's try it in

9    perfluorodecalin?

10   A.      Pfd.

11   Q.      Let's try it in pfd but as a suspension?

12   A.      As a suspension.

13   Q.      Let's turn to page 8 of that same document and go to

14   the first three sentences, if we could blow those up.   And

15   let's see what the results were of these reformulation

16   efforts.   So we have been through 11 in the late '96 time

17   frame.   We are now talking about five more in the early '97

18   time frame.

19             Could you read for us what this says and then

20   explain to us what it means?

21   A.      Just the highlighted portion.   Is that correct?

22   Q.      Yes, please.

23   A.      The reformulations that offered an ocular

24   pharmacokinetic advantage, however, were also cursed with a

25   significant systemic disadvantage.

Whitcup - direct

1          Plasma concentrations were consistently higher

2     after Aquasite and both carbopol formulations than after

3     Alphagan, registration mark.

4          I think that is a /35 microliters.  This

5     observation was both unexpected and unwanted, because such a

6     phenomenon in humans will lower the systemic safety margin.

7     Q.    What is -- we now know what it says.  Can you tell us

8     what it means?

9     A.    Basically, it's telling you that the drug is being

10    eliminated at such a rate, brimonidine tartrate, that is,

11    that, once instilled, is being eliminated via nasal lacrimal

12    duct, at which point the drug brimonidine tartrate will get

13    absorbed into the bloodstream, and, thereby, have this what

14    is termed here as systemic effect and can cause side effects

15    as a result.

16    Q.    I take it that's not a good thing?

17    A.    Well, we are not targeting the brimonidine tartrate

18    for the bloodstream in this particular case.

19    Q.    What are you targeting it for?

20    A.    I am targeting it for the eye, and specifically into

21    the aqueous humor, through the cornea.

22    Q.    Now, didn't you hypothesize that by using a gel that

23    the brimonidine would stay on the eye longer, giving it more

24    of an opportunity to be absorbed in the eye rather than end

25    up in the bloodstream?

1   A.    I would have predicted that but we had an unexpected

2   result.

3   Q.    Do you find the field of formulations always

4   predictable?

5   A.    No, far from.

6   Q.    Do you find the field of formulations that you always

7   end up with the expected results?

8   A.    Only if you are reproducing a study that you have

9   already done how many times.  The answer to your question is

10  no.  You do have unpredictable results and they do keep

11  happening.

12  Q.    In your reformulation efforts of trying to improve

13  Alphagan and make a more, either effective and/or safe

14  brimonidine product, did you find, based on your work, that

15  the results were expected, predictable, and anticipated?

16  A.    No, absolutely not.

17  Q.    In fact, what did you find?

18  A.    The complete opposite.

19  Q.    So now we have gone from the 11 formulations in late

20  '96, five more formulations in early '97, let's turn to

21  JTX-035, and go specifically -- sorry, I got ahead of

22  myself.  JTX-095, and go to page 3 and blow up "Manufacture

23  of Formulations."  Now we are in the mid-1997 time frame.

24  Now we see four more formulations on top of the 16 we have

25  already talked about.  Do I have that right?

Whitcup - direct

1  A.     Yes.

2  Q.     Can you describe for the Court what these formulations

3  are?

4  A.     Well, these were prototype formulations, again,

5  formulations that we are still evaluating.  There is the

6  Alphagan brimonidine tartrate as our control, .2 percent,

7  and the acidic conditions.

8  Q.     Is that the first line, if we could highlight that?

9          That is always the control, whatever

10  formulations you are testing against, you use the Alphagan,

11  the original Alphagan as the control?

12  A.     Yes, for studies that involved Alphagan, yes, that it

13  acted as an active control.

14  Q.     Now we see for the first time, 17 formulations later,

15  the appearance of Refresh Purite in the formulations.  Is

16  that right?

17  A.     Yes, that's correct.

18  Q.     So the first one says, brimonidine tartrate .2 percent

19  in Refresh Purite, pH 7.4.  Did I get that correct?

20  A.     You got that correct.  The only thing that I would

21  want to highlight, though, we used Refresh Purite as the

22  name because it's understood these were the excipients we

23  were using.

24  Q.     So you didn't just take a bottle of Refresh Tears off

25  the shelf and mix some brimonidine in it?

Whitcup - direct

1    A.    No, absolutely not.  And Refresh Purite is at 7.7

2    anyway.  And you had to adjust the excipients because of

3    tonicity, osmolality to make sure you had an isotonic system

4    for the eye.  You don't want too much salt in there, you

5    don't want too little.

6    Q.    You said tonicity, osmolality, and isotonic.  Can you

7    tell the Court briefly what those three terms mean?

8    A.    To put them all together for the Court to understand,

9    it's, whether it be the blood or other biological milieu

10   that you have with the human body that's specific to the

11   eye, you want to have a balance of solids that is kind to

12   the cells and the tissues that make up the eye.  In this

13   particular case, the precorneal area, which is a highly

14   sensitive area.

15        In order to do that, you want to ensure that the

16   excipients that you are using are in balance with the

17   biological tears, in this particular case, that bathe the

18   eye.  And you want to ensure that you don't create an

19   imbalance.  If you do, if you have too much salt there, it

20   is going to sting, as would changing pH.  If you had too

21   little salt in there, it would also sting.

22   Q.    Now, we have heard that Refresh Tears, the product

23   itself, was marketed in this time frame now, 1997, and was

24   FDA approved.  Why wouldn't you just take a bottle of

25   Refresh Tears, stick the brimonidine in it, and call it a

1    glaucoma medication?

2    A.    There was no data at that point in time for us even to

3    think about adding in an artificial tear.  It wouldn't

4    achieve what we were trying to achieve, which was a soluble

5    form of brimonidine tartrate as a physiological pH that had

6    a good bioavailability, good therapeutic effect.  And one

7    doesn't go down the path in just selecting -- there is so

8    many artificial tears out there in the marketplace, you

9    would be doing that consistently each and every time.

10   Q.    Well, at some point, you did take at least the, I

11   think you described them as the excipients from the Refresh

12   Tears product and combine them with brimonidine tartrate.

13   That is the formulation we are looking at right now?

14   A.    That is the formulation.  But understand why we are

15   thinking about Refresh Purite at the time, was to name it as

16   Refresh Purite.  And, again, you need to balance the salts.

17   You want to make sure the tissue cells have a good influx

18   and de-flux of water.  You don't want change that balance,

19   that gradient.  That could upset the cells, again, cause

20   some damage.

21         But we were interested in the Purite, per se, as

22   a preservative.

23   Q.    You have told us many times that you have been told

24   that brimonidine tartrate at a higher pH, for example, here,

25   7.4, is either not going to go into solution, or if it does,

Whitcup - direct

1    it's not going to stay in solution.  Yet, you are trying

2    this formulation right here.

3              Why did you do that if you thought it wasn't

4    going to work?

5    A.    Well, there was work that was being done with

6    Dr. Kerslake, and he had one of his staff, Angel Padilla,

7    who was a professional, a senior professional at the time,

8    we directed him to conduct some studies, formulation

9    studies, which included Purites.  We were interested in

10   Purite.  Purite was in Refresh Purite, let's also use the

11   excipients and produce a formulation, and we still wanted to

12   target physiological pH.

13   Q.    Did you think at this point in time, or did you

14   expect -- let me rephrase that.

15             Did you expect, at this point in time, that the

16   brimonidine would remain soluble at that 7.4 pH?

17   A.    No, not at all.  That is completely against what we

18   understood the behavior of brimonidine tartrate, the

19   behavior of the excipients that are being used in this

20   artificial tear.  That's the reason why, if you actually go

21   to the formulation below, we actually included a known

22   solubility enhancer, cyclodextrin.

23             MS. BROOKS:  We are going to talk for a moment

24   about cyclodextrin .  Your Honor, I am not sure when you

25   want to do the afternoon break?

1          THE COURT:  How much more direct?

2          MS. BROOKS:  Dr. Olejnik, at this point, I was

3   going to ask to come down and draw cyclodextrin for the

4   Court and explain its mechanism of action.  I don't know if

5   this is a good time to break or if you want to do it after

6   that.

7          THE COURT:  Depending upon how much more time

8   you have on direct.  But you probably have a substantial

9   amount more time.

10          MS. BROOKS:  I do, Your Honor.

11          THE COURT:  Let's take a short stretch break

12   then.

13          (Recess taken.)

14          THE COURT:  Please take your seats and let's

15   resume.

16          MS. BROOKS:  Your Honor, with the Court's

17   permission -- can Your Honor see that white board all right?

18   If Dr. Olejnik writes towards the top of it.

19          THE COURT:  Yes.

20          MS. BROOKS:  Thank you.  Can Dr. Olejnik step

21   down toward the white board.

22          (Witness steps down from stand.)

23   BY MS. BROOKS:

24   Q.   Sir, right before we broke --

25   A.   You want to see my artwork.

1    Q.    Yes.  Right before we broke, we were talking about how

2    in the third formulation down here, the Refresh -- the

3    brimonidine tartrate .2 percent in Refresh Purite was

4    cyclodextrin, that you deliberately added the cyclodextrin

5    because it was known to enhance solubility, if I understood

6    you correctly?

7    A.    That is correct.

8    Q.    Now, what was it about cyclodextrin that caused it to

9    enhance the solubility of, for example, something like

10   brimonidine.  Could you explain it to us graphically?

11   A.    There will be a little bit of words as to how I think

12   I am going to draw this thing.

13            THE COURT:  Do you want to move so you can see,

14   counsel?

15            MR. BOGGS:  May I.

16            THE COURT:  Yes.

17   BY MS. BROOKS:

18   Q.    You need to keep your voice up, Dr. Olejnik, so the

19   court reporters can hear you.

20   A.    I tend to have a loud enough voice.

21            The cyclodextrin is a known solubilizing agent,

22   it is well-known in the field.  It is used to increase the

23   solubility of those compounds that are in a non-ionized

24   insoluble form normally in water.

25            One of the things that cyclodextrin possesses as

1  its inherent properties -- and there are a variety of

2  cyclodextrins, it depends on the -- it's a ring circular of

3  basically sugars, if you will, and it can be in five, six,

4  seven sequences, and they are denoted alpha, beta, gamma.  I

5  do apologize to Your Honor and to the Court for my artwork.

6          Basically, it is a cyclical ring of various

7  sugars attached.  As it's in the system in solution, you

8  think of it as a cylinder.  So this sugar ring, if you will,

9  exists all around here, and so on and so forth.

10          What is interesting about the excipient, about

11  the cyclodextrins, is that the hydrophilic portions, the O-H

12  groups, it's more in a 2-D, not a 3-D, so apologies, exist

13  on the outside.  Inside is predominantly what's called the

14  hydrophobic core.  It is where it attracts oil-loving

15  compounds.  It's like attracts like.

16          So for a drug that is non-ionized, more

17  lipophilic, more oily, it has a preferential affinity for it

18  to reside inside the core of this cyclodextrin.  Think of it

19  also as a donut, essentially.  It will fit inside.

20          The outside of the ring is predominantly

21  hydrophilic.  It exists bathed in the water phase.

22          So what happens is the drug that is insoluble,

23  non-ionized, lipophilic, has an affinity to reside inside

24  this cylindrical core.  And the overall cyclodextrin is

25  protecting it to the aqueous phase, it looks as if the drug

Whitcup - direct

1   is in solution.

2           So it's basically what a cyclodextrin is.  There

3   are more, obviously, other chemical facets to it.  But

4   that's essentially what cyclodextrin does.

5   Q.    Thank you, Dr. Olejnik.

6           (Witness resumes stand.)

7   BY MS. BROOKS:

8   Q.    We are going to come back to the exhibit that is

9   presently up there.  Let's just go for one moment to

10  JTX-002, that is the '873 patent, and specifically to Claim

11  1.  That would be at Column 17.

12          There, you are talking about in that claim a

13  solubility enhancing component other than a cyclodextrin.

14          Did I read that correctly?

15  A.    That is where?

16  Q.    If you look up, perhaps we could highlight it, it's

17  the second element.  A solubility enhancing component --

18  A.    Yes, I see that.

19  Q.    -- other than a cyclodextrin.

20          So, in this particular patent, in the claim, it

21  specifically excludes what you have just drawn for us, the

22  cyclodextrin, as being the solubility enhancing component of

23  your invention?

24  A.    That's correct.

25  Q.    Is that correct?

Whitcup - direct

1    A.    That's correct.

2    Q.    And at the time that you were doing the work that

3    resulted in the four patents at issue, was it already known

4    that cyclodextrins operated in this fashion?

5    A.    Yes.

6    Q.    Now, if we could go back to what we had on the screen,

7    which was JTX-095, and the formulations, eventually -- I am

8    just going to skip ahead for one second in time,

9    Dr. Olejnik -- eventually, you would come to discover that

10   carboxymethylcellulose, or CMC, was actually acting in these

11   formulations to enhance the solubility of brimonidine.  Is

12   that right?

13   A.    Yes.  We observed that effect, yes.

14   Q.    Was there anything in the makeup of

15   carboxymethylcellulose that would lead you to believe that

16   it would act like cyclodextrin in this tubular fashion?

17   A.    No.  CMC doesn't exist in that state at all.

18   Q.    So is there anything in your prior work or knowledge

19   that would lead you to believe that in having CMC, or

20   carboxymethylcellulose, as part of the eventual formulation,

21   you would be getting a solubility enhancer of the

22   brimonidine?

23   A.    Not from CMC.

24            MR. BREISBLATT:  Objection.  Leading.

25            THE COURT:  It is leading.

Whitcup - direct

1          MS. BROOKS:  I apologize, Your Honor.

2     BY MS. BROOKS:

3     Q.    Did you believe, based on all your work, did you or

4     did you not believe, based on all your work, at the time of

5     the inventions, that carboxymethylcellulose would act to

6     enhance the solubility of brimonidine?

7     A.    No.

8     Q.    Now, if you knew, though, that cyclodextrin worked as

9     a solubility enhancer, why didn't you just start right away

10    with the second formulation there -- the Refresh Purite, if

11    we could highlight it again, with cyclodextrin -- why didn't

12    you just start your reformulation efforts right there with

13    that?

14    A.    Well, there were certain concerns that we had over the

15    use of cyclodextrins.  It is not to say that they don't have

16    utility.  They do.  Cyclodextrins have never been used in a

17    product that I was aware of in the eye.  There are also

18    concerns that the fact that you are able to solubilize the

19    drug in that center core, if you will, and as I alluded to

20    earlier, with regards to when you put a drop in the eye,

21    with the blink reflex, and all the other activities that go

22    on, to remove what is essentially a foreign substance being

23    thrown into the eye, again, mother nature is very adept at

24    eliminating stuff out of the eye, there was a concern that

25    by having the brimonidine tartrate inside the cyclodextrin

1    core, that as things are going extremely fast, would there

2    be sufficient time for the drug to be released out of the

3    hydrophobic core, to then go and have an effect in

4    penetrating through the cornea, and then on into the eye

5    itself, to have a therapeutic pharmacological effect in

6    lowering intraocular pressure.

7               So there was a concern over the fact that as

8    much as we have achieved a solution, if you will, there was

9    a concern that that may actually work against us, because

10   the drug would not be bioavailable to the sufficient level

11   that we were trying to achieve.

12              Then, as we understand about cyclodextrins, and

13   some of these have, again, depending on concentration,

14   nephrotoxicity effects that can impact the kidney.  So there

15   were some safety aspects surrounding the choice of that

16   excipient.

17   Q.    If, in fact, the cyclodextrin had ended up making the

18   brimonidine less bioavailable, meaning less of the

19   brimonidine got into the eye and more of it got into the

20   tear system, then what would happen to the brimonidine?

21   Where would it go?

22   A.    It would go into the bloodstream, be absorbed.  And

23   you would have a systemic effect that were described, I

24   think, by that David Small paper.

25   Q.    Again, is that a good or bad thing?

Whitcup - direct

1    A.    No, it is not something you would want.  I know the

2    risk-benefit.  But clearly, in this particular case, it is

3    something you would want to avoid.

4    Q.    Now, you have already, though -- not already, you have

5    now, 17 formulations later, do have a formulation that has

6    brimonidine tartrate .2 percent in Refresh Purite with a pH

7    of 7.4.  That is the one right above the one that is

8    highlighted.  If we could highlight that one.

9          Why haven't you then just finally settled on

10   this one?  Why do you have yet another formulation that

11   involves a gel, Smart Hydra Gel, and another formulation

12   that involves Castor Oil?

13   A.    Well, we were evaluating -- we weren't just satisfied

14   with putting a drug in excipients in Refresh Purite.  Again,

15   there were questions over whether that would work or not.

16   There was nothing that would lead us towards that

17   conclusion.  It was important for us to evaluate other

18   systems.

19          There was some interesting gel technology that

20   was going on at MIT.  And that was, I don't fully recall, I

21   think it was a spinoff company, it was part of the

22   university, I don't exactly recall, but they were called gel

23   sciences.  And they had some very interesting polymer

24   systems that could enable us to achieve our goal.  So we

25   were evaluating that system.

1          Then there was the Castor Oil emulsion, because

2     we were developing Restasis, although it wasn't called

3     Restasis at this time, this is the cyclosporin product that

4     Allergan has and the treatment of dry eye, understanding

5     artificial tears are palliative, they are not symptomatic,

6     they are not just addressing the underlying disease, but we

7     were dealing with cyclosporin, which is an extremely

8     hydrophobic compound.  So we already had a solubility issue

9     right from the get-go.

10         We were looking at technologies there, could we

11    enhance the solubility of the cyclosporin.  And the Castor

12    Oil emulsion, which ultimately became the system of choice

13    and became Restasis as a product with the cyclosporin

14    compound, a treatment of dry eye, we looked at the emulsion

15    system as well.

16         Well, if it is going to work for cyclosporin,

17    let's look and evaluate for brimonidine tartrate.

18    Q.    So this is now the mid-1997, where, if I am

19    understanding this correctly, you still have not settled on

20    putting the brimonidine or using the brimonidine with

21    Refresh Purite at 7.4 percent.  You are still looking at yet

22    other formulations?

23    A.    We are still evaluating these prototype formulations.

24    They are not the final formulations.  We are still doing a

25    full assessment.

1    Q.    And the Castor Oil, is that a solution or is that a

2    suspension or is that an emulsion?  And if there is a

3    difference?

4    A.    It's an oil in water emulsion.  It's basically very

5    small, micro sized globules of oil, discrete globules of oil

6    that are in what's called the continuous phase, which is

7    water.

8              And it's at a pH, although there isn't a pH

9    here, it is at a pH around 7.3-7.4.  The reason there is no

10   pH assigned here because what if you deal with an emulsion

11   and you are doing a pH measurement, the actual oil globules,

12   they will have an affinity for the glass probe or the pH

13   probe, and it causes the number, the pH to vary

14   considerably.  So it is difficult to do an actual

15   measurement with the oil present.  But if you took the oil

16   out and looked at the aqueous system itself, it would have a

17   pH in that same order.

18   Q.    Now, the last formulation, the Castor Oil emulsion,

19   actually, that doesn't have Purite in it, I take it?

20   A.    No, it does not.

21   Q.    And the one before that, the Gel Science Smart

22   Hydrogel, that doesn't have Purite in it?

23   A.    No, it does not.

24   Q.    But the Refresh Purite formulation with and without

25   the cyclodextrin, those actually have Purite?

1    A.    Yes, they do.

2    Q.    And what is Purite?

3    A.    Well, Purite is an oxychloro complex that has been

4    found to be an effective preservative agent.

5    Q.    Do you know what the preservative was in original

6    Alphagan?

7    A.    It was benzochlorine chloride, BAK.

8    Q.    Is that a fairly common preservative in ophthalmic?

9    A.    It's ubiquitous.  It is used considerably in the

10   ophthalmic field.  It has its own issues associated with it,

11   but, overall, it's a good conservative system recognizing

12   that the activity of a preservative is to essentially kill

13   cells.  In this particular case, microorganisms.  So you

14   have got to get a fine balance between killing the bacteria

15   that once upon opening the bottle, there is always the

16   potential for contamination, a microorganism entering into

17   the container closure system, there is a necessity to be

18   sure that if microorganisms get in, they get killed.  But

19   you don't want to have a deleterious impact on the actual

20   artificial cells themselves.  So there is a finite balance,

21   which is why we are very careful in the selection of the

22   concentration of the preservative that goes into an

23   ophthalmic product.

24   Q.    In this particular formulation where it has the

25   Refresh Purite, is the Purite going to be in lieu of the

1    BAK?

2    A.    It is.

3    Q.    Did you have any concerns at this point in time as to

4    how Purite might interact with the brimonidine?

5    A.    We did.

6    Q.    What were those concerns?

7    A.    Purite, it's mode of action, it is an oxidizing agent.

8    And one of the things that any formulator would know, that

9    the presence of an oxidizing agent on a compound that is

10    susceptible to oxidation, there would be an issue over the

11    actual drug compound.  It would degrade, and it could

12    degrade rapidly.

13    Q.    If it degraded, if the Purite degraded the active, the

14    drug compound, then what would happen to the medication

15    itself?

16    A.    Well, your potency diminishes, drops.  And you will

17    not have a therapeutically effective product at the end of

18    the day.

19    Q.    Up until this point in time, we are talking about the

20    mid-1997 now, had Purite, to your knowledge, been used as a

21    preservative with an active ingredient, combined in the

22    formulation?

23    A.    No.  No.

24    Q.    So was this going to be a first?

25    A.    This would be a first.

Whitcup - direct

1    Q.     Now, if you could turn to JTX-035 in your binder.

2           If we could go to the second page of the

3    memorandum.  Down at the bottom, it says, Minutes from

4    August 13, 1997, Team Meeting.  Correction.

5           Can you read to us what that says and then

6    explain to us what it means?

7    A.     Can you repeat that again, please?

8    Q.     Sure.  If we can just highlight where it says, Minutes

9    from August 13, 1997, Team Meeting, if we could highlight

10   the three lines that are underneath it, could you explain to

11   us -- first of all, could you read to us what it says and

12   then explain to us what it means?

13   A.     "The formulation needs to be above pH 6.8 in order to

14   minimize oxidation.  The formulation has a pH of 7.4.

15   In-lab stability available for ten days at 60 degrees, in

16   parentheses, 98 percent, with 100 ppm Purite."

17          That means parts per million, "ppm."

18   Q.     What does this mean?  Why does the formulation have to

19   be above a pH of 6.8 in order to minimize oxidation?  What

20   is the concern this is addressing here?

21   A.     The concern is, if you are looking at a very low pH,

22   the Purite itself degrades.  So you want to maximize the

23   stability of the Purite.  And stability is increased as the

24   pH is increased.  So in order to ensure that, one, you have

25   the Purite stable enough, by having it stable at a higher

Whitcup - direct

1    pH, the thinking was that we would reduce the impact,

2    oxidizing impact on the drug itself.

3              So there was a two for one sort of thing out of

4    this evaluation.  One, stabilizing the Purite, but also

5    looking to address the stabilization of the brimonidine

6    tartrate.

7    Q.    Let's fast-forward, then, to 1998, and then go to

8    JTX-054 in your binder.  If we could blow up the first part,

9    the "To," the "From," the "Subject," the date.  Who is Hans

10   Peter Pfleger?  JTX-054.  It should be close to the end of

11   your binder.  Hopefully, you are not missing it.  If you

12   are, we can share on the screen.

13              MS. BROOKS:  Your Honor, might I approach the

14   witness to help?

15              THE COURT:  Sure.

16              MS. BROOKS:  Thank you.

17              Your Honor, does the Court's binder have it,

18   might I inquire?  My binder does.

19              THE COURT:  The last page, the page ending in

20   976?

21              MR. BREISBLATT:  We have it.

22              MS. BROOKS:  Yes, Your Honor.  For some reason,

23   Dr. Olejnik is the only one that doesn't.  So I am going to

24   hand you my copy, Dr. Olejnik.

25              (Court hands document to witness.)

1          MS. BROOKS:  Oh, thank you, Your Honor.

2          THE WITNESS:  Thank you, Your Honor.

3    BY MS. BROOKS:

4    Q.    Dr. Olejnik, who is Hans Peter Pfleger?

5    A.    Hans Peter Pfleger is in marketing at Allergan.

6    Q.    Who is Ed Kerslake and Orest Olejnik?

7    A.    Dr. Edward Kerslake, he was my collaborator,

8    formulator, working in my organization.  Orest Olejnik, that

9    is me.

10   Q.    The subject here is Alphagan reformulation.  Is that

11   right?

12   A.    That's correct.

13   Q.    The date is now June 9th, 1998?

14   A.    Yes.

15   Q.    So you have been working on this for about a year and

16   a half, this project?

17   A.    At least.

18   Q.    If we could go to the second page of the memo, and

19   specifically the third page of the memorandum and blow up

20   that paragraph.  It says, "Despite the observed,

21   bioavailability improvements of brimonidine Purite .2

22   percent from animal pharmokinetic studies, this was not

23   reflected in the human Phase 2 studies."

24          Did I read that correctly?

25   A.    Yes, you did.

1    Q.    It says, "Based on this data, alternative formulations

2    are unlikely to offer any appreciable benefits to the

3    efficacy/safety profile of Alphagan."

4              Did I read that correctly?

5    A.    That is correct.

6    Q.    What did that mean?

7    A.    Well, in all the systems formulations that we had

8    considered, and there is an abundant number of them, the

9    data indicated that we are not going to achieve anything

10   that is better than the existing Alphagan product.

11   Q.    And this is in 1998, that this is being said?

12   A.    That's correct.

13   Q.    Now, you weren't present in court with Dr. Whitcup

14   testified, but I will represent to you, Dr. Olejnik --

15             MR. BREISBLATT:  Objection.  Form of the

16   question.

17             THE COURT:  Well, counsel, it's a Bench trial.

18   Continue.

19   BY MS. BROOKS:

20   Q.    Dr. Olejnik, I will represent to you that Dr. Whitcup

21   has testified that there actually turned out to be increased

22   safety profile of Alphagan P over Alphagan.  Are you aware

23   of that to be a fact?

24   A.    I am aware of that, yes.

25   Q.    So this statement here turned out not to be accurate.

Whitcup - direct

1    Is that right?

2    A.    That's correct.  It's contrary to the outcome.

3    Q.    But, in fact, back in 1998, this is what you believed?

4    A.    Yes.

5    Q.    In fact, did anyone else also believe it?  If you can

6    read the next line that's not highlighted.  "This was

7    consistent with the assessment and predictions submitted by

8    an external advisory panel of experts."

9              What's that talking about?

10   A.    We had brought in a number of key opinion leaders,

11   experts in the field, to review the data we had, to assess

12   our formulations, our strategies, and so on.  And we were

13   seeking their advice and input and guidance.

14   Q.    Did your formulation efforts at that point of the

15   brimonidine tartrate in combination with the Refresh Purite,

16   did that meet with skepticism?

17   A.    Would you repeat the question again?

18   Q.    Did your formulation efforts at this point in time,

19   which is now moved all the way up to '98, where you now

20   finally have combined the brimonidine Purite -- excuse me,

21   the brimonidine with the Refresh Purite, did that

22   combination, as far as it being more effective than original

23   Alphagan, did that meet with skepticism?

24              MR. BREISBLATT:  Objection.  Leading.

25              THE COURT:  Well, it is.  And maybe a little

1    vague.  Maybe you could reformulate the question.

2              MS. BROOKS:  Reformulate my question, Your

3    Honor.

4    BY MS. BROOKS:

5    Q.    Dr. Olejnik, what if anything were you being told by

6    outside experts as to whether or not a formulation

7    containing brimonidine and Refresh Purite was going to have

8    an increased efficacy or safety profile over original

9    Alphagan?

10             MR. BREISBLATT:  Objection.  Hearsay.

11             THE COURT:  Yes.  I am going to sustain that

12   objection.

13             MS. BROOKS:  Your Honor, again, I was offering

14   it because, once again, it turns out what they were saying

15   wasn't true and there was indeed an increased safety

16   profile.

17             MR. BREISBLATT:  She is offering it for the

18   truth of the statement at the time.

19             THE COURT:  Aren't you?

20             MS. BROOKS:  It turns out the statement wasn't

21   true, no.  I am offering it to show the skepticism of the

22   industry at the time.

23             THE COURT:  I will allow it.  Go ahead.

24   BY MS. BROOKS:

25   Q.    Dr. Olejnik, do you remember the question, because I

1    think I forgot it?

2    A.    Well, I will be kind.  I won't ask you to repeat it.

3          Hopefully, I will answer in addressing your

4    question.

5          When we had the experts and we presented all

6    this data to them, as they assessed it and evaluated it,

7    they said, You are barking up the wrong tree.  You are going

8    to have to go to a very sophisticated system to achieve what

9    you want to achieve.

10   Q.    And, in fact, it talks about a controlled ocular

11   delivery insert in the next sentence?

12   A.    Yes, it does.

13   Q.    Did you, however, you, the formulators, continue to

14   move forward with your attempts to develop a reformulation

15   of Alphagan that was going to have either an enhanced

16   efficacy or enhanced safety profile?

17   A.    Yes.  We would still continue the prototype

18   formulation development, gather more information, to go down

19   the path of a controlled ocular delivery insert, where you

20   are looking at a different time profile, very different

21   systems, very sophisticated, manufacturing costs, et cetera.

22   I think that would not be a benefit to the patient at the

23   end of the day just based on the costs of producing such a

24   product.

25   Q.    Now, we know, because we have already heard testimony

1    from Dr. Whitcup, that eventually Allergan did, in fact, get

2    FDA approval for a drug called Alphagan P?

3                THE COURT:  Ms. Brooks, probably it is not

4    necessary, with this witness, to say things like, We know

5    because we heard from Dr. Whitcup, I think that's improper.

6                MS. BROOKS:  Thank you, Your Honor.

7    BY MS. BROOKS:

8    Q.    Let's just fast-forward.  Do you know what Alphagan P

9    is?

10   A.    Yes, I do.

11   Q.    What is Alphagan P?

12   A.    It's brimonidine tartrate at .15 percent.

13   Q.    What is the pH of Alphagan P?

14   A.    It's at 7.2 is the target pH.

15   Q.    I believe you told us that you had been told that

16   brimonidine wouldn't be soluble at a higher pH?

17               MR. BREISBLATT:  Objection.  Leading.

18               THE COURT:  Well, overruled.

19               MS. BROOKS:  Just foundation, Your Honor.

20   BY MS. BROOKS:

21   Q.    Did you believe that brimonidine, before all of these

22   efforts, wouldn't be soluble at that pH of 7.2?

23   A.    Yes, we knew there were solubility challenges, yes.

24   Q.    Did you find that, in fact, that was not the case in

25   this particular formulation?

Whitcup - direct

1    A.    No.    The brimonidine tartrate was in solution.

2    Q.    Now, if we could go, please, to the '210 patent, and

3    specifically Figure 1 of the '210 patent.  Dr. Olejnik, that

4    is JTX- --

5              MS. BROOKS:  Your Honor, would the Court like

6    your notebook back?

7              THE COURT:  Yes.  I was just wondering where it

8    went.

9              THE WITNESS:  Sorry, Your Honor.

10   BY MS. BROOKS:

11   Q.    Dr. Olejnik, what are we looking at here?

12   A.    Now, which was the JTX?

13   Q.    The '210 patent, JTX-003?

14   A.    Okay.

15   Q.    Figure 1.  What are we looking at here?

16   A.    We are looking at the solubility of brimonidine

17   tartrate, which is on the y axis, y axis, and on the x axis

18   below, horizontal axis, that is the pH.

19              So we are looking at the solubility profile of

20   brimonidine tartrate with pH and its influence by CMC, the

21   legend up above in the top right quadrant, the CMC is the

22   carboxymethylcellulose, and they are designated at different

23   concentrations, and the signs are associated, representing

24   concentrations across at the top, representing percent, CMC

25   in a circle, 0.058 percent, and so on.

Whitcup - direct

1    Q.    Let me ask you this:  Was carboxymethylcellulose in

2    the original Alphagan formulation?

3    A.    No, it was not.

4    Q.    How did it come to be in the Alphagan P formulation?

5    A.    Again, we were evaluating the brimonidine tartrate in

6    looking at the utilization of the Purite preservative.  And

7    we decided that we would essentially take the excipients

8    that were being used in Refresh Purite and use that range of

9    excipients in the formulation of the .15 percent or the new

10   formulation, reformulation of brimonidine tartrate.

11   Q.    And in doing so, did you discover something about

12   carboxymethylcellulose and its effect on the solubility of

13   brimonidine?

14   A.    We saw some unusual event that was, in our minds, very

15   surprising.

16   Q.    Can you tell the Court, please, what you saw?

17   A.    What we saw was the effect, apparent effect of the CMC

18   enhancing the solubility of brimonidine tartrate at a higher

19   pH.

20   Q.    Was the CMC enhancing the solubility of brimonidine at

21   a higher pH, was that result expected by you?

22   A.    Absolutely not.  That was a surprise event for us.

23   Q.    As a result of that -- let me ask you this:  Was that

24   data that reflected CMC enhancing the solubility of

25   brimonidine at higher pH's, was that data reflected in the

Whitcup - direct

1    patents at issue?

2    A.    Yes.

3    Q.    And the chart we are looking at here, Figure 1, does

4    that reflect that data?

5    A.    That reflects that data, yes.

6    Q.    By having carboxymethylcellulose enhance the

7    brimonidine at higher -- the solubility of brimonidine at

8    higher pH's, did that enable you now, then, to formulate

9    brimonidine at the higher pH's without it falling out of

10   solution?

11   A.    Being able to now have the brimonidine tartrate in

12   solution at a more physiological pH, the answer is yes, in

13   the presence of CMC.

14   Q.    Now, you have mentioned several times throughout your

15   testimony the term "bioavailability."

16         Can you tell the Court what "bioavailability"

17   means?

18   A.    In the simplest form, it's, again, making the drug

19   available to the biological system, to then have an

20   appropriate effect.

21   Q.    Is there such a thing as something called the pH

22   partition theory?

23   A.    Yes, there is.

24   Q.    Does that relate in any way to bioavailability?

25   A.    Yes.

Whitcup - direct

1    Q.    In what way does the pH partition theory relate to

2    bioavailability?

3    A.    Well, the pH partition is where you have a higher

4    lipophilic moiety of the drug and you can control it by

5    changing the pH.  You can increase the non-ionized form of

6    the drug, which will have a higher lipophilic oil

7    characteristic.  And it will reside more in the oil phase,

8    and biological membranes are composed of phospholipids, yes,

9    they are a mix of aqueous lipid systems.  But having,

10   adjusting the pH, you can actually adjust the partitioning

11   of the drug as an outcome of pH.

12   Q.    Do you have an animation that would demonstrate to the

13   Court what you are talking about, where you change the

14   amount of ionized versus unionized in the compound?

15   A.    Yes, I do.  It's a little improved upon my artwork.

16   But I do have a large though simple schematic.

17   Q.    If we could play that, please, and as we are playing

18   it, Dr. Olejnik, if you could explain to the Court what the

19   Court is looking at?

20   A.    The Court is looking at the surface of the cornea.

21   Q.    Could we freeze it there?

22   A.    The cornea is highly lipophilic.

23   Q.    What does that mean, to be lipophilic?

24   A.    It's oily, waxy.  It's a little exaggeration on the

25   waxy.  It's an oily film.  And in order for it to ensure

Whitcup - direct

1    bioavailability and ensure maximum penetration of the drug,

2    you first and foremost want the drug to be in solution, and,

3    preferably, in a non-ionized state, meaning the non-ionized

4    form is more lipophilic than the ionized form, because under

5    the conditions in the eye, you want the non-ionized, which

6    is lipophilic, to have an affinity for the lipophilic

7    cornea.

8            So, again, it's like with like.  Oil to oil.  So

9    the non-ionized form is more oily, the epithelium layer of

10   the cornea is oily.  There is a propensity for the

11   non-ionized to have some affinity for the cornea.

12   Q.    You mentioned at the beginning of your testimony

13   something called pKa of the drug.

14           How, if at all, does that relate to this?

15   A.    Again, the pKa, you understand that with the pKa, it

16   will tell you the ionization aspects of the drug.  So you

17   will know how to manipulate the pH, if you will, to achieve

18   a higher non-ionized state.  In the case of brimonidine

19   tartrate, the higher the pH is, the more non-ionized form

20   you are going to have.

21           However, the characteristics of the non-ionized

22   form of brimonidine is such that it is insoluble, which is

23   why we went down the path of developing a formulation and

24   discovering a formulation that enhanced solubility of the

25   brimonidine in a more non-ionized state.

Whitcup - direct

1    So what we are seeing here, in a very schematic

2    representation, the red represent the ionized moieties of

3    the drug versus the yellow, which is more -- more of the --

4    versus the yellow, which is a non-ionized form, versus the

5    red, which is the ionized form.  And more of the non-ionized

6    form, lipophilic form, penetrate through the cornea.

7    That isn't to say that some of the ionized form

8    will not enter through the cornea.  It still does.

9    Q.    Did we just see a demonstration, then, of changing

10   where it's 50-50, you are at the pKa of the drug, there is

11   half that are ionized and half unionized, by formulating at

12   a higher pH, do you then end up with more of the unionized?

13   A.    You will have more of the unionized and a high

14   propensity for more of the drug to penetrate through to the

15   eye.

16   Q.    By having more of the drug penetrate through to the

17   eye, what does that, if anything, do for you?

18   A.    Well, that allows us to now think about, sometimes

19   more is not always better.  And by that, I mean, knowing

20   that we could get more drug into the aqueous humor, we still

21   wanted to be mindful of side effects, systemic effects, what

22   have you, but particularly any effect in putting too much

23   drug into the eye.  It allowed us to reduce the amount of

24   brimonidine tartrate, lower the concentration, but yet

25   achieve a certain equivalency to the original Alphagan, the

1    .2 percent.

2              So it allowed us to manipulate the amount of

3    drug we would be presenting to the eye because we knew that

4    we could increase the penetration, due to the non-ionized

5    form, lower the concentration, still achieve the therapeutic

6    effect, but diminish any potential side effects, systemic

7    effects due to wash out.

8    Q.    So you have just described for us over the course of

9    all these formulation efforts, it sounds like several

10   discoveries that you made.  Did you apply to the United

11   States Patent Office for patent protection for those

12   discoveries?

13   A.    Edward and I did, yes.

14   Q.    If you would look at JTX-008, is this a declaration

15   that you filed on behalf of the first application, patent

16   application, that you filed with the United States Patent

17   and Trademark Office?

18   A.    Yes, it is.

19   Q.    And if we could go specifically to Paragraph 7.

20   Actually, let me back up.

21             If we look at Paragraph 4, here you are talking

22   something about the Burke patent.  Is that right?

23   A.    That's correct, yes.

24   Q.    If we go to Paragraph 5, you are talking about

25   something called Remington?

1   A.      That's correct.

2   Q.      Had the original claims as filed with the U.S. Patent

3   Office been rejected as being obvious over Burke and

4   Remington?

5   A.      I believe, yes.

6   Q.      So did you file a declaration to explain to the

7   examiner why what you and Dr. Kerslake had discovered was,

8   indeed, different and new and novel over Burke and

9   Remington?

10  A.      Yes.  I felt it important to ensure that it was fully

11  understood about the observed effects.

12  Q.      If we could look at Paragraph 7, please.  Can you tell

13  us, please, in Paragraph 7, what it is that you are telling

14  the U.S. Patent and Trademark Office in this paragraph?

15  A.      Well, I am telling that the CMC at the concentrations

16  we were considering were very different in behavior to the

17  other listed polymers.  And the reason behind that was not

18  just because of the solubility enhancement of the CMC that

19  we unexpectedly observed, surprisingly observed, but the

20  fact that when you are dealing with the eye, which, again,

21  has good blink rates, the resonance time of products in the

22  eye are very, very short, we are still observing a

23  heightened amount of drug that is in the aqueous humor.

24  That was borne out of the studies that were conducted

25  through the pharmacokinetic group and there is data there

1    that have indicated that we were getting fairly substantial

2    concentrations of the brimonidine tartrate into the aqueous

3    humor.

4            And why is that?

5            Well, there is the solubility effect.  There is

6    the pH.  But it was also the fact that what was surprising,

7    and the other thing to also know about the cornea and the

8    eye, it is negatively charged.  That is contributed by new

9    things that are negatively charged.  CMC, being a polyanion,

10   is negatively charged.  And you think of it akin to putting

11   the North Pole of the magnet with the North Pole of your --

12   another magnet and trying to push them together, they will

13   repel.

14           Those are dipole-dipole reactions.  But they

15   basically illustrate the point that negative charge to

16   negative charge will repel.

17           So you would expect that the CMC not to reside

18   on the eye long enough and thereby causing the washout of

19   the system to be increased.  We didn't see that from the

20   pharmacokinetic studies.  I know there are mucoadhesive

21   studies that have been performed elsewhere.  That is a

22   different story.  We can spend many an hour on discussions

23   of those.

24   Q.    That's okay.

25   A.    But the CMC in this particular case, the

1    concentrations we were looking at, there is quite a lot of

2    papers out there, also, showing that certain polymers don't

3    adhere, there is also an interesting -- knowledge through

4    Caufield out of Bristol University, has done a lot of work

5    on mucin technology --

6              MR. BREISBLATT:  Your Honor, I think we are off

7    the course.

8              THE COURT:  What happens here is a little

9    different than what happens in the classroom or the lab.

10   There are rules.  He makes a proper objection.  I am going

11   to sustain it.

12   BY MS. BROOKS:

13   Q.    Dr. Olejnik, I know the subject is near and dear to

14   your heart, but just to cut to the chase here, when you say

15   to the Patent Office about three-quarters of the way down or

16   two-thirds of the way down, "This surprising result may be

17   due to the repulsive forces between the polymer and the

18   cornea orienting the hydrophilic portions of the molecule

19   away from the cornea, thus permitting the hydrophobic

20   domains of these polymers to form an interaction with the

21   lipid portion of the cell surface," are you essentially --

22   what are you, in five sentences or less, telling the Patent

23   Office there?

24   A.    What I am telling the Patent Office is that the CMC is

25   rearranging itself because of the negative charge,

Whitcup - direct

1    repelling, there must be a different orientation of the

2    polymer.

3    Q.    When we go up to, I believe it's the third sentence,

4    "I have discovered as a result of work done and/or directed

5    by me at Allergan, that CMC possesses the surprising

6    advantages of both increasing the solubility of brimonidine

7    in solution as shown in Table 1 and causing such solutions

8    to have superior adherence to cell surfaces, including

9    ocular surfaces such as the cornea."

10            Is that what you have just been describing to us

11   over the course of the last hour and a half?

12   A.    Yes.

13   Q.    Did you believe that when you said it to the U.S.

14   Patent and Trademark Office?

15   A.    I believed it then.  I believe it now.

16   Q.    And after you filed this declaration, did, in fact,

17   the first of the four patents issue?

18   A.    It did.

19   Q.    And did later, then, the additional three?

20   A.    Yes.

21            MS. BROOKS:  Thank you very much, Dr. Olejnik.

22   No further questions, Your Honor.

23            THE COURT:  Thank you, counsel.  Mr. Boggs, you

24   may cross-examine, sir.

25            MS. BROOKS:  I hate to ask this, Your Honor, but

1      could we have a copy.

2                  THE COURT:  I imagine you could.

3                  MS. BROOKS:  Thank you.  I hesitate to ask,

4      but...

5                  MR. BOGGS:  The logistics are a little rough

6      today, Your Honor.  I apologize.

7                  CROSS-EXAMINATION.

8      BY MR. BOGGS:

9      Q.    Hello, Dr. Olejnik.  How are you?

10     A.    Very well, Mr. Boggs.

11     Q.    Good.

12                 Just a few moments ago, you were talking about

13     Remington.  What is Remington?

14     A.    Remington is one of a number --

15                 MR. BENSON:  Your Honor, could we have a copy?

16     I request a copy of the exhibits as well.

17     BY MR. BOGGS:

18     Q.    Remington?

19     A.    Remington Sciences is one of many reference books,

20     there is Martindale, there is others, that talk about

21     ingredients, excipient's information about compounds,

22     basically a general reference book that one normally goes

23     to.

24     Q.    And is Remington one of those standard reference books

25     for pharmaceutical formulators?

Whitcup - direct

1    A.    It's one of the references that is used.  I know here

2    in the U.S. it is used considerably.  I have used it in the

3    U.K.  My preference is Martindale.  But they are all one and

4    the same at the end of the day.

5    Q.    And they have a lot of the same similar information in

6    them?

7    A.    They have similar information.  There is different

8    information.  Again, it's not holding just to one reference,

9    general reference source.  It just provides certain guidance

10   to formulators in the pharmaceutical sciences field.

11   Q.    Go ahead and open your book there.  The very first, we

12   probably should have done this a different way, but the very

13   first exhibit there, Joint Exhibit No. 9, that is the file

14   history for the '834 patent.  There should be a green tab in

15   there.  I would like you to turn to the declaration that you

16   signed when you filed the patent application, Doctor.

17             I would like you to turn to the declaration that

18   you signed when you filed the patent application.

19   A.    Where is that, sir?

20             MR. BOGGS:  May I approach and help.

21             THE COURT:  Please do.  You have leave to

22   approach freely, Mr. Boggs.

23             MR. BOGGS:  Thank you.

24             THE COURT:  It is on the screen, too.

25             THE WITNESS:  Yes, I can read the screen.

Whitcup - direct

1   BY MR. BOGGS:

2   Q.     This is the patent application, or the declaration for

3   the patent application that you signed.  Is that right?

4   A.     Well, I don't see my signature.  There it is.  Yes,

5   that's correct.

6   Q.     Okay.  Over your career at Allergan, you signed a

7   number of these?

8   A.     I have signed a number of these declarations, yes.

9   Q.     And you did, in fact, sign this one, you recognize

10  your signature.  Is that right?

11  A.     That is my signature above Edwards, yes.

12  Q.     When you signed this declaration, you said that you

13  had reviewed and understand the contents of the patent

14  application.  Is that right?

15  A.     That is correct.

16  Q.     And you also said that you had read the claims.  Is

17  that right?

18  A.     That is correct.

19  Q.     And at the time, you gained an understanding of the

20  claims.  Is that right?

21  A.     At that time, yes.

22  Q.     Can you flip to the original claims.  I believe, if

23  you can find the patent application in there, they start on

24  Page 33.

25  A.     This is which tab?

1    Q.    If you look at the Bates numbers on the bottom, it's

2    AGN 0226194.  It's still Joint Exhibit 9.

3    A.    Okay.

4    Q.    You have them in front of you now?

5    A.    Yes, I do.

6    Q.    Now, these are the claims that you filed with your

7    patent application and these are the claims that you

8    indicated in your declaration that you understood.  Is that

9    right?

10   A.    At that time, yes.

11   Q.    Now, this Claim No. 1, if we can highlight that, that

12   claim is not directed specifically to brimonidine tartrate,

13   is it?

14   A.    It's directed to an alpha-2-adrenergic agonist.

15   Q.    So that is a family of compounds.  Is that right?

16   A.    It's a family of compounds, class of compounds, yes.

17   Q.    Okay.  And can you look in your book there for the

18   Small article.  Are you familiar with the Small article?

19   A.    David Small had a number of articles.

20   Q.    There is only one in that book.  It's BDTX-166.  Do

21   you have that in front of you?

22   A.    I have that in front of me.

23   Q.    That article is entitled, "Influence of pH and buffer

24   concentration on occular bioavailability of ophthalmic AGN

25   191103...."

Whitcup - direct

1          Do you see that?

2   A.   Yes, I do.

3   Q.   Do you recall this article?

4   A.   I remember seeing the article, yes.  I don't know

5   when.

6   Q.   Could you tell from looking at the article when the

7   date is?

8   A.   Well, it was received at the International Journal of

9   Pharmaceutics on the 29th of May, 1996.  It was revised a

10   couple of times and then was published in the shortened

11   version, the IJ Pharm in 1997.

12   Q.   Now, David Small, you mentioned him earlier, I

13   believe.  Who is he?

14   A.   He was one of the pharmacokineticists at Allergan at

15   the time.

16   Q.   He was on the brimonidine X team.  Is that right?

17   A.   I believe so, but I would have to go back and check.

18   Q.   Now, who are the other authors on this paper?

19   A.   There is a Maria Dais.  I don't know who she is.

20   There is a Michelle Wong and a Diane Tang-Liu.  I know

21   Michelle Wong and Diane Tang-Liu, at the time, they were at

22   Allergan, Diane Tang-Liu, Dr. Tang-Liu is still at Allergan.

23   I don't know about Maria Dais.

24   Q.   What is AGN 191103?

25   A.   It was another compound that Allergan was studying at

1    the time.  It had therapeutic effect, some pharmacologic

2    effect on lowering intraocular pressure.

3    Q.    It was an alpha-2-adrenergic agonist.  Is that

4    correct?

5    A.    It was an alpha-2.

6    Q.    And it is a member of the alpha-2 family.  Right?

7    A.    It falls into that class, yes.

8    Q.    And, structurally, it differs from brimonidine by only

9    one substituent.  Is that right?

10   A.    Well, it differs by a methyl group versus a bromine

11   group.

12   Q.    If you look at Page 197 of the article, which is

13   EDTX-166, the bottom page in the left column, that is the

14   structure for AGN 191103.  Is that right?

15   A.    That's correct.

16   Q.    And the methyl group that you just referred to is that

17   CH-3 group at the middle off the middle of the ring.  Is

18   that correct?

19   A.    Correct.

20   Q.    Now, in the case of brimonidine, is it correct to say

21   that that methyl group is substituted with a Bromo group?

22   A.    It's a bromine.

23   Q.    So, structurally, that is the only difference.  Is

24   that right?

25   A.    It's a significant difference.  But that is the

1    difference from a CH-3 to a Br, yes.

2    Q.    Structurally, it's the only difference?

3    A.    Yes.

4    Q.    Now, when you filed your patent application, and we

5    have seen the claims, the original claims, you intended to

6    embrace AGN 191103 when you filed your patent application

7    which led to the '834 patent.  Isn't that right?

8    A.    It's embracing the family of the alpha-2-adrenergic

9    agonists.

10   Q.    And AGN 191103 is a member of that family.  Right?

11   A.    That would fall under that umbrella.

12   Q.    What does the designation "AGN" stand for?

13   A.    It's just short for Allergan.

14   Q.    So this was an Allergan compound.  Is that right?

15   A.    It would have been owned by Allergan.  We haven't

16   licensed compounds where we do designate an AGN number.

17   Q.    And it was being worked with by Allergan scientists.

18   Is that right?

19   A.    Yes.

20   Q.    Including a scientist who was a member of the

21   brimonidine X team.  Is that right?

22   A.    Again, if David Small was on the team, then he would

23   have been associated with this compound.

24   Q.    And David Small and his co-authors reported to the

25   world the results from this compound before you filed your

Whitcup - direct

1    patent application.  Is that right?

2    A.    I don't know.  I would have to go back and check.

3    Q.    What was the date on the article?

4    A.    That was '97, 1997.  You are referring to the patent

5    being 2000, whatever that was.  Is that what you are

6    referring to?

7    Q.    Yes.

8    A.    Under that circumstance, yes.

9    Q.    Did you ever submit the small article to the examiner

10   for his consideration during prosecution of the '834 patent?

11   A.    I don't remember.  I would have to go back and check.

12   Q.    Did you, yourself, ever work with AGN 191103?

13   A.    I don't remember specifically on this compound.  I

14   know I was aware of it.

15   Q.    You were aware of it?

16   A.    I was aware of the 103, yes.

17   Q.    In fact, one of those internal memorandums you just

18   finished testifying about referred to AGN 191103.  Do you

19   recall that?

20   A.    Could you repeat that again, please?

21   Q.    One of the internal Allergan memoranda that you just

22   testified about referred to AGN 191103.  Is that right?

23   A.    Yes.  Yes, it did.

24   Q.    I would like you to look in the book that Ms. Brooks

25   gave you before and look at JTX-095.  Do you see that?

Whitcup - direct

1    A.    Yes.

2    Q.    Look at the first page of it, if you would.  Do you

3    see that it was written by David Small?

4    A.    Yes, D. Small.

5    Q.    Who was it reviewed by?

6    A.    By a Joel Usansky and Edward Kerslake.

7    Q.    Edward Kerslake?

8    A.    That's correct.

9    Q.    And he is your co-inventor on the '834 patent.  Is

10   that right?

11   A.    He is, indeed.

12   Q.    Now, what is the date on this internal memorandum?

13   Let me try to help you a little bit.  Can you tell from the

14   dates next to the signatures by the author or the reviewer

15   about the time when the memorandum was written?

16   A.    It's in March of '98.

17   Q.    And that, too, was before you filed your patent

18   application.  Is that right?

19   A.    Yes.

20   Q.    I would like you to look at Page 7 of 12, if you

21   would.  That is AGN 0064123.  Look at the last paragraph of

22   text before the references.

23         Do you see any reference to AGN 191103?

24   A.    Yes, towards the bottom.

25   Q.    Okay.  Okay.  That sentence says, "A previous invitro

Whitcup - direct

1    assessment of the effect of pH on corneal penetrations of

2    brimonidine showed no influence, but invivo experiments with

3    a closely related compound, AGN 191103, showed substantial

4    improvement in ocular bioavailability with increasing pH."

5            Do you see that?

6    A.    Yes, I do.

7    Q.    "Although there are physicochemical differences

8    between brimonidine and AGN 191103 that may attenuate the

9    effect of increasing formulation pH on brimonidine's ocular

10   penetration, theoretical considerations and previous

11   experience with AGN 191103 strongly suggest that increasing

12   pH may have a positive effect on life rabbits."

13           Do you see that?

14   A.    Yes, I fully agree with it.

15   Q.    Did AGN 191103 help lead to the discovery that you

16   made for which you filed your patent application?

17   A.    No.

18   Q.    Not at all?

19   A.    No.  It's a well-known fact in the formulation

20   sciences that manipulating pH can change the nonionic, ionic

21   balance.  This isn't new.  Plus, the 103 has a very

22   different solubility profile to brimonidine in solution.

23   And there are compounds that can exist in a nonionic state

24   that are in solution.  You don't need any solubilization

25   system.  This isn't new.  This has been known for many, many

1    years.

2    Q.    So you chose not to give it to the examiner?

3    A.    Well, I don't know about that.

4    Q.    I would also like you to look at JTX-054.  That is the

5    memo that yourself and Dr. Kerslake sent to Mr. Pfleger.  Do

6    you recall that?

7    A.    I do.

8    Q.    Dated June 9, 1998?

9    A.    Unless it's something I don't have.  That is something

10   I don't have, I am sorry.

11   Q.    I can let you borrow mine.

12             THE COURT:  That is fine.

13   BY MR. BOGGS:

14   Q.    I would like you to blow up the second page.

15             Now, in this particular memorandum, it was

16   indicated that the results from the rabbit studies for

17   brimonidine did not translate into the Phase 2 studies.  Do

18   you recall that?

19   A.    Yes, that's in that fourth paragraph, I believe.

20   Despite the observed bioavailability improvements of

21   brimonidine Purite of .2 from animal pharmacokinetic

22   studies, this was not reflected in the human Phase 2

23   studies.

24   Q.    Now, did you ever figure out why those results did not

25   translate into the Phase 2 studies with humans?

Whitcup - direct

1    A.     Well, when you do pharmacokinetic studies in animals,

2    and the rabbit is the, normally the animal of choice, these

3    are accessible, but it's known that there are differences

4    between the rabbit and the human, although we do use

5    animals, unfortunately, in the line of work that we are in,

6    which we wouldn't, but we do.

7           But we look at trends.  And when you try to

8    translate from the rabbit to the human, there are clearly

9    different physiological effects.

10   Q.     Now, were you in the room when I gave my opening this

11   morning?

12   A.     Yes, I was.

13   Q.     And did you hear my description of, with these kind of

14   compounds, you have to do animal studies, and then you hope

15   that the results of those animal studies translate into

16   humans, then you have to do human studies, and there is

17   costs associated with those and there is limitations on

18   human studies?  Did you hear me say that?

19   A.     I don't know if you said those exact words.  I would

20   like to get away from the hope, there is a lot of hope in my

21   life, but you try to go down a path of good, clear,

22   scientific approach in the development of your products.

23   Q.     What happened here in 1998, where your results from

24   the animal studies did not translate into the human studies,

25   is exactly an example of what I was talking about, a

1   real-world example.  Is that right?

2   A.    There are occasions where you have a difference of

3   effect from animal to human, those events do occur.

4   Q.    Okay.  If you would go back to the original claims

5   that we were looking at, of your patent application?

6            MR. BOGGS:  Your Honor, may I?

7            THE COURT:  Yes, sir.

8   BY MR. BOGGS:

9   Q.    Dr. Olejnik, we are looking at the original claims

10   again.  Now, original Claim 1 does not specify a

11   concentration for the alpha-2-adrenergic agonist.  Is that

12   right?

13   A.    It doesn't specify -- what was the question again?

14   Q.    Original Claim 1 does not specify a concentration for

15   the alpha-2-adrenergic agonist.  Is that right?

16   A.    Yes.  It doesn't provide a number.

17   Q.    In fact, none of the original 46 claims specify a

18   concentration for the alpha-2-adrenergic agonist.  Right?

19   A.    I would have to go through and cross-check.

20   Q.    We did this during your deposition.  Do you recall

21   that?

22   A.    I recall the deposition.

23   Q.    Do you recall what your answer was?

24   A.    I would have to go back and look at the deposition

25   notes.

Whitcup - direct

1    Q.    Well, I think -- do we have the transcript up here?

2          I believe your deposition transcript is there in

3    front of you.  I would like you to turn, if you would, to

4    Page 15?

5    A.    Page 15?

6    Q.    Yes.  Day 2.

7          You recall that I took your deposition.  Right?

8    A.    Oh, yes.

9    Q.    And you were under oath during that deposition?

10   A.    Of course.

11   Q.    Now, I would like you to confirm for me that during

12   that deposition, I asked you the following question and you

13   gave me the following answer.

14         "Question:  Now, do any of those 46 claims

15   specify a concentration of the active ingredient?

16         "Answer:  As a concentration, it does not

17   specify that."

18         Did I ask you that question and did you give me

19   that answer?

20   A.    It's at Page 15?

21   Q.    16.

22   A.    16?

23   Q.    16.

24   A.    I have Page 15 on the monitor.  I am looking at the

25   monitor.

 1          Could you repeat that again?

 2     Q.    Yes.  Please confirm for me, did I ask you the

 3     following question and you gave me the following answer:

 4            "Question:  Now, do any of those 46 claims

 5     specify a concentration of active ingredient?

 6            "Answer:  As a concentration, it doesn't specify

 7     that."

 8     A.    Yes, that's what I said.

 9     Q.    Did I ask you that question and did you give me that

10     answer?

11     A.    And that's the answer I gave you.

12     Q.    Now, original Claim 1 also does not specify pH.  Is

13     that right?

14     A.    No, it does not.

15     Q.    Do you have a copy of the '834 patent in front of you?

16     A.    Yes, I do.  JTX-004.

17     Q.    Look at Claim 1 of that patent, if you would?

18            That claim specifies up to about 0.15 percent of

19     5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate.

20            Correct?

21     A.    Correct.

22     Q.    And that's brimonidine tartrate.  Right?

23     A.    That is.

24     Q.    That claim specifies a range of possibilities for

25     brimonidine tartrate in terms of concentration.  Is that

1    right?

2    A.    What do you mean by "possibilities"?  I am trying to

3    understand the range of what possibilities.

4    Q.    In terms of concentration, that claim provides for a

5    number of different possibilities.  Is that right?

6    A.    It's a range of concentrations up to .15.

7    Q.    So it provides for a number of different

8    possibilities.  Is that right?

9    A.    Well, I am trying to understand what "possibilities"

10   means.

11   Q.    Do you understand what the word "possibilities" means?

12   A.    I understand what possibility is, but in what context

13   are you referring to it?  That's what I am trying to

14   understand.

15   Q.    Does that claim embrace .14 percent?

16   A.    Yes, it does.

17   Q.    Does it embrace .02 percent?

18   A.    .02 percent?

19   Q.    Yes.

20   A.    Up to and about .15, it's falling into that range,

21   yes.

22   Q.    All the way down to 0.02?

23   A.    It says up to and about 0.15 percent.

24   Q.    That claim would encompass 0.2 percent.  Is that

25   right?

1    A.      In my understanding.  I don't know what it would be

2    from the legal profession.

3                    THE COURT:  Counsel, let's take a break.

4                    (Recess taken.)

5                    THE COURT:  Please be seated.  Apologize,

6    counsel, but it can't be helped.  Mr. Boggs.

7                    MR. BOGGS:  Thank you, Your Honor.  Can I have a

8    read back?

9                    (Pending question read.)

10   BY MR. BOGGS:

11   Q.      Dr. Olejnik, what is the lower limit of that range up

12   to about 0.15 percent?

13   A.      Well, it says up to and about 0.15 percent.

14   Q.      What is the lower limit?

15   A.      There is no lower limit that has been specified in

16   terms of a number.

17   Q.      How would we determine what that would be?

18   A.      Well, if you look at the Claim 1, a therapeutically

19   effective aqueous ophthalmic composition, you would want to

20   have a therapeutically effective composition.

21   Q.      What therapy is being referred to there?

22   A.      Ophthalmic.

23   Q.      Is the word "ophthalmic" in the original patent as

24   filed, do you recall?

25   A.      Did you ask me that question in the deposition?

Whitcup - direct

1    Q.    Do you recall?

2    A.    No, I don't recall.

3    Q.    Dr. Olejnik, do you know whether the words "glaucoma"

4    or "intraocular pressure" are mentioned in the '834 patent?

5    A.    Indirectly, if you go to the cited patent of Burke.

6    Q.    Let's go to the cited patent of Burke.

7              MR. BOGGS:  May Mr. Suggs approach, Your Honor?

8              THE COURT:  He may, yes.

9    BY MR. BOGGS:

10   Q.    I want to take you back for a minute to the '834

11   patent.  Now, in Column 5, Lines 59 through 64, we have it

12   up here on the screen, if that helps you.

13             Have you seen that?

14   A.    Yes, I do.

15   Q.    This is from your patent.  It refers to the Burke et

16   al. patent.  The one you just asked for.  Is that right?

17   A.    There are a couple of Burke patents other than what is

18   listed on the front page of the patent.

19   Q.    This is the Burke patent that you incorporated in its

20   entirety by reference.  Do you see that?

21   A.    Correct, yes.

22   Q.    Do you believe this patent will tell us what therapy

23   we should be talking about?

24   A.    I would have to read them.

25   Q.    Why don't you take a look, I will help you here, take

1    a look at Column 1 of the Burke patent, the '077 Burke

2    patent.  And in particular, the first paragraph under the

3    background of the invention, these are the therapies Burke

4    notes.  This has been incorporated into your patent, so this

5    is part of your patent.  Here, it says, "Methods of using

6    such derivatives as therapeutic agents, to effect reduction

7    in peripheral pain."

8              Is that just a pain reliever?  Do you use it as

9    a pain reliever?

10   A.    You would have to ask a clinician in terms of the

11   definition.  But reduction in peripheral pain, it can be

12   ocular pain.

13   Q.    That means ocular pain?

14   A.    It can be pain.  The way I read this, the way I

15   interpret it, it would be an ocular injury that you would

16   need to use some medication to reduce pain.

17   Q.    Anesthetize the central nervous system.  What does

18   that mean?

19   A.    You need to talk to a pharmacologist.  But my

20   understanding is it would be to provide an anesthetic effect

21   to the CNS.

22   Q.    To constrict one or more blood vessels, what does that

23   mean?

24   A.    To reduce the size of a blood vessel.

25   Q.    Is that like an Epigen, something like that?

Whitcup - direct

1   A.      You may want to constrict blood vessels in the eye.

2   If you have red eye from being on a plane, vasoconstrictors,

3   you have a class of compounds that have been used.  You may

4   want to relieve the retinas.

5   Q.      To treat ischemia.  What does that mean?

6   A.      That is for the heart.

7   Q.      To decongest one or more nasal passages.  What does

8   that mean?

9   A.      Open up the nasal pathways.  There has been work done

10  in the field of ophthalmic looking at delivering drugs to

11  have an effect on the nasal passages by ophthalmic products.

12  Q.      And to effect reduction of one or more effects of an

13  inflammatory disorder to increase renal fluid flow and to

14  effect an alteration in the rate of fluid transport in the

15  gastrointestinal tract.  What are those?

16  A.      You would have to talk to a clinician, pharmacologist

17  specific to that.

18  Q.      This is part of your patent.  Is glaucoma included

19  somewhere in here?

20  A.      There is nothing related to intraocular pressure.  But

21  it doesn't relate to using the product for other aspects of

22  treating certain ophthalmic diseases.

23  Q.      When was Alphagan P launched as a product?

24  A.      I don't remember.

25  Q.      Was it in --

Whitcup - direct

1   A.    I think it was --

2   Q.    2000?

3   A.    I think it was March or April of, I forget the date

4   now.

5   Q.    How is it that you could file the patent application

6   without the -- for the '834 patent and never mention the

7   word "glaucoma" or "intraocular pressure"?

8   A.    I don't know.  You would have to talk to the patent

9   attorneys on that.

10  Q.    Therapeutically effective in Claim 1 of the '834

11  patent could be for treating an inflammatory disorder or to

12  increase renal fluid.  That's what's in your patent

13  application.  Is that right?

14  A.    Well, as contained, as extracted from that, yes.

15  Again, you can use ophthalmic products that have been shown

16  and developed to target other areas through the eye, where

17  it has been considered in those areas, as another route of

18  administration.

19             MR. BOGGS:  Can I have a moment?

20             THE COURT:  Yes.

21             (Pause.)

22  BY MR. BOGGS:

23  Q.    I want to look at the curve at Figure 1 of the '834

24  patent.  What does this curve indicate?

25  A.    As I just said earlier, that this is a solubility

1    profile of brimonidine tartrate and pH in the presence of

2    CMC and without CMC.

3    Q.    What was the formulation of formulation used to

4    generate this data?

5    A.    I would have to go to the actual study itself.

6    Q.    It's actually in Column -- or Table 3 and Table 4.

7    Right?

8    A.    It came out of the Table 3, Table 4 work that was

9    done.

10   Q.    And each of those formulations that are listed in

11   Table 3, sample one, sample 2, sample 3, sample 4, sample 5,

12   each of those is a .2 percent formulation.  Is that right?

13   A.    Well, it says .2 percent, that's correct.  But one

14   needs to understand, in terms of an equilibration study,

15   someone that is familiar in the art understands that you

16   have to have a saturated amount of drug presence.

17   Q.    Do you recall an experimental formulation at Allergan

18   with the designation 9115 X?  Do you recall that?

19   A.    I would have to look at the "X" number.

20   Q.    Now, you told me at your deposition that the curve in

21   Figure 1 was 0 percent CMC.  That's the first curve on the

22   left.  Right?

23   A.    That is correct.

24   Q.    That could -- that particular curve could support all

25   possible concentration range for active ingredient.  Is that

Whitcup - direct

1    right?

2    A.    On that line?

3    Q.    Yes.

4    A.    For each specific dot, it would support in the

5    absolute sense, but in the real sense, in dealing with a

6    product that has excursions in pH, it wouldn't.  But in the

7    absence, yes.

8    Q.    I would like you to take a look at your transcript, if

9    you would.  Page 22.  Line 21.

10   A.    Okay.

11   Q.    Please confirm for me that I asked the following

12   question and that you gave me the following answer:

13                "So if you look at the curve with zero percent

14   CMC, what's the range that that supports for an active

15   ingredient?

16                "THE WITNESS:  It can support any range."

17                Did I ask you that question and did you give me

18   that answer?

19   A.    Yes, I did.

20   Q.    Now, looking back at Claim 1 of the '834 patent, that

21   claim also contains a range specified as about 7.0 or

22   greater.  Correct?

23   A.    In Claim 1?

24   Q.    Yes.

25   A.    That's correct, yes.

Whitcup - direct

1   Q.      And none of the original claims use those words,

2   "about 7.0 or greater."  Is that right?

3   A.      That's correct.

4   Q.      And the original specification never used those words,

5   either.  Right?

6   A.      I would have to go back and verify.  But I believe

7   that that is correct, yes.

8   Q.      Now, the brimonidine X project started in January of

9   1997.  Is that right?

10  A.      That's when it got elevated as a project.

11  Q.      And at various times, the brimonidine team had

12  different lead formulations.  Is that right?

13  A.      Different prototype formulations being assessed,

14  correct.

15  Q.      Different lead formulations?

16  A.      We do have lead formulations that we assess and

17  prototype formulations, leads emanate out of prototype.

18  Q.      And the .15 percent formulation, which corresponds to

19  Alphagan P, became the lead formulation on May 29th, 1998.

20  Is that right?

21  A.      I believe that is correct.

22  Q.      And this came about after looking at a number of other

23  formulations.  Is that right?

24  A.      Yes.

25  Q.      And as you went through a screening process, you moved

1     towards this final lead formulation that you took in the

2     Phase 3 trials.  Is that right?

3     A.     Could you repeat that again, please.

4     Q.     As you went through the screening process, you moved

5     towards this final lead formulation which you then took into

6     the Phase 3 trials.  Right?

7     A.     Yes, on one of them, yes.

8     Q.     And that was Alphagan P .15 percent.  Right?

9     A.     It was .15.  It was .2 as well.

10    Q.     In the '834 patent, there was no composition table

11    that talks about .15 percent and lists the components part

12    of Alphagan P.  Is that right?

13    A.     Could you repeat that again?

14    Q.     In the '834 patent, there is no composition table that

15    talks about a .15 percent formulation and lists the

16    components of Alphagan P.  Is that correct?

17    A.     Well, there is no table listed in here, but you can,

18    by knowledge, define the .15.

19    Q.     It does disclose a .2 formulation.  Is that right?

20    A.     Are you referring to Table 3?

21    Q.     Yes.

22    A.     It says .2.  But in a pH solubility study, you need to

23    saturate a system.  Anyone that is familiar in conducting pH

24    solubility studies will know that one would have to have

25    saturated systems.  And when you are dealing with looking at

Whitcup - direct

1    a pH in acidic conditions, you are going to add in even more

2    brimonidine.  That is going to be a known fact.  It's just

3    that it got listed as .2.

4              But anyone with an understanding in pH

5    solubility profiles and studies thereof fully understands

6    that you have to have saturated systems, they need to be

7    equilibrated, and you have to have enough drug in there to

8    achieve that saturated state.

9              Part of the reason when you run studies within

10   the pharmaceutical companies, one has to be careful in how

11   much drug you begin to add.  You do want to have a saturated

12   state.  If you are dealing with a very, very expensive drug,

13   you don't waste too much.  So you build, build, and build.

14   Q.   So you have more than .2 percent?

15   A.   In the studies that we conducted, there would have

16   been more than .2.

17   Q.   Now, in our claim, we have up to about .15 percent.

18   Right?

19   A.   That is correct.

20   Q.   And that's less than .2 -- or .2-plus.  Right?

21   A.   Yes.

22              THE COURT:  Mr. Boggs, about how much more do

23   you think you have?

24              MR. BOGGS:  Maybe five minutes.

25              THE COURT:  Okay.

Whitcup - direct

1          MR. BOGGS:  At most.

2     BY MR. BOGGS:

3     Q.    Now, back in the '834 patent, Table 2, you talked

4     about that a little earlier today.  Do you recall discussing

5     that this morning?

6     A.    Yes, I do.  This afternoon.

7     Q.    And there is an error in there, in this table?

8     A.    Yes.

9     Q.    I thought I heard you say this morning that this table

10    includes results from some prior work that existed when you

11    got involved in the project.  Is that right?

12    A.    No, I didn't say anything this morning.

13    Q.    Where did this data come from?

14    A.    This came from a study under Shulin Ding.  It was a

15    Scott Jordan study, I believe.

16    Q.    But this isn't work that you did.  Right?

17    A.    No.

18    Q.    And, in fact, this is a -- this is work from a .5

19    percent formulation.  Right?

20    A.    I need to go back to the study.

21    Q.    Okay.  Well, let's look at Column 14 of the patent.

22    And we have Table I and Table II.  And confirm for me that

23    Table II has the solubility results from Table I.

24          Here you have .5 percent, is that .5 percent?

25    A.    In Table I?

Whitcup - direct

1    Q.    Yes, for brimonidine tartrate?

2    A.    Yes, it says, Brimonidine tartrate, .5 percent.

3    Q.    And benzalkonium chloride, .0050?

4    A.    Yes.

5    Q.    Polyvinyl alcohol, do you see that?

6    A.    Yes, I do.

7    Q.    Sodium chloride, and you have the citrate buffers?

8    A.    Yes.

9    Q.    Sodium hydroxide, and purified water?

10         Is that the .5 percent formulation that Allergan

11   submitted an NDA on in 1996?

12   A.    An NDA?

13   Q.    Yes.

14   A.    I don't remember.  I will have to go back and check.

15   I submitted an NDA on .2 percent for Alphagan.  I would have

16   to go back and check on the .5.

17   Q.    You don't know one way or another whether they

18   submitted a .5 percent NDA at the same time as --

19   A.    I would have to go back and -- it's, again, in the

20   early stages of my joining with Allergan at the time.

21              MR. BOGGS:  I don't have any further questions.

22              THE COURT:  Thank you, Mr. Boggs.  We will

23   resume tomorrow at 9:00.

24              (Court recessed at 5:01 p.m.)

25