```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        -  -  -

4
    IN RE BRIMONIDINE              )     C.A. 07-md-1866-GMS
5   PATENT LITIGATION              )

6                        -  -  -

7                   Wilmington, Delaware
                 Thursday, March 12, 2009
8                      9:00 a.m.
                   Day 4 of Trial
9
                         -  -  -
10

11  BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

12

    APPEARANCES:
13
            WILLIAM J. MARSDEN, JR., ESQ.
14          Fish & Richardson, P.C.
                   -and-
15          JUANITA BROOKS, ESQ.
            Fish & Richardson, P.C.
16          (San Diego, CA)
                   -and-
17          JONATHAN E. SINGER, ESQ.
            Fish & Richardson, P.C.
18          (Minneapolis, MN)
                   -and-
19          W. CHAD SHEAR, ESQ.
            Fish & Richardson, P.C.
20          (Dallas, TX)
                   -and-
21          STEVEN C. CARLSON, ESQ.
            Fish & Richardson, P.C.
22          (Redwood City, CA)

23                          Counsel for Plaintiff
                            Allergan, Inc.
24

25
```

Dziabo - cross

1    APPEARANCES (Cont'd.):

2

             FREDERICK L. COTTRELL, III, ESQ., and
3            KELLY E. FARNAN, ESQ.
             Richards, Layton & Finger, P.A.
4                    -and-
             B. JEFFERSON BOGGS, JR., ESQ.,
5            SHARON E. CRANE, Ph.D., ESQ., and
             ERIN M. DUNSTON, ESQ.
6            Bingham McCutcheon
             (Washington, D.C.)
7
                                    Counsel for Exela, Paddock
8
             RICHARD L. HORWITZ, ESQ., and
9            DAVID E. MOORE, ESQ.
             Potter Anderson & Corroon LLP
10                   -and-
             ROBERT B. BREISBLATT, ESQ.,
11           STEPHEN P. BENSON, ESQ., and
             BRIAN J. SODIKOFF, ESQ.
12           Katten Muchin Rosenman LLP
             (Chicago, IL)
13
                                    Counsel for Apotex Inc.
14                                  and Apotex Corp.

15
                            -   -   -
16

17

18

19

20

21

22

23

24

25

Dziabo - cross

1    THE COURT:  Good morning.

2         (Counsel respond "Good morning.)

3         THE COURT:  Mr. Singer, you were up yesterday?

4         MR. SINGER:  Yes, with Mr. Dziabo.

5         THE COURT:  Why don't we resume.  Let's go.

6         MR. BREISBLATT:  Your Honor, I think we are

7    beginning cross-examination this morning.

8         THE COURT:  Had you completed, Mr. Singer?

9         MR. SINGER:  Yes, Your Honor.

10        THE COURT:  Re-swear Mr. Dziabo.

11        ANTHONY J. DZIABO, JR., having been duly

12   sworn as a witness, was examined and testified as

13   followings...

14        THE COURT:  Good morning, Mr. Dziabo.

15        THE WITNESS:  Good morning, Your Honor.

16        CROSS-EXAMINATION

17   BY MR. SODIKOFF:

18   Q.    Mr. Dziabo, do you recall that Frank Uxa was your

19   lawyer in the Patent Office during part of your attempts to

20   get the '078 patent?

21   A.    Yes, I do.

22   Q.    In fact, he was your lawyer on the appeal you referred

23   to yesterday, wasn't he?

24   A.    Yes, I believe that's correct.

25   Q.    And that appeal was in the Patent Office, that wasn't

Dziabo - cross

1    in the Federal Circuit.  Correct?

2    A.    I believe it was at the Patent Office.

3    Q.    Mr. Uxa was paid by Allergan to represent you, wasn't

4    he?

5    A.    I believe so.

6    Q.    Mr. Dziabo, are you aware of the fact that Mr. Uxa,

7    your legal representative before the United States Patent

8    and Trademark Office, made this statement:  "The fact that

9    stabilized chlorine dioxide is a well-known preservative for

10   other applications may make it useful to try to adapt this

11   preservative material to ocular applications"?

12   A.    I don't recall where he made that statement.

13         MR. SODIKOFF:  Your Honor, may I approach the

14   witness and the Bench?

15         THE COURT:  Yes.

16         MR. SODIKOFF:  Your Honor, I have handed up what

17   we have marked as JTX-006A.  This is part of the prosecution

18   history of the '078 patent.

19   BY MR. SODIKOFF:

20   Q.    This is a filing in your patent application, sir,

21   isn't it?  The title at the top there, "Aqueous Ophthalmic

22   Solutions and Methods for Preserving Same"?

23   A.    Yes.

24   Q.    Let's go to Page 11 of this filing made on behalf of

25   you by your representative at the U.S. PTO.  Allergan

Dziabo - cross

1  0978373.

2           Doesn't your lawyer here admit to the U.S.

3  Patent Office, as part of your efforts to procure this

4  patent, that the fact that stabilized chlorine dioxide is a

5  well-known preservative for other applications may make it

6  useful to try to adapt this preservative material to ocular

7  applications?

8  A.    That's what it reads.

9  Q.    So Mr. Uxa, on your behalf, admitted that stabilized

10 chlorine dioxide is a well-known preservative, didn't he?

11 A.    Well, I think it's rather --

12 Q.    I am sorry, that is a yes or no question, sir.

13 A.    Would you repeat the question?

14 Q.    Mr. Uxa admitted that stabilized chlorine dioxide is a

15 well-known preservative, didn't he?

16 A.    That's what he states here, yes.

17 Q.    And are you aware that statements made to the PTO are

18 binding?

19           MR. SINGER:  Objection, Your Honor.  Foundation.

20           THE COURT:  If he is aware.

21           If you are aware, you are.  If you are not --

22           THE WITNESS:  I am --

23           THE COURT:  You don't have guess.

24 BY MR. SODIKOFF:

25 Q.    It's a yes or no question, sir.

Dziabo - cross

1    A.    No.

2    Q.    In fact, are you aware that Mr. Uxa made the same

3    statement not once but twice during the prosecution history,

4    including in the appellate brief?

5    A.    No.

6          MR. SODIKOFF:  Your Honor, may I approach the

7    witness and the Bench?

8          THE COURT:  You may do so freely, counsel.

9          MR. SODIKOFF:  If I can direct the Court to

10   Allergan 098378.

11         THE COURT:  JTX-078 006B?

12         MR. SODIKOFF:  JTX-078 006B, another excerpt

13   from the file history of the '078 patent.

14   BY MR. SODIKOFF:

15   Q.    At the top of this document, Mr. Dziabo, you would

16   agree that, on the top left here, it says, "In Re

17   Application of Dziabo, et al"?

18   A.    Yes.

19   Q.    This is your patent application, sir, isn't it?

20   A.    Yes.

21   Q.    This document was sent to the notice of appeal, to the

22   Honorable Commissioner of Patents and Trademarks in

23   Washington, wasn't it, sir?

24   A.    I would assume so.

25   Q.    On the front page, we have a signature by Mr. Uxa, who

                         Dziabo - cross

1    was your attorney.  Correct?

2    A.    Yes.

3    Q.    If we can move to Allergan 978398.

4          Here again, your attorney states, on your

5    behalf, "The fact that stabilized chlorine dioxide is a

6    well-known preservative for other applications may make it

7    useful to try to adapt this preserve material to ocular

8    applications."  Is that correct?

9    A.    That's correct.

10   Q.    Sir, are we now in agreement that your patent attorney

11   repeatedly admitted that stabilized chlorine dioxide was a

12   well-known preservative before you filed your patent

13   application?

14   A.    He certainly stated that.

15   Q.    Thank you.

16         Let's look now at JTX-252.  Sir, can you tell me

17   what this is?

18   A.    This is a United States Patent for No. 4,499,077,

19   Stockel, et al.

20   Q.    And the Stockel, et al. Patent, if we can call it up,

21   DTX-252, the date of that patent is February 12, 1985.  Is

22   that correct?

23   A.    That's correct.

24   Q.    And you do not dispute that this patent is prior art

25   to your patent, do you?  Looks like?  Do you dispute that,

1    sir?

2    A.    Yes, I do.

3    Q.    You dispute that this patent is prior art?

4    A.    Yes, I do.

5    Q.    Do you know what the term "prior art" means, sir?

6    A.    I believe I do.

7    Q.    Was this patent issued on February 12th, 1985?

8    A.    It so reads.

9    Q.    Do you have any reason to dispute that this

10   government-issued paper was not, in fact, issued on February

11   12th, 1985?

12   A.    No.

13             THE COURT:   He says he disagrees with you on

14   that, he disagrees with the characterization of the document

15   as prior art.

16   BY MR. SODIKOFF:

17   Q.    Can you explain to me why you think this is not prior

18   art?

19   A.    Well, if this is the patent I am thinking of, this

20   particular patent describes the use of an antimicrobial

21   composition for the use of contact lenses.

22   Q.    I am sorry.  I think you might be confused on what

23   prior art is.

24             THE COURT:   I don't think he is confused.   I

25   think you should let him finish his interest.

1           Go ahead and finish your answer.

2           THE WITNESS:  If you give me a moment to read

3    the abstract.

4           THE COURT:  Go right ahead, Mr. Dziabo.

5           THE WITNESS:  Okay, your question again?

6    BY MR. SODIKOFF:

7    Q.    I withdraw my question.

8           Mr. Dziabo, would you agree that this document

9    was published more than one year before you filed your

10   patent application?

11   A.    Yes.

12   Q.    Let's look at Column 12, beginning at Line 20 through

13   28.  Do you see here where it talks about the antimicrobial

14   effectiveness of the combination of IL-779 and stabilized

15   chlorine dioxide?

16   A.    Yes, I do.

17   Q.    Do you see where it states that the lowest

18   concentration of this combination resulting in complete

19   inhibition of visible growth for 48 hours represents the

20   minimum inhibition concentration, abbreviated "MIC," value?

21           Do you see that?

22   A.    Yes.

23   Q.    And the next sentence says that these values are

24   intended to be used as an index of efficacy for preservative

25   applications, doesn't it?

Dziabo - cross

1    A.    Yes.

2    Q.    And according to your lawyer, and his admissions in

3    the '078 patent prosecution history, we know that stabilized

4    chlorine dioxide was a known preservative.  Correct?

5    A.    That's what was stated in the patent.

6    Q.    Now, if we move on, move to Column 11 of this patent,

7    the 077 Stockel, in the table on the left, the paragraph

8    just before it -- the last table, Line 45 through 55.  We

9    find here a solution described, don't we, sir?

10   A.    Yes.

11   Q.    And this solution includes stabilized chlorine

12   dioxide, does it not?

13   A.    Yes, it does.

14   Q.    And this solution contains sodium chloride, sir.  Is

15   that correct?

16   A.    Yes, it does.

17   Q.    And the solution contains boric acid.  Is that

18   correct?

19   A.    Yes, it does.

20   Q.    And this solution is at a pH of 7.0.  Is that correct?

21   A.    Yes, it is.

22   Q.    The concentration of stabilized chlorine dioxide, .005

23   percent, is the same concentration that you describe in your

24   patent, isn't it?

25   A.    Yes.

Dziabo - cross

1              THE COURT:  Do you need a moment, counsel?

2              MR. SODIKOFF:  Just one second, please.

3              THE COURT:  All right.

4              MR. SODIKOFF:  Thank you, I am sorry.

5    BY MR. SODIKOFF:

6    Q.    Now, this solution that we see here in the Stockel

7    '077 patent, it states that it's for use in sterilizing

8    contact lenses.  Is that correct?  Line 46, Column 11.

9    A.    Yes, it does say that.

10   Q.    And this solution that is used to sterilize contact

11   lenses contains the same concentration of stabilized

12   chlorine dioxide as the concentration that you describe in

13   your patent.  Isn't that correct?

14   A.    That's correct.

15             MR. SODIKOFF:  Your Honor, can I have one

16   second?

17             THE COURT:  Sure.

18             (Pause.)

19   BY MR. SODIKOFF:

20   Q.    If we can go to the '078 patent, JTX-001.

21             MR. SODIKOFF:  May I approach, Your Honor.

22             THE COURT:  Yes, you may.

23   BY MR. SODIKOFF:

24   Q.    This is your patent, isn't it, sir?

25   A.    Yes, it is.

1    Q.    I would like to look at Example 1, Column 7 of this

2    patent, and I would like to look specifically at Lines 25

3    through 42 -- actually, through 48.

4              Does this table describe a solution that you

5    have referred to as a borate buffered saline solution?

6    A.    Yes, it does.

7    Q.    And this is a stock solution within Allergan, is it

8    not?

9    A.    I wouldn't characterize it as a stock solution.  But

10   it is a typical solution that is used as a vehicle for

11   ophthalmic products?

12   Q.    It is a typical vehicle used in ophthalmic products

13   both inside and outside of Allergan.  Correct?

14   A.    I can't speak for outside of Allergan.

15   Q.    Well, there is nothing unusual about that solution, is

16   there, sir?

17   A.    Unusual in what way?

18   Q.    It's not unique in any way, is it?

19   A.    It's typical.

20   Q.    And, indeed, it is a solution that Allergan had been

21   using for some time as a base for products, for

22   ophthalmology products.  Correct?

23   A.    For ophthalmic products, yes.

24   Q.    And the borate buffered solution is a standard vehicle

25   that Allergan used.  Is that correct?

Dziabo - cross

1    A.    It is a vehicle that was used, yes.

2    Q.    And it's in the physiological range for tonicity, sir?

3    A.    This solution would yield an isotonic solution.

4    Q.    And an isotonic solution is the same as the tonicity

5    in the eye.  Is that correct?

6    A.    That's correct.

7    Q.    Below, it says that, in this patent, you used the

8    hydrochloric acid or sodium hydroxide to adjust the pH?

9          That wasn't something that was unique to

10   Allergan, was it, sir?

11   A.    No, it was not.

12   Q.    Adjusting the pH through this manner was well-known in

13   the art, wasn't it?

14   A.    That is typical pharmaceutical technique.

15   Q.    Known both to those inside and outside of Allergan.

16   Correct?

17   A.    Correct.

18   Q.    And actually creating this basic borate buffered

19   saline solution is also within the skill of the art of those

20   both inside and outside of Allergan.  Isn't that correct,

21   sir?

22   A.    Yes.

23   Q.    And the pH chosen here of about 7.7 to 7.9, that's

24   within .3 or .4 of what you referred to as physiological pH

25   of the eye.  Isn't that correct, sir?

1    A.    Yes.

2    Q.    Sir, are you aware that Allergan was selling a

3    thimerisol preserved saline solution out on the market at

4    least one year before the filing of your patent application

5    in 1989?

6    A.    Yes.

7    Q.    Are you aware that this thimerisol preserved saline

8    solution used thimerisol as a preservative?

9    A.    Yes.

10   Q.    In fact, this was one of Allergan's biggest sellers,

11   wasn't it?

12   A.    I can't recall where it ranked as products for

13   Allergan.

14   Q.    Well, it was a preserved saline solution, it was

15   referred to as "the green bottle."  Does that ring a bell?

16   A.    Yes.

17   Q.    And would you disagree with Mr. Ripley if, during his

18   deposition, he stated that this thimerisol preserved saline

19   solution was a big seller for Allergan before 1989?

20   A.    You know, I just can't speak to the magnitude or the

21   sales volume.  But it was a good product for Allergan.

22   Q.    And you wouldn't dispute what Mr. Ripley said, would

23   you?

24   A.    No.

25   Q.    Are you aware of what the components were in

1    Allergan's big selling thimerisol preserved saline solution?

2    A.     I can't recall exactly today.  I was aware at the

3    time, I am sure.

4    Q.     This thimerisol preserved saline solution was on sale

5    well before 1989.  Isn't that correct?

6    A.     I believe so, yes.

7    Q.     Would you dispute it if Mr. Ripley said that the

8    preserved thimerisol solution was thimerisol at a low

9    concentration, sodium chloride, and a borate buffer?

10   A.     No, I would not dispute that.

11   Q.     Would you dispute that Mr. Ripley's best recollection

12   was that the thimerisol preserved saline solution had a

13   target pH of 7.3?

14           MR. SINGER:  I would okay object to the --

15           THE COURT:  I would sustain the objection to the

16   form of that question.

17           MR. SINGER:  Thank you.

18   BY MR. SODIKOFF:

19   Q.     Did the thimerisol preserved saline situation, to your

20   knowledge, have a target pH of 7.3?

21   A.     I would say that the -- I would expect that product to

22   have had a pH in the physiological range.  I cannot speak to

23   the exact pH value for that product.  It's been a while.

24   Q.     Would you dispute Mr. Ripley's best recollection that

25   the thimerisol preserved saline solution had a target pH of

1   7.3?

2   A.    No, I would not.

3   Q.    So the preserved saline solution, the thimerisol

4   preserved saline solution, was thimerisol, buffer, and the

5   tonicity agent, salt.  Is that correct?

6   A.    Sodium chloride would be more precise.  Yes.

7   Q.    And looking back at your patent, in Column 7, Lines 35

8   to 40, that table, aside from the thimerisol preservative,

9   the other ingredients there are the exact same, aren't they?

10  A.    I don't know at this point in time.  I haven't seen

11  that formulation in some time.  There could be other agents

12  in that solution.  Thimerisol was very typically formulated

13  with EDTA, ethylenediaminetetraacetic acid, to help its

14  antimicrobial activity.  My recollection is weak on the

15  exact formula.  So I can't say that they were identical.

16  Q.    Well, let's look at Mr. Ripley's deposition.  You can

17  see if you dispute what he said.

18          MR. SINGER:  I am going to object.  That is an

19  improper use.

20          THE COURT:  That is improper.  I agree.

21  Sustained.

22  BY MR. SODIKOFF:

23  Q.    Let's look at Mr. Ripley's deposition and see if it

24  refreshes your recollection, sir.

25          MR. SINGER:  Your Honor, this is not

Dziabo - cross

```
 1    impeachment.  He wasn't at Mr. Ripley's deposition.  This is
 2    not a proper use of deposition testimony.
 3                   THE COURT:  I agree.  Sustained.
 4                   I sustained the objection, counsel.  Move on.
 5    BY MR. SODIKOFF:
 6    Q.    Please look at DTX-357, which I just handed to the
 7    witness on the screen.
 8                   Mr. Ripley, have you ever seen these proposed
 9    rules at the Department of Health & Human Services?
10                   I am sorry, Mr. Dziabo.  I apologize.
11                   Have you seen these proposed rules before, sir?
12    A.    I can't recall at the moment.
13    Q.    Would you agree with me that these rules were
14    published in the C.F.R. on Tuesday, June 28th, 1983?
15    A.    It so reads.
16    Q.    And this is, under the action, it is a "Notice of
17    Proposed Rulemaking."  Is that correct, sir?
18    A.    That's how it's defined, titled, yes.
19    Q.    If we can go to Page 2 --
20    A.    Page 2 of the document?
21    Q.    Yes.  Page 2 of the document, AI 26803.  The second
22    paragraph, the second-to-last sentence.
23    A.    Second-to-last sentence.
24    Q.    Where it starts with, "In response."
25                   Would you agree with me that this says that, "In
```

Dziabo - cross

1    response to the advance notice of proposed rulemaking, one

2    drug manufacturers' association, five drug manufacturers,

3    and many individual consumers submitted comments"?

4    A.    Yes.

5    Q.    If I can turn to AI 26824.  I would like to look at

6    the definitions, specifically, definition F?

7          Do you see here where this government-published

8    document defines eyewash, eye lotion, irrigating solution,

9    as a sterile aqueous solution containing no

10   pharmacologically active ingredients, intended for bathing

11   or mechanically flushing the eye?

12   A.    Yes.

13   Q.    Can we turn to AI 00026827.

14         I would like to look specifically at 21 C.F.R.,

15   Section 349.20, entitled "Eyewashes."

16         Do you see here, sir, that this is a definition

17   by the FDA in this published document of what an eyewash

18   should be?

19   A.    Yes.

20   Q.    And this was published in 1983.  Is that correct?

21   A.    Yes.

22   Q.    It states that, "These products contain no

23   pharmacologically active ingredients, but contain water,

24   tonicity agents to establish isotonicity with tears, agents

25   for establishing pH and buffering to achieve the same pH as

Dziabo - cross

1      tears, and a suitable preservative agent"?

2                Is that correct?

3      A.    It so reads.

4      Q.    And your thimerisol preserved saline solution would

5      meet this definition, wouldn't it, sir?

6      A.    Yes.

7      Q.    So now we have both the FDA with this directive and

8      you have an actual product that contains a suitable

9      preservative, tonicity agents to establish isotonicity with

10     tears, and agents for establishing pH and buffering to

11     achieve the same pH.  Is that correct, sir?

12     A.    Yes.

13     Q.    If we could turn back to the '078 patent.  Let's look

14     at Claim 1 for a second?

15                Let's look at, after the language "therefore

16     comprising."

17                First, we have described here the stabilized

18     chlorine dioxide.  Correct, sir?

19     A.    Let me catch up with you.  Where is that?

20     Q.    We are in the '078 patent.  JTX-1.  For me, that is

21     Column 11, Line 65?

22     A.    Column 11, Line 65.  I am there.  You addressed a

23     particular portion of that.

24     Q.    If you look on the screen, I think he is building all

25     of Claim 1, so we can see it together.

Dziabo - cross

1    A.    Okay.

2    Q.    We are in Claim 1.  Right, sir?

3    A.    Yes.

4    Q.    I am looking, after the term "comprising"?

5    A.    Okay.  I am with you now.

6    Q.    So the first part of this formulation is "stabilized

7    chlorine dioxide in an amount effective to act as a sole

8    preservative."

9              Is that correct, sir?

10   A.    Correct.

11   Q.    The second part of your formulation is "one

12   ophthalmically acceptable buffer component in an amount

13   effective to maintain said aqueous ophthalmic formulation at

14   a pH in the range of about 6.8 to 8."  Is that correct, sir?

15   A.    That's correct.

16   Q.    You would agree that 6.8 to 8 is intended to be at the

17   same pH of the human eye; is that correct, sir?

18   A.    That's correct.

19   Q.    And the use of a buffer component to maintain the pH

20   at this level was specifically provided for in the FDA's

21   definition of an eyewash, wasn't it, sir?

22   A.    It was part of the definition for the eyewash, yes.

23   Q.    Let's look at the next part:  At least one

24   ophthalmically acceptable tonicity component in an amount

25   effective to maintain said aqueous ophthalmic formulation at

Dziabo - cross

```
 1    an osmolarity of at least about 200 million licensee Osmol

 2    per kilogram?

 3              Did I read that correctly, sir?

 4    A.    Yes.

 5    Q.    The reason you wanted it at this osmolality is because

 6    that's the osmolality, or at least getting closer to the

 7    osmolality of the human tear.  Is that correct, sir?

 8    A.    It is the range of the physiology of the eye, yes.

 9    Q.    Having a tonicity component to get into this range of

10    the human eye was again specifically disclosed in the

11    definition of an eyewash in the FDA regulation.  Is that

12    correct?

13    A.    Yes.

14    Q.    I would like to now talk about the preservative,

15    stabilized chlorine dioxide, because the other two elements

16    were clearly required by the FDA in their definition for

17    eyewash, weren't they, sir?

18    A.    In the definition for eyewash, yes.

19    Q.    I believe, yesterday, you gave us what you thought was

20    your invention and what your private thoughts were regarding

21    what stabilized chlorine dioxide was.  But I would like to

22    look at what you disclosed and gave the public notice of in

23    your patent.

24              If we turn to Column 3 -- we are still in

25    JTX-1 -- Column 3, Line 41 through 50, about, just above the
```

Dziabo - cross

1     50, where the period is.

2              This is in your patent.  Is that not correct,

3     sir?

4     A.    Yes, it is.

5     Q.    And here, you tell the public that, "The term

6     'stabilized chlorine dioxide' is well-known in the industry

7     and by those skilled in the art."

8              Is that correct?

9     A.    That's correct.

10    Q.    And, earlier, we established that your attorney

11    admitted that stabilized chlorine dioxide was a well-known

12    preservative.  Is that correct, sir?

13    A.    That's what he stated.

14    Q.    And, next, it provides what stabilized chlorine

15    dioxide includes, does it not?

16    A.    The next line, yes.

17    Q.    And it says, "one or more chlorine dioxide

18    precursors," "one or more."  Correct, sir?

19    A.    Yes.

20    Q.    ..."such as one or more chlorine dioxide-containing

21    complexes."  Is that correct, sir?

22    A.    Correct.

23    Q.    ..."and/or one or more chlorite containing

24    components."

25              Is that correct, sir?

Dziabo - cross

1   A.    Yes.

2   Q.    ..."and/or one or more other entities capable of

3   decomposing or being decomposed in a liquid, preferably

4   aqueous, medium to form chlorine dioxide."

5           Is that correct, sir?

6   A.    Yes.

7   Q.    And Purogene, the product that was sold by Bio-Cide,

8   fits within this definition, doesn't it, sir?

9   A.    Yes, it does.

10  Q.    In fact, if we look at Line 59 through 69 of this

11  patent, you tell people, the public, where we can get this

12  stabilized chlorine dioxide, don't you, sir?

13  A.    Yes.

14  Q.    You tell the public that, "A commercially available

15  stabilized chlorine dioxide which can be utilized in the

16  practice of the present invention is the proprietary

17  stabilized chlorine dioxide of Bio-Cide International, Inc.

18  of Norman, Oklahoma, sold under the trademark Purogene."  Is

19  that correct, sir?

20  A.    Yes.

21  Q.    Then you actually provide for other suitable

22  stabilized chlorine dioxide products, including those -- and

23  I will just summarize here -- called Dura Klor, by Rio Linda

24  Chemical Company.  Is that correct, sir?

25  A.    Yes.

Dziabo - cross

1    Q.    And you also disclose that, for you, stabilized

2    chlorine dioxide also includes what was sold under the

3    trademark Anthium Dioxcide by International Dioxide, Inc.

4    Is that correct?

5    A.    Yes.

6    Q.    So, in this paragraph, you tell the public that

7    Purogene is a form of stabilized chlorine dioxide.  Is that

8    correct?

9    A.    That's correct.

10   Q.    And you tell the public that Dura Klor is a form of

11   stabilized chlorine dioxide.  Is that correct?

12   A.    Yes.

13   Q.    And you also tell the public that anthium dioxcide is

14   a form of stabilized chlorine dioxide as claimed in your

15   invention.  Is that correct?

16   A.    Yes.

17   Q.    Are you aware that, inside Allergan, Purogene is

18   referred to as Purite?

19   A.    Yes.

20   Q.    But there is no difference between Purogene and

21   Purite, is there, sir?

22   A.    Not to my knowledge.

23   Q.    And you didn't play any part in formulating Purogene,

24   itself, did you, sir?

25   A.    No.

Dziabo - cross

1    Q.     And no one at Allergan played any part in formulating

2    Purogene, to your knowledge, did they, sir?

3    A.     To my knowledge, no.

4    Q.     And you never directed Bio-Cide to make any changes to

5    Purogene itself to make it more stable, did you, sir?

6    A.     Particularly to make the product more stable, we did

7    not direct Bio-Cide to make any changes to the formula.

8              MR. SODIKOFF:  If I can step away for one

9    second, Your Honor.

10             Your Honor, may I approach again?

11             THE COURT:  You have free leave, counsel.

12             MR. SODIKOFF:  Thank you.

13   BY MR. SODIKOFF:

14   Q.     Mr. Dziabo, I just handed you what has been marked as

15   DTX-216.  Is that correct?

16   A.     Yes.

17   Q.     If we can blow up the body of this letter.

18             Can you tell me, sir, do you recognize, sir,

19   looking at the full body of this letter, actually, sir,

20   first, that this letter is from Bio-Cide Chemical Company,

21   Inc.?

22   A.     Yes.

23   Q.     And it was sent to Allergan on March 2nd, 1983?

24   A.     That's the date of the letter.

25   Q.     When did you start working at Allergan, sir?

Dziabo - cross

1    A.    July, I believe it was July 4th -- no.  Immediately

2    after the July 4th holiday of 1983.

3    Q.    So this letter was sent to Allergan before you arrived

4    at the company.  Is that correct?

5    A.    That would be correct.

6    Q.    I would like to go to the second paragraph.  Here it

7    states that, "The purpose of this communication is to

8    introduce our product, Purogene, as a replacement for your

9    disinfectant, Quaternium, and your preservative, thimerisol.

10   Is that correct, sir?

11   A.    It so reads.

12   Q.    At this time, as we established earlier, Allergan was

13   selling a thimerisol preserved saline solution.  Isn't that

14   correct, sir?

15   A.    Yes, but that solution did not contain --

16   Q.    I am sorry.  Yes or no, sir?

17   A.    Yes.

18   Q.    If we can go back to the '078 patent.

19           JTX-001.

20           I would like to look at Example 5, in Column 8.

21   I would like to compare that to the base solution that we

22   saw in Example 1.  So, on the top here, sir, we have the

23   buffered saline solution.  Is that correct?

24   A.    That's correct.

25   Q.    And that was a stock saline solution at Allergan.  Is

Dziabo - cross

1   that correct?

2   A.    That was a typical vehicle used at Allergan.  Again,

3   your terminology "stock" --

4   Q.    I apologize.  It was a typical vehicle used at

5   Allergen.  Is that correct?

6   A.    Yes.

7   Q.    And looking below, ignoring for a second the

8   stabilized chlorine dioxide, you would admit that the other

9   three ingredients are exactly what you would see in the

10  typical buffered saline solution.  Is that correct, sir?

11  A.    Yes.

12  Q.    The only addition to get your preservative, preserved

13  saline solution is to put in some stabilized chlorine

14  dioxide.  Is that correct?

15  A.    Yes.

16  Q.    Expanding on what we talked about earlier, in order to

17  get this second solution, the preserved saline, you would

18  take some Purogene and put it in this stock saline solution.

19  Isn't that correct, sir?

20  A.    Yes, that's the technique for formulating.

21  Q.    And Purogene, at this time, was literally available at

22  Sears, was it not, sir?

23  A.    That's not a very correct characterization.

24  Q.    Was it or was it not available at Sears, sir?

25  A.    I have no idea.  I would not expect it to be so.

Dziabo - cross

1          MR. SODIKOFF:  I will move on, Your Honor.

2    BY MR. SODIKOFF:

3    Q.    Now, Example 5 that we just looked at, the same

4    vehicle was also used, or the same buffered saline solution

5    that was typically used at Allergan was also used in

6    Examples 6 and 7.  Isn't that correct, sir?

7    A.    Yes.

8    Q.    And all of these are Purogene .005, sodium chloride as

9    a tonicity agent, boric acid as a buffer, and purified

10   water.  Is that correct, sir?

11   A.    Yes.

12   Q.    I believe that once you make this solution, you tested

13   it for antimicrobial activity.  Is that correct?

14   A.    That was part of the testing regimen, yes.

15   Q.    And you have heard of the U.S. Pharmacopeia.  Is that

16   correct, Mr. Dziabo?

17   A.    Yes.

18   Q.    In common parlance, is it referred to as the USP?

19   A.    Correct.

20   Q.    Do you mind if I use that abbreviation, sir?

21   A.    Please do.

22   Q.    The USP requirements for a preservative were known to

23   the public before 1989.  Isn't that correct, sir?

24   A.    That's correct.

25   Q.    And the USP was kind of known as the benchmark adopted

Dziabo - cross

1   by the FDA for a preservative.  Isn't that correct, sir?

2   A.    That's correct.

3   Q.    And the USP provides specific protocols for testing

4   for preservative effectiveness.  Isn't that correct, sir?

5   A.    That's correct.

6   Q.    Now, Mr. Dziabo, you did not actually conduct in the

7   laboratory the preservative testing.  Is that correct?

8   A.    Myself personally?

9   Q.    Correct.

10  A.    That's correct.

11  Q.    Lab technicians at Allergan did that.  Is that

12  correct?

13  A.    The Allergan research microbiology department, who is

14  skilled and trained in these techniques, performed the

15  testing.

16  Q.    Well, you haven't listed any of the lab technicians as

17  an inventor here, have you, sir?

18  A.    No, we have not.

19  Q.    The only inventors listed on the '078 patent are you

20  and Mr. Ripley.  Is that correct?

21  A.    That's correct.

22  Q.    So actually conducting the preservative testing isn't

23  anything that is inventive, is it, sir?

24  A.    No.  Those are standard protocols.

25  Q.    I believe you mentioned yesterday that Allergan also

1    conducted toxicology tests of a preservative.  Is that

2    correct?

3    A.    That's correct.

4    Q.    Toxicology studies of this specific formulation, sir?

5    A.    That's correct.

6    Q.    The toxicology studies were not actually performed by

7    you, were they, sir?

8    A.    That's correct.

9    Q.    They were, again, performed by others within Allergan,

10    presumably, in the toxicology department?

11    A.    That's correct.

12    Q.    And no one in the toxicology group is listed as an

13    inventor.  Is that correct, sir?

14    A.    That's correct.

15    Q.    So actually conducting toxicology tests is nothing

16    that was new, was it, sir?

17    A.    That's correct.

18         MR. SODIKOFF:  I would like to hand Exhibit

19    215 -- I am sorry, Exhibit 118 to the defendant, Your Honor?

20         MR. SINGER:  I don't think Mr. Dziabo is on

21    trial for anything, Your Honor.

22         MR. SODIKOFF:  I apologize, Your Honor.  I have

23    been watching too many court shows.

24    BY MR. SODIKOFF:

25    Q.    This is the Radcliff '215 patent, sir.  Can you tell

1    me what date this patent was issued?

2    A.    August 25th, 1987.

3    Q.    And this patent was also issued before -- more than

4    one year before you filed your application.  Isn't that

5    correct, sir?

6    A.    Yes.

7    Q.    Looking at Column 2 of this patent, if we can look at

8    the bottom half -- actually, just the last sentence, the

9    last two sentences, can you read for me what that says, sir?

10   The second-to-last sentence starting with "a form of."

11   A.    "A form of stabilized chlorine dioxide usable with the

12   present invention is sold under the trademark PUROGENE by

13   Oxyfresh USA, Inc.  It is to be noted that the Purogene

14   stabilized chlorine dioxide may be purchased from any

15   service center of the Sears department stores."

16   Q.    If we can move further within Radcliff, sir.

17         If we can look at Column 11 of the '215 patent,

18   Example 8, the first paragraph, Lines approximately 16

19   through 27.  This describes a contact lens soak, wouldn't

20   you agree with that, Mr. Dziabo?

21   A.    It's so written.

22   Q.    Included in this contact lens soak is chlorine

23   dioxide.  Is that correct, sir?

24   A.    That's correct.

25   Q.    And it states here that, "The known bactericidal,

Dziabo - cross

1    fungicidal, and viraloidal capacity of chlorine dioxide

2    along with the low toxicity makes chlorine dioxide solution

3    an ideal lens soak."

4              Is that correct, sir?

5    A.    Yes.

6    Q.    And we are talking about contact lenses.  Is that

7    correct, sir?

8    A.    Yes.

9    Q.    And contact lenses are ultimately placed in the eye.

10   Is that correct, sir?

11   A.    Yes.

12   Q.    The next sentence says, "In addition, capacity to

13   degrade organic debris keeps the lens clean and

14   non-irritating."

15             Is that correct, sir?

16   A.    Yes.

17   Q.    Then, finally, it says, "The preferred range of

18   concentration" -- and I believe this is referring to the

19   chlorine dioxide.  Correct, sir?

20   A.    That would be my interpretation.

21   Q.    So the preferred range of chlorine dioxide is .005

22   percent to .2 percent in sterilized water.  Is that correct,

23   sir?

24   A.    Yes.

25   Q.    And .005 percent is the same concentration that you

Dziabo - cross

1     used?

2     A.      Incorrect.

3              MR. SODIKOFF:  Your Honor, can I have one

4     second?

5              THE COURT:  Yes, sir.

6              (Pause.)

7     BY MR. SODIKOFF:

8     Q.      Continuing in the Radcliff patent, if we could look a

9     little broader at just the top half of this, on the bottom,

10    Line 36, it says that chlorine dioxide is approved by the

11    Environmental Protection Agency.  And it gives the No. EPA

12    Reg. No. 9048-3.

13              Are you aware of that EPA regulation number,

14    sir?

15    A.      That's a registration number, not a regulation number.

16    Q.      Do you know that register number, sir?

17    A.      I do not know that registration number.

18    Q.      Do you know that that registration number is for

19    Oxine, which is a Purogene product?

20    A.      It very well could be.  I have not memorized all the

21    EPA registration numbers for various products.

22    Q.      Thank you, sir.

23              Sir, do you still have your book from yesterday?

24    A.      Yes, I believe so.

25    Q.      Do you have JTX-083 in there?

Dziabo - cross

1   A.    Yes.

2   Q.    I believe yesterday you mentioned that you came

3   across, was, I think, the language you used, this document?

4   A.    Yes.

5   Q.    Wasn't it, in fact, this document sent to Allergan by

6   Bio-Cide along with that March 2nd, 1983, letter?

7   A.    I would have no knowledge of that.

8   Q.    You have no reason to dispute that, though, do you,

9   sir?

10  A.    It's possible.

11  Q.    Turning to the second page of this document, at the

12  top -- actually, let's just move on past that.

13        Let's go to Page 3, Allergan 730572.  Isn't it

14  true that Bio-Cide is describing stabilized chlorine dioxide

15  as a dilutable liquid, and that the solutions display a

16  great deal of application flexibility-adjustments in

17  concentration, pH, and contact time can be made to fit a

18  large array of applications?  Is that correct, sir?

19  A.    That's what it reads.

20  Q.    In the next paragraph, it states that "the products

21  have very low toxicity to mammals."

22        Isn't that correct, sir?

23  A.    That's what it states.

24  Q.    In fact, the Stockel '077 patent that we looked at put

25  stabilized chlorine dioxide in an eye formulation.  Isn't

Dziabo - cross

1  that correct, sir?

2  A.    They described the formulation for use in contact lens

3  care.

4  Q.    And that formulation that they described included

5  stabilized chlorine dioxide.  Is that correct, sir?

6  A.    That's correct.

7  Q.    So you certainly were not the first person to describe

8  using stabilized chlorine dioxide in an eye formulation,

9  were you, sir?

10  A.    That's correct.

11  Q.    Here, it goes on to say that, "Class 3 chemicals which

12  represent the next to the lowest toxicity."

13        Is that correct, sir?

14  A.    Yes.

15  Q.    Finally, this last one is pretty interesting, it says,

16  "No special precautions are required, and, in fact, the

17  product is currently registered up to 50 parts per million

18  as a potable water treatment chemical for human

19  consumption."

20        Is that correct, sir?

21  A.    That is correct.

22  Q.    50 parts per million is the concentration that you use

23  in your -- that you describe in your patent.  Isn't that

24  correct, sir?

25  A.    That's correct.

1    Q.    If we can move on to Allergan 0730578.  This is the

2    biological report that you discussed yesterday.  Isn't that

3    correct, sir?

4    A.    That's correct.

5    Q.    And the ingredients here include chlorine dioxide at

6    two percent.  Is that correct?

7    A.    That's correct.

8    Q.    Isn't that 20,000 parts per million?

9    A.    Yes, it is.

10   Q.    But on the other page, didn't they say that you could

11   use stabilized chlorine dioxide at 50 parts per million?

12              THE COURT:  The question is argumentative,

13   counsel.  You can make that argument at closing.  Let's ask

14   the questions, get the answers and move on.

15              MR. SODIKOFF:  I apologize, Your Honor.

16   BY MR. SODIKOFF:

17   Q.    This concentration of 2 percent stabilized chlorine

18   dioxide, 20,000 parts per million, was shown to be only a

19   slight ocular irritant.  Isn't that correct?

20   A.    In this test, yes.

21   Q.    And your concentration is many times less concentrated

22   than here, isn't it, sir?

23   A.    That's correct.

24   Q.    Mr. Dziabo, I have handed you DTX-359.  Is that

25   correct?

Dziabo - cross

1    A.    Yes.

2    Q.    This is a statement about anthium dioxcide.  Is that

3    correct, sir?  If you look at "Directions For Use," I think

4    you see the name there a couple times?

5    A.    Yes.

6    Q.    And anthium dioxcide is an example that you provided

7    in your patent as a stabilized chlorine dioxide.  Is that

8    correct, sir?

9    A.    Yes.

10   Q.    If we can go to Page 3 of this document.  I would like

11   to look at the typical properties of this anthium dioxcide.

12   A.    Not the third page, but Page 3?

13   Q.    I am sorry.  It's AI 0026855, Page 3 of the document

14   but I think it's numbered Page 1 on the bottom.

15   A.    Yes, that's my confusion.

16   Q.    Here, it describes the formulation anthium dioxcide.

17   Is that correct, sir?

18   A.    Yes.

19   Q.    And it says that anthium dioxcide includes sodium

20   carbonate that's 3.65 percent, and chlorine dioxide, 5

21   percent.  Is that correct, sir?

22   A.    Yes.

23   Q.    And the other ingredient is water?

24   A.    Yes.

25   Q.    And the shelf-life of this product exceeds one year.

Dziabo - cross

1    Is that correct, sir?

2    A.    Yes.

3    Q.    Mr. Dziabo, I have handed you DTX-253.  I would like

4    to ask you, at the top, what this is?

5    A.    It's titled, "Patent Specification."

6    Q.    And it's a Great Britain application.  If you can tell

7    me the -- what years you see described here under the patent

8    specification?  Specifically, the complete specification

9    published date.

10   A.    24 May '72.

11   Q.    And this patent describes, Line 43 in Column 1, "We

12   have now found, surprisingly, that the undesirable microbial

13   growth or contamination in antacid compositions does not

14   incur in the case of an aqueous antacid composition, which

15   comprises water and aluminum hydroxide and/or magnesium

16   trisilicate and/or magnesium hydrocide, together with .005

17   to .100 percent by weight of chlorine dioxide as a

18   preservative."

19           Is that correct, sir?

20   A.    Yes.

21   Q.    And it moves on, in Column 2, Line 60, that chlorine

22   dioxide has been used extensively in water purification

23   processes?

24           Is that what it tells us, sir?

25   A.    Yes.

Dziabo - cross

1   Q.    And then it says that, "The activity of this compound

2   is dependent upon the pH."

3           Is that correct, sir?

4   A.    Yes.

5   Q.    Then it goes on and gets a patent in 1972 for saying

6   that, "It is quite surprising that, even in a high alkaline

7   pH, such as those systems containing antacid compounds, it

8   is capable of suppressing growth of microorganisms."

9           Is that correct, sir?

10  A.    Yes.

11  Q.    If we could look at the next page, Page 885, Line 8

12  through 13:  "Chlorine dioxide in the form of gas is bubbled

13  into the solution, or a solution containing 5 percent by

14  weight chlorine dioxide and 3.65 percent by weight sodium

15  carbonate is added."

16          Did I read that correctly, sir?

17  A.    Yes.

18  Q.    Do you recognize those as the exact two concentrations

19  that were found in the anthium dioxcide product?

20  A.    Yes.

21  Q.    Mr. Dziabo, I think that you looked at DTX-226

22  yesterday in your booklet.  Do you still have that with you?

23  A.    DTX-226?

24  Q.    Yes, sir.

25  A.    Yes.

Dziabo - cross

1    Q.    On the second page -- I am sorry, the third page,

2    Bio-Cide 00535 -- actually, I think there are four zeros,

3    but Bio-Cide 535.

4    A.    Yes.

5    Q.    Everyone here has this page, if we could turn that

6    off, the 5 and 6 are redacted.  Is that correct, sir?

7    A.    In my copy, yes.

8    Q.    In No. 7 -- at the top here, it says November 19,

9    1986.  Is that correct, sir?

10   A.    That's correct.

11   Q.    If I can put it on the Elmo.

12         If we can go back to the first page of this for

13   just one second.  It lists here the people who were

14   attending the meeting for Bio-Cide and for Allergan.  Is

15   that correct, sir?

16   A.    Yes.

17   Q.    And these are some pretty important people at

18   Bio-Cide, aren't they, sir?

19   A.    Yes.

20   Q.    We have Mr. Danner, the president, Mr. Knapp, vice

21   president, Mr. O. Hardy, another vice president, Mr. Ringo,

22   the assistant technical director, and we actually have a

23   Mr. Wilkens, chairman of the board.

24         Is that correct, sir?

25   A.    That's correct.

Dziabo - cross

1    Q.    Also, for Allergan, we have Mr., and I will probably

2    murder this, Karageozian, vice president, we have Mr. Kiral,

3    the director, we have you, sir, the manager, we have

4    Mr. Ripley, the senior professional, we have Mr. Courtney, a

5    director, and we have two other managers and two other

6    senior personnel.

7            Is that correct, sir?

8    A.    Yes.

9    Q.    And looking at, going to the next page -- Page 3 of

10   this document, Bio-Cide 53.  If we look at No. 7 here.

11   A.    Yes.

12   Q.    It states that, "In order to strengthen the

13   cooperative development efforts between Bio-Cide and

14   Allergan and ensure prompt and necessary communications, Bob

15   Danner proposed a monthly project review which would update

16   all parties on the status of experiments, patents, and other

17   pertinent project issues."

18           Is that correct, sir?

19   A.    That's correct.

20   Q.    So Mr. Danner proposed a monthly project review that

21   would include an update to all parties on patents.  Is that

22   correct, sir?

23   A.    That was an agenda item to be discussed at the

24   meeting.

25   Q.    Mr. Dziabo, yesterday, you said that you were not

Dziabo - cross

```
 1   aware that Bio-Cide and Allergan filed patent applications

 2   on the exact same day.  Is that correct, sir?

 3   A.    I was not aware up until the time of my deposition,

 4   that's correct.

 5   Q.    But you are aware of it today, sir?

 6   A.    Excuse me?

 7   Q.    Are you aware today?

 8   A.    Obviously, yes.

 9   Q.    And you don't dispute that the specifications of those

10   two patent applications are largely exactly the same?

11               THE COURT:  You might want to establish that he

12   is familiar with the other.

13               MR. SODIKOFF:  Sorry.

14   BY MR. SODIKOFF:

15   Q.    Have you had an opportunity to look at the Bio-Cide

16   patent application?

17   A.    No, I have not.

18   Q.    Mr. Dziabo, if I can just -- Mr. Dziabo, is this a

19   document that you haven't seen before?

20               I am sorry.

21               Can you just tell --

22   A.    This is one of many documents I have never seen

23   before.

24   Q.    The serial number at the top, can you just tell me

25   what that says, sir?
```

Dziabo - cross

1   A.    It's a little difficult to read the serial number.

2   Q.    JTX-099, Bio-Cide 615.

3   A.    I am not with you here.

4   Q.    I was just telling him the Bates number on the back.

5         The serial number is on the top.

6   A.    What I have in the serial number here on the top is

7   AWS, it appears.

8   Q.    Under that, sir.

9   A.    Under it?

10  Q.    Yes.

11  A.    This copy is a little weak.  It looks like it's better

12  on the screen.

13         07/277, 790.  That's the best I can read.

14  Q.    The filing date, sir, next to it?

15  A.    I would say 11/29/83.

16  Q.    I believe that's an '88, sir.

17  A.    It's hard to read.

18  Q.    But the first named applicant?

19  A.    I am going to guess Danner.

20  Q.    If I represented to you that it said Danner, would you

21  recognize that name?

22  A.    I would say that's possible.

23  Q.    And that is Mr. Bobby Danner from Bio-Cide.  Is that

24  correct?  Do you know a Mr. Bobby Danner from Bio-Cide?

25  A.    It says "Danner."

Dziabo - cross

1    Q.    The next part is Bill D. McCarthy.  Do you recognize

2    that name, sir?

3    A.    I recognize that name, yes.

4    Q.    And he was an attorney for you in your patent

5    application.  Isn't that correct, sir?

6    A.    My recollection of Mr. McCarthy's involvement in the

7    patent application is very weak, over time.  I remember

8    Mr. Uxa being the primary person I dealt with.

9    Q.    Let me show you JTX-075.

10          Do you have JTX-075 in front of you, sir?

11   A.    Yes, I do.

12   Q.    I would like to look at AI 17334.

13          MR. SINGER:  My copy does not have that.

14          THE WITNESS:  Mine doesn't, either.

15          MR. SODIKOFF:  I apologize.

16   BY MR. SODIKOFF:

17   Q.    Do you have AI 17302 up there, sir.

18          Do you have that document, sir?

19   A.    I am sorry.  What was the document again?

20   Q.    AI 17302.

21   A.    Yes.

22   Q.    And this is the part of the prosecution history for

23   the original patent that you -- it was a C-I-P and

24   eventually became the '078 patent.  Is that correct, sir?

25   A.    I believe so.

Dziabo - cross

1  Q.    And about halfway down, under, does it list a Mr. Bill

2  McCarthy, Bill D. McCarthy?

3  A.    Yes.

4  Q.    And name him as your lawyer, sir?

5  A.    I don't know what that means.  His name is listed

6  there.

7  Q.    If we can look at the next page of this document,

8  AI 17334.

9        It's not the next page of yours.  But AI 17334.

10 A.    Yes.

11 Q.    Do you recognize, at the top, that this says,

12 "Declaration and the Power of Attorney-Original

13 Application"?

14 A.    Yes.

15 Q.    Do you recognize, about halfway through, that you

16 hereby appoint Bill D. McCarthy to be your attorney?

17 A.    Yes.

18 Q.    And down below, the full name for sole inventor

19 listing Anthony J. Dziabo, Jr.  That is you, sir.  Correct?

20 A.    Yes.

21 Q.    Would you agree with me that in this power of

22 attorney, you made Mr. Bill D. McCarthy your attorney for

23 this patent application?

24 A.    It appears so.

25 Q.    And if we go back just for a second to JTX-099, the

1    first page?

2    A.    JTX-099, okay.

3    Q.    That also lists Mr. Bill D. McCarthy.  Is that

4    correct, sir?

5    A.    Yes.

6    Q.    So you would agree with me now that Mr. Bill D.

7    McCarthy filed both of these applications?

8    A.    I don't know if he filed both applications.  I have no

9    recollection of that.

10   Q.    He is listed as the attorney on both applications,

11   though.  Isn't he, sir?

12   A.    Yes.

13            MR. SODIKOFF:  Thank you, Mr. Dziabo.

14            THE COURT:  Mr. Boggs?

15            MR. BOGGS:  I have no questions, Your Honor.

16            THE COURT:  All right.  Your redirect,

17   Mr. Singer.

18            MR. SINGER:  Thank you, Judge.  If I may have a

19   moment to get a little organized, then we will go forward.

20            THE COURT:  All right.

21                    REDIRECT EXAMINATION

22   BY MR. SINGER:

23   Q.    Good morning, Mr. Dziabo.  Good to see you again.  I

24   want to start with, it was right near the end before we got

25   to the patent applications that you hadn't seen before.

Dziabo - redirect

1   DTX-253, please.  Do you still have a copy of that up there?

2   That is this British thing with the seal on the front.

3   A.    Yes.

4   Q.    If I can direct your attention to the paragraph that

5   counsel showed you, which is at the bottom of the first

6   column overlapping to the second.

7   A.    Yes.

8   Q.    And if we could put that together, to get the whole

9   paragraph, please.

10         This is the invention in this patent, is it not?

11   A.    That's correct.

12   Q.    It says, "We have now found," and you have patents.

13   Correct?

14   A.    Yes.

15   Q.    And this is -- do you understand this to be a way of

16   saying this is what I have invented?

17   A.    Yes.

18   Q.    And doesn't it say that, "We have now found,

19   surprisingly, that the undesirable microbial growth or

20   contamination in antacid compositions does not occur in the

21   case of an aqueous antacid composition, which comprises

22   water and aluminum hydroxide and/or magnesium trisilicate

23   and/or magnesium hydroxide, together with .005 to .100

24   percent by weight of chlorine dioxide as a preservative"?

25   A.    Correct.

Dziabo - redirect

1   Q.    Did I read that correctly?

2   A.    Yes, sir.

3   Q.    That is not stabilized chlorine dioxide.  Is that

4   right?

5   A.    That's not --  I agree with your interpretation, this

6   is the chlorine dioxide gas, not stabilized chlorine

7   dioxide.

8   Q.    Thank you.

9         Now I would like to go to -- Mr. Dziabo, you

10  should have the International Dioxide label in front of you.

11  A.    I am sorry?

12  Q.    The International Dioxide label, which should be

13  marked as DTX-359.  And I know you probably have a pile of

14  papers up there.

15  A.    359, yes, I have it.

16  Q.    Counsel walked you through the composition of this

17  product.

18  A.    Yes.

19  Q.    And that was, I believe at Page 3 of the document,

20  which is Page 1 internally, which is AI -- it's Page 1

21  internally, Page 3 of the exhibit, which is AI, in very

22  small print, 0026855.

23  A.    855.

24  Q.    It's the third page of the exhibit.

25        We are getting closer.

1          It should say "typical properties."  Do you have

2     that, Mr. Dziabo?

3     A.    I have the packet.

4          MR. SINGER:  May I approach, Your Honor, just to

5     help?

6          THE WITNESS:  I can't find 855.

7          855, I have got it.  Those numbers are kind of

8     small.

9     BY MR. SINGER:

10    Q.    They are very small.

11          That describes chlorine dioxide as the active

12    ingredient, does it not?

13    A.    Yes, means of using chlorine dioxide in products and

14    processes.

15    Q.    And, again, that is the gas, not the stabilized

16    chlorine dioxide.  Is that right?

17    A.    That's correct.

18    Q.    And then if I could even turn to the front page of

19    this document, you will see it says a note on the front, and

20    I will read it, if we can highlight it, can we spin that so

21    we have it, highlight just the note, where it says, "Note,"

22    and I will read that:  "All working solutions must be

23    adjusted to pH of approximately 4.0 prior to use, employing

24    acidic acid, vinegar, citric acid or suitable buffer, or

25    added to a medium which will result in a final pH of 4.0."

                          Dziabo - redirect

1                        Did I read that correctly?

2    A.    Yes, you did.

3    Q.    That will result in the production of chlorine dioxide

4    gas, will it not?

5    A.    That's correct.

6    Q.    You can put that aside.

7                 Mr. Dziabo, if you can go to JTX-83.  This is

8    the packet of material that you said you reviewed?

9    A.    Yes, I am there.

10   Q.    Do you recall being asked by counsel about the use

11   of -- I think he said stabilized chlorine dioxide in water

12   treatment.  Do you remember that?

13   A.    Yes.

14   Q.    I would ask you to turn to the Bates stamp page

15   Allergan 0730577.  And I would like to highlight Section 3.

16   That describes the "use of chlorine dioxide in water

17   treatment," does it not?

18   A.    That's correct.

19   Q.    Again, that's the gas.  Right?

20   A.    That's correct, chlorine dioxide is the gas.

21   Q.    That's not the stabilized chlorine dioxide, which is

22   the sodium chloride we talked about yesterday.  Right?

23   A.    That's correct.

24   Q.    I think you can put that aside.

25                 If we can have, I think counsel showed you

1    DTX-118.

2    A.     Is that in the book?

3    Q.     No.  It was handed to you by counsel.  It's the

4    Radcliff '214 patent.

5    A.     Yes.

6    Q.     And he referred you to the example of the contact lens

7    soak, which is Example 8 on Columns 11 and 12.

8               If we could highlight the first paragraph, and

9    it's really the second sentence, it says, "The known

10   bactericidal, fungicidal and viraloidal capacity of chlorine

11   dioxide along with the low toxicity makes chlorine dioxide

12   solution an ideal lens soak."

13              I don't mean to be repetitive.  But, again, is

14   that chlorine dioxide, the gas?

15   A.     That's how I would read this sentence.

16   Q.     And then, again, if we go to the bottom of Example 8,

17   it's the last sentence, and it says, "Chlorine dioxide is

18   approved by the Environmental Protection Agency, (EPA

19   Registration No. 9048-3), for water purification, food

20   preparation and preservation as well as a bacteriostatic,

21   fungistatic and virostatic agent."

22              Did I read that correctly?

23   A.     Yes.

24   Q.     And again, that's the gas, not the stabilized chlorine

25   dioxide.  Right?

1    A.    Yes.

2    Q.    You can put that aside.

3          I think -- you had a discussion with counsel

4    about some arguments your -- one of your lawyers made,

5    Mr. Uxa, do you recall that?  It was right at the outset of

6    your activity?

7    A.    Yes.

8    Q.    He kept claiming that your lawyer had admitted that

9    chlorine dioxide -- or stabilized chlorine dioxide is a

10   well-known preservative.  Do you remember that?

11   A.    Yes.

12   Q.    If we could bring up the brief, and I would like to

13   show you something that he didn't tell you.  If we could go

14   to Allergan, I think it's JTX-006B.

15          Do we have that, Mr. Exline?

16   A.    JTX-?

17   Q.    006B.  Mr. Dziabo, it is one of these briefs that we

18   lawyers file?

19   A.    It's in my book?

20          MR. SINGER:  May I approach to help, Your Honor?

21          THE COURT:  Yes.  I think it was handed to you.

22          THE WITNESS:  I have it.  Oh, it was 063?

23          MR. SINGER:  Let me approach, Your Honor.

24   BY MR. SINGER:

25   Q.    Now, I am going to read from Allergan 978398.  It is

1    down near the bottom of the page.

2              I think counsel showed you the paragraph that

3    says "the fact that."

4              Do you see that?  Do you remember him showing

5    you that?

6    A.    Yes.

7    Q.    He didn't show you the preceding paragraph, did he?

8    And I will highlight the preceding paragraph.

9              If we can just have the preceding paragraph.

10             "The Examiner contends that stabilized chlorine

11   dioxide is well-known as a preservative in many applications

12   and that it would be obvious to adapt it to ocular

13   applications."

14             So that was the examiner's contention in this

15   brief.  Isn't that right?

16   A.    Yes.

17   Q.    And your lawyer was responding to the examiner's

18   contention, wasn't he?

19   A.    Yes.

20   Q.    As you understand it?

21   A.    Yes.

22   Q.    You were also shown, I think, the -- let's get

23   something on the record here.  You were shown DTX-357, which

24   is an FDA, I guess a monograph for over-the-counter

25   products.  Do you remember that?

                        Dziabo - redirect

1    A.    Yes, I have it here.

2    Q.    This is where we went through the requirements for

3    eyewashes?

4    A.    Yes.

5    Q.    Mr. Dziabo, are you claiming you invented the concept

6    of preserved eyewashes?

7    A.    No.

8    Q.    Are you claiming you invented the concept of preserved

9    saline?

10   A.    No.

11   Q.    Thank you.

12             THE COURT:  Mr. Dziabo, go back to Page 15, if

13   you would, JTX-006B.

14             Mr. Singer directed you to the first paragraph

15   on that page.  Would you read to yourself the first three

16   sentences of the second paragraph and tell me how you

17   interpret it.

18             THE WITNESS:  Page 15, Your Honor?

19             THE COURT:  The paragraph beginning with the

20   word "further."  Read those to yourself, those first three

21   sentences, please, and tell me how you interpret that.

22             (Pause.)

23             THE COURT:  What is the lawyer saying there?

24             THE WITNESS:  Well, he is basically saying that,

25   it reads that the stabilized chlorine dioxide is in

Dziabo - redirect

1    combination with another antimicrobial agent, both of which

2    are necessary to provide the antimicrobial activity for

3    their described invention.

4              THE COURT:   Then the last sentence, he offers

5    the view that, In this important regard, Stockel, et al.

6    patents teach clearly, directly and expressly, away from the

7    present invention.   What do you interpret that to mean?

8    Just what it says, I would imagine.

9              THE WITNESS:   I would interpret that as saying

10   that it was an improper interpretation by the reviewer.

11             MR. SINGER:   Thank you, Your Honor.   You

12   anticipated where I was going.   I was going to put up the

13   Stockel patent.

14   BY MR. SINGER:

15   Q.    Just for the record, let's put up the '077 patent,

16   which was DTX-252, Mr. Dziabo.

17   A.    Yes, I have it.

18   Q.    I will show you a few things that counsel didn't show

19   you, which were the source of the arguments made by your

20   lawyer that His Honor just went through.

21             If we could go, just highlight the first line of

22   the abstract.   The first two lines, really.   It says, "An

23   antimicrobial composition is provided comprising an aqueous

24   solution of an oxyhalogen compound and a polymeric

25   germicide."

Dziabo - redirect

1          The next line says, "The oxyhalogen compound is

2    preferably stabilized chlorine dioxide and the polymeric

3    germicide is preferably a quaternary ammonium compound."

4    Did I read that accurately?

5    A.    That's correct.

6    Q.    And the quaternary ammonium compound is another

7    preservative agent.  Is that correct?

8    A.    Yes.

9    Q.    The oxyhalogen composition was the stabilized chlorine

10   dioxide?

11   A.    That's correct.

12   Q.    And that is what your lawyer was talking about, and

13   Your Honor just referred you, where the Stockel requires two

14   active agents for preservation?

15   A.    That's what it describes to me.

16   Q.    Also, you were referred to, I believe, Example 2.  It

17   was the sentence that he read, I think, that said, it's

18   Column 12, if I can help, Additional Example 2.  I think

19   counsel read to you -- actually, he didn't read this to you,

20   now that I think about it.

21          It says, "The antimicrobial effectiveness of the

22   combination of IL-779 and stabilized chlorine dioxide was

23   measured by a broth dilution method."

24          Did I read that correctly?

25   A.    Yes, you have.

1    Q.    Again, the stabilized chlorine dioxide was not a sole

2    preservation in this composition.  Correct?

3    A.    It was not the sole antimicrobial agent in this

4    composition.

5    Q.    What is your understanding of how the stabilized

6    chlorine dioxide was used in Stockel's inventions?

7    A.    Stockel describes an invention where the stabilized

8    chlorine dioxide is used as what is known as a potentiator.

9    Q.    What does that mean?

10   A.    Basically, a potentiator is a substance that interacts

11   with another substance in a manner to enhance or to leverage

12   or to increase the desired functional effects.

13   Q.    So, if I understand this correctly, the stabilized

14   chlorine dioxide was used to sort of activate the other

15   preservative to make it more effective.  Is that right?

16   A.    That's correct, yes.

17   Q.    Actually, let's go to Column 11.  It was the table

18   right there, at the bottom, and I remember counsel going

19   through that.  Do you remember him going through that?

20   A.    Yes.

21   Q.    Do you remember when he skipped the polydiguanide?

22   A.    Yes.

23   Q.    Mr. Dziabo, I would ask you to look at DTX-216.  This

24   was the letter that you were shown?

25   A.    So it's in the book?

Dziabo - redirect

1   Q.    No.  It's something that counsel handed you.  It's a

2   one-page letter.

3   A.    I have it.

4   Q.    I am sorry.

5           MR. SINGER:  Your Honor, before I do that, I

6   would actually like to show the witness the appeal, if I

7   could.

8           THE COURT:  Yes.

9           MR. SINGER:  Your Honor, it's an excerpt from

10  DTX-257.  I have excerpted it to make things easier.  It's

11  the file history.  I just took a piece from it.

12  BY MR. SINGER:

13  Q.    I would ask you to look at Page 4, Mr. Dziabo.  This

14  is the appeal that counsel referred you to in the Patent

15  Office.

16           You understand it took place in the Patent

17  Office?

18  A.    Yes.

19  Q.    I didn't mean to suggest yesterday it had taken place

20  in an appellate court.  It was the Patent Office.

21           You understand these to be the findings on

22  appeal?

23  A.    Yes.

24           MR. SODIKOFF:  I object, Your Honor.  The

25  decision by the board, the appeal, the brief, I think it

Dziabo - redirect

1    speaks for itself.  Mr. Dziabo certainly didn't write it.

2                THE COURT:  Overruled.

3    BY MR. SINGER:

4    Q.    If we could turn to Page 4 of the board's decision.

5    A.    I am on Page 4, yes.

6    Q.    I can also put it on the Elmo.

7                THE COURT:  He didn't write the lawyer's briefs,

8    either, counsel.

9    BY MR. SINGER:

10   Q.    I am going to switch to the Elmo.  Okay.

11               Right here.  I will read this from the board's

12   appeal, that, "such positively charged nitrogen-containing

13   cationic polymers are critical to Stockel's invention is

14   clear from the disclosure of the Stockel '208 patent, Column

15   9, Lines 5 to 13 reproduced below."

16               Did I read that correctly?

17   A.    Yes.

18   Q.    That is consistent with your understanding of the

19   Stockel patents?

20   A.    Yes.

21   Q.    It is not just the Stockel '208 patent but the other

22   Stockel patent you were shown?

23   A.    Yes, it is.

24   Q.    Now I would just like to refer you to the letter

25   again, which is Defendant's Exhibit 216.

Dziabo - redirect

1          Mr. Dziabo, you were going to say something

2    about the line there about the preservative thimerisol.  You

3    were told it was a yes or no question.

4          What is it that you wanted to say about that?

5    A.    I just wanted to make the point that I thought that

6    the terminology of the preservative was very loose, and that

7    the more correct indication in my interpretation, there

8    should have been the antimicrobial agent thimerisol,

9    because, in reading this letter, we did have a disinfectant

10   product called Allergan Hydrocare Cleaning and Disinfecting

11   Solution.  It was a soft lens disinfecting solution.

12          And it used the quaternium and the thimerisol in

13   combination, they were the two -- they were, the two were

14   together.  It is the only product where we had a combination

15   of thimerisol and quaternium.

16          So he had to have been looking at and referring

17   to the disinfecting product, so his terminology of

18   preservative in this instance was incorrect.

19   Q.    Thank you.

20          MR. SINGER:  I have nothing further, Your Honor.

21          THE COURT:  All right.  You are excused.

22          MR. SODIKOFF:  Your Honor, may we just have a

23   moment?

24          THE COURT:  No, that is it.  I explained my

25   process.  You can ask, or if I offer it, okay.

Dziabo - redirect

```
 1                    (Witness excused.)

 2                    THE COURT:  I think we will take our morning

 3       break.

 4                    (Recess taken.)

 5                    THE COURT:  All right.  Please take your seats.

 6       Ms. Brooks, you were about to say?

 7                    MS. BROOKS:  Yes, Your Honor.  Allergan calls

 8       its next witness, Dr. Valentino Stella.  Just for context,

 9       Your Honor, Dr. Stella, at this point in time, will only be

10       talking about infringement as far as Exela and the '834

11       patent is concerned.  We will be recalling him later after

12       Exela and Apotex have presented their validity case in

13       rebuttal of that case.

14                    Mr. Singer will be doing the direct.

15                    MR. BREISBLATT:  With that in mind, I have let

16       some of my team leave, Your Honor.

17                    THE COURT:  That is fine.

18                    ...VALENTINO JOHN STELLA, having been duly

19       sworn as a witness, was examined and testified as follows...

20                          DIRECT EXAMINATION

21       BY MR. SINGER:

22       Q.   Good morning, Dr. Stella.

23                    MR. SINGER:  Your Honor, may I approach to hand

24       the witness his binder?

25                    THE COURT:  Please do, Mr. Singer.
```

```
 1    BY MR. SINGER:

 2    Q.    Good morning, Dr. Stella.

 3    A.    Good morning.

 4    Q.    Thank you for coming today.

 5              Where are you currently employed?

 6    A.    I am currently a distinguished professor of

 7    pharmaceutical chemistry at the University of Kansas.

 8    Q.    And what is a distinguished professor at the

 9    University of Kansas?

10    A.    As you know, the normal ranks of professor is

11    assistant, associate, and full professor.  And

12    "distinguished professor" is a higher distinction.  It

13    comprises about 40 to 50 professors at the University of

14    Kansas.

15    Q.    What types of courses do you teach?

16    A.    I currently teach classes in pharmacokinetics.  Your

17    Honor, that is a time profile of drugs in the body.  How

18    drugs are absorbed.  How they are eliminated.

19              I also teach a class in drug stability.  And,

20    over the years, I have taught classes in drug formulation,

21    solubility, pharmaceutical equilibrium.

22    Q.    How long have you been at the University of Kansas?

23    A.    This is my 36th year at the University of Kansas.

24    Q.    And when did you become a full professor?

25    A.    I became a full professor in 1981.  And a
```

Stella - direct

1    distinguished professor in 1990, I believe.

2    Q.    Have you held other positions at Kansas University

3    other than in the professorial capacity?

4    A.    Yes, I have had two other positions.  From 1989 to

5    1999, I was the director of the Center for Drug Delivery

6    Research at the University of Kansas.  And about three or

7    four years ago, I became director of the Drug Development

8    and Experimental Therapeutics Group within the University of

9    Kansas Cancer Center.

10   Q.    You have an Australian accent.  Are you from

11   Australia?

12   A.    I am, sir.

13   Q.    Can you describe your educational background for the

14   Court?

15   A.    I have a Bachelor of pharmacy degree which I received

16   in 1968 from the Victoria College of Pharmacy in Melbourne,

17   Australia.  Subsequent to that, I worked as a pharmacist for

18   one year in hospital pharmacy.

19             In 1968, late '68, I went to graduate school at

20   the University of Kansas, with the late Professor Takeru

21   Higuchi, and received my Ph.D. in 1971.

22   Q.    What was the subject matter of your Ph.D. thesis?

23   A.    It was on the drug delivery and formulation of the

24   antiseizure drug Dilantin.

25   Q.    How long have you worked in drug formulations?

1    A.    All my career.

2    Q.    Do you have any particular experience with ophthalmic

3    drug formulations?

4    A.    I have -- yes, I do.  When I was a pharmacist at

5    Bendigo Base Hospital, it is a small town in North Central

6    Victoria, I produced ophthalmic formulations.  There was no

7    research involved.  It was simply batch making of

8    formulations, sterilization, et cetera.

9              I then, in my capacity as a consultant to the

10   pharmaceutical industry of 36 years, I have worked very

11   closely with formulators and researchers in the area.  And

12   in my own work, I have published a number of papers in the

13   area of ophthalmics, and, also, but much more extensively,

14   sterile products, which have a lot of similarities to

15   ophthalmic formulations.

16   Q.    Have you consulted for Allergan in the past?

17   A.    I have.

18   Q.    Have you consulted for other pharmaceutical companies?

19   A.    Just about all of them.

20   Q.    Have you consulted for generic pharmaceutical

21   companies?

22   A.    Yes, I have.

23   Q.    Do you have any patents?

24   A.    U.S. patents, I think it's 35 or 36.

25   Q.    Have you worked on any notable products you would like

Stella - direct

1   to tell the Court about?

2   A.    I am the inventor or co-inventor of the drug called

3   fosphenytoin, it is also Cerebyx, it is a safe injectable

4   form of the drug Dilantin.

5               I was also the, I helped formulate the

6   anticancer drug Velcade, which is a new anticancer drug,

7   it's generic name is bortezamib.

8               I am the coinventor of the top-selling anti-AIDS

9   drug, which is Viread.

10              I think, Your Honor, you know the product that

11  came out about two years ago, which was three drugs in one

12  tablet, you take one tablet once a day for the treatment of

13  AIDS.  The principal drug in that is Viread.  I was the

14  co-inventor of that.

15              Last December, I had the honor of having a new

16  anesthetic drug that went onto the market called Lusedra.

17  There is a product called Captisol, which is a cyclodextrin,

18  it is a safe injectable form of cyclodextrin.  That is in

19  five commercially approved FDA products.

20  Q.    Have you served as an expert in patent litigation

21  before?

22  A.    Yes, I have, for both branded names as well as for

23  generics.

24  Q.    Dr. Stella, were you retained to render an opinion on

25  infringement with respect to the Exela defendant here today?

1   A.    Yes.  I was asked by Allergan to be, to offer an

2   opinion as to whether the asserted claims of the '834 patent

3   are infringed by the Exela formulation.

4   Q.    Did you reach such an opinion?

5   A.    Yes, I did.

6   Q.    What is your opinion?

7   A.    My opinion is that they do infringe on the patent.

8   Q.    You are going to get a chance to come back on validity

9   and talk about a lot of things.  But I want to focus you

10  here, because we are only talking about infringement, were

11  there particular aspects of ophthalmic formulation in the

12  area of pH that were important to your opinion on

13  infringement?

14  A.    Yes.  It is my understanding that that is the major

15  issue that is in dispute here.

16         So I will render an opinion on pH as it

17  affects -- pH is an important component of a formulation.

18  It affects solubility, stability, and stability not only of

19  the drug but also of any component that is present in the

20  formulation.

21  Q.    What is the concept of pH drift?

22  A.    PH drift occurs when you have a goal to achieve a

23  particular formulation, either during manufacture and other

24  stages of the product life.  And pH of a formulation can

25  drift, depending on the formulation itself.

1        That can come from things such as the drug

2    degrading or a component degrading.  It can come from the

3    fact that, in the case of ophthalmic formulations, it is a

4    plastic container, not a hermetically sealed container.  So

5    you can have absorption of carbon dioxide.

6        There is a certain amount of evaporation that

7    occurs with ophthalmic formulations on storage.  Again,

8    because of the plastic container.

9        So the pH can drift.  It is something that you

10   set specifications on in formulating your drug.

11   Q.    In reaching your opinion on infringement, what did you

12   consider with respect to that opinion?

13   A.    I considered a lot of documents, microorganisms of

14   which are present here.  But, largely, it is the '834

15   patent, itself, both the claims and specifications.

16        I also considered the ANDA that was filed by

17   Exela.  Communications between Exela and the FDA.

18   Depositions by a number of people that were deposed,

19   Professor Mitra, Dr. Koneru, Stoelzle and Friedly, I

20   believe.

21   Q.    Is that Friedly?

22   A.    Friedly.

23   Q.    Were there also additional documents that were

24   produced in the case that you looked at?

25   A.    Yes.  There was some stability data from India, and I

Stella - direct

1    believe that's the major documents.  I may have missed one.

2    Q.    We are going to try something a little different.  We

3    have a PowerPoint that combines the demonstratives and

4    excerpts from documents in the record.

5              We have it on the screen.  I will go to the

6    first slide.

7              Do you understand it to be Claim 1 of the '834

8    patent?

9    A.    Yes, that is highlighted, Claim 1 of the '834 patent.

10   Q.    Do you understand that in order for there to be

11   infringement, there has to be something that meets each

12   limitation of the claims?

13   A.    Yes.  The claims are broken down into elements, and it

14   is my understanding that to infringe, it has to infringe on

15   all elements of the claim.

16   Q.    We will go to the next slide.  Does that break out the

17   elements of the '834 patent, Claim 1?

18   A.    Yes, it does.  It is a nice way to summarize it.

19   Q.    What is the first element?

20   A.    The first element is it has to be therapeutically

21   effective aqueous composition, ophthalmic composition

22   comprising, et cetera.

23   Q.    What is the second element?

24   A.    Up to about .15 percent of bromo-6, et cetera.

25              Your Honor, if you don't mind, can I call that

1    brimonidine?

2                    THE COURT:  Please do.

3                    THE WITNESS:  Thank you.  And a composition

4    having a pH of 7.0 or greater.

5                    And the final element is brimonidine being

6    soluble in the composition at about 21 degrees centigrade.

7    BY MR. SINGER:

8    Q.    Let's talk about the first element, the

9    therapeutically effective element.

10                   What did you review to see whether or not the

11   Exela ANDA met that requirement?

12   A.    Well, very simply, the fact that Exela filed an ANDA

13   for a generic, to be considered a generic equivalent to the

14   Alphagan P product .15, by that very act of doing that, they

15   are, in fact, telling us that they believe that it is, in

16   fact, therapeutically effective.

17   Q.    Now, the FDA ultimately decides whether that is the

18   case.  Is that right?

19   A.    That is correct.

20   Q.    Now, did Exela say anywhere in the ANDA that you saw

21   that they were selling or were attempting to sell a

22   therapeutically effective formulation?

23   A.    Yes.  In fact, this is a part of the ANDA.  I will

24   just read out the document, the part that is highlighted,

25   "Brimonidine tartrate ophthalmic solution is indicated for

Stella - direct

1    the lowering of intraocular pressure in patients with

2    open-angle glaucoma or ocular hypertension."

3    Q.    This is, at the bottom, an excerpt from Plaintiff's

4    Exhibit 288.

5    A.    That's correct.

6    Q.    And that is the Exela ANDA?

7    A.    That's correct.

8    Q.    It looks like it's a comparison of the generic and

9    reference drug?

10   A.    That is correct.  They are effectively asking the FDA

11   to approve their product and asking for a bioequivalency

12   waiver to have this product approved.

13   Q.    Do you understand there to be a dispute over this

14   limitation?

15   A.    No, not to my understanding.

16   Q.    Let's go to the next limitation in the claim.

17         So we have checked off the first one.  The next

18   one is the brimonidine tartrate.  Correct?

19   A.    That's correct, .15 percent.

20   Q.    We will go to the exact same document we were looking

21   at before.

22         What does it say here from the Exela ANDA?

23   A.    The Exela ANDA states that the formulation contains,

24   is a solution, and it contains .15 percent.  We have cut off

25   the fact that it is brimonidine tartrate.  That is at the

Stella - direct

1    top of that column.

2    Q.    Does that meet the second limitation of the claim?

3    A.    It does.   There is also an error in this slide, if you

4    will notice -- not on the slide, but in the ANDA, they said

5    it's a .1 percent, the top column, it should be .15, I

6    assume.

7    Q.    Is that the error you are referring to (indicating)?

8    A.    Yes.   In both columns, both for the Alphagan P as well

9    for the brimonidine solution (indicating).

10   Q.    We can see below that they are actually using Alphagan

11   P.15.   Right?

12   A.    That's correct.   I assumed it was just a typographical

13   error.

14   Q.    All right.   We can check off that box.

15         I am going to skip ahead to the fourth element.

16         By the way, do you understand there to be a

17   dispute about whether the Exela product meets that second

18   element of .15?

19   A.    Not to my understanding.

20   Q.    Let's skip the one where there is the dispute so we

21   can get to that and go to the last element of the claim, the

22   brimonidine tartrate being soluble in about, in the

23   composition at about 21 degrees Centigrade.

24         I point you again to that same document.

25         What does the document say about whether or not

Stella - direct

1    the Exela product is soluble in the composition at the noted

2    temperature.

3    A.    This slide shows that they claim it to be a solution.

4    So, by a "solution," it means that the drug is soluble in

5    their formulation.

6          Also, I think it's on the next slide, they have

7    a temperature range which is on the label, a proposed

8    package insert, I guess, that the product is to be stored at

9    15 to 25 degrees.  In the first claim of the patent, they

10   claim a room temperature of 21 degrees.  That is in the

11   middle of this temperature range.

12   Q.    Does that meet the limitations of the fourth element

13   of the claim?

14   A.    Yes.  And I don't believe there is any dispute on

15   that.

16   Q.    Okay.  You do understand there is a dispute about the

17   third limitation.  Right?

18   A.    Yes, that is my understanding.

19   Q.    Dr. Stella, what is your understanding of the pH of

20   Exela's product?

21   A.    I wish I knew.  If you read the ANDA, an ANDA claim, I

22   think, is stating a, I believe there is a manufacturing pH,

23   a release pH, and a pH range for the lifetime of the

24   product.

25   Q.    What is that range?

Stella - direct

1   A.      The lifetime of the product, I believe, was claimed to

2   be 5.5 to 6.7.

3   Q.      Did you have a reaction when you learned that that was

4   the range they were claiming?

5   A.      Well, my reaction when I saw that is, No way is the

6   FDA going to approve this product as being bioequivalent to

7   the Alphagan P without clinical trials to prove that to be

8   the case.

9   Q.      Did you see anything that confirmed the skepticism?

10  A.      Well, the FDA sent them a letter, saying that there

11  was a deficiency, I think that's the term, a deficiency,

12  because the FDA felt that the relationship between pH and

13  effectiveness of the Alphagan P product had been

14  established, and that, therefore, the fact that this product

15  could drift down to a pH as low as 5.5 merely brought into

16  question whether this product could meet that

17  bioequivalency.

18  Q.      Let me show you the next slide.  Is this that letter

19  that you are referring to?

20  A.      Yes, it is.  I would like to read it out.  "There is

21  evidence that pH and/or Purite preservative plays a role in

22  the ocular bioavailability of brimonidine.  Higher pH in the

23  presence of Purite has been reported to increase the

24  bioavailability of brimonidine in the aqueous humor in

25  rabbits.  The current reference listed drug, RLD, product,

Stella - direct

1    Alphagan P .15 percent, with Purite as a preservative, has a

2    pH range of 6.6 to 7.4, whereas, the test product, with

3    benzalkonium chloride, BAK, as a preservative, has a pH

4    range of 5.5 to 6.7.  You have not shown conclusively that

5    the difference in pH range between the test and RLD products

6    has no significant impact on bioavailability or efficacy of

7    the drug."

8    Q.    And, for the record, that is Plaintiff's Exhibit 29

9    and XLA 000395.  It refers to the pH range 5.5 to 6.7?

10   A.    That is correct.

11   Q.    What is that?

12   A.    I think -- this seems to be a moving target.  But that

13   was the pH that was claimed as the lifetime pH of the

14   product in the ANDA.

15   Q.    Did you see a response by Exela to this letter?

16   A.    Yes, I did.  As a result of getting this, and I

17   believe it's in the next slide, there was an excerpt from a

18   paragraph in the letter from the FDA to Exela.  I have got

19   two areas highlighted there.  I would like to just read

20   those.

21   Q.    Let me read the exhibit into the record.  This is an

22   excerpt from Plaintiff's Exhibit 30 at XLA-000401.

23         Dr. Stella, you may go ahead and read what you

24   wanted to.

25   A.    "The pH range of Exela's proposed product, as required

Stella - direct

1    by the release specification in ANDA, is 6.5 to 6.7."

2              That is another moving target.  The ANDA release

3    specification is not 6.5 to 6.7.

4    Q.    What is the release specification in the ANDA?

5    A.    The release specification, as best as I can determine,

6    it was 6.2 to 6.7.

7    Q.    So this is something different than the release

8    specification?

9    A.    It is.

10             The last sentence that I have highlighted there

11   is, "Exela plans to submit an amendment to its ANDA within

12   the next few days to clarify the proposed labeling to align

13   with the release specification."

14             Then again, that's confusing because I am not

15   sure if they are claiming that the 6.5 to 6.7 is the release

16   or the whole lifetime.  I am assuming it's the lifetime,

17   because there is a paragraph in the previous page that says

18   that it's, it may be the whole specification.

19   Q.    And did they, in fact, change the lower limit to a

20   point you could see?  They underlined the 6.5 and the 5.5.

21   What was the 5.5 in the ANDA?

22   A.    The 5.5 in the ANDA was, as far as I can gather, the

23   lowest pH on the lifetime of the product.

24   Q.    Then they change it to a 6.5 here?

25             MR. BOGGS:  Objection.  There was no change made

```
 1    here, Your Honor.  It is mischaracterizing what that letter

 2    is talking about.

 3                 MR. SINGER:  Your Honor, that sounds like

 4    cross-examination.

 5                 THE COURT:  Yes, Mr. Boggs.  No. 1, you can't

 6    testify.  You can certainly examine the witness about that

 7    on cross.

 8                 The objection is overruled.

 9    BY MR. SINGER:

10    Q.    The proposed change is to change the 5.5 to a 6.5.  Is

11    that correct?

12    A.    That was my interpretation, yes.

13    Q.    Is that significant, in your view?

14    A.    That is very significant, because, as we will see in

15    some stability data, pH drift data that is in both the ANDA

16    and in some additional data, my feeling is that you cannot

17    maintain a pH of 6.5 to 6.7 without producing a product that

18    would be up into the pH range that infringes on the about

19    7.0 element of Claim 1 and other claims.

20    Q.    Let's just get some terminology straight, because I

21    think it will help.  What does it mean for the product to

22    have a release specification?  What is that?

23    A.    There is usually -- the release specification is when

24    the product leaves the manufacturer and is available to the

25    public to be used as a prescription, yes.
```

Stella - direct

1    Q.    Is that different from the manufacturing pH?

2    A.    Yes.  The manufacturing pH is usually a pH in which,

3    literally, the product is manufactured at.  That

4    manufacturing pH may be different than the release pH, if

5    there has been some pH drift.  It usually takes two to three

6    months from manufacture to where it is on the shelf to that,

7    quote-unquote, the release condition.

8              Then there is a third element, or the third

9    aspect of pH.  That is the lifetime of the product over two

10   years.

11   Q.    Now, we have the 5.5 to 6.7 range.  That reflects a

12   downward drift in the pH.  Is that correct?

13   A.    Yes, it does.

14   Q.    In a product with a downward drift in the pH, is the

15   manufacturing pH going to be above the release pH?

16   A.    It isn't necessarily for all products.  But, clearly,

17   in this case, based on the ANDA data, the ANDA stability

18   data, and other data that has been presented, that we will

19   be presenting, Your Honor, there is a very significant drift

20   in pH with this product.

21             In fact, even over a relatively limited period

22   of time, pH drifts of up to half a pH unit were observed.

23   Q.    Let's take a look at some of that data?

24             One other question:  Did you also see that

25   your -- was there someone else who agreed with your

Stella - direct

1    assessment -- let's move on.

2              Let's take a look at the actual data.

3              Dr. Stella, I have gone forward two slides.

4    What are we looking at here?  It's Plaintiff's Exhibit 35 at

5    EX-022333.

6    A.    Yes.   This was called Long-Term Stability Data.

7              Your Honor, there is two types of stability work

8    that is usually done.  One is what we call long-term

9    stability.  It is really essentially storing the product

10   under the same conditions as the product is expected to be

11   stored, for example, in a pharmacy, on average, in a home.

12             Usually, you do that study over an extended

13   period of time.  Often, you want to confirm at the end of

14   the study that the drug, or the product, in fact, you can

15   put the label on, Use by December 2010.

16             When you pick up your prescription and the

17   prescription says, or the bottle says, Use by 2010, that is

18   the shelf life of the product.

19             So long-term stability is where you put the

20   products up under conditions that would be considered to be

21   an average, if you like, for room temperature.

22             You can see here that this is data taken from a

23   15 mil bottle.  It was stored at 25 degrees and 60 percent

24   relative humidity.  This particular product was stored in an

25   inverted condition.

1   Q.      What does that mean, Dr. Stella?

2   A.      If you ever used eyedrops, Your Honor, it's a plastic

3   bottle, it is a dropper bottle.

4           When you normally would store that on your,

5   hopefully not in your bathroom, with the high humidity, but

6   if you store that product, you would normally leave it in

7   its normal vertical condition.

8           But if you were to take that into your

9   briefcase, et cetera, it could, in fact, become invertible,

10  lay on its side.

11          So the inverted condition is, you are required,

12  in ophthalmic process, to study the stability of the

13  product, both in the normal vertical position as well as in

14  an inverted position.

15          What you can see here is that they had an

16  initial pH of 6.7, and after three months of storage, the pH

17  had dropped down to 6.2.  Then, for some reason, it went

18  back up to 6.4.  I have no idea why that happened.

19  Q.      Did you also review other long-term stability data?

20  A.      Yes.  I think that's shown on the next slide.

21  Q.      I think we have a demonstrative on the next slide

22  which is a graph of this stability data.

23  A.      Yes.  There was a number of pages of this.  Just for

24  ease of clarification, I will just graph them.  It is a

25  little easier for us to read what those numbers mean.

Stella - direct

1    Q.    Let's go through the graph.  This is ADX-26.

2          We looked at the 15 milliliter fill, the prior

3    page.  Right?

4    A.    Right.

5    Q.    That's the orange line.  We used, for some reason,

6    various shades of yellow and orange.  I suppose we should

7    have chosen different.  But what is the yellow line that we

8    are looking at?

9    A.    The yellow line is for ten mil fill.  There were,

10   apparently, three bottle sizes that were planned, a 5 mil,

11   10 mil, and 15 mil fill.  I drew the red line at pH 6.5,

12   because that is the questionable, whether it is released

13   product.  I am not going to -- when Mr. Boggs presented his

14   opening, he showed a range of pH's that were different than

15   what I interpreted the pH to be.  But we drew the line at

16   6.5 regardless of how you interpret that.

17         What it shows is under long-term storage, there

18   was at least a drop of greater than .2 of a pH and as high

19   as .5 of a pH, Your Honor.  That is the antilog, Your Honor.

20   The antilog of pH, of .5, actually, is a threefold

21   difference in change of fraction of drug in the unionized

22   forms.  What you can see, regardless, is a very rapid

23   dropoff of pH.

24   Q.    Did you also look at the, quote, accelerated pH

25   stability data?

Stella - direct

1   A.    Yes, I did.  Can I explain to Your Honor what

2   accelerated studies represent?  I think one of the previous

3   witnesses described it to you.  And I think did a very nice

4   job.

5           But the accelerated stability study is, you

6   don't want to develop a formulation, wait two years to see

7   if it works, and then find out it didn't work and you have

8   lost two years.

9           What we do is do accelerated stability testing.

10  That means we expose the product to elevated temperature

11  conditions, and exposing it to elevated temperature

12  conditions, we push any changes along.

13          There are what's called ICH, it is a

14  harmonization guideline around the world, that says that you

15  aim to, in fact, look at to get at lease adequate stability

16  at 40 degrees, that is 15 degrees higher than 25 degrees,

17  and you look for whether your product is within

18  specifications over three months.

19          That is often projected, not always accurately,

20  but often projected to be able to say that you will get a --

21  you have got a greater chance of having a shelf life stable

22  product over two years.

23  Q.    Let's go to the next slide.  Is that some accelerated

24  pH stability data from the ANDA?

25  A.    Yes.  This is a stability data for the ANDA, Your

Stella - direct

1    Honor.  You will notice that the test condition there says

2    40 degrees at 75 percent relative humidity.  That is the ICH

3    guidelines.

4              You can see that at zero time they have a pH of

5    6.7.  And within one month, the pH had drifted down to 6.2.

6    And within two months, it drifted down to 6.2.

7    Q.    This is from PTX-288 at EX-003380?

8    A.    That's correct.

9    Q.    By the way, just for the record, this is not data that

10   Exela generated.  Is that right?

11   A.    No.  This was actually done by Pharmaforce.

12   Q.    Who is Pharmaforce?

13   A.    Again --

14   Q.    To your understanding?

15   A.    It is my understanding that they, that Pharmaforce

16   acted as the U.S. agent for applying to the FDA for Exela,

17   and that these stability studies, I think, were performed by

18   Pharmaforce.

19   Q.    Is most of the data in the ANDA from Pharmaforce?

20   A.    I believe all the data in the ANDA is from

21   Pharmaforce.

22   Q.    And then we have, further -- by the way, what does the

23   accelerated pH stability data show?

24   A.    What it shows is that there is a drift of, over two

25   months, of about .5 of a pH.

Stella - direct

1    Q.      I think we have, further, accelerated pH stability

2    from the next slide.  What is this we are looking at,

3    Dr. Stella?

4    A.      This is another, also done at 40 degrees upright.  I

5    think the previous one was inverted.  This one is upright.

6    Again, over three months in this case.  We don't have a

7    two-month, one- or two-month study.  But, again, we got

8    about half a pH in the drift, from 6.7 to 6.2.

9    Q.      This is for the record PTX-288 at EX-003331.

10          Then we go to the next slide, which I believe is

11   a demonstrative that you prepared?

12   A.      It is a graph of the same data that we just talked

13   about.

14   Q.      What is the dashed line at 6.5, what does that

15   reflect?

16   A.      Again, it reflects both the change from 6.7 to 6.5.

17   What it shows is that if someone was to have a release pH

18   of, for example, 6.7, and from manufacture to release, which

19   is two to three months, there could be up to .5 of the pH

20   unit drift during that time.

21          When I say that the product infringes, it would

22   seem difficult to me, if not impossible, for Exela to

23   produce a formulation with a pH of 6.7 on release, that

24   could not be that as manufactured at a pH that begins to

25   directly infringe into the about 7.0 claim of the patent --

Stella - direct

1    element of the patent.

2    Q.    Let's do the math and we will make it simpler.  6.7

3    plus .5 is 7.2?

4    A.    Yes.

5    Q.    And 6.5 plus .5 is 7.0?

6    A.    7.0.

7    Q.    And both of those about 7.0 or are greater?

8    A.    That's correct.

9    Q.    Besides the stability data, from the ANDA, did you

10   also look at stability data that Exela had prepared before

11   filing the ANDA?

12   A.    Yes.  There is two additional pieces of information

13   that I would like to talk about on pH.  The first is some

14   stability data that apparently was produced by Exela, it was

15   not in the ANDA, but came up during discovery, I assume.

16   Q.    Let's go forward to that, and we have the next slide,

17   which is PTX-208 at XLA-004358.  It also comments on PTX-209

18   and PTX-123.

19              What are we looking at here?

20   A.    This is data I assume generated by Exela in India.

21   It's interesting that they, I believe they state that the

22   target initial pH was 6.9, but they actually made a solution

23   of pH 7.08 as the initial pH.  There is two pieces of data

24   there.  There is both the 25 degree data at 60 percent

25   relative humidity and the 40 degree data.  It is all in the

1    same table in this case, Your Honor.

2              You can see that the initial pH for both samples

3    was started off at 7.08.  And, as you can see, both in the

4    25-degree data as well as with the 40-degree data, there was

5    a substantial drift in the pH with time in the range of

6    approximately .3 to .5 pH units?

7    Q.    If we just see the circles that you have made, 7.08

8    minus 6.09 is just about .5?

9    A.    .5.

10   Q.    Did you also draft the stability data from Exela

11   India?

12   A.    Yes, I did.

13   Q.    ADX-28.  That is the next slide.  What are we looking

14   at here?

15   A.    This is just data plotted on the graph for visual

16   purposes.  This formulation, assuming it was manufactured,

17   the pH, as so stated, would have infringed if --

18   Q.    If made at that pH?

19   A.    Made at that pH.  You can again see the drift of

20   approximately .5 pH units in the 40-degree data over three

21   months and approximately .3, .4 of a pH unit at 25 degrees

22   over three months.

23   Q.    We have highlighted, again, this time at the bottom of

24   the chart, the 6.5.  What does that reflect?

25   A.    That reflects whatever their pH means in their

1   formulation.  Again, it appears to be a moving target.  To,

2   in fact, keep the pH above 6.5, they would have had to

3   manufacture the product at pH of approximately 6.7 to 7.1.

4   Q.    Dr. Stella, did you also look at any other data

5   surrounding the pH of the proposed Exela product?

6   A.    Yes, I did.

7         There was a bioavailability study performed by

8   Professor Mitra in five rabbits.  That was done as evidence

9   to supply to the FDA, part of the ANDA, that they felt that

10  their .15 percent solution was bioequivalent to the Alphagan

11  P product.

12  Q.    And what was the purpose of submitting this study to

13  the FDA?

14  A.    The purpose of the study was an intent to get a waiver

15  that would allow them to claim that their product was

16  bioequivalent to the Alphagan P .15 percent solution.

17  Q.    What are the consequences of the FDA granting a

18  waiver, if you know?

19  A.    Well, it would allow them to, in fact, go on the

20  market and compete with the Alphagan P product.

21  Q.    Does it also mean they don't have to run clinical

22  trials?

23  A.    Yes.

24  Q.    Let's look at that.  Just one more question for the

25  record.  Was that rabbit study included with the Exela ANDA

1    at the FDA?

2    A.    Yes, it was.  But there was a piece of evidence that

3    was, in fact, not supplied to the FDA.

4    Q.    Let's look at that.

5          This is an excerpt from PTX-288, the Exela ANDA,

6    at DXE-000047.

7          What does this say in Exela's request for a

8    bioequivalence waiver?

9    A.    Basically, on the first block, there is a lot number.

10   That lot number represents a production lot number of some

11   kind.  I assume it was a lot number produced by Exela.

12         And they then state in a subsequent paragraph,

13   "However, because both the Exela product and the Alphagan P

14   product were studied under same conditions, Professor Mitra

15   states that he had statistically indistinguishable IOP

16   lowering from the two products in question."

17   Q.    So this was -- was this a study in rabbits?

18   A.    It was done in rabbits.  It was five rabbits.

19   Q.    It compared Alphagan P to supposedly the Exela

20   proposed product?

21   A.    That's correct.

22   Q.    Was the pH of the formula 05 BT 0S09A contained in the

23   request for bioequivalence waiver that Exela supplied to the

24   FDA?

25   A.    Exela did not, or Pharmaforce, the combined entities,

1    did not, to the best of my knowledge, tell the FDA what the

2    pH of the solution was.

3    Q.     Did you learn what the pH of that solution was during

4    discovery in this case?

5    A.     Yes.  There was a document, I think it was a document,

6    I assume, from Professor Mitra to Exela executives, a

7    report, if you like, of their formulation and their

8    findings.

9    Q.     What was the pH that they failed to report to the FDA?

10   A.     The pH that they did not give to the FDA was pH 6.9.

11   In my opinion, the 6.9 is a pH that one infringes on the

12   patent, that is, that it is about 7.0.

13           In addition, the performance of this drug

14   product is well within the scope of the Alphagan P product,

15   it is potentially a higher pH, has a higher probability of

16   being bioequivalent, not the pH below 6.7.

17   Q.     Let's take a look at the documents you relied on for

18   the pH 6.9.  What are we looking at here Dr. Stella?  It is

19   PTX-014 and XLA-0002518.

20   A.     If I remember correctly, this is a part of the report

21   supplied by Professor Mitra to, I believe it was to Exela,

22   specifically, Dr. Koneru.  But it was to Exela, I believe.

23   Q.     I actually think, it is a little typo -- no.  That is

24   correct.  I am sorry.  And, Dr. Stella, if you need to look

25   at, in your binder, we should have PTX-14.  It's the last

1  document in your binder.  If you want to look at it just to

2  make sure.

3  A.      This is the document that I was referring to.  Exela

4  Privileged and Confidential Information.

5  Q.      This is the brimonidine corneal permeability and IOP

6  reduction study given to the FDA?

7  A.      I believe so, yes.

8  Q.      And the pH in this document that we have excerpted is

9  6.9?

10  A.      That's correct.

11  Q.      And the pH was not given to the FDA.  Is that right?

12  A.      To the best of my knowledge, that is the case.

13  Q.      All right.  Now, did you rely on any testimony from

14  Dr. Koneru about that rabbit testing?

15  A.      I believe, in his deposition, he was asked whether the

16  formulation that was used in the, the formulation that was

17  used in the Mitra study was the same formulation that was

18  the ANDA formulation.

19  Q.      We will put that excerpt on the screen.  What did he

20  say that it was?

21  A.      He said that the rabbit testing was done on the

22  formulation that was the subject of the ANDA.

23          The answer was:  I believe so.

24  Q.      Dr. Stella, based on all that information, the

25  stability data, long-term and accelerated from the ANDA, the

1     stability data from the Exela India, and the rabbit study,

2     did you reach a conclusion as to whether the Exela product

3     would infringe the third element of the claim, the

4     composition having a pH of about 7.0 or greater?

5     A.    It's my belief that they cannot produce a product that

6     will be in the range of 6.5 to 6.7 without infringing the pH

7     element of the first claim of the '834 patent.

8     Q.    All right.  I think, then, we can check off that last

9     box.

10          Does that mean the Exela product will infringe

11    Claim 1 if, as represented to the FDA, it has the 6.5 to 6.7

12    release specification?

13    A.    Yes.

14    Q.    Let's take a look at some of the other claims.  We can

15    go through this fairly quickly, because they are very

16    similar.

17          I am going to put up independent Claim 10.  If

18    independent Claim 1 is infringed, is independent Claim 2

19    infringed for the same reasons?

20    A.    Yes, it is.  The only difference is in the second

21    element.  In the second element, in addition to the

22    brimonidine tartrate, it calls for other salts or esters

23    thereof.  And, therefore, since the brimonidine tartrate

24    would be included in that element, it includes brimonidine

25    tartrate.

Stella - direct

1   Q.    Is it your opinion that the Exela ANDA, if the release

2   specification applies, will meet all the elements of Claim

3   10?

4   A.    Yes.

5   Q.    Now we will go to the next demonstrative slide, which

6   includes Claims 2, 3, 4, 11, 12, and 13.

7           Looking at Claim 2, 3, and 4, is it your opinion

8   that the Exela product will meet those additional

9   limitations in the dependent claims?

10  A.    Yes.  The only difference is that Claim 1 is up to

11  about .15.  Claim 2 is up to .15.  The third claim is about

12  .15.  And the final one includes .15.  And the Exela product

13  is said to contain .15.

14          Therefore, it meets all three of those claims.

15  Q.    I think we skipped over a slide.  That was the slide

16  we skipped (indicating).

17          That is the same slide we looked at before?

18  A.    That's correct.

19  Q.    Then we have the same elements depend off of Claim 10

20  as well?

21  A.    Claim 10, which are the same.  I don't think it is

22  worthwhile repeating it.

23  Q.    The Federal Circuit makes me do this, so I am just

24  going to ask.  Is it your opinion that the .15 percent

25  brimonidine that we just looked at meets the additional

Stella - direct

1    elements in Claims 11, 12, and 13 on the Slide ADX-31?

2    A.    Yes.

3    Q.    Let's look at a couple other things from the Exela

4    proposed brimonidine product.

5              What are we looking at here, Dr. Stella?

6    A.    This is a side-by-side comparison of the formulations.

7    And you will notice that in the Alphagan P product, it

8    contains sodium carboxymethylcellulose.  The Exela

9    brimonidine tartrate formulation .15 does not include an

10   anionic cellulosic polymer.

11   Q.    That is from PTX-288 at EX-000037?

12   A.    Yes.

13   Q.    That is the Exela ANDA?

14   A.    That's correct.

15   Q.    And let's take a look at the dependent claims 8, 9, 17

16   and 18.

17             What are the additional claim elements in Claims

18   8 and 9?

19   A.    Claims 8 and 9, which refer back to Claim 1, requires

20   that the product be substantially free of anionic cellulosic

21   derivatives.  Specifically, in Claim 9, is free of

22   carboxymethylcellulose.  And they relate back to Claim 1 in

23   the Exela product, it is free of both those elements.

24             In Claim 17 and 18, they refer back to

25   independent Claim 10.  It has the same elements, free of

Stella - direct

```
 1    anionic cellulosic derivatives and free of

 2    carboxymethylcellulose.

 3              They would meet those claims.

 4    Q.    Is it your opinion that Excela's brimonidine product

 5    infringes Claims 8, 9, 17, and 18 as you understand the

 6    proposed product to be?

 7    A.    Yes.

 8    Q.    Let's look at one other thing from the ANDA, which is

 9    excerpted from PTX-288 at EX-000037.

10              What are we looking at here, Dr. Stella?

11    A.    This is a list of the inactive ingredients.  It shows

12    that the Exela product contains benzoalkonium chloride, a

13    quaternary ammonium preservative.

14    Q.    I apologize for the photocopy quality.  This is the

15    best quality that was produced to us.

16              What is benzoalkonium chloride?

17    A.    It's as a quaternium ammonium preservative.

18    Q.    Let's look at the dependent Claims 6, 19, 20, and 21.

19              What are the additional elements in Claim 6?

20    A.    Claim 6 relates back to independent Claim 1.  It says,

21    "Which further comprises a preservative selected from a

22    group consisting of an oxychloro and a quaternary ammonium

23    compound in the amount effective to at least assist in

24    preserving the composition."

25    Q.    The benzoalkonium chloride is a quaternary ammonium
```

Stella - direct

1    compound that is being used or supposed to be used to

2    preserve the composition?

3    A.    That is my understanding.

4    Q.    Let's look at Claim 19.  What does that add to Claim

5    6, which we just looked at?

6    A.    It says that the specific quaternary ammonium compound

7    is benzoalkonium chloride.

8    Q.    Looking at Claims 20 and 21, what is the difference in

9    Claim 20?

10   A.    The composition of Claim 10 which further comprises, I

11   believe it's similar to Claim 6.

12            But referring back to Claim 10, consisting of an

13   oxychloro compound and a quaternary -- from a group

14   consisting of oxychloro component and a quaternary ammonium

15   component in amount effective at least assist in preserving,

16   I believe Exela meets that requirement.

17   Q.    That is because of the benzoalkonium chloride that we

18   looked at?

19   A.    That's right.

20   Q.    Claim 21 looks to be similar to Claim 19.

21   A.    Right.  And that specifically states benzoalkonium

22   chloride.

23   Q.    Is it your opinion that the Exela proposed product, as

24   you understand it, infringes Claim 6, 19, 20 and 21?

25   A.    Yes.

Stella - direct

1          MR. SINGER:  That concludes my examination, Your

2     Honor.

3          THE COURT:  Okay.  Mr. Boggs, start your cross.

4          MR. BOGGS:  Yes.

5                    CROSS-EXAMINATION

6     BY MR. BOGGS:

7     Q.   Good afternoon Dr. Stella.

8     A.   Good afternoon.

9     Q.   You have been working on this case for a number of

10    months.  Right?

11    A.   Yes.

12    Q.   Probably pretty close to a year?

13    A.   I don't remember when we started.

14    Q.   Before that, you worked on the Alcon case involving

15    the same patents.  Is that right?

16    A.   I believe so, yes.

17    Q.   And you had your deposition taken.  Is that right?

18    A.   That's correct.

19    Q.   In fact, I took your deposition.  Right?

20    A.   Yes.

21    Q.   That was on December 12th, 2008.  Right?

22    A.   I believe that's correct, yes.

23    Q.   That was in Lawrence?

24    A.   Yes.

25    Q.   And Mr. Marsden was there.  Right?

Stella - cross

1   A.    I believe so, yes.

2   Q.    You have given a lot of thought to your direct

3   examination that you just gave.  Right?

4   A.    That's correct.

5   Q.    And you know there are some difficult questions

6   involved in this case.  Right?

7   A.    Yes.

8   Q.    And you have given some thought as to how you are

9   going to answer to those difficult questions.  Right?

10  A.    Yes.

11  Q.    And you are fully prepared to do so.  Right?

12  A.    To the best of my ability.

13  Q.    Now, you mentioned doctor Mitra in your direct

14  examination.  You know doctor meet.  Correct?

15  A.    Yes, I know him very well.

16  Q.    You were one of his professors.  Correct?

17  A.    That's correct.

18  Q.    That was about 25 years ago.  Correct?

19  A.    Is it that long?

20  Q.    You were on his thesis committee at the University of

21  Kansas?

22  A.    I was.

23  Q.    And doctor meet is also a graduate of the University

24  of Kansas.  Right?

25  A.    He is.

Stella - cross

1    Q.    Now, Dr. Mitra has focused his career on ophthalmics

2    and is well-respected in the field.  Correct?

3    A.    Yes, he is.

4    Q.    Now, you told me at your deposition that you

5    understood your role in this case to be an advisor to the

6    Court.  Is that right?

7    A.    That's correct.

8    Q.    And you told me that you were going to tell both sides

9    of the story.  Do you remember that?

10   A.    Yes, of course.

11   Q.    Now, target pH, release pH, and shelf life pH, those

12   are three categories of pH associated with ophthalmic

13   products.  Correct?

14   A.    Yeah.  I think it's called manufacturing pH, release

15   pH, and shelf life pH.  I don't remember the specific

16   terminology.

17   Q.    Some people call target pH manufacturing pH.  Right?

18   A.    Perhaps.  I don't know.

19   Q.    Some people call the manufacturing pH compound pH.

20   Right?

21   A.    Yes, it can, yes.

22   Q.    Then there is release pH.  That is the middle one.

23   Right?

24   A.    Yes.

25   Q.    And some people think that's, as you do, I believe,

Stella - cross

1    that's the point in time when it is released to the public.

2    Correct?

3    A.    It is released out of the warehouse and gets to the

4    public, yes.

5    Q.    Now, there are also people that believe release pH is

6    when it's released from manufacturing and goes into storage,

7    before it's released to the public.   Correct?

8    A.    That's not my understanding.   But there may be that

9    element out there.

10   Q.    Some people also call the release pH the product pH.

11   Right?

12   A.    If people use that terminology, I would ask them to

13   define what they mean by that.

14   Q.    That's right.   Because some people call the product pH

15   the target pH, too.   Correct?

16   A.    They might.

17   Q.    The bottom line is, there is a lot of names for these

18   and they all overlap.   Correct?   A little?

19   A.    There is some confusion, yes.

20   Q.    So it is very important that we pay very close

21   attention to what people are talking about.   Right?

22   A.    That's correct.

23   Q.    And sometimes people get confused and make mistakes

24   about what's being referred to.   Correct?

25   A.    Yes, there is confusion.

Stella - cross

1    Q.    Now, you put a letter up there that was sent to the

2    FDA about 5.5 to 6.7 being changed to 6.5 to 6.7.  Do you

3    remember that?

4    A.    Yes, I do.

5    Q.    In fact, that is the basis of your opinion of

6    infringement.  Right?

7    A.    Well, Dr. Mitra also agreed with that.

8    Q.    Dr. Mitra did?

9    A.    Yes.  At his deposition.

10   Q.    But did Dr. Koneru agree with that?

11   A.    I don't know what Dr. Koneru said on it.

12   Q.    Did you talk to anybody and ask anybody if a mistake

13   had been made in that letter?

14   A.    I can only go on what I have read and what I have been

15   told.

16          So, as I said in my opening, my opening

17   comments, I am very confused as to what Exela plans to do.

18   I can only read the documents and interpret them to the best

19   of my ability.

20   Q.    Fair enough.

21          So you didn't talk to anybody and ask if there

22   was a mistake in the letter.  Right?

23   A.    No, I did not talk to anybody.  I read the letter

24   directly, what was stated in the letter.

25   Q.    Did you ever consider whether that might have been a

Stella - cross

1   mistake?

2   A.   Oh, then I think that should have been corrected to

3   the FDA as well.

4   Q.   But did you consider it?

5   A.   I don't know -- no, I did not consider it.

6   Q.   Well, did you ever check to see if that amendment had

7   ever been made, that proposed amendment?

8   A.   It was interesting.  Right after that sentence, they

9   said there would be an amendment filed within two days.  I

10  don't know of any amendment after that.  All I know is they

11  received a letter that eventually said that as presented it

12  would not be approved.

13  Q.   I think what you are referring to, I am not sure, but

14  what was missing from this presentation here was the letter

15  that responded to the August 9th letter.  Do you remember

16  seeing that?

17  A.   I did not see that.

18  Q.   No one ever gave you that letter?

19  A.   No, I did not see that.

20  Q.   No one ever gave you the letter from the FDA that said

21  don't bother changing the pH?

22  A.   Not to the best of my knowledge.

23  Q.   We will look at that in a little bit?

24       JTX-078004.  This is the '834 patent.  This is

25  the one that you have expressed your opinion on.  I want to

Stella - cross

1    look at Claim 1.

2              Claim 1, the composition having a pH of about

3    7.0 or greater.  Do you see that?

4    A.    Yes.

5    Q.    In fact, you talked about it on direct.  Right?

6    A.    Yes.

7    Q.    In rendering your opinion, when you were thinking

8    about all of these things, which category of pH did you

9    consider these, the claims of the '834 patent to be directed

10   to?  Remember, we talked about target, release, stability.

11   Which category?

12   A.    At this point, any product at any time which

13   approaches or exceeds the about 7.0, at any time, when made,

14   used, or sold.  If it reaches that particular element of

15   about 7.0, it would infringe.

16   Q.    Whether it is at the manufacturing level, the release

17   level, or the stability level?

18   A.    The long-term stability, yes.

19   Q.    By the way, you mentioned pH drift.  Is there any

20   mention of pH drift in the '834 patent?

21   A.    There is not, no.

22   Q.    Now, you indicated that Exela's product, that it was

23   your opinion that Exela's product would infringe the patent.

24              It is also your opinion that if the pH of

25   Exela's product never exceeded 7.0, it would not infringe.

Stella - cross

1    Is that correct?

2    A.    Sorry?

3    Q.    If Exela's product never exceeds 7.0 -- excuse me.  If

4    Exela's product never exceeds 6.7 as a pH, it would not

5    infringe.  Correct?

6    A.    If it never exceeds under make, use or sell, that's

7    correct.

8    Q.    So as long as Exela's at 6.7 or below, it would not

9    infringe.  Correct?

10   A.    At any point during manufacture, release, or sold,

11   yes, I agree that at that point it would not infringe the

12   patent.

13   Q.    Now, if it were true that that amendment had never

14   been made, the one that you are basing your theory of

15   infringement on, if that had never been made, would the

16   Exela product infringe the '834 patent?

17   A.    Could you restate that?  I am a little bit confused on

18   it.

19   Q.    Fair enough.  If the amendment, the one referred to in

20   the letter that you are relying upon, if that amendment had

21   not been made --

22   A.    Sorry.  The amendment?  What amendment?

23   Q.    Okay.  Do you recall during your direct testimony

24   there was a letter, and the letter referred to a proposed

25   amendment of the pH specification to 6.5 to 6.7?  Do you

Stella - cross

1    remember that?

2    A.    Yes.

3    Q.    That amendment is what you are basing your opinion of

4    infringement upon.  Correct?

5    A.    Yes.  If that pH was the pH of the product and it had

6    to be maintained in that pH, then my infringement opinion is

7    that you cannot maintain the pH in that range without

8    producing a pH higher than the 6.7, which would then

9    infringe on the '834 patent.

10   Q.    If that amendment had not been made, or has not been

11   made, would the product, as described in the Exela ANDA,

12   infringe any claim of the '834 patent?

13   A.    In other words, if the product -- can I ask for a

14   clarification on that?

15             THE COURT:  Yes.

16             THE WITNESS:  If the product is manufactured,

17   made, sold, et cetera, never exceeds 6.7?

18   BY MR. BOGGS:

19   Q.    Yes.

20   A.    If that is the case, I do not believe that it

21   infringes, although I also believe it would never be

22   approved by the FDA without clinical trials.  That is not a

23   legal question.  That is a regulatory issue.

24   Q.    You don't work for the FDA, do you?

25   A.    That's right.

Stella - cross

1    Q.    You work for the University of Kansas?

2    A.    Yes.

3    Q.    And we are glad to have you.

4          Dr. Stella, these four categories here that you

5    spoke about, each one of those that you testified about, you

6    went to the ANDA to get your information.  Correct?

7    A.    That's correct.

8    Q.    You relied on information in the ANDA for the top, for

9    the first one, information in the ANDA for the second one,

10   information in the ANDA for the fourth one.  Correct?

11   A.    That's correct.

12   Q.    For the third one, you went to the letter, and the --

13   the letter we spoke about with the proposed amendment, and

14   some data from India.  Correct?

15   A.    That's correct.  Also the data, the 6.9 from Mitra's

16   bioavailability study and the noted pH of his formulation.

17   Q.    That bioavailability study, did you notice in the

18   letter that it referred to that formulation as an

19   exploratory formulation?

20   A.    I would hope that they would not supply to the FDA an

21   exploratory formulation which they are then claiming

22   bioequivalency of.

23   Q.    I think they were just submitting data from an

24   exploratory formulation.  Correct?

25   A.    And they are giving it to the FDA as evidence for

Stella - cross

1    bioequivalency?

2    Q.    Whether that's a good way to do it or not --

3    A.    It's an illegal way to do it, sir.

4    Q.    They identified it as an exploratory formulation.  Did

5    you notice that in the letter?

6          THE COURT:  I guess the question is, Doctor, did

7    you notice it?

8          THE WITNESS:  I did not notice it.

9    BY MR. BOGGS:

10   Q.    Okay.  So, as I understand it, you believe that if

11   Exela changed its ANDA from a shelf life or stability pH of

12   5.5 to 6.7 --

13   A.    Sorry.  Say that again?

14   Q.    If Exela changed its ANDA to require a shelf life or

15   stability pH from 5.5 to 6.7 to 6.5 to 6.7, that would

16   require Exela to make the formulation in an infringing way.

17   Is that correct?

18   A.    I would also state that if it was 5.5 to 6.7 and in

19   producing that as a shelf life product they produced a

20   product that was about 7.0, it would also infringe.

21   Q.    Why is that?

22   A.    Because if they made it or sold it or distributed it

23   at any point with a pH -- during manufacturing, for example,

24   if the pH was 7 and yet the shelf life of the product was

25   still 6.7, it would infringe, as long as they made.  Sold,

Stella - cross

1    or distributed the product at pH's of about 7.0, it would

2    infringe.

3    Q.    What if they made it at 6.5, released it at 6.2 to

4    6.7, and then it had a shelf life or stability pH of 5.5 to

5    6.7.  Would that infringe?  In fact, Exhibit EDTX-133, now,

6    this is the proposal that we were talking about.  Correct?

7    A.    That's correct.

8    Q.    And this letter, in this letter, it refers to a change

9    of 5.5 to 6.7 to 6.5 to 6.7.  Right?

10   A.    That's correct.

11   Q.    And as I understand it, you are not aware of any

12   evidence that that proposed amendment has ever been made.

13   Correct?

14   A.    No.  This is the last letter that I saw that was an

15   exchange between Exela and the FDA.

16   Q.    Okay.  Now, an amendment to an ANDA requires a special

17   form.  Correct?

18   A.    I am actually not privy to that.  I assume -- I will

19   take your word for it.

20   Q.    You have never heard of Form FDA 356H?

21   A.    No, I have not.

22   Q.    Did anyone ever show you a Form FDA 356H that

23   indicated that the pH had been changed from 5.5 to 6.7 to

24   6.5 to 6.7?

25   A.    No.

Stella - cross

1    Q.    All you have seen is EDTX-133.  Correct?

2    A.    Yes, and also, the -- some comments from Professor

3    Mitra in his deposition.  Also, some comments from Stokely

4    and also are some comments from Friedly.

5    Q.    From those comments, you drew the inference that the

6    change had actually been made?

7    A.    Yes, I did, yes.

8    Q.    But you never confirmed that.  Right?

9    A.    No.  I saw nothing, as I said, post this document.

10   Q.    Now, this is the letter that I was referring to

11   before.

12            This is the response that they got from the --

13   A.    Yes.

14   Q.    -- from the FDA.

15   A.    Sorry, this is what?

16   Q.    This is the response that they got from the FDA?

17   A.    From the FDA, all right.

18   Q.    "The differences in pH alone have not demonstrated to

19   account for the ability to alter the innovators' formulation

20   to a lower strength and still maintain the efficacy.

21   Consistency in pH, without the same ingredients, cannot be

22   used to assure equivalent efficacy."

23            That was the response they received?

24            Now, knowing that, knowing that there is no

25   formal amendment made, do you think Exela has amended?

Stella - cross

1    A.    I have no idea what you just asked me.

2    Q.    How do you interpret Item No. 3 on this letter?

3    A.    I think what the FDA is saying, that there is a

4    holistic issue associated with the formulation, that it

5    depends on all the components of the formulation, and it's

6    saying that pH alone may not account for everything.  It's

7    the whole formulation.

8          And, therefore, they are asking that the work

9    that was done in the ANDA was not enough to assure the FDA

10   that you had an equivalent product.

11   Q.    This is the first sentence of the letter.  "This

12   facsimile is in reference to the bioequivalency data

13   submitted on August 9, 2007."

14         That was the letter with the proposed pH change.

15   And this is the response that they received.  Correct?

16   A.    Mr. Boggs, you have got me totally confused now.  This

17   is a letter from the FDA to Exela?

18   Q.    Yes.

19   A.    So this is a response to the letter that they -- okay.

20   This is not the amendment.  This is another letter that they

21   got from --

22   Q.    Do you remember when the letter proposing the

23   amendment was sent?

24   A.    Yes.  August 7th, 2000 -- August 3rd, 2007.

25   Q.    And this is the response.  Correct?

1    A.    Okay.  That's right.  That was the letter to the FDA.

2    That's correct, sorry, I was getting confused there.

3                  Okay.  So this came from the FDA after that

4    document, okay.

5    Q.    Right.  I take it you have never seen this letter?

6    A.    No, I have not seen this letter before.

7                  THE COURT:  Would this be a good point to break

8    for lunch?  Bore.

9                  MR. BOGGS:  Sure.

10                  (Luncheon recess taken.)

11                  THE COURT:  Please take your seats.

12                  Doctor, good afternoon.

13                  Mr. Boggs, you may continue.

14                  MR. BOGGS:  Thank you, Your Honor.

15   BY MR. BOGGS:

16   Q.    Dr. Stella, this document here, I don't have the

17   PowerPoint presentation, it wasn't provided to me, but I

18   will try to trace back through the documents.

19                  MR. SINGER:  For the record, I object.  We did

20   give you the PowerPoint presentation prior to your opening.

21                  MR. BOGGS:  We don't have the electronic

22   version.

23   BY MR. BOGGS:

24   Q.    Do you recognize this document here?

25   A.    Yes, I do.

Stella - cross

1    Q.    What is this?

2    A.    I believe this is the data that was from some

3    stability work that was done in India, I believe.

4    Q.    Is this the stability work that you used to generate

5    that graph?

6    A.    Yes, I believe so.  I am not sure if it's this one or

7    the next one.  It is one of these.

8    Q.    How would we check that?

9    A.    I believe the PDX number is at the bottom left-hand

10   corner of the slide.

11   Q.    Okay.  This is the chart that you produced from the

12   results in India.  Is that correct?

13   A.    I believe so, yes.  Not I believe.  It is, yes.

14   Q.    And that formulation had exactly the same formulation

15   as the one that Exela is seeking approval for at the FDA?

16   A.    I would have to look at the formula.

17   Q.    You don't remember?

18   A.    No, I don't remember.  I think I think there may have

19   been a slight difference.  But I don't remember if it is

20   exactly the same.

21   Q.    Here is your expert report.  Correct?  Page 13.  Up at

22   the top, here is the location in your expert report, "The pH

23   stability studies from formulation development in India show

24   that, for a formulation with a target pH of 6.85, designated

25   as 5BT0S08."  Do you see that?

Stella - cross

1   A.   Yes.

2   Q.   What is the 5BT0S08?

3   A.   I see it as a lot number, formulation number.

4   Q.   The 6.85, during your deposition in Lawrence, you told

5   me it is difficult one way or another to decide whether 6.8

6   would infringe.  Is that correct?

7   A.   That's correct.

8   Q.   05BT0S08, this was something that was prepared in

9   India.  Is that right?

10  A.   That is my understanding.

11  Q.   Now, in the far right column -- we will need the left

12  column -- I decided I wanted to check out what the

13  formulation was.  I found this.  You weren't asked about

14  this on your direct examination.  Right?  This document?

15  A.   No.

16  Q.   What is a buffer used for?

17  A.   It's used to try to control pH.

18  Q.   Control pH.  Right?

19  A.   Yes.

20  Q.   This Indian formulation has a different buffer than

21  the Exela formulation.  Correct?

22  A.   I would like to see it side-by-side.  But if you --

23  Q.   You don't remember?

24  A.   I don't remember.  I don't remember the exact

25  ingredients.  I have seen so many formulas over the last

Stella - cross

1   couple days...

2   Q.    .15 brimonidine tartrate?

3   A.    Right.

4   Q.    It looks like it has a complex combination of a borate

5   and citrate buffer.  Right?

6   A.    I notice that, yes.

7   Q.    Do you remember the Exela formulation, as they are

8   seeking approval for, having a borate buffer or any borate

9   component to it?

10  A.    You know, I don't think it does.  But, again, if you

11  are going to ask me that comparison, I would like to just

12  confirm that.

13  Q.    Fair enough.  We will look at that in a little bit.

14  A.    If you attest that it doesn't contain borate, I am

15  comfortable with that.

16  Q.    We will get it up here.  Okay.  You can see the Exela

17  formulation there in the middle.

18        Do you see any borate or boric acid in the Exela

19  formulation?

20  A.    No, it does not.

21  Q.    Okay.  So, can we conclude, sitting here right now, or

22  standing here right now, that the formulation from India

23  from which you were drawing your conclusion about pH, and

24  where the pH has to be, has a different buffer than the

25  Exela formulation?

Stella - cross

1    A.    Yes.

2    Q.    And it is the buffer in a formulation that controls

3    pH?

4    A.    Yes.   It should attempt to control the pH, yes.

5    Q.    Do you remember noticing that when you gave your

6    opinion?

7    A.    Actually, no, I did not notice that.   In fact, I am

8    not sure that I had the formula.

9              Can I ask a question?

10             THE COURT:   You have to wait until Mr. Boggs

11   asks.

12             THE WITNESS:   Okay.

13   BY MR. BOGGS:

14   Q.    Now, your proposal for meeting the specification that

15   we were talking about before lunch was to raise the pH up

16   high, above 7.

17             There are other ways in formulation work to

18   control pH, focus the pH of a particular area.   Right?

19   A.    I don't know what you mean by that.

20   Q.    Isn't it true that you could satisfy the pH

21   requirement of 6.5 to 6.7 by using phosphate buffer?

22   A.    Yes.

23   Q.    So that's an alternative to manufacturing above 7.

24   Right?

25   A.    Yes.

Stella - cross

1    Q.    And another way to control the pH would be to increase

2    the buffer concentration.   Right?

3    A.    It can help, yes.   It should help.

4    Q.    Or you could just specify that the product needs to be

5    refrigerated to meet the shelf life.   Is that an

6    alternative?

7    A.    It's an expensive alternative.   But it is an

8    alternative.   You are making the assumption that

9    refrigeration slows up any deleterious process that swings

10   the pH, that's correct.   I don't have any experience in

11   that, in ophthalmic products with refrigeration, but,

12   hypothetically, it could help.

13   Q.    Insulin products, for example, are refrigerated.

14   Right?

15   A.    There is a lot of refrigerated products.   That is

16   usually due to chemical stability issues.

17   Q.    Or you can simply reduce the shelf life from 24 months

18   to 18 months or whatever?

19   A.    There are some products that have shorter than

20   two-year shelf lives.

21   Q.    So there are other alternatives than manufacturing at

22   a pH higher than 7.   Right?

23   A.    There could be, yes.

24   Q.    Here we are again, Dr. Stella.   I want to talk to you

25   about the last item on this list.   Soluble in the

1    composition at about 21 degrees C.  Do you see that?

2    A.    Yes.

3    Q.    I am a little concerned about this.  I heard you say

4    that there was no dispute about it.  I also heard you say

5    that you noticed from the ANDA literature that the product

6    was in solution and therefore it's soluble?

7           Is that your logic?

8    A.    Yes.  That both the Alphagan P and the Exela

9    formulations claim that it is an ophthalmic solution.

10   Q.    Okay.  Now, there are different gradients of

11   solubility.  Would you agree with that?

12   A.    Yes.  Standard textbooks often give a range.  But they

13   are controversial as to what they encompass.  But, yes,

14   there is some reasonable numbers out there that people use

15   generally, yes.

16   Q.    And the categories are, there are several different

17   categories.  Correct?

18   A.    Yes.  I don't remember them all, in terms of technical

19   names.

20   Q.    If you wanted to find out what they were, how would

21   you do that?

22   A.    Go to some literature, go to a textbook.

23   Q.    Would you go to Remington's?

24   A.    It's one book in our field, yes.

25   Q.    I think in your textbook, or in your book, you have an

Stella - cross

1    excerpt from Remington.  Do you see that?

2    A.    Can you tell me what the number is?

3    Q.    Well, it has no number.  It's just in there, near the

4    back.  It says Remington's 1953.  It should be a tab.

5    A.    56.

6    Q.    56, that's right.  Do you see that?

7    A.    Yes.

8    Q.    I see a chart in this document which caught my eye.

9    Do you see that chart?  It's about three pages in.  Page

10   149?

11   A.    Yes, I see that.

12   Q.    Up at the top left, do you see that?

13   A.    Yes.

14   Q.    It says, Very Soluble, Freely Soluble, Soluble.  There

15   is a category, Soluble, Sparingly Soluble, Slightly Soluble,

16   Very Slightly Soluble, Practically Insoluble, or Insoluble.

17         At least five of those seven are in solution?

18   A.    Correct.

19   Q.    There are seven categories there.  Right?

20   A.    Yes.

21   Q.    Of those seven, there are at least six solutions?

22   A.    This is not saying that they are in solution.  This

23   just says that if you take a drug, for example, that is

24   considered to be very soluble and you mix one part of drug

25   with one part of solvent, you will have a drug in -- below

Stella - cross

1    that ratio, you would have the drug in solution.

2              In excess of that, if you have more than one --

3    less than one, right.  So, in that case, the one that is

4    always in solution when you take that drug would be the

5    first one, for the most part.  Even in the second one, it

6    says that, actually, if you have one part of drug and less

7    than one part of solvent, it would be a suspension.  This is

8    just defining the range of conditions under which you would

9    put a solute to have the drug in solution and outside of, at

10   the upper end of that range, it would be in a suspension.

11   Q.    When you were rendering your opinion in category 4,

12   did you do any measurements like that?

13   A.    Why would I do any measurements, sir?

14   Q.    Well, I see soluble.  And there is numbers next to it.

15   It seems to me that you would need to do a measurement?

16   A.    There were measurements -- there were solubility

17   measurements in the patent, and when the -- in the ANDA, and

18   when we did the comparison, both sides had agreed -- not

19   agreed, the ANDA says that they have a solution.  It is a

20   solution of .15 percent brimonidine tartrate.  I don't

21   understand where you are going?

22   Q.    It is a solution, therefore, it's soluble.  That is

23   the logic you applied.  Right?

24   A.    The word "solution" means that it's not a suspension.

25   Q.    Right.  It could have some particulates in it.  Right?

Stella - cross

1    A.    Sorry?

2    Q.    Soluble, something that is soluble, if it's in

3    solution, it can have some particulates in it?

4    A.    Well, it would have -- not the drug particulates, but

5    it would have a particularity -- there is a particularity

6    requirement in ophthalmic products.  You cannot have

7    particulates and call it a solution if it's an ophthalmic

8    solution.

9         It then would render the product outside the

10   specifications, I believe.

11   Q.    Very soluble, soluble, freely soluble, different

12   categories.

13        I was looking at this chart.  6.7, the

14   solubility is very high.  Correct?  On this chart?

15   A.    It has some limiting solubility at 6.7, but it's off

16   that chart, that's correct.

17   Q.    It is off the chart.

18        7.2, 7.3, it is much lower?

19   A.    Yes.

20   Q.    And we do know from the patent that that level is

21   soluble.

22   A.    Below, at concentrations below those lines, it's

23   soluble.

24   Q.    So a formulation that has a pH of 6.7 is going to be

25   much more soluble than one at 7.2 or 3?

Stella - cross

1   A.      For brimonidine tartrate, that's correct.

2   Q.      So it is very soluble, isn't it?

3   A.      Sorry?

4   Q.      It's very, very soluble at 6.7?

5   A.      Again, I would have to look at the definitions, do the

6   calculation numbers and tell you which category it fits

7   into.

8   Q.      I agree.

9           Now, I was concerned, I had this 1956 -- have

10  you seen this chart, by the way, before?

11  A.      I have seen charts like this.  If you pick up -- I

12  don't know if that is a rigid classification.  It might be.

13  But I have seen charts.  I don't use it.

14  Q.      Well, I was concerned that it was out of date or out

15  of style?

16  A.      People usually just report the solubility.

17  Q.      You have this in your book, too.  This is another

18  Remington.  Dr. Olejnik said he prefers Martindale.  Do you

19  like Martindale?

20  A.      It depends if you come from the British system or the

21  American system.

22  Q.      This is much newer in the 2000s.  If you turn four

23  pages, Table 16.1 at the bottom, we see it again.  "Very

24  soluble, freely soluble, soluble, sparingly soluble,

25  slightly soluble."

1          So will you agree with me that it is not out of

2     date?

3     A.    I never said it was outdated.  Just that a lot of

4     people use this and other people don't.  This is not a

5     hard-and-fast rule that people use.

6     Q.    And then the next one, I just wanted to check the

7     1990.  I didn't have a Remington sitting around my room.  I

8     had Physical Pharmacy from the 1990s.  Table 10.1.  There we

9     see it again.

10          Will you agree with me that this seems to be an

11    acceptable way of characterizing solubility?

12    A.    Yes.  I mean, I am not disagreeing with that.  In the

13    case of a drug like -- can I explain?

14    Q.    He will have a chance.

15    A.    Okay.

16    Q.    In fact, I am going to give them a chance right now.

17    I don't have any further questions.

18              THE COURT:  Thank you.  Mr. Singer.

19                    REDIRECT EXAMINATION

20    BY MR. SINGER:

21    Q.    Very briefly, apropos, since I am here, why don't you

22    explain what you wanted to say with regard to counsel's

23    question about solubility.

24    A.    It is just that that classification doesn't take into

25    account for an ionizible drug, the solubility will vary as

Stella - redirect

1    pH various.  That is all I needed to say.

2    Q.    Brimonidine is an ionizible drug?

3    A.    It is an ionizible drug, so if you put brimonidine

4    tartrate into water, you would have a particular solubility,

5    and, therefore, it would fit into that classification at one

6    pH value and it would slide through that classification as

7    you change pH.

8    Q.    I would like to put up EDTX-171.

9          This was the letter from the FDA, just to remind

10   everybody, in response to the letter that you relied on,

11   Dr. Stella.

12         Do you recall seeing this with counsel?

13   A.    Yes, I did.

14   Q.    I would just like to go over a couple things that

15   weren't highlighted by counsel.  I first would like to go to

16   the second paragraph right there, and I will read this.  It

17   says -- this is in response, correct, to the August 9, 2007,

18   letter?

19   A.    I assume it is, yes.

20   Q.    It says, "The division of bioequivalence has completed

21   its review of the submissions referenced above and has

22   identified deficiencies which are presented on the attached

23   page."

24         Did I read that correctly?

25   A.    Yes.

1    Q.     And "this facsimile is to be regarded as an official

2    FDA communication, and, unless requested, a hard copy will

3    not be mailed."

4             Did I read that correctly?

5    A.     Yes.

6    Q.     Is that what the FDA said in response to the Exela

7    letter of August 9, 2007, in part?

8    A.     That appears to be the case, yes.

9    Q.     And then I would like to go to the next paragraph and

10   highlight the first sentence.  It says, "You should submit a

11   response to these deficiencies in accord with 21 C.F.R.

12   314.96.  Your amendment should respond to all the

13   deficiencies listed."

14            Do you see that?

15   A.     Yes.

16   Q.     Dr. Stella, have you seen any response to this

17   bioequivalency amendment from the FDA?

18   A.     Not to my knowledge.

19   Q.     Go to the next page.  There are some other things that

20   weren't pointed out.  If we could highlight the paragraph

21   that says, "In the current correspondence."  I will read

22   this.  It says, "In the current correspondence, you have not

23   submitted any new information or data to address adequately

24   the deficiencies communicated to you in our previous letter.

25   You have not provided any new evidence necessary to

Stella - redirect

1    demonstrate that the differences between the test and RLD

2    formulations do not significantly affect the safety or

3    efficacy of the drug product."

4              Did I read that correctly?

5    A.    Yes.

6    Q.    For the record, the test formulation, is that the

7    proposed generic formulation?

8    A.    Yes.

9    Q.    And, then, what does "RLD" stand for?

10   A.    Reference listed drug, I believe.  This would be the

11   Alphagan P .15 percent.

12   Q.    Then the FDA officer goes on to say, "The medical

13   officer of the Division of Antiinfective and Ophthalmalgic

14   Products, Office of Antimicrobial Products, at the agency

15   also has the following comments concerning your original and

16   current submissions."

17             Paragraph 1.  "The proposed drug product is not

18   the same with respect to the inactive ingredients.  The

19   proposed differences have the capability of affecting the

20   efficacy of the drug product."

21             Did I read that correctly?

22   A.    Yes.

23   Q.    I have one more thing, then I have a question for you.

24   At the bottom, it says, "For the reasons listed above, our

25   previous recommendation for denial of your waiver request

Stella - redirect

1    has not changed."

2                Do you see that?

3    A.    Yes.

4    Q.    I believe we talked a little bit on direct examination

5    about what a waiver request was.  I think you testified that

6    it's a request to waive the requirement to do clinical

7    trials.  Is that your understanding?

8    A.    I believe that's my understanding.

9    Q.    Have you seen, in your infringement analysis, any

10   clinical trials performed by Exela in response to this FDA

11   request?

12   A.    No.

13                MR. SINGER:  I have nothing further, Your Honor.

14                THE COURT:  Doctor, thank you.

15                THE WITNESS:  Thank you.

16                (Witness excused.)

17                MR. MARSDEN:  Your Honor, that completes our

18   affirmative case.  We just wanted to understand how Your

19   Honor wants to handle exhibits.  We referred to them,

20   obviously, throughout the trial.  This is a Bench trial.  I

21   didn't know whether you're going to want us, at some point,

22   to submit a list of those we referred to during the

23   testimony.

24                THE COURT:  A list might be helpful,

25   Mr. Marsden.  We have, of course, received Bench books.  I

1      should think that a general list, a list more

2      particularized, or that you want me to pay close attention

3      to, both parties.

4                  MR. MARSDEN:  We can provide that, Your Honor.

5                  MR. BREISBLATT:  Your Honor, may I ask a

6      question?

7                  THE COURT:  Sure.

8                  MR. BREISBLATT:  Earlier in the proceeding, I

9      think somebody, and I forget who it was, went to move an

10     exhibit in.  The Court noted that, since we had done lists,

11     they were all admitted.

12                 Now, that's what I now need clarification on.

13                 May we use -- so, for example, if we do findings

14     of fact and conclusions of law after the case, can we refer

15     to exhibits that are on the exhibit list even though no

16     witness referred to them?

17                 THE COURT:  Yes.

18                 MR. BREISBLATT:  So what the Court said is all

19     the exhibits on that list are in, and we don't have to stand

20     up here and move them in.

21                 THE COURT:  That's correct.  Absent an

22     objection, my blanket procedure has been to admit.  Thus

23     far, no exhibits on the list have been contested, beyond

24     that ruling.

25                 MR. BREISBLATT:  The reason I ask, I know we

1   made some objections to some of their exhibits.  They made

2   objections to some of those, 403, that kind of thing.

3              THE COURT:  There was a listing of objections.

4   But those have been summarily dealt with.  Unless there is

5   an issue with any future exhibit --

6              MR. BREISBLATT:  The reason I ask, it will

7   shorten some of our examinations.  In some courtrooms, a

8   judge won't allow an exhibit to be used unless someone

9   touched it or saw it.

10             THE COURT:  We all do it differently.  That is a

11  process I adopted from your hometown, a Northern District

12  judge out of Chicago.  I find it, I have found it, over the

13  course of the years, to be an effective process.

14             MR. BREISBLATT:  That makes it fine, Judge.

15  That will simplify our case.

16             MR. MARSDEN:  One other housekeeping matter,

17  Your Honor.  You may recall that we moved in limine to

18  preclude some of the expert testimony.  Your Honor denied

19  that but allowed us to do supplemental expert reports.  In

20  doing so, there were some exhibits identified in those

21  supplemental reports.  We provided an updated trial exhibit

22  list to the defendants.  We have not yet provided that to

23  the Court.  I can do that now and we can also file it so

24  it's of record.

25             THE COURT:  Let's see if there is a problem with

                        Stella - redirect

1    that.

2                  MR. BREISBLATT:  No, Your Honor.

3                  THE COURT:  That is fine, Mr. Marsden.

4                  Are we ready?

5                  MR. BOGGS:  May I be heard, Your Honor?

6                  THE COURT:  Yes, sir.

7                  MR. BOGGS:  Your Honor, Exela moves, under Rule

8    52C, for judgment as a matter of law on the matter of

9    infringement.  We don't believe they have offered evidence

10   on the issue of soluble in the claim, and, also, the Exela

11   formulation, as described in the ANDA, does not meet the

12   about 7.0 or greater limitation of the claims.

13                 THE COURT:  Okay.  I will reserve on that.

14                 MR. BOGGS:  Thank you, sir.

15                 MS. BROOKS:  With that, Your Honor, Allergan

16   rests its case-in-chief.

17                 THE COURT:  Thank you, Ms. Brooks.

18                 Who is going to start?

19                 MR. BREISBLATT:  Your Honor, I think the way the

20   Court has suggested this be done is that Exela does its

21   noninfringement case, because you just heard the

22   infringement case and it will make it easier for the Court

23   to follow, then we will do our invalidity case.  Then I

24   believe Allergan will have a chance to put on a rebuttal

25   case to the invalidity case.

Stella - redirect

1             Did I fairly say that?

2             THE COURT:  I think that comports with our

3     previous discussion, does it not?

4             MR. SINGER:  I think that's right, if I

5     understand it correctly.  Just to make sure, Exela is going

6     to present its expert only once, he is going to testify

7     about noninfringement and then validity so we don't have to

8     do this twice.

9             MR. BOGGS:  I only have three witnesses, Your

10    Honor.  I would just like to do it all at once, if that is

11    okay.

12            MR. SINGER:  That is fine with us.

13            THE COURT:  You have an agreement.

14            MR. BOGGS:  Your Honor, we have a paper on the

15    52C.

16            THE COURT:  You want to Bench-file it.

17            MR. BOGGS:  Yes.

18            THE COURT:  I am assuming the other side has it?

19            MR. BOGGS:  They will.

20            THE COURT:  Mr. Boggs, why don't you

21    electronically file that?

22            MS. FARNAN:  I will take care of that.

23            MR. BOGGS:  That is what she recommended as

24    well.

25            THE COURT:  She is right.  Given who she is,

Stella - redirect

```
1    absolutely.
2                    MR. BOGGS:  Your Honor, our first witness is
3    Dr. Phanesh Koneru.  He is the founder, the president, and
4    the CEO of Exela Pharmsci.  Dr. Koneru will testify about
5    his unique background and his company, Exela.  He will also
6    testify about the product work that was done to development
7    the 0.15 percent formulation for which approval is sought.
8    And Dr. Koneru will testify about Exela's ANDA.
9                    THE COURT:  All right, Doctor.
10                   ...PHANESH KONERU, having been previously duly
11   sworn as a witness, was examined and testified as follows:
12                        DIRECT EXAMINATION
13   BY MR. BOGGS:
14   Q.    Dr. Koneru, will you please introduce yourself to the
15   Court by way of describing your educational and professional
16   background and your relationship with Exela?
17   A.    Thank you.
18                   Thank you, Your Honor.
19                   THE COURT:  You are welcome.
20                   THE WITNESS:  My name is Phanesh Koneru.  I am
21   president and CEO of Exela Pharmacia, Inc.
22                   My background includes the legal, business and
23   pharmaceutical fields.  I have a Bachelor's degree, I have a
24   Master's degree in pharmaceutical sciences from Andhra,
25   India.  I obtained my Ph.D. in biomedical chemistry from the
```

Stella - redirect

1    University of California in Los Angeles.  I specialized in

2    biomedical chemistry.

3              After that, I went to the U.C. San Diego School

4    of Law and I got my J.D. degree from there.  Then I

5    graduated from Columbia University School of Law from the

6    LLN program.

7              THE COURT:  What did you do your LLN in?

8              THE WITNESS:  In business law.

9              After that, I worked in a law firm in New York

10   and another law firm in Palo Alto, California.  After that,

11   I went to Watson Pharmaceuticals as an in-house patent

12   counsel.

13             I was there for about four-and-a-half years.

14   After joining Watson and working there for eight-and-a-half,

15   I became their vice president of intellectual property.

16             I was a registered pharmacist in California for

17   12 years.  I was a pharmacy manager for most of it.

18             I am a registered patent attorney, registered at

19   the U.S. Patent Office.  I am a member of the California

20   Bar.

21   Q.   Dr. Koneru, how did you get involved in the

22   pharmaceutical sciences?

23   A.   It's a long story.  It has its basis from my childhood

24   days in India.  It's emotional, so --

25             THE COURT:  Take your time.

1          THE WITNESS:  I grew up in a rather poor family

2     in India.  My family had no fixed assets.  My parents could

3     not afford to raise three children, so they sent me to live

4     with my grandparents in a small village.  The village had no

5     electricity, no water, or no telephones.  I used to walk for

6     a mile to school.

7          The school had thatched roofs and mud floors, so

8     when it rained, the school would close for a few days.

9          One day, I was walking to school with my

10    classmate, Ramah, he was about 15, 20 feet behind me, and

11    all of a sudden, I heard a loud scream, and I turned back

12    and I saw him fall to the ground.

13         I saw a snake, brown snake, passing by.  I

14    immediately knew that he was attacked by a King Cobra.

15    There was no antidote available at the time.

16         And he died within a very short time.  And the

17    tragedy affected me.

18         I decided to become a scientist, a medicinal

19    scientist, to help make medicines.

20    Q.   In what way did you pursue becoming a medicinal

21    scientist?

22    A.   I graduated at the top of the class from my high

23    school, and I was given a national merit scholarship.  And I

24    went to Andhra University School of Pharmacy which was about

25    200 miles away from my place.  It's on the East Coast of

1    India.  The university was the second oldest pharmacy school

2    in INdia.  It was built by the British, and the fact is that

3    we were trained under the U.K.  I graduated again from the

4    school with honors.

5              Then I wanted to come to the United States for

6    my higher education.

7    BY MR. BOGGS:

8    Q.    How did you find your way to the United States?

9    A.    It was not easy.  I got admission to the Philadelphia

10   College of Pharmacy and Science here, which is the oldest

11   pharmacy school in the U.S.

12             I was given a fellowship.  But I couldn't get

13   the visa.  I tried about three times, and I still couldn't

14   get the visa from India.  The diplomatic relations between

15   India and the U.S. at the time were very poor.  All the

16   relations were frozen.  I had to take a detour, so I went to

17   Germany, because at the time, Germany did not require any

18   visas.  When I went there, I had about $500 in my pocket.

19             After going there, I realized it was going to

20   cost a lot more money to learn German.  I decided to teach

21   myself German, and I did.

22             I learned German very fast.  In about five

23   months, I was fluent to attend the universities in Germany.

24   I was writing and reading and speaking German more fluently.

25   And I got admitted into six universities there.

Stella - redirect

1          But before I could attend any of them, I got a

2     visa to the United States.  So I came here.

3     Q.    Where did you go when you went to the United States?

4     A.    I went to the University of Southern California School

5     of Pharmacy.

6     Q.    What did you do after that?

7     A.    I specialized in biomedicinal chemistry.  I did my

8     Ph.D. there.  While I was doing my Ph.D., I passed the

9     California pharmacy boards.  And I became a registered

10    pharmacist.  And I started working evenings and weekends as

11    a pharmacist.

12    Q.    What prompted you to go to law school?

13    A.    As I was working in the pharmacy, I noticed that there

14    were some products that had no generic equivalents.  And

15    there were some other products that had generic equivalents

16    coming at the time.

17          So I was talking to the presidents of the

18    companies and I asked why some products had generics and the

19    others didn't.  And they told me it is because of the patent

20    protection some parties have.  And that kind of intrigued me

21    and I wanted to learn more.

22          I started reading about that.  Then it occurred

23    to me that patents are very important for the pharmaceutical

24    industry.  And I wanted to be a patent lawyer.

25          That's one way I could get to the pharmaceutical

Stella - redirect

1    industry.

2    Q.    What did you do after San Diego Law School?

3    A.    As I first graduating from San Diego Law School, I

4    realized that one day I would join industry in a senior

5    management position.

6              So I wanted to be prepared.  And I wanted to

7    learn more about the business side of it.  At the time,

8    Columbia University School of Law has some of the best

9    business faculty.  So I joined the LLN program, I joined in.

10   Q.    How did you end up at Watson Pharmaceuticals?

11   A.    Watson was one of the clients of the law firm I was

12   working in Palo Alto.  And I was advising them on the

13   branded and generic patent statutes.  One day, they called

14   me and asked me if I was interested in joining Watson as an

15   in-house patent counsel, and I did.  I took the opportunity

16   because I felt that gave me the best position where I could

17   bring to bear all my diverse educate and experiences and

18   bring it to the patent area.  And that's what I did.

19   Q.    You mentioned you are president and CEO of Exela.

20   What is Exela all about?  What's its mission?

21   A.    Exela is a pharmaceutical formulation development

22   company.  Our mission is to facilitate the entry of generic

23   products to the market at a much earlier rate than otherwise

24   possible.  I feel very passionate about this.

25              When I was at the pharmacy, I had seen a lot of

Stella - redirect

1   people come with prescriptions.  But they couldn't get the

2   prescriptions filled.  These are elderly people, uninsured,

3   unemployed, otherwise can't afford them.

4          The people asked me how much it cost, and I

5   would tell them.  And I would see the despair in their

6   faces.  They practically had to make a decision whether to

7   pay for the medication or rent, or for groceries.  I used to

8   feel bad about it.  But there is nothing I could do.

9          When we started Exela, we wanted to make Exela's

10  mission this, which is to make the generic pharmaceuticals

11  and make them, get them into the market at a faster rate.

12  Q.    How would you get them there at a faster rate?

13  A.    Our objective is really to design around patents.  To

14  make noninfringing formulations.

15         Ideally, we would not want to be sued.  If the

16  noninfringement is good, then we want to get the 30-month

17  stay on the approval.  Because of that we could get to the

18  market faster.  That was the business model.

19  Q.    Faster than what?

20  A.    Faster than if you had a 30-month stay, and then you

21  go through the lawsuit, then you have to wait for 30 months

22  again.

23  Q.    Now, what did you do specifically to advance that

24  goal?

25  A.    I teemed up with a classmate of mine, Dr. Mitri.  We

1    were classmates in India when I was doing my Bachelor's and

2    Master's.   He was one of the best formulators I know.

3                 We started a lab in India.   Our objective is to

4    do the formulation work there.   And I would tell him, you

5    know, what the formulation should contain.   And then he

6    would formulate it.

7                 Once we formulate, you know, this is an

8    integrative process, where you make several different

9    formulations and you refine it and refine it until you get

10   it right.

11                Once you feel that you are getting there, then

12   you can start talking to the partnership, talking to

13   different companies for partnerships.   That's what I was

14   doing.

15                So we formulate, we come up with a

16   noninfringement formulation and see that the product is

17   stable.   Then we go to a pharmaceutical company here and

18   offer them for licensing.

19                They will take it up to the next step, which is

20   manufacturing of the product and then filing of the FDA,

21   getting the approval, and then launching onto the market.

22   Q.    Just so we are clear, what is your contribution to the

23   process?

24   A.    My contribution is to help the company come up with a

25   with the noninfringing positions.   And I have done this

1    before several times at Watson.

2            We have designed around several patents and

3    several products to come up with noninfringing products.  We

4    have done this with products that belong to big companies,

5    like Pfizer, Bristol Myers, and also smaller companies, such

6    as Solvey.  In some cases, we were not sued.  And in a

7    couple cases, we were sued, but once they understood the

8    formulation, the lawsuits were dismissed.

9            We were able to do that even at Exela.  For

10   example, our first product, which we licensed, was a

11   noninfringing formulation.  And this was so clear for us

12   that the company did not even bring the lawsuit.  Because of

13   that, we were able to get it approved much faster and we

14   were able to launch.

15           The product was licensed to Teva

16   Pharmaceuticals, which is the largest generic company in the

17   world.

18   Q.    Dr. Koneru, what is brimonidine?

19   A.    Brimonidine is an alpha-2-adrenergic agonist.  It is

20   used to treat glaucoma, or intraocular pressure.

21   Q.    What brimonidine products are you familiar with?

22   A.    I have seen four different approvals for brimonidine

23   at different strengths.  They are all in the Orange Book

24   listing, you will see them.  The highest strength is .5

25   percent.  Then you have a .2 percent.  And you have .15

Stella - redirect

1    percent.  And the .1 percent.

2                The .5 percent or the .2 percent are called

3    Alphagan products.  And then the .15 and the .1 percent are

4    called Alphagan P products.

5    Q.    And did Exela have a brimonidine project?

6    A.    Yes, we do.

7    Q.    And describe that for us, please.

8    A.    It is a generic formulation for brimonidine, for

9    Alphagan P .15 percent.

10               Our formulation will contain brimonidine

11   tartrate .15 percent, and then some excipients, which are

12   not in the Alphagan P formulation.

13   Q.    So, what did you do once you decided to explore

14   brimonidine as a potential candidate?

15   A.    I asked Dr. Mitra to start working on the formulation

16   with this drug.  I gave him what he should read and he

17   started working on the formulation.  We were going back and

18   forth and making several different formulations and see

19   which one would work, which one would be stable.

20               As we were doing that, you know, we were also

21   looking at other things.

22               At one point, he asked me to do the formulation.

23   I did.  It looked to be stable.  Then, for me, the next

24   thing is, okay, we can make the formulation, it may be

25   stable, and it is noninfringing.  But then, will it be

1    equivalent?  Will it be safe and effective?  Because we can

2    get a product that is noninfringing, but it is not stable or

3    safe.  And if it's not safe or effective, you know, we will

4    not get the approval.

5            So we looked at the, I started reading up on the

6    FDA approval documents and all the literature that I could

7    find on the clinical studies, on the pharmacology of

8    brimonidine.

9            After reviewing all of that, it was clear to me

10   that we could formulate the product that is noninfringing

11   and also would be clinically effective and safe.

12   Q.    Okay.  Let's look specifically to the .15 percent

13   Alphagan P.

14   A.    Yes.

15   Q.    What did you find out from your initial review of the

16   documents?

17   A.    The initial review, you know, I looked at the FDA

18   documents, such as the summary basis of approval.  And then

19   I also looked at the product labeling of the .5 percent and

20   the .2 percent.

21           They are available on the FDA websites.  From

22   there, I compared that with the patents, and the patents

23   that I was going for.  And I looked at the file history of

24   the patents.  Then I also looked at the different articles,

25   publications made by Allergan and others.  From that, I

1    could come up with a noninfringing position, for which I

2    felt good about.

3            The formulation ideally should have no Purite

4    and no solubility enhancing component.  And then it will

5    have a different pH.

6            And then, also, I felt good that we could come

7    up with a different buffer.

8    Q.    Okay.  Do you recall what the formulations of the

9    original Alphagan were?

10   A.    Yes, I do.

11   Q.    What were they?

12   A.    The original Alphagan had brimonidine tartrate with a

13   .5 percent or the .2 percent.  And it had the polyvinyl

14   alcohol as a thickening agent.  Then it had the citrate

15   buffer as a buffer component.  Then it had the benzoalkonium

16   chloride as the preservative.  Then --

17   Q.    Did it have a thickening agent?

18   A.    Yes.  It's polyvinyl alcohol, PVA.

19   Q.    And what was the pH of that product?

20   A.    The pH of the product, according to the package

21   insert, was from 5.6 to 6.6.

22   Q.    Are you familiar with the formulation of the Alphagan

23   P product?

24   A.    Yes.

25   Q.    What does that include?

1  A.      The Alphagan P had brimonidine tartrate .15 percent,

2  and then it had a thickening agent, which is sodium

3  carboxymethylcellulose, then it had the borate buffer.  And

4  there you have Purite as a preservative.

5  Q.      Did the carboxymethylcellulose have a special

6  function?

7  A.      Yes.  It was described in the patents as having a

8  solubility enhancing property.

9  Q.      And what was the pH of Alphagan P?

10  A.      Alphagan P, the package insert said from 6.6 to 7.4.

11  Q.      Now, throughout this process, where you were looking

12  at brimonidine, did you look at the Orange Book?

13  A.      Yes, I did.  That was one of the first things I did.

14  Q.      What is the Orange Book?

15  A.      The Orange Book is an FDA publication that is not only

16  available online, it shows the drug products that are

17  approved where the therapeutic equivalents as well as the

18  therapeutic equivalents code.  And you click the hyperlinks

19  and you will see the patents listed against each product, if

20  there are, anyway.

21  Q.      And were there any patents listed for Alphagan P .15

22  percent?

23  A.      Yes.  There were five patents listed against the

24  Alphagan P product.

25  Q.      Okay.  How would you describe those five patents?

1    A.      The oldest patent, I believe it was expiring in 2012,

2    covered the usage of the Purite as a preservative.  I called

3    it as a Purite patent.

4            Then there are four patents that all came from

5    the same family.  I think the one was sometime in July 2000.

6    All four patents had the same specification.  I call those

7    as the CMC patents.

8    Q.    What is your understanding of what the CMC patents are

9    about?

10   A.      The invention, as I understood it, to be stated, as

11   the product, you know, as you raise the pH of the product,

12   you get more absorption into the system because more drug

13   will be ionized.  And when you raise the pH, then you have a

14   problem, which is the solubility.  As the pH goes up, then

15   the solubility of brimonidine goes down.

16           To solve the problem, the patent states that you

17   need to use a solubility enhancing component to make the

18   brimonidine solution.

19   Q.    Did you have any preliminary thoughts at the time that

20   you looked at the patents as to whether you could design a

21   noninfringing alternative?

22   A.      Yes.  I felt confident that I could design around

23   these patents.  I could do that by not using the Purite and

24   not using the solubility enhancing component and also

25   keeping the pH lower than about 7.0 or greater.

Stella - redirect

1    Q.      What did you do to investigate that?

2    A.      I asked Dr. Mitra to start making formulations to see

3    how they are going to work.  Then, also, I have talked to

4    several different consultants to see whether this

5    formulation would be acceptable for filing with the FDA.

6    And we were, obviously, going on.

7             As we investigated more into the formulation

8    work, we wanted to really understand the effect of the pH on

9    the Purite.  We felt, it has been my thought always that you

10   may be able to get the product filed, but, you know, can we

11   get the approval?  And what kind of studies are needed and

12   are we going to be bioequivalent?

13            I was studying on the effect of the pH on the

14   Purite.  So we asked, and I asked Dr. Mitra to work on some

15   kind of invitro study test.  And that's what he did.  And he

16   found out that the pH has no effect on absorption from the

17   invitro study.

18            Then we also had some thoughts about the invivo

19   studies.  And we decided, we went back to Dr. Mitra's lab,

20   did a rabbit study to see how the formulation at the time

21   would work in the rabbits.  And the formulation at the time

22   was evolving.  And it was starting to get interesting, but

23   we wanted to see.  Because we had already lowered the pH

24   from 7.2 of the product to 6.9.  Then we wanted to see how

25   that works.  And that's why we had Dr. Mitra's lab -- the

Stella - redirect

1    results that I related.  And we have the results that showed

2    that the product was bioequivalent.  Then we were going to

3    do further studies to lower the pH and then further do the

4    rabbit study.

5    Q.    Let's back up a step here.  It seems to me that if you

6    lower the concentration of brimonidine from the .2 percent

7    level to the .15 percent level, that you are necessarily

8    going to impact the efficacy of the drug.

9          What did you find out about that?

10   A.    Yes.  I mean, there is always the concern, I think we

11   heard yesterday in the testimony, that doctors always want

12   to use the lowest effective dose.  Again, there will be

13   tradeoffs when you go down.  So there is a concern.

14         So I read reviewed the literature.  And I found

15   one article, which was the Walters article that we talked

16   about yesterday.  And it gave me a lot of comfort.  I think

17   it was published in 1996.  In the Walters article,

18   especially, I remember the Figure 3, where they talked about

19   the rather shorter period, the results of the expert.

20         There, you will see the study contained the .5

21   percent and .2 percent and then .08 percent.  There was also

22   a placebo there.  And the conclusion was that all three

23   strengths were, effectively lowered the intraocular pressure

24   with at all ten points.

25         I understand that they were practically

1     comparable in their efficacy.

2              THE COURT:  What was the three strengths?

3              THE WITNESS:  .2 percent, .5 percent, and .08

4     percent, three strengths.  That assured me that by lowering

5     the concentration, you could still have an effective

6     product.  And as you are lowering, you could go all the way

7     up to 0.08 percent and still have an effective product.  So

8     I did not have any concerns that the product would not be

9     effective.

10    BY MR. BOGGS:

11    Q.    We were talking about the Alphagan, the original

12    Alphagan product a little while ago.  Why didn't you just

13    pursue the original fact product?

14    A.    You mean the original Alphagan?

15    Q.    The .2 percent.

16    A.    The .2 percent.  The product was discontinued by

17    Allergan, because they have introduced the .15 percent.

18    And, in fact, I saw a citizens' petition that was answered

19    by the FDA, in which the FDA said that the product was not

20    withdrawn from the market for safety or efficacy reasons.

21    It was purely for commercial reasons that they withdrew it.

22    So that told me, by looking at that, it told me there was no

23    safety or efficacy issue with the previous product.  And now

24    the vehicle that they had had no safety or efficacy issues.

25    So I could use that vehicle and I also would not have any

Stella - redirect

1    safety or efficacy issues with that.

2    Q.    By "vehicle," what are you referring to?

3    A.    I am referring to all the other excipients except the

4    active ingredient.

5    Q.    And that would include the preservative?

6    A.    Yes.   That would include the preservative, the

7    thickening agent, and the buffer.

8    Q.    Did you ever figure out why Allergan discontinued the

9    Alphagan product?

10   A.    Yes, I did.   I am familiar with the strategy.   It's

11   called lifecycle management.   Basically, what some brand

12   companies do, they try to --

13              MR. SINGER:   I am sorry to interrupt.   I want to

14   interpose an objection.   It seems to be in the zone of

15   expert testimony of what branded companies do as a general

16   matter.

17              THE COURT:   I don't know that it is expert

18   testimony.   He worked in a branded company.

19              MR. SINGER:   I don't think he worked in a

20   branded company.

21              THE WITNESS:   I did.

22              THE COURT:   I am going to overrule the

23   objection.

24              MR. SINGER:   Thank you, Your Honor.

25              THE WITNESS:   The strategy is to, as you are

Stella - redirect

1    getting closer to the time period where you don't have

2    product exclusivity or you are expecting generic

3    competition, you make the next generation product, making

4    some formulation changes or some other changes.   Sometimes

5    trivial; sometimes meaningful, then you will get patent

6    protection for it.   Then you withdraw the product that was

7    there before from the market.   Then you force the

8    substitution of the treatment into the new product.

9              With that, you have an extended monopoly for a

10   long time.  And, for the generics, the product is withdrawn

11   from the market so there is really nothing there to compete

12   against, because even if you make a generic for the

13   withdrawn product, that cannot be substituted for the new

14   product.

15   Q.    Back to the reformulation, once you were satisfied

16   that you could reformulate Alphagan .15 percent, what did

17   you do?

18   A.    I started talking to partners.  One of the partners

19   was Paddock, there was a doctor, they were interested in

20   this.  So we got together and we had an agreement signed up

21   quickly after that.

22             They hired Pharmaforce to do contract

23   manufacturing, and that's where the ANDA batch was made.

24             And then we had filed the ANDA.

25   Q.    I thought I heard you mention Paddock.

Stella - redirect

1    A.    Yes.

2    Q.    You are going to have to speak up a little bit.

3          What role did Paddock play?

4    A.    Paddock was involved with contract, because Paddock,

5    itself, I don't believe, had any manufacturing capability

6    for these kind of products.  So they went to Pharmaforce and

7    had the product made.  And the ANDA was filed, while they

8    still had the rights on the ANDA, and the ANDA was filed.

9    And after that, I got the acceptance letter from the FDA.

10   Once I received the acceptance letter, I sent the

11   notification letter to Allergan, as per the statute.

12   Q.    Whatever happened to Paddock?

13   A.    After we got sued, they had some private conversations

14   with Allergan.  I was not privy to them.  Then they came up

15   with an agreement.  That's the last I heard of them.

16   Q.    Okay.  Dr. Koneru, Exela has filed an ANDA directed to

17   the .15 percent formulation.  Correct?

18   A.    Yes.

19   Q.    I would like you to look in your book, if you would, I

20   would like to direct your attention to JTX-124.  Excuse me,

21   EDTX-124.

22   A.    Yes.

23   Q.    I would like you to take a look at that document and

24   tell me if you recognize it.

25   A.    Yes, I do.

1    Q.     What is it?

2    A.     It is the publicly available copy of the Alphagan .5

3    percent approval document from the FDA.

4               MR. BOGGS:  May I have a moment, Your Honor?

5               THE COURT:  Yes, sir.

6               (Pause.)

7               MR. BOGGS:  I am sorry, Your Honor.  A little

8    confusion.

9               THE COURT:  Counsel, while you are taking a few

10   minutes, let's take a stretch.

11              MR. BOGGS:  Thank you, Your Honor.  I appreciate

12   that.

13              (Recess taken.)

14              THE COURT:  Counsel, let's be seated, come to

15   order, and, Mr. Boggs, are you ready?

16              MR. BOGGS:  Thank you, Your Honor.  We

17   discovered the error.

18              It is EDTX-129.  The problem that we had was the

19   back was in the front and the front was in the back.  It

20   should be the cover letter for the ANDA.  The reason we

21   presented it this way is we have nine boxes back here --

22              THE COURT:  You don't have to explain.

23              What is the exhibit?

24              MR. BOGGS:  EDTX-129.

25              Then the white notebook that you have in your

Stella - redirect

1    hand are little excerpts from the handbook, there were nine

2    boxes.

3                THE COURT:  129 is in Volume 1 here.

4                MR. BOGGS:  Yes, 129.  Then if you open it up,

5    Volume 3, if you open up 129, you should see what I saw,

6    which is an appendix or something.

7                THE COURT:  I see an executive summary.  But it

8    says, "Appendix D."

9                MR. BOGGS:  Yes.  The Appendix D goes in the

10   back.

11               THE COURT:  I am with you.  I see the letter.

12               MR. BOGGS:  Thank you.

13               Sorry for that.

14   BY MR. BOGGS:

15   Q.    Dr. Koneru, do you have 129 in front of you?

16   A.    Yes, I do.

17   Q.    And do you recognize that document?

18   A.    Yes, I do.

19   Q.    What is it?

20   A.    It's a cover letter from the ANDA file that we made

21   for the FDA.

22   Q.    How is it that you recognize this?

23   A.    I have seen this before.  And, also, I have

24   participated in preparing this.

25   Q.    Where can I find the formulation for the Exela product

Stella - redirect

1    in this document?

2    A.      It's on the third page, the Exhibit No. XLA-004579.

3                (There followed a portion of the proceedings

4    ordered sealed by the Court.   That portion has been

5    transcribed, bound separately, and will be sealed

6    separately.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stella - redirect

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stella - redirect

1

2              MR. BOGGS:  Your Honor, I am not sure what the

3   protocol here is for this.  But this information that we

4   have just read into the record is still highly confidential,

5   in terms of the formulation, the exact formulation.

6              I wasn't sure whether there is a mechanism for

7   sealing the record, sealing the transcripts for this part.

8              THE COURT:  We will discuss it, you will remind

9   me.

10             MR. BOGGS:  Okay, I will.  Thank you.  I just

11  wanted to --

12             THE COURT:  Mr. Maurer, you have the capability.

13             COURT REPORTER:  Yes.

14  BY MR. BOGGS:

15  Q.    Dr. Koneru, we just looked at the Exela brimonidine

16  formulation.  And you stated previously that your objective

17  was to produce a product that would not infringe the Orange

18  Book patents that cover the Alphagan P .15 percent.

19             Do you believe that you satisfied that objective

20  through your reformulated 0.15 percent brimonidine tartrate

21  product?

22  A.    Yes, I have.

23  Q.    And could you explain why?

24  A.    Yes.  The formulation, we have a pH of 6.7 either

25  during the manufacturing or during the release or what it is

Stella - redirect

1    on stability.

2                    THE COURT:  Would you repeat that, Doctor,

3    please?  It doesn't exceed 6.7?

4                    THE WITNESS:  Either during the manufacturing or

5    during the release.  Nor during the shelf life.

6    BY MR. BOGGS:

7    Q.    Okay.  By "shelf life," what pH are you referring to

8    there?

9    A.    The shelf life pH is 5.5 to 6.7.

10   Q.    What is the release pH?

11   A.    The release pH is 6.2 to 6.7.

12   Q.    And what is the manufacturing pH?

13   A.    6.5 to 6.7.

14   Q.    And here is a slide from my opening.  Does that

15   accurately characterize the pH's of the ANDA?

16   A.    Yes.

17   Q.    Now, do these ranges correspond to any geometrical

18   figure?

19   A.    If you use the lower end of the ranges, you could

20   construct a pyramid.  6.5 at the manufacturing is at the

21   top, and then 6.2, the release, and 5.5 in the shelf.

22   Q.    So it is narrow at the top during manufacture and it

23   progressively gets wider.  Right?

24   A.    Yes.

25   Q.    So the first pH that you frequently see referred to is

Stella - redirect

1    right after it's manufactured.  And then you have a broader

2    range at release.  Then, of course, the shelf life is even

3    broader.  Is that correct?

4    A.    That's correct.

5    Q.    Now, do you have an understanding -- what was your

6    understanding or your belief at the time as to why a product

7    that has a pH that never exceeds 6.7 would not be the same

8    as one with a pH of about 7.0 or greater?

9    A.    Well, the product has a solubility profile that is

10   dependent upon pH.  In other words, as the pH changes, the

11   solubility changes.

12        Also, as the pH changes, the amount of ionized

13   drug versus the unionized drug changes.

14        A pH of 6.5 will give you a different solubility

15   and ratio of ionized versus unionized compared to the pH of

16   7.0.

17        Like that, as you go down each different pH, you

18   will have different amounts.  So it will not be the same.

19   Q.    In designing your product, did you think that your pH

20   in the '834 patent was going to be a problem?

21   A.    No.  I never felt that way.  Like I say, I have read

22   the specification, I have read the claims, and, also, I have

23   read the file history.  And I reviewed the prior art.  If

24   you look at the .5 percent and the .2 percent product

25   labeling, the prior art products, they have a pH range of

Stella - redirect

1   5.6 to 6.6 ranges.  And then in the file history, they

2   mention, they are trying to distinguish their products from

3   the prior art by saying that the Alphagan prior art product,

4   .2 percent, had a pH of 6. -- 6.3 to 6.5, and, also, 6.6 to

5   6.8.

6           So I felt that the 6.6 -- 6.7 pH is firmly

7   within the prior art.

8   Q.   Okay.  You mentioned the .5 percent Alphagan NDA, I

9   think.

10  A.   Yes.

11  Q.   I would like you to turn to EDTX-124.  I tried to show

12  you this earlier.

13          I would like you to go first to XLA-011932 --

14  82, excuse me.

15  A.   Yes.

16  Q.   Do you see that?

17  A.   Yes.

18  Q.   And what is this document that we are looking at?

19  A.   It is part of the NDA approval package.  The NDA

20  number is 20-490, which is brimonidine tartrate .5 percent.

21  Q.   Okay.  What are the ingredients of that formulation?

22  A.   The inactive ingredients are polyvinyl alcohol, sodium

23  chloride, sodium citrate dihydrate, citric acid monohydrate,

24  and purified water.  They have also used sodium hydroxide

25  and hydrochloric acid for pH adjustment for your targeted

1    formulation pH of 6.3 to 6.5.

2    Q.    Now, do you use any of those ingredients in your

3    formulation?

4    A.    Yes.  We use the polyvinyl alcohol, sodium chloride,

5    sodium citrate dihydrate, citric acid monohydrate and

6    purified water and sodium oxide and hydrochloric acid.

7                 THE COURT:  Would you say that again, Doctor, a

8    little more slowly.

9                 THE WITNESS:  Sorry.  Can I just compare my

10   formulation, just to make sure?

11                THE COURT:  Sure.

12                THE WITNESS:  Yes.  My formulation, we use

13   polyvinyl alcohol, and we use sodium chloride, sodium

14   citrate, and citric acid.

15                THE COURT:  Is that sodium citrate dihydrate?

16                THE WITNESS:  I believe so, Your Honor.  It was

17   abbreviated in here.

18                THE COURT:  Okay.  What was the next one?

19                THE WITNESS:  The next one is the citric acid

20   monohydrate.  And we used citric acid as abbreviated, also.

21   And purified water.  And sodium hydroxide, and/or

22   hydrochloric acid.

23                THE COURT:  Okay.

24                THE WITNESS:  There, it says preservative

25   benzoalkonium chloride --

Stella - redirect

1        THE COURT:  He can ask another question.

2   BY MR. BOGGS:

3   Q.     Dr. Koneru, does your formulation contain a

4   preservative?

5   A.     Yes, it does.

6   Q.     What is that?

7   A.     That's benzyl benzoalkonium chloride.

8   Q.     Dr. Koneru, I would like you to turn your document to

9   XLA-012181, if you would.

10       THE COURT:  What volume are we in now?

11       MR. BOGGS:  It should be the same document, Your

12   Honor.

13       THE COURT:  I am sorry.  What is the Bates

14   number?

15       MR. BOGGS:  XLA- --

16       THE COURT:  Just the last three numbers.

17       MR. BOGGS:  12181.

18   BY MR. BOGGS:

19   Q.     Dr. Koneru, what is this?

20   A.     This is part of the .5 percent NDA where they are

21   describing the product, the physical properties and its

22   chemical structure and its water solubility.

23   Q.     You mentioned water solubility.  Where do you see

24   information about that?

25   A.     You see the chart down at the bottom of the page.

Stella - redirect

1   Q.    And what does that chart tell you?

2   A.    It is giving the solubility of the brimonidine

3   tartrate as a function of pH in water.

4   Q.    And the left column is the pH.  Is that right?

5   A.    Yes.

6   Q.    And the right column is the solubility.  Is that

7   right?

8   A.    Yes.

9   Q.    Now, that is in milligrams per milliliter.  Is that

10  right?

11  A.    That's correct.

12  Q.    Can you translate that into percentages?

13  A.    Yes.  You usually put a zero in the front.  So you put

14  the decimal point once.

15  Q.    For example, if you looked at 7.00 pH, that would be

16  .01 percent?

17  A.    No, .194 percent.

18  Q.    I would like you to look at JTX-4, if you would.

19          Do you recognize this document?

20  A.    Yes.

21  Q.    I would like you to turn to Table 1 in the patent,

22  Column 4.

23  A.    Yes.

24  Q.    Tables 1 and 2, do you see those?

25  A.    Yes.

Stella - redirect

1   Q.    First of all, what is the '834 patent?

2   A.    This is the patent that was asserted against Exela.

3   Q.    So this is the patent that you are being sued for

4   patent infringement on.  Is that right?

5   A.    That's correct.

6   Q.    Now, Table 1, what do you see there?

7   A.    It's the solubility -- I am sorry.  It is the

8   composition of .5 percent brimonidine tartrate in ophthalmic

9   solution.

10   Q.    And are all those ingredients the same as those that

11   we just looked at in the NDA, EDTX-124?

12   A.    I believe so.  Let me double-check.

13         I believe it doesn't mention the citric acid.

14   Q.    Okay.  Now, here is Table 2 from the '834 patent.  Do

15   you see that?

16   A.    Yes.

17   Q.    What information is contained in here?

18   A.    It is giving the solubility data of brimonidine

19   tartrate in the ophthalmic solution for a pH range of 5 to

20   8.

21   Q.    Now, how do those solubility characteristics compare

22   to those that we saw in the Allergan NDA 2490 in EDTX-124?

23         MR. SINGER:  Your Honor, is Dr. Koneru being

24   offered as an expert on solubility?  It seems we have gone

25   far afield and I am going to interpose an objection.

Stella - redirect

1          MR. BOGGS:  We are going over the things he

2     considered in formulating --

3          THE COURT:  That is my understanding.

4          MR. SINGER:  With that explanation, thank you.

5          THE WITNESS:  Would you take me back to the

6     Bates number.

7     BY MR. BOGGS:

8     Q.    For the NDA?

9     A.    Yes.

10    Q.    XLA-012181.

11    A.    Yes, I see that.

12    Q.    Now, do both of these pieces of information tell you

13    that formulating your product at the pH that you did would

14    provide for a solution whereas the brimonidine would have

15    the appropriate solubility characteristics at your desired

16    pH?

17    A.    I was interested in the .15 percent brimonidine

18    tartrate solution.  And, so, I was looking at the solubility

19    of the brimonidine tartrate .15 percent solution.  And it

20    would correspond roughly to, when you look at the milligram

21    per amount, it's 1.5 milliliters per amount.

22          From this data, I would say that it's plainly

23    soluble.  I don't have any solubility problem.

24    Q.    Where would the .15 formulation fall in the table on

25    the left?

Stella - redirect

1    A.    It would be between 7.0 and 7.4.  7.00 and 7.40.

2    Q.    Be somewhere in there.  Is that correct?

3    A.    Right.

4    Q.    So anything less than that would be what?

5    A.    Would be soluble, quite soluble.

6    Q.    That's correct.

7          Now, this information in XLA-012181, is that

8    publicly available information?

9    A.    Yes.

10   Q.    How is it that we know that?

11   A.    I went to the website of the FDA, and you can search

12   on the FDA website for summary business of approvals, the

13   package, the approval package, the approval package summary.

14   From the information that you see here on the top, you see a

15   date, April 17, 1997.  And this is a FOIA request, Freedom

16   of Information Services?

17         It is a commercial company.  They have obtained

18   this document on April 17th, 1997.  So it is available at

19   least from that point on publicly.

20   Q.    Dr. Koneru, you should have a white binder in front of

21   you.

22   A.    Yes.

23   Q.    Now, this white binder contains some excerpts from the

24   handout that we looked at a larger portion of earlier.  Do

25   you have this?

Stella - redirect

1    A.    Yes, I do.

2    Q.    The very first page, as you open up the notebook, is

3    that the chart that we were just looking at a little while

4    ago?

5    A.    Yes.

6    Q.    And that has -- that's designated XLA-004579.  And

7    it's the side-by-side comparison with Alphagan P, Exela's

8    product, and the Alphagan .2 percent.  Is that correct?

9    A.    That's correct.

10   Q.    Okay.  Now, I would like you to look through this book

11   and tell me if there is anything in here that tells you how

12   to make the .15 percent formulation?

13   A.    Yes.  I see in Tab 2.

14   Q.    Tab 2?

15   A.    Yes.

16   Q.    If you look at Tab 2, what is the number at the top

17   right of the page?  It's not a number, it's a designation.

18   Do you see that?

19   A.    Compounding instructions.

20   Q.    What is to the right under "lot number"?  Do you see

21   that?

22   A.    Yes.

23   Q.    What is X015, what does that signify to you?

24   A.    That is brimonidine tartrate .15 percent in solution.

25   Q.    Does that represent anything in particular?

Stella - redirect

1   A.      That represents the Exela exhibit batch number.

2   Q.      The batch number.  What is a batch?

3   A.      A batch is a -- A batch is a product you make for

4   various reasons.  You can call them commercial batches,

5   exhibit batches, trial batches, clinical batches.  It is a

6   group of products.

7   Q.      A group of products for what?

8   A.      For whatever purpose.  It could be for trial purposes,

9   clinical purposes, it could be for commercial launch, it

10  could be for ANDA purposes, ANDA filing purposes.

11              THE COURT:  A batch is a commercial run of the

12  product?

13              THE WITNESS:  It's not a commercial size, Your

14  Honor.  It can be commercial --

15              THE COURT:  Or a run.

16              THE WITNESS:  A run.

17  BY MR. BOGGS:

18  Q.      It is an actual material made.  Correct?

19  A.      It is actual material, yes.

20  Q.      Compounding instructions, what does that mean?

21  A.      These are the instructions on actually how to mix the

22  various ingredients of the product.

23  Q.      Okay.  This tells you how to make it.  Is that

24  correct?

25  A.      Yes.

Stella - redirect

1    Q.    Okay.  Now, if you would, I would simply like you to

2    step through here and tell me how you add all these things

3    together that are mentioned in here and where in this

4    section under Tab 2 things are identified?

5    A.    Okay.

6           On the front page itself, 6302, you will see the

7    various things about the actual time that has to be done and

8    the temperature for the bulk solution and what precautions

9    the personnel must take.  And then the various ingredients

10   that are going to be used and how to handle them.

11          Then on the next page, you will see the room

12   qualification.  It is confirming that the room is ready for

13   manufacturing.

14   Q.    Dr. Koneru, let me interrupt for a minute.  I see

15   writing on this paper.  What does that mean to you?

16   A.    This is an actual executive batch record.  That means

17   people have actually done the work and they have put the

18   code in, the numbers, and they have signed it, verified it

19   with a date and sometimes even the time.

20   Q.    Okay.  I am sorry.  Continue.

21   A.    You go on, and you will see various things have been

22   taken care of, like the water projection and the heat

23   exchangers and various things that need to be ready for the

24   batch preparation.

25          So you go on, and I used the numbers on the left

Stella - redirect

1    side column to practice.  You go to, for example, the,

2    probably No. 24.  That will be a good starting point for us.

3    Q.    That's 6307.

4    A.    Yes, 6307.  You start with the water and add the

5    calcium chloride dihydrate, that would be the first thing to

6    add.  It's on the next page.

7            Item No. 26.

8            Then it tells you what to do and how long you

9    have to mix it.  And you measure the weight of the vessel

10   and all that.

11   Q.    And what is the next thing that you add?

12   A.    Then you add magnesium chloride.

13   Q.    And that's shown where?

14   A.    It's on Item 27.

15   Q.    Okay.  What is the next thing that you add?

16   A.    Then you add potassium chloride.  That is Item 28.

17   Q.    Item 28?

18   A.    Yes.

19   Q.    That was done.  Correct?

20   A.    That was done.

21   Q.    And how do you know that?

22   A.    Because somebody put their initials and then a date on

23   it.  It shows it was done on 6/22/06.

24   Q.    What is the next item?

25   A.    The next thing you do is add sodium chloride, which is

```
 1    Item 29.

 2    Q.    That was done?

 3    A.    Yes.

 4    Q.    What is the next thing?

 5    A.    Then Item 30 is citric acid monohydrate.

 6    Q.    That was done?

 7    A.    Yes.

 8    Q.    And what do you do after that?

 9    A.    Item 31, you add sodium citrate dihydrate.

10    Q.    That was done?

11    A.    Yes.

12    Q.    The next item?

13    A.    Item 32, you add polyvinyl alcohol.

14              Then Item 33 --

15    Q.    I am sorry, Dr. Koneru.  What item was the polyvinyl

16    alcohol?

17    A.    It's 32.

18    Q.    Then what do you do?

19    A.    Then you add brimonidine tartrate.  That's Item 33.

20    Q.    And was that done?

21    A.    Yes.

22    Q.    Okay.  What's in Box 34?

23    A.    34 is information on the pH meter.  And, because, at

24    35, Item 35, you will be measuring a pH of the product at

25    the time.  And, so, a preparation for that, you have to make
```

Stella - redirect

1   sure that your pH meter is working properly.  It has to be

2   added, what pH meter you use.  That is this information

3   here.

4   Q.   Then you use that pH meter to do what?

5   A.   You want to measure the pH of the bulk solution that

6   has been prepared up to that point.

7   Q.   Was that done here?

8   A.   Yes, it was.

9   Q.   And what was it?

10  A.   The pH was measured, and it showed a pH of 5.60.

11  Q.   Now, at the top of that box, Box 35, it refers to

12  limits.  What does that mean?

13  A.   That is the specification that we have established,

14  which tells the operator that the pH cannot exceed 6.7.

15  Q.   And did you satisfy that limit?

16  A.   Yes.  As you can see in the table here, there is a

17  checklist here.  It says, "pH confirms"?  "Yes or no"?  And

18  it was checked as "yes."

19  Q.   Then, after you checked the pH, what do you do?

20  A.   If it confirms -- if it is below 6.7, then you go onto

21  the next step.

22  Q.   Okay.  What is the next step?

23  A.   The next step is add benzoalkonium chloride.

24  Q.   By the way, what happens if the pH doesn't meet the

25  specification?

Stella - redirect

1    A.    Then the operator has to notify his or her supervisor.

2    Q.    All right.  Back to 36.  What is that?

3    A.    In 36, you add the benzoalkonium chloride.

4    Q.    Okay.  37?

5    A.    Then you add water.

6    Q.    Then 38?

7    A.    38, you check the pH of the solution again.

8    Q.    Are there any limits associated with that?

9    A.    Yes.  It says it should be between 6.5 and 6.7.

10   Q.    With Batch No. X-015, what was that pH measured at?

11   A.    It was measured at 5.6.

12   Q.    What is the next step?

13   A.    You will see here, the pH is not confirmed to 6.5 to

14   6.7.  It was below that.  So the operator has checked no.

15   And then you go to 39.

16         39, it says, If the pH is not pyramid, adjust to

17   6.5 to 6.7 with one normal hydrochloric acid or one normal

18   sodium hydroxide.

19         And they have page numbers where there are

20   procedures on how to make them.

21   Q.    So, in this particular batch, the product came out at

22   a pH of, in the middle fives.  And you had to raise it up --

23   A.    Yes.

24   Q.    -- into the range that you wanted.  Is that correct?

25   A.    That's correct.

Stella - redirect

1          I am aware of here you will see the operator has

2     used sodium hydroxide, 615 mil of it, to raise the pH to

3     6.6.

4     Q.    Then what happens?

5     A.    Then you go to Item 40, which says, Add some more

6     water.  Then go to Item 41 and then 42, you verify the pH

7     again.  And you have another spec there, it says, 6.5 to

8     6.7.  And the result shows that it was at 6.7.

9          So the operator has checked yes, confirms.

10    Q.    Okay.

11    A.    And then the bulk solution has additional finishing

12    steps that you need to go through.  And they are all the way

13    up to Item 50.  That concludes the compounding portion.

14    Q.    Okay.  So that was the compounding portion.  Would

15    some people call that the manufacturing portion?

16    A.    That's correct.

17    Q.    And if you look up on our demonstrative, No. 15, is

18    that the pH that's specified in the ANDA?

19    A.    Yes.

20    Q.    And, in fact, we just stepped through an actual

21    production of Lot X-015.  Isn't that right?

22    A.    That's correct.

23    Q.    And it met the pH specifications.  Correct?

24    A.    The manufacturing pH specifications, yes.

25    Q.    The manufacturing pH specs, that's right.

Stella - redirect

1          Now, if you would, turn to the next item behind

2    Tab 3.  Do you see that?

3    A.    Yes.

4    Q.    What is that?

5    A.    This is the finished product test certificate, which

6    is part of the ANDA we filed.

7    Q.    Now, does that include a batch number?

8    A.    Yes, it includes the batch number.

9    Q.    And where is that?

10   A.    It's in the middle of the box.  It says lot X-01500.

11   Q.    Okay.  It's also on the next page, too, Batch No.

12   X-01500.  Do you see that?

13   A.    Yes.

14   Q.    What does this particular form tell us?

15   A.    This is the list of the specifications and the results

16   of the specifications that the finished product has to have.

17          You will see in the middle, it says, Finished

18   product, test summary.  And then it comes down to

19   brimonidine tartrate, 1.5 milligrams per amount.  And then

20   it has a batch number, and then it has a fill size.  We have

21   three different sizes, 5 ml, 10 ml, and 15 ml.  This is the

22   information on the five ml bottle size.

23   Q.    So you took your batch sample, X-01500, and you

24   created smaller samples of 5 mil, 10 mil, and 15 mil

25   bottles?

Stella - redirect

1  A.     Yes.   These were already filled in.

2  Q.     And you tested them.   Is that right?

3  A.     Yes.   When you are filling the bottle, for final use

4  by the consumer, the product has to meet certain

5  specifications.   And there is all the different items that

6  every product has to pass.   Otherwise, the product will not

7  be released to the market.

8          In the left column, it starts, Appearance,

9  clarity, foreign matter, pH.   It goes on, particularity,

10  osmolality, viscosity, et cetera.

11          Then next to that is, you see the minimum sample

12  is required and method, what method to use, to test that.

13  Then you have the limits of compliance.   That tells you what

14  the limits should be.

15          And then, the next column, you see the results.

16  These are the actual observed results.

17          Then you have a column that says "pass/fail."

18  And then somebody has to initial it and put a date on it.

19  Q.     Now, is pH listed on that form?

20  A.     Yes, it is.

21  Q.     And where do you find that?

22  A.     It's the last row on this page.

23  Q.     Okay.   Last row on this page, okay.   What does that

24  line tell us?

25  A.     That the pH is one of the specifications, and it has a

Stella - redirect

1    limit of compliance, 6.2 to 6.7.  And the result shows 6.7.

2    It looks like there were two samples taken.

3              One of them had a 6.7.  The other one also had a

4    6.7.  Then, right next to it, it says "pass."  It is passing

5    because it is falling within this range, in the compliance

6    column.

7    Q.    This was for Batch No. X-01500.  Right?

8    A.    That's correct.

9    Q.    Now, down at the bottom, it says, "Limit of

10   compliance."  Do you see that?  What is that range?

11   A.    The range is 6.2 to 6.7.

12   Q.    What does that correspond to?

13   A.    It corresponds to the release pH.

14   Q.    That is the second pH that we encounter.  Right?

15   A.    Yes.

16   Q.    So we have the manufacturing pH.  We saw that as we

17   were going through the manufacturing protocol.  Right?

18   A.    Yes.

19   Q.    And that was 6.5 to 6.7.  Correct?

20   A.    That's right.

21   Q.    Then we just found the release pH.  Right?

22   A.    Yes.

23   Q.    And that was 6.2 to 6.7?

24   A.    That's correct.

25   Q.    Now, the next section, under Tab 4, do you see that?

Stella - redirect

1    A.     Yes.

2    Q.     What is this?

3    A.     This is a document from the ANDA we filed which gives

4    the stability test data.

5    Q.     And this was the stability test data for what lot?

6    A.     It's lot X-01500.

7    Q.     A couple pages in, what is this chart?

8    A.     This chart gives you the summary of the stability

9    testing done on Batch No. X-01500.

10   Q.     How do we know that?

11   A.     Because it says on the left, on the top.

12   Q.     The very first line, it says, Batch No. X-015000.  Is

13   that right?

14   A.     That's correct.

15   Q.     What does this table tell us about pH?

16   A.     The pH is listed on the sixth row.  It has a

17   specification of 5.5 to 6.7.  Then it has the various time

18   points where you would measure the pH.  And the time is

19   measured in months.  And you can see that the pH was

20   measured, and you will see a date there in the bottom, in

21   the box, and you will see that the pH was measured four

22   times here.

23   Q.     Now, when you say "four times," that's over a

24   three-month period of time.  Is that right?

25   A.     Yes.  There is a time zero, and then one-month,

1    two-month, three-month point.

2    Q.    What information can we derive out of the one-month

3    testing?  Describe that one-month testing.

4    A.    Okay.  After one month, you take the sample and you

5    measure the pH according to the method listed here, that's

6    following SOP Chem 437.  They give you all the details on

7    exactly how to measure, how to calibrate the machine, and

8    all that.  Then you see the results.  At one month, you have

9    6.4 pH.

10   Q.    What conditions were those run under?

11   A.    The product was started at 40 degrees C and 75 percent

12   relative humidity.  This is called an accelerated stability

13   condition.

14   Q.    So, after one month under 40 degrees in these

15   accelerated conditions, what would that tell you about the

16   shelf life of this product?

17   A.    It's -- you know, usually, shelf life you measure

18   after three months' data.

19   Q.    So you take three months of data and you determine the

20   shelf life?

21   A.    Yes.

22   Q.    Is there a correlation between the accelerated test

23   and the shelf life?

24   A.    Yes.  This is usually extrapolated because we wanted

25   to save time on storage.  So if the product is stable and

Stella - redirect

1    meets all the specifications, after a three-month

2    accelerated stability, then FDA permits you to have a

3    two-year shelf life for the product.

4    Q.    So, in this particular test, stability testing, these

5    were accelerated tests.  Is that right?

6    A.    That's correct.

7    Q.    And can you tell what the shelf life of the product

8    was after three months?

9    A.    It appeared to be that the product was passing all the

10   specifications.  So the shelf life should be two years.

11   Q.    Two years, okay.

12         The lowest the pH got there was 6.2.  Is that

13   right?

14   A.    That's correct.

15   Q.    After two years?

16   A.    No.  That is after three months of accelerated

17   solubility.

18   Q.    That's right.  But that's equivalent to 6.2 after two

19   years?

20   A.    Yes.  The product is expected to be like this after

21   two years, at two years.

22   Q.    So what are the limits for pH under these conditions?

23   A.    The pH specification we have is 5.5 to 6.7.

24   Q.    Did Batch No. X-01500 pass the test?

25   A.    Yes, it has.

Stella - redirect

1   Q.    All right.  Now, we saw that pH range in the stability

2   testing chart.  What range does that correspond to?

3   A.    That is the shelf life.

4   Q.    5.5 to 6.7.  Is that correct?

5   A.    That's right.

6   Q.    Tab 5, what is under Tab 5 in the white book?

7   A.    This is part of the ANDA.  The document is titled

8   "Stability Summary Report and Specification Rationale

9   Report" for Lot X-01500.

10  Q.    That's under Tab 5?

11  A.    Yes, sir.

12  Q.    And it is still Lot X-01500.  Right?

13  A.    That's correct.

14  Q.    What does this report tell us?

15  A.    This says, Summary of the stability data.  Then, also,

16  it's the rationale for selecting those specifications.  As

17  you go through the document, you will see that it talks

18  about the various parameters, such as appearance, foreign

19  matter, et cetera.  First, on the top, you will see the

20  study design.  And then it goes through the various

21  parameters.

22          The next page, you see color of the solution,

23  pH, particularity matter, on and on.  It goes through each

24  and every one of those specifications.

25  Q.    What does it say about pH?

1  A.    The pH's on Exela 007061, it says that the batch

2  samples met the established criteria of 5.5 to 6.7,

3  following the accelerated set of conditions.

4  Q.    So it passed the test.  Is that right?

5  A.    It passed the test.

6  Q.    Now, what's under Tab 6?

7  A.    Tab 6 is a side-by-side comparison of the package

8  inserts for the reference listed drug and Exela's proposed

9  product.

10  Q.    I would like you to look under Tab 1 there.

11  A.    Yes.

12  Q.    And what is Tab 1?

13  A.    It is a stability commitment from the company to the

14  FDA that we will conduct the studies as per the protocol and

15  will test them as per the protocols for 24 months.  It talks

16  about how we do the tests.  And then it also commits to

17  provide that information as required by the statute, the

18  declarations.  Then it says, We commit to withdraw from the

19  market any pharmaceutical outside of the approved

20  specifications for the drug product.

21          This is all on paper.

22          That means if the product fails any of the

23  conditions that are outlined in the specification, the

24  product will be withdrawn from the market.

25  Q.    In other words, you can't sell the product?

Stella - redirect

```
 1    A.      You cannot sell the product, and, also, any product

 2    that is out there sitting on the shelf should be withdrawn,

 3    should be recalled.

 4              THE COURT:  Mr. Boggs, where does that letter

 5    occur?

 6              MR. BOGGS:  This is under Tab 1.

 7              THE COURT:  I see.  Thank you, sir.

 8    BY MR. BOGGS:

 9    Q.    Dr. Koneru, if you are making the Exela brimonidine

10    product and you don't meet the process specifications, what

11    happens to the product?

12    A.      The product should be destroyed.

13              MR. BOGGS:  May I have a moment, Your Honor?

14              THE COURT:  Yes, sir.

15              (Pause.)

16    BY MR. BOGGS:

17    Q.    Dr. Koneru, you indicated before that you had looked

18    at five patents that were listed in the Orange Book.  Do you

19    recall that?

20    A.    Yes, I do.

21    Q.    And you indicated that one was the '078 patent, and

22    then you referred to four other patents, including the '834

23    patent, which we recently discussed.  Do you recall that?

24    A.    Yes, I do.

25    Q.    Now, the '078 patent is on the right.  Do you see
```

Stella - redirect

1    that?

2    A.    Yes.

3    Q.    And I take it you looked at that patent.  Is that

4    right?

5    A.    Yes, I did.

6    Q.    And you designed the Exela product to avoid

7    infringement of that patent.  Is that right?

8    A.    That's correct.

9    Q.    And what is it about, at a minimum, what is it about

10   your formulation that is different than what is required by

11   the '078 patent?

12            MR. SINGER:  Your Honor, for the record, we are

13   not asserting this patent against Dr. Koneru's company.  We

14   are just asserting the '834 patent.

15            THE COURT:  Where are we going?

16            MR. BOGGS:  This is just more of the process

17   that he went through in developing his product.  He designed

18   the various features.

19            THE COURT:  You don't think you have covered

20   this enough?  I am not trying to tell you how to try your

21   case.

22            MR. BOGGS:  Perhaps we can move to something

23   else.

24            THE COURT:  It is up to you.  I think Mr. Singer

25   makes the point that this line of inquiry may be largely

1   irrelevant, if not cumulative, perhaps.  But, again, it's

2   your case.

3              MR. BOGGS:  Thank you, Your Honor.  I will just

4   move on.

5              THE COURT:  Okay.

6              Maybe I should say at least cumulative.  It's

7   probably relevant.  It seems to be, potentially, cumulative.

8   BY MR. BOGGS:

9   Q.    Okay.  EDTX-103, if you would.

10  A.    Which number is this?

11             THE COURT:  I think that's the next volume, Doc.

12             Is that in 2, Mr. Boggs?

13             MR. BOGGS:  3.  Volume 3.

14             THE WITNESS:  Yes.

15             THE COURT:  Where did he find it?  Is it in 2?

16             THE WITNESS:  It is in 2, Your Honor.  No, I am

17  sorry.  3.

18             THE COURT:  Here it is.

19  BY MR. BOGGS:

20  Q.    Dr. Koneru, efficacy has been raised as an issue with

21  respect to your product.  Do you agree?

22  A.    Yes.

23  Q.    Now, originally, you mentioned that you reviewed a

24  paper called the Walters paper.  Do you remember saying

25  that?

Stella - redirect

1    A.    Yes.

2    Q.    Is this the Walters paper?

3    A.    Yes, it is.

4    Q.    How is it that this paper is relevant to your design

5    of your product?

6    A.    This paper is from 1996.  It was published in 1996.

7          This talks about various concentrations of

8    brimonidine and their effectiveness and safety and dose

9    response and dosing studies.  That's what the title says.

10         Then you go in there, and you will see Figure 3.

11         The study was conducted for 28 days.  And the

12   concentrations of brimonidine are listed here.  The very

13   bottom curve is the.5 percent.  That is the highest

14   strength.

15         Then the one up is the.2 percent.  Then one up

16   is 0.08 percent.  And all the way at the top is the placebo,

17   the vehicle.

18   Q.    When you are saying the "top," you are talking about

19   the top line that runs from the left to the right?

20   A.    That's correct.

21   Q.    Then the next line down is the .08 percent.  Then the

22   next line is the .2 percent.  Then the next line is the .5

23   percent?

24   A.    That's correct.

25   Q.    What is being measured here?

Stella - redirect

1    A.      The measurement is the introduction to the intraocular

2    pressure.

3    Q.      What does the 0 represent, the .0?

4    A.      On the x axis, which is on the horizontal axis, there

5    is a time.  On the y axis, you will see the measurement of

6    IOP in milliliters of Mercury.  The zero is the day zero,

7    the first day.

8            That's where it was before the drug was

9    administered.

10   Q.      And 7 and 14, 21, and 28, those are all days?

11   A.      Those are all days.

12   Q.      What are the numbers on the left side?

13   A.      The left side is the measurement of the IOP for

14   patients.  And you see the number 25, 27, and 23, and 21.

15   They are all considered to be relatively high numbers.  That

16   means if a person has, let's say, an IOP measurement of 25,

17   the person maybe tends to be having glaucoma.

18   Q.      And then you want a -- a good number is a much lower

19   number.  Is that right?

20   A.      Yes.  A good number is definitely lower.  17 is

21   definitely a good number.  But depending on who you talk to,

22   sometimes 21 is a good number.  And sometimes even 23 is a

23   good number.  There are cases where I have read that the IOP

24   can go up to 30, 35, also.

25   Q.      So the objective here is to lower intraocular

Stella - redirect

1   pressure.  Is that right?

2   A.    That's correct.

3   Q.    So there is a drop.  And that drop, the bigger the

4   drop, the better.  Is that right?

5   A.    Yes.

6   Q.    So the .2 percent formulation, do you know what that

7   was?

8   A.    Well, the .2 percent, it looks like it came down to

9   20, on the first time point.  Then it went up a little bit,

10  but then kind of stabilized, and it merged with the .5

11  percent from Day 14 on.  So that tells me that after 14

12  days, the treatment with .5 percent and the treatment of the

13  .2 percent were right angle.

14  Q.    The .2 percent formulation, was that Alphagan?

15  A.    That's correct.

16  Q.    That was the original Alphagan product?

17  A.    I believe so, based on the date of the publication.

18  Q.    And the excipients, what were the excipients of the

19  original Alphagan product, the vehicle?

20  A.    The excipients were the polyvinyl alcohol and the

21  citrate buffer and benzoalkonium chloride as a preservative.

22  Q.    Okay.  So it had the same preservative as you were

23  planning to use, the same thickener that you were planning

24  to use, the same buffer; is that right?

25  A.    That's correct.

Stella - redirect

1    Q.    All right.  The concentration that you were planning

2    on using, what was that?

3    A.    .15 percent.

4    Q.    .15.  Where would that fall in this graph, if you were

5    to estimate its presence?

6    A.    That would be roughly between the .08 and the .2

7    percent.

8    Q.    Now, all of these formulations, the .08, .2, .5, they

9    all had the polyvinyl alcohol as the viscosity enhancer,

10   they had the benzoalkonium chloride as the preservative, and

11   they all had the citrate buffer.  Is that right?

12   A.    That's probably right.  I couldn't confirm, because

13   they haven't given the formulation here in the paper.  But

14   based on the NDA for the 12.5 percent and also the NDA for

15   the .2 percent, that was the only type of formulation that

16   was available at the time.

17   Q.    Now, the .5 percent, you mentioned the NDA for that.

18   That's the one that we looked at before.  Is that right?

19   A.    That's correct.

20   Q.    And we were looking at the solubility data.  Is that

21   right?

22   A.    That's correct.

23   Q.    And it was that solubility data that would indicate

24   that a .15 percent formulation would be soluble without a

25   solubility enhancer at pH below 7.  Right?

Stella - redirect

1  A.     That's correct.  In fact, if I can take you to the

2  patent, the '834 patent, I can -- that also gives the

3  indication that you don't need a solubility enhancing

4  component for the .15 percent.

5  Q.     Where on the '834 patent?

6  A.     You can focus on this graph here.  You will see on the

7  white axis, the solubility is given.

8            There is a concentration of the brimonidine

9  here.  The scale is in ppm.  That roughly corresponds to

10  about, you know, the best way to get to the data is you put

11  a zero in the front -- you put a decimal point in the front.

12  So, here, 1500 ppm, that roughly corresponds, is the .15

13  percent.

14            If you want to see the solubility of this, you

15  follow this curve, and you look at the pH.  They have 7.0

16  pH, the 1500 ppm, which is .15 percent, is clearly soluble.

17  There is no solubility issue here.

18            And the product that we were going to make would

19  have a pH of 6.7 or less, so I have no worries about

20  solubility.

21  Q.     At what point do you need the solubility enhancer?

22  A.     For a .15 percent, if you were going about here, let's

23  say, 7.5 pH, or 7.4, from that point on, I think you need a

24  solubility enhancing component, according to this graph.

25  Q.     Can you point in the patent where it discusses the

1   solubility enhancers?

2   A.    Yes.   It mentions about the solubility enhancing

3   component at several different places.   You can start with

4   the abstract, on the face of the patent.

5            MR. SINGER:   Your Honor, for the record, we are

6   not asserting those patents against Dr. Koneru and Exela,

7   either, just for the record.   I didn't know if that was

8   relevant examination.   I thought we were talking about what

9   he considered with respect to a solution.   But we are not

10  asserting the solubility component patents against Exela.

11           MR. BOGGS:   It is more background.   How he

12  designed his formulation, how he was able to do without the

13  solubility enhancer.   You know, of course, you have to

14  know --

15           THE COURT:   I think that going to be helpful to

16  me.   We did hear from Allergan at some length about its

17  development.

18           MR. SINGER:   If the Court finds it helpful,

19  absolutely, Your Honor.

20           THE WITNESS:   As I read through the

21  specification, solubility enhancing component was mentioned

22  several different places.   It looks like almost about 30, 40

23  percent of the specification was about solubility enhancing

24  components.   And they describe various of them, polyanionic

25  components, and various other polymers, on and on.   Then

Stella - redirect

1    they also talked about cyclodextrins.

2    Q.    Can you point to where you are looking, Doctor?

3    A.    Yes.  There are numerous places.  I just want to save

4    some time.  In Column 5 -- I am sorry, Column 6, you will

5    see them, starting from Line 17.  It goes on through Column

6    8, and all the way to Column 9, through Line 22.

7              Then again, it goes to Column 11, talks about

8    SECs again.  And, also, you will see the summary of the

9    invention, Column 2, Line 9.  It was the first paragraph,

10   the paragraph there, then it goes into the -- it starts at

11   Column 2, Line 52, 53, all the way to the next column.

12             So this is really, when you read this, you come

13   away with the impression that you need to have a solubility

14   enhancing component to make the brimonidine soluble at pH's

15   of about 7.0 or greater.  And they haven't really -- I am

16   trying to find a way to see if there is anything described

17   that you don't need to use a solubility enhancing component

18   to make it soluble.  And I didn't find it.

19             So my impression was that to make a brimonidine

20   tartrate soluble at a pH of 7.0 or greater, you have to have

21   a solubility enhancing component.

22             But then when I looked at the chart, if my pH

23   was below 7, it tells me, their own data tells me that I

24   don't need an SEC.

25   Q.    Solubility enhancing component.  Is that right, an

Stella - redirect

1    SEC?

2    A.    That's correct.

3    Q.    Okay.  Dr. Koneru, you designed your product, you

4    worked Dr. Nitra in India.  You did a lot of development

5    work.  You teamed up with Paddock.  And then, ultimately,

6    you filed your ANDA.  Is that right?

7    A.    That's correct.

8    Q.    Okay.  Now, I have put up EDTX-164.  Do you see that?

9    A.    Yes, I see that.

10   Q.    What is this?

11   A.    That's a notification letter from Exela to Allergan

12   about the filing of the ANDA.

13   Q.    How is it that you recognize it?

14   A.    This is the document I signed, and sent to Allergan.

15   Q.    That you signed?

16   A.    I believe I did.  Let me double-check.

17             THE COURT:  That's what he said.  He signed it.

18             MR. BOGGS:  I thought he said he had to

19   double-check.

20             THE COURT:  He said he signed it.

21             MR. BOGGS:  Okay.

22   BY MR. BOGGS:

23   Q.    What is the purpose of this letter, Dr. Koneru?

24   A.    This is a notification that an ANDA has been filed and

25   we seek approval for the ANDA before the list of patents are

Stella - redirect

1   going to expire.  This is a statutory requirement that we

2   send a notification to the brand company, and it also

3   explains why we don't think, why we don't believe, we do not

4   infringe the patents or the patents are invalid or not

5   enforceable.  And, also, it makes an offer to Allergan,

6   offer of confidentiality so that they can inspect our ANDA.

7   I believe it also offers our product for inspection so they

8   can take our product and test it and then check and see for

9   themselves that we don't infringe.

10  Q.   Was that ever done?

11  A.   I do not believe that the confidentiality was signed,

12  at least before the lawsuit was filed.

13  Q.   So, in Paragraph 2 of the letter, you say the ANDA

14  number is 78-590.  That is the ANDA at issue here.  Is that

15  right?

16  A.   That's correct.

17  Q.   And in Paragraph 3, there you identify the RLD.

18  Correct?

19  A.   That's correct.

20  Q.   The reference listed drug?

21       Paragraph 4, you identify the active

22  ingredients.  And then Paragraph 5, you identify the patents

23  that are listed in the Orange Book.  Right?

24  A.   That's correct.

25  Q.   There you see the '078, '873, '210, '834, and '337

Stella - redirect

1    patents listed.  Do you see that?

2    A.    That's correct.

3    Q.    And you are currently being sued on the '834 patent of

4    those five.  Is that right?

5    A.    That's correct.

6    Q.    Was there anything attached to this letter?

7    A.    Yes.  There were two attachments.  One was a detailed

8    statement of the factual and legal basis.  The other one is

9    the offer of confidential access.

10   Q.    So, what was in the detailed statement, generally?

11   A.    This is a statement of facts, and the, our reasoning

12   as to why we don't infringe these patents.  It's extremely

13   detailed as to why we believe we don't infringe those

14   patents, or the patents are invalid.

15   Q.    And that is in -- we just put Page 1 up on the screen.

16   Is that right?

17   A.    Yes.

18   Q.    How many pages was that document, Doctor?

19   A.    This is 47 pages.

20   Q.    47 pages.  You explained your position of

21   noninfringement and invalidity in 47 pages.  Is that right?

22   A.    That's correct.

23   Q.    And, then, can you find the offer of confidential

24   access?

25   A.    Yes, I did.

Stella - redirect

1   Q.    So, this, you also attached.  Is that right?

2   A.    That's correct.

3   Q.    Did anybody from Allergan contact you before you were

4   sued?

5   A.    I do not believe so.

6   Q.    Next page.  Now, I see a signature on there.  Whose

7   signature is that?

8   A.    That's my signature.

9   Q.    So, you signed the offer of confidentiality in

10  advance, or at the same time that you mailed out ^  your own

11  letter.  Is that right?

12  A.    That's correct.

13  Q.    So you were ready to show them what you were doing and

14  get their blessing.  Is that right?

15  A.    That's correct.

16  Q.    Now, where were you sued initially?

17  A.    I believe we were sued in California, District Court

18  in California.

19  Q.    In California?

20  A.    I believe so, yes.

21  Q.    Dr. Koneru, how many times have you had your

22  deposition taken in this case?

23  A.    Three times.

24  Q.    Three times?

25  A.    That's right.

Stella - redirect

1   Q.    How long after the suit was filed before your first

2   deposition?

3   A.    I believe it was a month or so after the lawsuit was

4   filed.

5   Q.    Right after the lawsuit was filed.  What was the

6   purpose of that deposition?

7   A.    As I understood it, it was to find out what my company

8   is, what I do, and how the company is formed, that sort of

9   thing.

10          MR. BOGGS:  Just a moment, Your Honor.

11          (Pause.)

12          MR. BOGGS:  Your Honor, we don't have any

13   further questions.

14          THE COURT:  All right.  Counsel, how are we

15   doing on time?

16          MR. SINGER:  I have got about, I was wondering

17   if I could have a bio break, actually.  I have about 40

18   minutes of cross-examination.

19          THE COURT:  I mean overall in the case.  I have

20   a sense we are a little ahead of schedule.  Is that fair?

21          MR. BOGGS:  Yes.

22          MR. BREISBLATT:  Your Honor, I am making a quick

23   estimate.  I don't know how long crosses are going to take.

24   Based on my talking, it sounds like Exela will probably

25   finish its case sometime tomorrow.  We will put on

854

Stella - redirect

1    Dr. Banker, may run over to Monday.  Then I believe, how

2    many more witnesses do you have after that?

3              MS. BROOKS:  Two to three, Your Honor.  Which I

4    think we could wrap up in a day.

5              MR. BREISBLATT:  I think what we are talking

6    about, the Court gave us until Wednesday.  I think we are

7    going to meet that schedule.

8              THE COURT:  All right.  Let's break a little

9    early today.  Let's recess.

10             (Court recessed at 4:42 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25